*IN THE UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF PUERTO RICO*

PEDRO ROSELLÓ, ET AL.          *
                              *
     Plaintiffs               *    Civil No.: 97-01910 (JAF)
                              *
          vs.                 *
                              *
BROWN & WILLIAMSON TOBACCO     *
COMPANY, ET AL.               *
                              *
     Defendants               *
                              *
************************************

## COMPLAINT FOR DECLARATORY RELIEF ENFORCEMENT, CONSTRUCTION AND BREACH OF MASTER SETTLEMENT AGREEMENT

**TO THE HONORABLE COURT:**

**NOW COMES** plaintiff, Bekenton USA, Inc., through its undersigned attorneys, **TRONCOSO & SCHELL**, and very respectfully states, alleges and prays as follows:

Plaintiff Bekenton USA, Inc. ("Bekenton"), a Subsequent Participating Manufacturer under the Master Settlement Agreement ("MSA") between various Settling States, including Puerto Rico, and various Participating Manufacturers, including Bekenton, brings this action for declaratory relief, enforcement, construction and breach of various provisions of the MSA against The National Association of Attorney Generals (NAAG), and The Honorable Steve Carter, in his capacity as the President and class representative for

the Defendant Class composed of all members of the NAAG. A copy of the MSA is attached and incorporated herein as Exhibit "A."

### PARTIES

1.  Plaintiff Bekenton is a Delaware corporation which is a Participating Manufacturer under the MSA by virtue of having entered into the MSA on June 25, 2003.

2.  Defendant, The National Association of Attorneys General ("NAAG") is a not for profit association with its principal place of business at 750 First Street, NE, Suite 1100, Washington, DC 20002.  NAAG's members are the attorneys general of the several states, commonwealths, and territories of the United States, including Puerto Rico.  NAAG is the entity charged by the fifty-two jurisdictions comprising forty-six states and six territories that signed the MSA ("Settling States") with managing the MSA.  Among other things, NAAG provides coordination and facilitation for implementation and enforcement of the MSA (MSA § VIII(a)); is responsible for monitoring conflicting interpretations of the MSA (MSA § VII(f)); coordinates MSA inspection and discovery proceedings regarding compliance with the MSA (MSA § VII(g));

2

and is responsible for providing accurate information and data to the Independent Auditor for the calculation of payments, credits and adjustments due Participating Manufacturers. (MSA §§ XI, XI)

3.    Defendant, The Honorable Steve Carter, is the Attorney General for the State of Indiana (Defendant "Carter") and is an Indiana resident who is a member and serves as the President of NAAG.

### *JURISDICTION AND VENUE*

4.    This court retains jurisdiction and venue over this action for implementation, enforcement and resolution of disputes of the MSA pursuant to MSA Section VII(a).  See, Rosello, et al., v. Brown & Williamson Tobacco Company, et al, Case No. 97-cv-01910-JAF.

5.    On May 11, 2005, Plaintiff Bekenton satisfied all conditions precedent to invoke this Court's jurisdiction by giving a thirty day notice to sue pursuant to MSA Section VII(c)(2) to all the Settling States and NAAG.  See letter dated May 11, 2005, attached and incorporated herein as Exhibit "B."

6.    Bekenton is a tobacco products manufacturer that is

3

incorporated in the State of Delaware with its principal place of business in the State of Florida, and manufacturing facilities in the State of North Carolina. Bekenton's tobacco products are sold to distributors throughout the United States. In addition, Bekenton is a Participating Manufacturer of the MSA, and prior to adoption of the MSA, no Settling State had sued Bekenton. Further, Bekenton did not commence manufacturing tobacco products until after the MSA was adopted.

7. Defendant NAAG is an unincorporated association in the District of Columbia with its principal place of business in Washington, D.C. In addition to the duties set forth in Paragraph 2, supra, NAAG and the Settling States authorize distribution of the payments Participating Manufacturers make to the Settling States, including Puerto Rico, pursuant to the MSA. (MSA § XI).

8. Defendant Carter is a resident of the State of Indiana.

9. The named parties are citizens of different States for the purposes of diversity jurisdiction and the matter in controversy exceeds, exclusive of interest and costs, the sum

4

specified by 28 U.S.C. § 1332(a). Therefore, based upon this Court's retention of jurisdiction and existence of diversity jurisdition, jurisdiction and venue properly lie in this Court.

## GENERAL ALLEGATIONS
### The MSA

10. The Settling States and Original Participating Manufacturers entered into the MSA in November 1998.

11. The MSA requires all Participating Manufacturers (i.e., cigarette manufacturers who are parties to the MSA) to make certain payments for the benefit of the Settling States. Thus, it puts all Participating Manufacturers at a competitive disadvantage with respect to any cigarette manufacturers who are not parties to the MSA (i.e., Non-Participating Manufacturers) and are not required to make such payments.

12. Neither the Settling States nor the Participating Manufacturers wanted the MSA to cause Participating Manufacturers to lose market share to Non-Participating Manufacturers as a result of being parties to the MSA. (See, e.g., MSA § IX(d)) Therefore, the MSA includes certain provisions intended and designed to "level the playing field"

between Participating and Non-Participating Manufacturers.

13.  To "level the playing field," the MSA requires that if a Participating Manufacturer becomes a party to the MSA after the MSA Execution Date, that manufacturer must, within a reasonable time, make all payments (including interest at the Prime Rate plus three percent) that it would have been obligated to make in the intervening time had it been a signatory to the MSA as of the MSA Execution Date. (MSA § II(jj))

14.  To further "level the playing field," the MSA contemplates that the Settling States would pass legislation (the "Model Statute") which would require Non-Participating Manufactures to make payments into an escrow account to provide security for payments of judgments or settlements. (MSA §  IX(d), Ex. T)

15.  To further "level the playing field" between cigarette manufacturers, the MSA also contains a "most favored nations provision" which provides that if at any time any Settling State agrees to relieve, in any respect, any Participating Manufacturer's obligation to make the payments as provided in the MSA, then, with respect to that Settling

State, the terms of the MSA shall be revised so that all the other Participating Manufacturers receive terms as relatively favorable. (MSA § XVIII(b))

16. NAAG's own Master Settlement Agreement for Attorneys General, a publicly available document, describes the most favored nations clause as follows:

**\*If a Settling State enters into a settlement agreement with a tobacco company that is not a party to the MSA . . . and the overall terms of such agreement are more favorable . . . than are the terms of the MSA, the MSA will be revised as to the original signatory tobacco companies to incorporate the more favorable overall terms.**

**\*If any Settling State agrees to relieve any company that is a party to the MSA from any part of its payment obligation, then as to such Settling State the MSA will be revised to provide all other signatory tobacco companies the same payment relief.**

17. To further protect the Participating Manufacturers, the MSA expressly provides it may only be amended by a

written instrument executed by all Participating Manufacturers affected by the amendment and by all Settling States affected by the amendment. (MSA § XVIII(j))

18. To further "level the playing field," the Settling States enacted various contraband statutes to enforce the MSA and the Model Statute and prevent Non-Participating Manufacturers from selling low cost cigarettes without satisfying their financial obligations to the Settling States.

### *SUBSEQUENT PARTICIPATING MANUFACTURERS*

19. Cigarette manufacturers who were not Original Participating Manufacturers could become parties to the MSA with the Settling States by becoming Subsequent Participating Manufacturers. A Subsequent Participating Manufacturers becomes a Participating Manufacturer entitled to all rights and all obligations applicable to other Participating Manufacturers under the MSA.

20. The MSA requires that all Subsequent Participating Manufacturers must, within a reasonable period of time after signing the MSA, make any payments, including interest thereon, that it would have been obligated to make in an

8

intervening period if it had been a signatory as of the original MSA execution date.

## *BEKENTON BECOMES A PARTICIPATING MANUFACTURER*

21.  Bekenton determined to enter the cigarette market by becoming a Participating Manufacturer under the MSA. Prior to becoming a Participating Manufacturer, Bekenton had not been in the cigarette business.

22.  In its initial discussions with representatives of NAAG and the Settling States, Bekenton was never informed the Settling States would provide any Participating, Subsequent Participating or Non-Participating Manufacturers with any terms more favorable than those applicable to Bekenton under the MSA without also making terms as relatively favorable available to Bekenton as well as required by the MSA.

23.  In deciding to enter the cigarette business and become a Participating Manufacturer, Bekenton relied on the protections provided by the express provisions of the MSA, including the obligation of the Settling States to enforce the MSA as well as abide by the provisions designed to "level the playing field," such as the most favored nations provision, and the requirement that the MSA may only be

amended by a written instrument executed by all Participating Manufacturers affected by the amendment.

### *THE SETTLING STATES GIVE PREMIER MORE FAVORABLE TERMS*

24.  At the time Bekenton entered into the MSA, Premier Manufacturing, Inc. ("Premier") was a cigarette importer and was a Subsequent Participating Manufacturer, subject to all obligations under the MSA.

25.  In 2002, Premier admitted falsely reporting its sales and overstating its grandfathered share in order to evade MSA payment obligations of between $31.7 million and $46.4 million over a three-year period.  Premier settled the resulting dispute with the Settling States through a Forbearance Agreement in September 2002.  Premier then defaulted under its obligations under the 2002 Forbearance Agreement.

26.  Unbeknownst to Bekenton, at the same time Bekenton was in discussions with the Settling States and NAAG concerning becoming a Subsequent Participating Manufacturer, the Settling States and NAAG were in discussions with Premier concerning allowing Premier settlement terms more favorable than the MSA to resolve Premier's default under the 2002

Forbearance Agreement.

27. Neither the Settling States nor NAAG ever informed Bekenton of the discussions with Premier or the possibility the Settling States would allow a Participating Manufacturer terms more favorable than those applicable to Bekenton under the MSA.

28. On or about July 14, 2003, the Settling States entered into an "Amendment to Forbearance Agreement" with Premier by which Premier was granted terms substantially more favorable to Premier than the terms of the MSA applicable to Bekenton. By virtue of the July 2003 agreement, Premier was once again relieved of its financial obligations under the MSA and rewarded for its misrepresentations and defaults.

### *THE SETTLING STATES GIVE FARMERS MORE FAVORABLE TERMS*

29. Also unbeknownst to Bekenton, the Settling States and NAAG also had discussions with a Non-Participating Manufacturer, Farmers Tobacco Company ("Farmers"), concerning settlement terms more favorable than those applicable to Bekenton under the MSA.

30. Farmers had increased its sales from 48.4 million units in 2001 to 663.2 million units in the first seven

11

months of 2003 by pursuing a low selling price strategy made possible by the fact Farmers was paying only approximately 5% of what it would have owed as a Participating Manufacturer under the MSA.

31.  On or about December 23, 2003, the Settling States entered into an "Agreement" with Farmers whereby Farmers became a Participating Manufacturer under the MSA and was also granted terms more favorable than those applicable to Bekenton under the MSA, including a deduction of $823,000 as an additional "settlement amount" and a periodic payments of the Farmers' Unpaid Amount over ten years to account for the 29-month period in which Farmers had made payments under the Escrow Statutes of only about 16 cents per carton instead of the $3.35 per carton required under the MSA.

32.  These favorable terms were awarded to Farmers after a 29 month period in which Farmers made payments under the Escrow Statutes of only about 16 cents per carton, instead of the $3.35 under the MSA, thereby enabling Farmers to sell its brands at artificially low prices while earning profits and increasing its market share.

### *THE SETTLING STATES GIVE GENERAL MORE FAVORABLE TERMS*

33. In January 2004, the NAAG tobacco project's chief counsel told Bekenton's representatives that General Tobacco ("General") would only be admitted as a Subsequent Participating Manufacturer "over my dead body." This was no doubt because General had been a notorious renegade Non-Participating Manufacturer. General had expanded its sales from 53.8 million units in 2000 to 7.7 billion units in 2003 by capitalizing on the fact that it paid fees of only about 25% of what it would have owed as a Participating Manufacturer under the MSA.

34. On or about August 19, 2004, the Settling States entered into an "Adherence Agreement" with General Tobacco ("General") pursuant to which General became a Participating Manufacturer under the MSA on terms more favorable than those available to Bekenton, including: (1) exempting General from its required annual payment due on April 15, 2005, and instead, allowing it to make the payment over a 12-year period; (2) failing to require that General make all of its back MSA payments within a reasonable time, but instead allowing a 12-year payment period; (3) charging interest on the payments owed by General at a fixed rate lower than the

prime rate plus three percent; (4) affording credits to General for payments made to Non-Settling States which are not provided for in the MSA; (5) allowing General a deduction for an additional "settlement amount" of $5.6 million; (6) effectively allowing General a six-month payment-free grace period; and (7) effectively charging General an initial rate of 22 cents per carton rather than the full amount charged to other Participating Manufacturers under the MSA.

35.  These generous terms were awarded to General after a 53 month period in which General paid as little as 22 cents per carton under the first year of the Escrow Statutes instead of $2.37 under the MSA, enabling General to sell its brands at artificially low prices while earning profits and establishing a market share comprising approximately 2% of the U.S. Market.

### *THE AMENDMENTS TO THE MSA ADVERSELY AFFECTED BEKENTON WITHOUT THE CONSENT OF BEKENTON OR ANY OTHER PARTICIPATING MANUFACTURERS*

36.  The above-referenced agreements between the Settling States and Premier, Farmers and General constituted amendments to the MSA in that they added new Participating Manufacturers and created special terms and conditions for

14

those parties.

37. The terms and conditions provided by the Settling States to Premier, Farmers and General substantially adversely impacted Bekenton because those Participating Manufacturers, who were direct competitors of Bekenton, were relieved of significant financial obligations and burdens imposed on Bekenton under the MSA.

38. Bekenton, Premier, Farmers and General compete in a very price sensitive market segment. Therefore, the special favorable terms provided by the Settling States to Bekenton's three direct competitors gave those Participating Manufacturers a substantial competitive advantage and imposed on Bekenton a substantial competitive disadvantage.

39. The Settling States entered into the agreements with Premier, Farmers and General without the written consent of Bekenton or any of the Participating Manufacturers, all in violation of MSA § XVIII(j).

40. This was all contrary to the terms and purpose of the MSA to even the playing field and not adversely impact the market share of Participating Manufacturers.

### *THE SETTLING STATES REFUSE TO COMPLY WITH THE MOST FAVORED NATIONS PROVISION*

15

41. After Bekenton learned the Settling States had entered into the agreements with Premier, Farmers and General, Bekenton's representatives met with representatives of NAAG and the Settling States in March 2005 to discuss the implications of the Premier, Farmers and General agreements, including the most favored nations issue.

42. Bekenton's representatives presented NAAG's represen-tatives with a 21-page factual and legal analysis of Bekenton's position. Among other issues, Bekenton requested the Settling States comply with the most favored nations clause and provide Bekenton with terms as relatively favorable as those provided to Premier, Farmers and General. See memorandum dated March 8, 2005, attached and incorporated herein as Exhibit "C."

43. The representatives of NAAG and the Settling States rejected Bekenton's positions outright, including rejecting any applicability of the most favored nations clause.

44. Indeed, NAAG and the Settling States have imposed on Bekenton various requirements that are more onerous than those required of other Participating Manufacturers and Bekenton competitors under the MSA. For example, NAAG has

16

repeatedly demanded that Bekenton make escrow payments against projected future MSA obligations on terms significantly more onerous than those applicable to other Participating Manufacturers, and has questioned Bekenton's pricing which simply matches its competitors.

### *THE MOST FAVORED NATIONS CLAUSE MUST BE ENFORCED*

45. Pursuant to the above-referenced agreements with Premier, Farmers and General, the Settling States agreed to relieve those Participating Manufacturers of various obligations to make the payments provided in the MSA.

46. Therefore, the MSA must be revised so that Bekenton and the other Participating Manufacturers receive terms as relatively favorable as those the Settling States agreed to give to Premier, Farmers and General.

### *BEKENTON'S PAYMENT DISPUTE*

47. On or about March 30, 2005, the Independent Auditor issued a Final Calculation of Bekenton's payment obligation under the MSA, which totaled $7,720,361.75.

48. On April 7, 2005, pursuant to MSA § V(c)(2), Bekenton properly delivered a written statement indicating various ways in which it disputed the Independent Auditor's

17

Final Calculation, including the failure to invoke the most favored nation provision, failure to apply a Previously Settled States Credit, reliance on inaccurate data, and failure to recalculate prior years over payment obligations using net data.

49. NAAG and the Settling States rejected and refused to honor Bekenton's April 7, 2005 notice disputing the Final Calculation, and refused to recognize any adjustments to the Final Calculation to which Bekenton is duly entitled by virtue of the most favored nations clause and other provisions of the MSA.

50. Instead, by letter dated April 29, 2005 NAAG and forty-one Settling States, notified Bekenton that it had "breached" its obligation to make the payment that was due on April 15, 2005, and that if the matter was not resolved within 30 days, one or more of the "undersigned Settling States" would initiate enforcement proceedings. However, the letter failed to specify how the "undersigned Settling States" or NAAG asserted Bekenton breached or provided a method for cure. See copy of letter attached and incorporated herein as Exhibit "D."

18

51.  Further, on June 3, 2005, the State of California, one of the 41 "undersigned Settling States" furthest from Bekenton's Florida corporate office or North Carolina manufacturing facility, filed an Application for an Enforcement Order in the Superior Court of California, San Diego County, in Case No. JCCP 4041 directing Bekenton to comply with its MSA payment obligation for all Settling States in the amount incorrectly set forth in the Independent Auditor's Final Calculation.

### THE CONSEQUENCES OF THE SETTLING STATES' AND NAAG'S POSITION

52.  Bekenton was not in the cigarette manufacturing business until it decided to become a Participating Manufacturer.

53.  Bekenton's entire business plan is and was based on the financial and competitive model created by MSA, with the understanding NAAG and the Settling States would uphold and enforce the MSA as to Bekenton as well as all other Participating Manufacturers, including Non-Participating Manufacturers seeking to join the MSA, and enforcing provisions to "level the playing field" against Non-Participating Manufacturers. Bekenton correctly concluded

that the Non-Participating Manufacturers selling at low costs could not meet their financial obligations to escrow funds as required under the MSA (MSA § IX(d), and Ex. T), and therefore Bekenton could ultimately gain a foothold in the low cost market segment so long as the terms of the MSA were enforced.

54. If NAAG and the Settling States do not uphold and enforce the MSA as to Bekenton as well as all other Participating and Non-Participating Manufacturers as required by the MSA, and if Bekenton does not receive terms as relatively favorable as those provided to Premier, Farmers, General, it will be extremely difficult for Bekenton to compete on the "uneven playing field" NAAG and the Settling States have created, which is contrary to the purpose and intent of the MSA.

### *FIRST CAUSE OF ACTION*
### *(Breach of the MSA)*

55. Plaintiff hereby incorporates paragraphs 1 through 54 as if fully set forth herein.

56. Bekenton has performed all its obligations under the MSA except such obligations that have been excused or relieved.

20

57.  The Settling States and NAAG have breached the MSA by (a) failing to enforce the terms of the MSA; (b) failing to enforce the obligations of the Non-Participating Manufacturers and Subsequent Participating Manufacturers; (c) entering into agreements with Premier, Farmers and General which adversely affected the rights of Bekenton; (d) not obtaining the written consent of Bekenton and the other Participating Manufacturers to the terms made available to Farmers, Premier, and General; (e) failing and refusing to revise the terms of the MSA so that Bekenton receives terms as relatively favorable as those provided to Premier, Farmers and General.

58.  As a result of the Settling States' and NAAG's breaches and failure to enforce the MSA, Premier, Farmers and Generals MSA payments have been significantly lower than Bekentons.

59.  Further, as a result of the Settling States, and NAAG's failure to vigorously enforce the provisions of MSA designed to "level the playing filed", Bekenton in 2004 and in 2005, Bekenton has not been able to reach the market share it projected would have been feasible if NAAG and the

21

Settling States had vigorously enforced said provisions of the MSA.

60. Additionally, as a result of the Settling States' and NAAG's failure to vigorously enforce and abide by the provisions of the MSA, Bekenton has not been provided approximately $831,284.40 as to the year 2003 Previously Settled States deduction.

61. As a result of the Settling States and NAAG's breaches of the MSA, Bekenton has been damaged in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

62. Plaintiff hereby incorporates paragraphs 1 through 61 as if fully set forth herein.

63. The MSA includes an implied covenant of good faith and fair dealing which requires the Settling States and NAAG to deal with Bekenton fairly and in good faith in implementing and enforcing the MSA.

64. The actions and inactions of the Settling States and NAAG referred to herein constitute breaches of the implied covenant of good faith and fair dealing in the MSA.

65. As a result of the Settling States' and NAAG's breaches of the implied covenant in the MSA, Bekenton has been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (Declaratory Relief)

66. Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein.

67. Bekenton seeks declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2 as to the interpretation and application of the MSA (Exhibit "A") between the parties, and the Settling States' and NAAG's breach thereof.

68. A judicial determination is necessary and appropriate at this time under the circumstances in order that Bekenton may ascertain it rights and duties under the MSA.

69. Bekenton contends (a) the agreements between the Settling States and Premier, Farmers, General are breaches of the MSA; (b) Bekenton is entitled to a revision of the MSA so that it receives terms as relatively favorable as those provided to Premier, Farmers, General; (c) Bekenton duly and

properly disputed the Independent Auditor's Final Statement; and (d) Bekenton owes no more than $198,488.40 in payments for Fiscal Year 2004 with the balance deferred under the MSA – an amount based on the express terms of the MSA, including the most favored nations clause and the more favorable terms offered to Premier, Farmers and General, the Non-Participating Manufacturer adjustment and the Previously Settled States reduction.

70. Based upon information and belief, the Settling States and NAAG contend that: (a) the agreements between the Settling States and Premier, Farmers, General are not breaches of the MSA; (b) Bekenton is not entitled to a revision of the MSA so that it receives terms as relatively favorable as those provided to Premier, Farmers, General; (c) Bekenton did not duly and properly dispute the Independent Auditor's Final Statement; and (d) Bekenton owes $7,720,361.75 in payments for Fiscal Year 2004 under the MSA.

71. Based upon the Settling States and NAAG's contentions set forth in the preceding paragraph, the Settling States and NAAG have notified Bekenton that it may be sued in one or more of the 41 jurisdictions of the

24

"undersigned Settling States." See letter notice dated April 29, 2005, attached and incorporated herein as Exhibit "D" Litigating in multiple and/or distant jurisdictions, and/or payment of the $7,720,361.75 that NAAG and the Settling States incorrectly claim is due, will cause Bekenton a significant financial burden and irreparable harm that will result in, inter alia, significant loss of market share.

72. An actual controversy has arisen between the contentions of Bekenton and the Settling States and NAAG concerning the interpretation, application and enforcement of the MSA.

73. Bekenton seeks a declaration from this Court that its contentions are correct and the Settling States' and NAAG's contentions are incorrect under the MSA.

74. Bekenton has no other adequate remedy at law.

**WHEREFORE**, plaintiff prays judgment as follows:

1. For damages in an amount to be proven by trial;

2. For a declaration that (a) the agreements between the Settling States and Premier, Farmers, General are breaches of the MSA; (b) Bekenton is entitled to a revision of the MSA so that it receives terms as relatively favorable as those provided to Premier, Farmers, and General; (c)

Bekenton duly and properly disputed the Independent Auditor's Final Statement; and (d) Bekenton owes no more than $198,488.40 in payments for Fiscal Year 2004 with the balance deferred under the MSA;

3.    For Enforcement of the Most Favored Nations and Previously Settled States provisions of the MSA;

4.    For costs of suit;

5.    For attorneys' fees;

6.    For such other and further relief as the Court may deem proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 18th day of July, 2005.

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that I served through the mail the National Association of Attorneys General ("NAAG"), at its principal place of business, 750 First Street, NE, Suite 1100, Washington, DC 20002 and the Honorable Steve Carter, Office of the Indiana Attorney General, I.G.C. South 5th Floor, 302 West Washington Street, Indianapolis, IN 46204.

s/ *Francisco M. Troncoso*
FRANCISCO M. TRONCOSO 120007
s/ *Richard Schell-Asad*
RICHARD SCHEL-ASAD 203207
TRONCOSO & SCHELL
P.O. Box 9023352
San Juan, PR 00902-3352
Tel: (787) 722-0741
Fax: (787) 724-2563
e-mail: ftroncoso@troncosolaw.com