EXHIBIT
tabbies
C

1540 BROADWAY NEW YORK, NY 10036-4039 212.858.1000 F: 212.858.1500

FOR SETTLEMENT PURPOSES ONLY

MEMORANDUM
CONFIDENTIAL

To: Donald D. Stanley, Jr., Esq.
Assistant Attorney General
State of Iowa

Mark E. Greenwold, Esq.
Chief Counsel for Tobacco Project
National Association of Attorneys General

From: Pillsbury Winthrop LLP

Date: March 8, 2005

Re: Bekenton Claims for Relief Under the MSA

Bekenton USA, Inc. ("Bekenton") has asked Pillsbury Winthrop LLP to:

(1) Study the circumstances that led to Bekenton's becoming a party to the Master Settlement Agreement ("MSA"), and the circumstances that have affected Bekenton's competitive position since it became a party; and

(2) Recommend legal options available to Bekenton to redress the competitive disadvantage at which it is now forced to operate.

Our analysis, reasoning and conclusions are set forth in detail below.

This document has been prepared for, and is intended solely for use in, compromise negotiations and is subject to the provisions of F.R.Evid. 408.

In our considered judgment, Bekenton has good grounds to obtain relief under the MSA, under state common law, and under the antitrust laws of the United States. Bekenton will pursue whatever actions or remedies it deems appropriate to protect its rights. This memorandum is without prejudice to any and all rights that Bekenton may have in this matter, which Bekenton expressly reserves.



PILLSBURY WINTHROP LLP

FOR SETTLEMENT PURPOSES ONLY

## Executive Summary

After studying the market for cigarettes in the United States in light of the litigation fallout of the late 1990s, Bekenton determined to enter the market by becoming a Subsequent Participating Manufacturer ("SPM") under the MSA. In doing so, Bekenton relied on the protections provided by the terms of the MSA itself, as well as on the representations of the Settling States ("States") regarding enforcement of such terms, both of which assured that Non-Participating Manufacturers ("NPMs") would not be permitted to acquire market share or be allowed to later join the MSA except in conformity with the express terms of the MSA.

Bekenton's business projections, based on such reasonable reliance, assumed that the NPMs could not remain in the market. Given the high volumes of cigarettes that the NPMs had sold at low prices, it was inevitable that they would be unable to meet, in full, the escrow obligations that state laws imposed upon them. Bekenton anticipated that, when the NPMs had exited the market, Bekenton would "inherit" their share and thrive because of Bekenton's low cost structure.

As a result of the States' misapplication and non-application of the MSA and violation of its terms, Bekenton's legitimate expectations have not been met. Two NPMs have been given very favorable entry inducements, and Bekenton cannot viably compete against them over the long term. Thus Bekenton has been damaged because of these variances granted by the States, variances which constitute breaches of the contract that Bekenton entered into in good faith.

To date, Bekenton has fulfilled all of its obligations under the MSA and has made every payment due. In addition, Bekenton has become a fully licensed domestic manufacturer and has commenced production at a modern manufacturing facility in North Carolina which is second to none. As a result of the States' breaches, however, Bekenton may well not be able to make its April 2005 payment and therefore seeks the required relief discussed herein. Without such relief, Bekenton may not be in a position to provide the States any financial benefits in the future, which is contrary to the MSA's policy calling for parties to remain financially viable and therefore able to make current and future payments under the MSA.

FOR SETTLEMENT PURPOSES ONLY

Pursuant to § VII(c)(6) of the MSA, Bekenton seeks to discuss and amicably resolve its concerns without invoking the enforcement mechanisms of the MSA. With that goal in mind, Bekenton submits this memorandum in support of its requested relief. Should resolution of the matters discussed herein not be achieved by consent, Bekenton is prepared to pursue all of its rights through proceedings consistent with the MSA's enforcement mechanisms.

## I. Factual Background Considered and Relied Upon by Bekenton Before Signing the MSA

Bekenton started considering entry into the U.S. cigarette market in early 2003.

The MSA was in place. As a result, Bekenton's choice was either to accept or ignore the MSA – that is, to sign the MSA and enter the market as a SPM or not to sign the MSA and enter as a NPM.

Bekenton's analysis of the market, as affected by the MSA, indicated to it that the SPM option was clearly preferable, given the facts that Bekenton knew at the time, and in light of Bekenton's reasonable expectations based on those facts.

The MSA appeared to provide a stable, dependable structure of mutual obligations that SPMs and the States could rely on to govern their relationships.

One key element was the Limited Most-Favored-Nation Provision ("MFN") of MSA § XVIII(b)(4):

> "If at *any time* any Settling State *agrees to relieve, in any respect, any Participating Manufacturer's obligation to make the payments as provided in this Agreement*, then, with respect to that Settling State, the terms of this Agreement shall be revised so that the *other Participating Manufacturers receive terms as relatively favorable*."[1]

[1] Unless otherwise noted, all emphasis herein is ours. Since this Subsection applies "at any time," it covers favorable treatment of new as well as existing PMs. *See also* MSA

(... continued)



FOR SETTLEMENT PURPOSES ONLY

*See* National Association of Attorneys General ("NAAG") *Master Settlement Agreement Summary for Attorneys General*:

> • If a settling state enters into a settlement agreement with a tobacco company that is not a party to the MSA (Non-Participating Manufacturer or "NPM") and the overall terms of such agreement are more favorable to the NPM than are the terms of the MSA, *the MSA will be revised as to the original signatory tobacco companies to incorporate the more favorable overall terms.*
>
> • If any settling state agrees to relieve any company that is a party to the MSA from any part of its payment obligation, then as to such settling state *the MSA will be revised to provide all other signatory tobacco companies the same payment relief.*[2]

Bekenton reasonably expected that, if it signed the MSA, it would receive the full benefit of this and other provisions that had been fashioned to protect the long-term interests of Participating Manufacturers.

By contrast, Bekenton saw the obvious disadvantages of entering the U.S. market as a NPM. Bekenton understood that (as Louisiana's Attorney General has expressed it):

> The Settling States were concerned about the prospect that NPMs, which had contributed nothing to the settlement and had assumed none of its public health and anti-promotional restrictions, would take advantage of their lower costs and commercial freedom to expand their

(... continued)

§ II(jj) ("'Participating Manufacturer' means a Tobacco Product Manufacturer that is *or becomes* a signatory to this agreement").

[2] http://www.in.gov/attorneygeneral/tobacco/msa.pdf at 12.



PILLSBURY WINTHROP LLP

FOR SETTLEMENT PURPOSES ONLY

markets at the expense of companies that had chosen to settle their claims with the states.[3]

Accordingly, NPMs had for some time been the object of legislative action to further the goals of the MSA and restrain share-grabbing opportunism. The legislation consisted of Escrow Statutes (referred to as "Qualifying Statutes" in the MSA § IX(d)(2)(E))[4] and Contraband Statutes. As Bekenton was formulating its U.S. business plan, Escrow Statutes were being strengthened by Allocable Share Release Repealers.[5] All of these laws aimed at limiting NPMs' ability to acquire market share and build brand loyalty among consumers by charging unsustainably low prices in the short term.

For example, a New York State Division of the Budget Report, included in the legislative history of the New York Escrow Statute, enunciated a key state policy behind the law: "Enactment of this bill would level the playing field in

---

[3] Memorandum in Support of Motion to Dismiss in *Xcaliber International Ltd. v. Ieyoub*, File No. 04-0069, at 6-7 (E.D. La. Feb. 2, 2004).

[4] *See, e.g.*, N.Y. Pub. H. L. § 1399-nn. 6, New York's Qualifying Statute: "It would be *contrary to the policy of the state if tobacco product manufacturers who determine not to enter into such a settlement [i.e., the MSA] could use a resulting cost advantage to derive large, short-term profits* in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to * * * prevent such manufacturers from deriving large short-term profits. . . ."
*See also*, Memorandum in Opposition to Preliminary Injunction in *Carolina Tobacco Co. v. Carter*, No. 49C01 0308 PL 002403 (Cir. Ct. Marion Co, Indiana):

> At the time they entered into the MSA, the Participating Manufacturers and the Settling States . . . were concerned that tobacco product manufacturers who are not parties to the MSA ("Non-Participating Manufacturers," or "NPMs") *would be able to increase their cigarette sales* by taking advantage of the fact that they were not bound by the payment obligations or marketing restrictions of the MSA, and could structure their business operations to evade liability for the health costs and other damages that the marketing and sale of their cigarettes will inevitably inflict on the States. Ind. Code § 24-3-3-1; *see also Star Scientific, Inc. v. Beales*, 278 F.3d 339, 349-50 (4th Cir.), *cert. denied*, 123 S.Ct. 93 (2002).

[5] West Virginia was the first to repeal its Allocable Share Release provision, on March 20, 2003. By the end of 2003, 18 more states had followed suit. Opinion and Order in *Freedom Holdings v. Spitzer*, 02 Civ. 2939 (S.D.N.Y. Sept. 14, 2004) ("*Freedom Holdings* Op.") at 14.

PILLSBURY WINTHROP

FOR SETTLEMENT PURPOSES ONLY

New York for all tobacco manufacturers selling cigarettes within the State" by removing the "*significant competitive advantage over participating manufacturers*" that NPMs could have, were they not required to make any payments to the State.

To the same effect, in an August 16, 1999 letter to Governor Pataki, the head of New York's Department of Taxation and Finance stated:

> In addition to providing funds for satisfaction of judgments or settlements, these escrow payments are meant to 'level the playing field' so that non-participating manufacturers will not have a cost advantage over participating manufacturers that are obligated to make payments under the MSA. *This will help insure that participating manufacturers will not lose market share*, so that NPM adjustments will not be necessary.

NPMs nevertheless posed a significant and growing problem, as they had ever since execution of the MSA. For example:

* General Tobacco, a notorious NPM renegade, started to sell in the United States in 2000. It rapidly expanded its sales from 58.8 million units in 2000 to 7.7 billion units in 2003.[6] The reason for General's explosive growth was low prices. General could charge lower prices because, under the Escrow Statutes, it paid only about 34% of what it would have owed as a SPM under the MSA.

* Another NPM, Farmers Tobacco Co., pursued the same strategy, growing from 48.8 million units in 2001 to 663.2 million units in the first seven months of 2003.[7] Under the Escrow Statutes, Farmers paid only about 11% of what it would have owed as a SPM under the MSA.

---

[6] *See* General Tobacco Adherence Agreement dated August 19, 2004.

[7] *See* Agreement Between Farmers Tobacco Co. and Settling States dated December 23, 2003.

FOR SETTLEMENT PURPOSES ONLY

* In the U.S. market as a whole, between 1998 and 2003 NPMs' sales rose from 2.43 billion to 33.31 billion cigarettes – a 1,271 percent increase – and their U.S. market share grew from 0.5% to 8.2%.[8]

NAAG and the States took a dim view of the NPMs' conduct.

In its 2003 *Resolution Supporting Allocable Share Legislation*, NAAG observed that "several NPMs have enjoyed an unintended competitive advantage over the more than 40 companies that have chosen to join the Master Settlement Agreement *and have thereby expanded their sales at the expense of those companies.*"

In January 2004 the NAAG Tobacco Project's Chief Counsel responded to an inquiry by Bekenton's attorneys, Frank Rubio and Rod Bryson, by announcing that General would only be admitted as a party to the MSA "over my dead body."

II. Developments After Bekenton Signed the MSA

Bekenton became a SPM on June 25, 2003. Bekenton based its decision on the reasonable belief that it could rely on the MSA, on enabling state legislation, and on the NAAG Tobacco Project to do what they were designed to do. As a result, Bekenton believed the vigorous measures mandated against the NPMs would make their short term share-grabbing strategy unsustainable. When that happened, Bekenton reasoned, it would acquire some if not all of the NPMs' share – and would maintain that share in the long term thanks to Bekenton's low cost of production and the natural tendency of cigarette prices to rise to profitable levels once severe price-cutting pressure was removed. As Bekenton stated:

> Bekenton's business plan assumes that the Non-Participating Manufacturers will not be as competitive in the future given the new complementary legislation with quarterly payments and no allocable share cap reduction. We believe that as a Subsequent Participating

---

[8] *Freedom Holdings* Op. at 12.

FOR SETTLEMENT PURPOSES ONLY

> Manufacturer, Bekenton will have a competitive edge in the marketplace.[9]

But the States changed their policy for dealing with NPMs in a way that ignored important terms of the MSA that they had just agreed to with Bekenton, and impaired the rights and reasonable expectations that Bekenton had counted on when it signed the MSA.

Until approximately March 2003, NPMs had manipulated a loophole in the Escrow Statutes' Allocable Share Release provision to gain a substantial economic advantage over PMs: [10]

> NPMs that distributed cigarettes to only a few states paid their per-cigarette tax directly to the states in which they made sales, satisfying the Escrow and Contraband Statutes. But these states could retain only their allocable shares of the aggregate payments made by the NPMs; the balance had to be returned annually to the NPMs under the Allocable Share Release provisions as initially enacted. *As a result, it appears that the NPMs continued to have a competitive advantage in comparison to the cost burdens of the OPMs and SPMs.*
>
> *In practical effect, the Allocable Share release provision provided NPMs with substantial competitive advantages*

---

[9] Letter from Cono Fernando Lamaita to Mark E. Greenwold dated September 10, 2003. *See* letter from Stephen Falowski to Mark E. Greenwold dated November 17, 2004: "Bekenton initially sold its product at a loss to 'purchase market share.' Mr. Bruce explained this strategy to NAAG and the 2003 escrows were established to alleviate NAAG's concerns."

[10] *See* footnote 4, above. More than four years after the MSA took effect, this NPM manipulation finally started to become illegal as additional States repealed the Allocable Share Release provision. NAAG, in its 2003 *Resolution Supporting Allocable Share Legislation*, acknowledged the harm that PMs had already suffered: "[S]everal NPMs have enjoyed an unintended competitive advantage over the more than 40 companies that have chosen to join the Master Settlement Agreement *and have thereby expanded their sales at the expense of those companies.*"

p.7

Jul 13 05 11:12a

FOR SETTLEMENT PURPOSES ONLY

> from concentrating their efforts on regional cigarette distribution.[11]

For more than four years, the States thus allowed an NPM to pay "*substantially less than the Post-1998 SPM [such as Bekenton]* after receiving statutory rebates" of escrowed funds.[12]

NAAG, recognizing that NPM sales cut deep into the States' MSA revenues – because NPMs were taking business away from Participating Manufacturers – sent the States a memorandum urging them to act more vigorously than they had in the past:

> *Increasing sales by NPMs* will sharply reduce the next scheduled payments to all States under the MSA. . . . * * *
>
> These payments are net of reductions totaling about $2.5 billion caused by the Volume Adjustment applicable to all agreements. One of the principal contributors to this revenue loss is *the accelerating increase in sales of cigarettes by NPMs.* * * *
>
> These results underscore *the urgency of all States taking steps to deal with the proliferation of NPM sales,* including enactment of complementary legislation and allocable share legislation and consideration of other measures designed to serve the interests of the States in avoiding reductions in tobacco settlement payments. * * *
>
> [R]eductions in settlement payments resulting from the displacement of OPM sales by NPM sales confer no benefits on the States. Such displacement is occurring. *At the same time that sales by Participating Manufacturers are shrinking, sales by Non-Participating Manufacturers, particularly*

---

[11] *Freedom Holdings* Op. at 42, 16.

[12] Amended Complaint in *Alliance Tobacco Corp. v. NAAG*, Civil Action No. 1:03CV-26-M (W.D. Ky. Mar. 10, 2003) ¶¶ 25-26.



FOR SETTLEMENT PURPOSES ONLY

> *imports, continue to grow and to reduce settlement payments to the States.* * * *
>
> All States have an interest in reducing NPM sales in every State. * * * *In order to protect MSA payments, Settling States must diligently enforce their NPM statutes.*[13]

The correct solution would have been for the States to follow NAAG's directions and enforce strictly the NPMs' compliance with Escrow Statutes. But the States were lax in doing so – and tardy in beefing up their enforcement authority by repealing Allocable Share Release provisions, the mechanism by which NPMs typically evaded their full escrow obligations. As noted in a mid-2004 affidavit:

> [T]he Settling States . . . have not 'diligently enforced' their [Escrow] Statutes. If the Settling States had diligently enforced [Escrow] Statutes, I do not believe that the market share of NPMs would have risen from close to 0% in 1997 to 8% or more, as the Independent Auditor has determined for 2003, or to 10-15%, as other sources indicate. Similarly, the number of NPMs has also grown dramatically since the MSA was signed in 1998. There were very few NPMs in existence in 1997. Today, there are at least 70-80 NPMs operating in the marketplace.
>
> * * * [I]t appears that there is very little [MSA enforcement] activity in most states. * * * Regardless of the number of actions filed, however, there is an obvious disconnect between the claimed diligence of the enforcement efforts of the Settling States and the ever-

---

[13] Memorandum #03-111 from A.G. William H. Sorrell and Mark E. Greenwold to "All Attorneys General," et al. dated September 12, 2003.

*See also* NAAG's admission that the Allocable Share Release provision was a mistake. "The desire was to create a situation where it [the MSA] would not . . . give them [NPMs] an advantage over companies that came into the agreement." "Upstart Brands Hurt Big Tobacco," *The News and Observer* (Raleigh, NC) January 4, 2004.

FOR SETTLEMENT PURPOSES ONLY

growing share of the market that has been captured by NPMs.[14]

Instead of remedying their enforcement failures, the States made matters worse by setting out to recruit new SPMs at any price, negotiating discriminatory long-term payment plans and other cost reductions with certain NPMs as inducements to sign the MSA.

* The Farmers Agreement dated December 23, 2003, (the "Farmers Agreement") contained the following favorable terms: (1) A deduction for a "settlement amount" of $823,000;[15] and (2) a periodic payment, over 10 years, of the "Farmers' Unpaid Amount."

These generous terms were awarded to Farmers after a 29-month period in which Farmers made payments under the Escrow Statutes of only about 16 cents per carton – instead of $1.48 per carton under the MSA – enabling Farmers to sell its brands at artificially low prices while earning a profit and establishing brand recognition and a growing market share.

* The General Tobacco "Adherence Agreement" dated August 19, 2004, (the "General Agreement") relieved this new SPM of its obligations to make payments as provided under the Agreement. Specifically (as summarized in part by Liggett Group),[16] the Settling States provided more

---

[14] Affidavit of Spencer A. Coates, executed June 10, 2004, ¶¶ 38-39, filed in *State of New York v. Philip Morris*, Index No. 400361/97 (Sup. Ct. N.Y. Co.). *See* letter from John C. Polling, II to Independent Auditor to the Master Settlement Agreement dated March 4, 2004 at 3, footnote 2: "The undisputed growth in NPM market share would not have occurred if the MSA and supporting statutes had worked the way they were anticipated to work and [if] the Settling States had enforced them properly."

[15] This settlement amount accounted for a dispute regarding the application of the NPM adjustment.

[16] *See* Vector Group Ltd. News, *Vector Group Subsidiaries to Sue State Attorney General for Violating Terms of Master Settlement Agreement* (Aug. 30, 2004), *available at* http://www.vectorgroupltd.com/newsArticleGroup.asp?pvNewsID=140 (identifying violations of the MSA contained in General's "Adherence Agreement"). Liggett gave the NAAG 30 days notice of its intention to sue, as required under the MSA. *See* MSA § VII(c)(2). To date no action has been filed and it appears that the States have settled, or are in the process of settling, with Liggett on terms as relatively favorable to Liggett as to

(... continued)

FOR SETTLEMENT PURPOSES ONLY

favorable terms to General by: (1) exempting General from its required annual payment due on April 15, 2005,[17] and instead allowing it to make the payment over a 12-year period; (2) failing to require that General make all of its back MSA payments "within a reasonable period of time" as required of all new SPMs under the MSA,[18] again allowing a 12-year payment period; (3) allowing interest to accrue on payments owed by General at a rate lower than provided for in the MSA;[19] (4) affording credits to General for payments made to non-Settling States (the so-called, Credit for Previously Settled State Fee") which the MSA does not provide for; and (5) allowing General a deduction for a "settlement amount" of $5.6 million. [20]

These generous terms were awarded to General after a 53-month period in which General paid only approximately 96 cents per carton under the Escrow Statutes, instead of $2.83 per carton under the MSA, enabling General to sell its brands at artificially low prices while earning a profit and establishing brand recognition and a growing market share.

If NAAG instead had enforced the express terms of the MSA against General as it should have done, General would have exited the market because it would not have been able to afford to pay its arrears of $233 million.

On June 18, 2004, soon after NAAG announced General's application to become a SPM and well before the General Agreement had been negotiated, Bekenton raised serious concerns and questions about the terms on which

(... continued)

General. Such practice further supports Bekenton's claim for similarly favorable treatment.

[17] *See* MSA § IX(e) (OPM annual payments due April 15th of each year); MSA § IX(i)(1) (payment dates under Section IX(e) apply to SPM annual payments).

[18] *See* MSA § II(jj).

[19] *See* MSA § IX(h) (accrual of interest shall be at the Prime Rate plus three percentage points). The interest rate calculated under the MSA would currently be 7.5%. The interest rate under General's Adherence Agreement it is a fixed rate of 5% over the 12-year payment period. Nothing in the MSA provides for a fixed rate. This combination of the reduced and fixed rate violates the MSA's express terms and represents a significant reduction in General's obligations under the Agreement, thereby triggering the appropriate remedy available to other PMs in Section XVIII(b)(4).

[20] This settlement amount accounted for a dispute regarding the application of the NPM adjustment.

FOR SETTLEMENT PURPOSES ONLY

General might be admitted. For example, Bekenton requested "that the total amount of past due liability by General Tobacco be provided for comment." Bekenton questioned the timing and amounts of General's arrears payments, the interest to be charged on those payments, and the security or collateral that General would be required to provide. NAAG, acting for the States, never responded to these concerns and questions, nor did NAAG seek Bekenton's consent to admit General.

Just days after Bekenton became a SPM, moreover, the States gave a second discriminatory break to a competing SPM: The Premier Manufacturing, Inc. "Amendment to Forbearance Agreement" dated July 14, 2003 (the "Premier Agreement").

In 2002, Premier had admitted overstating its 1998 sales by some 21.6% and understating by substantial amounts its 1999-2001 sales.[21] The net effect of Premier's false reporting – an artificially high grandfathered share and artificially low subsequent-years' sales -- was allegedly to evade MSA payments of between $31.7 million and $46.4 million over a three-year period.[22] Premier and Missouri settled their dispute in a September 23, 2002 "Forbearance Agreement," signed by all the States. Premier agreed to a reduced grandfathered share and was given four years in which to make good its prior underpayments. Premier agreed that, if it defaulted, its grandfathered share would be reduced by the percent of the underpayment then outstanding, and the full unpaid amount would become due and payable.

Premier defaulted on its payments due April 25, 2003. An amendment was negotiated – the July 14 Premier Agreement referred to above – (1) relieving Premier of the grandfathered-share forfeiture and acceleration provisions, and (2) continuing (albeit for a reduced period) Premier's extended payment

---

[21] Statement of Uncontested Facts in *Missouri v. American Tobacco Co., Inc.*, Case No. 972-1465 (St. Louis City Cir. Ct., Sept. 23, 2002) ¶¶ 13-33.

[22] Plaintiff State of Missouri's Post-Judgment Motion to Declare and Enforce Obligations of Premier Manufacturing, Inc. in *Missouri v. American Tobacco Co., Inc.*, Case No. 972-1465 (St. Louis City Cir. Ct., July 10, 2002) at 10.

schedule. Thus, with the States' help, Premier avoided penalties for material misrepresentation and breach of the MSA – not once but twice.[23]

The arrangements summarized above are separate agreements between the NPM or SPM in question and the States. They were not treated as amendments under the MSA. Many if not all Participating Manufacturers did not know the terms of these side agreements until they had been finalized and announced.

Since Bekenton became a SPM, it has been put at a critical disadvantage to renegade NPMs that have received generous preferential "signing bonuses," and in comparison to a non-compliant SPM that has repeatedly flouted its obligations under the MSA. Moreover, it has also been singled out for negative treatment by the NAAG Tobacco Project:

* NAAG has repeatedly demanded that Bekenton make escrow payments against projected future MSA obligations on terms significantly more onerous than those required of other SPMs.[24]

* Price-increase demands from NAAG hinder Bekenton's ability to remain competitive with other fourth-tier manufacturers. For example, in August 2004, Dhanraj began selling its 10/20's brand for $8.05 per carton. When Bekenton reduced its prices to meet this competition from another SPM, NAAG responded harshly and questioned the bona fides of Bekenton's business plan.

## III. The States Have Breached the MSA

By granting favorable entry terms to certain NPMs and resolving SPM noncompliance on an ad-hoc basis, the States (through the NAAG Tobacco Project acting on their behalf) have undermined Bekenton's reasonable expectations as a SPM and have breached the MSA in several crucial ways. Speaking for the States, NAAG has repeatedly emphasized that "[t]he

---

[23] In a related side agreement, the States credited Premier for all the disputed payments it had made in connection with its claimed NPM Adjustments in 1999 and 2000, plus $275,407.63. This gave Premier a total additional benefit of $562,213.17. *See* Agreement Between Settling States and Premier Manufacturing, Inc. dated June 19, 2003.

[24] *See, e.g.*, Letter from Mark E. Greenwold to Paul Mendoza, dated January 21, 2004.

Settling States' concern . . . is to ensure that Bekenton will fully comply with its MSA obligations."[25] NAAG has unfortunately not shown similar eagerness to ensure that other manufacturers, and the States, also fully comply with their MSA obligations.

A. Amendment Process Ignored

The General, Farmers and Premier Agreements amend the MSA for the benefit of those three SPMs. But these modifications do not comply with the MSA's explicit requirement that amendments be documented in "a written instrument executed by *all Participating Manufacturers affected by the amendment* . . . ." MSA § XVIII(j). Conversely, the MSA contains no language authorizing the States to bypass such provisions and create de-facto special purpose side deals such as the General, Farmers and Premier Agreements.

The States' failure to obtain Bekenton's written consent to the General and Farmers Agreements is compounded by NAAG's public claim that, in effect, such consent is unnecessary and irrelevant. Ignoring MSA § XVIII(j), NAAG asserts that to admit an applicant manufacturer (*e.g.*, Farmers) only requires the *States'* written assent, and to admit an applicant importer (*e.g.*, General) only requires an MSA amendment executed by the *States*.[26]

Further, evidence of NAAG's disregard for MSA § XVIII(j) is a 2004 e-mail, announcing General's submission of its application to join the MSA, which states: "NAAG will *accept comments* while the [General] application process is pending." The e-mail, significantly, failed to mention (or apparently even to recognize) the State's contractual obligation to obtain the approval of Bekenton and other Participating Manufacturers.

---

[25] Letter from Mark E. Greenwold to H. Frank Rubio dated August 26, 2003.

[26] http://www.naag.org/upload/1065822213_01_MSA_Application_Process.pdf.

General was the subject of MSA Amendment No. 24. But that amendment (a) did not set out the terms of the General Agreement (which it referred to only in passing) and (b) was not submitted for Bekenton's written consent in any event.

FOR SETTLEMENT PURPOSES ONLY

B. MFN Provision Ignored

As noted above, the MSA has specific most favored nation ("MFN") provisions. The General, Farmers and Premier Agreements ignore these, in that they do not provide equivalent benefits to Bekenton. The States have evaded their obligation under § XVIII(b)(4).

An MFN clause that is unambiguous on its face will be enforced by a court according to its express terms. *See DeLoach v. Lorillard Tobacco Co.*, No. 04-1923, 2004 WL 2785104, *5 (4th Cir. Dec. 6, 2004) (reversing district court and enforcing MFN clause according to the plain language of the contract) (applying North Carolina law); *CBS, Inc. v. American Soc'y of Composers, Authors & Publishers*, 276 A.D.2d 337, 338, 714 N.Y.S.2d 44, 45 (1st Dept. 2000) (looking to plain language of MFN clause which allowed for similar terms if subsequently signed agreement provided for lower "total price or payments"); *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1096 (D.C. 1988) (enforcing plain language of MFN clause). This is a basic tenet of contract interpretation. *See DeLoach*, 2004 WL 2785104 at *5 (when language of a contract is clear and unambiguous, effect must be given to its terms); *Masters v. 14-22 Leonard Street Assocs. LLC*, 11 A.D.3d 380, 784 N.Y.S.2d 38, 39-40 (1st Dept. 2004) (written contract which is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms); *Internet East, Inc. v. Duro Communications, Inc.*, 553 S.E.2d 84, 87 (N.C. App. 2001) (where terms of an agreement are clear and unambiguous, courts cannot rewrite the plain meaning of the contract); *1010 Potomac Assocs. v. Grocery Mfrs. Of Am.*, 485 A.2d 199, 205 (D.C. 1984) (when document is facially unambiguous, its language should be relied upon).

The MFN provision in the MSA allows for no ambiguity as to when it applies, to whom it applies, or whether its terms are conditioned upon other occurrences. *See Computer Assocs. Int'l Inc. v. U.S. Balloon Mfg. Co.*, 10 A.D.3d 699, 782 N.Y.S.2d 117, 118 (1st Dept. 2004) (contract is unambiguous if language used has a definite and precise meaning, unattended by danger of misconception, and concerning which there is no reasonable basis for difference of opinion). It applies "at any time," as between "any" PMs, and the relief is mandatory: the terms "*shall be revised*" to afford other PMs similarly favorable accommodation. *See Internet East*, 553 S.E.2d at 87 (courts must give ordinary words their

ordinary meaning when construing a contract; the word "shall" in a contract provision means "must" or what is "mandatory").

Indeed, MFN clauses in settlement agreements arising out of tobacco litigation have been strictly enforced according to their plain language. In *DeLoach v. Lorillard Tobacco Co.*, the Fourth Circuit enforced the MFN clause in an agreement settling antitrust claims against Lorillard and Philip Morris that entitled those companies to a reduction of their tobacco purchase obligations if plaintiffs negotiated such a reduction in a subsequent settlement "entered before the beginning of trial." *DeLoach*, 2004 WL 2785104 at *8-9. Plaintiffs reached settlement with RJR on the day trial was to begin, but before trial had actually commenced. The district court refused to apply the MFN. The Fourth Circuit reversed, finding that that the district court "meaningfully" and impermissibly "rewrote the First Settlement Agreement by interpreting the 'beginning of trial' to mean 'the day trial was scheduled to start.'" *Id.* at *11. The same plain-language construction compels application of the MSA's MFN to Bekenton here.

C. The States and NAAG Lack Authority To Enter Into Side Agreements

The MSA confers certain responsibilities on NAAG for the purpose of "implementation and enforcement" of the MSA § VIII(a).[27] This provision does not allow extraneous commitments such as the General, Farmers and Premier Agreements.

[27] Specifically:

> Upon approval of the NAAG executive committee, NAAG will provide coordination and facilitation for the *implementation and enforcement of this Agreement* on behalf of the Attorneys General of the Settling States, including the following: ...

MSA § VIII(a). The MSA then lists several responsibilities the NAAG shall perform under the Agreement: Coordinate the inspection and discovery activities regarding compliance with the Agreement by PMs (VIII(a)(1)); convene meetings with the parties throughout the year to evaluate the success of the Agreement (VIII(a)(2)); report on the results of these meetings at the local level (VIII(a)(3)); support the AGs of the Settling States carry out their responsibilities under the Agreement (VIII(a)(4)); and "perform the other functions specified for it in this Agreement," such as enforcing the provision which requires the PMs to make litigation documents available to the public. MSA § VIII(a)(5).

p.16

Jul 13 05 11:14a

FOR SETTLEMENT PURPOSES ONLY

Those Agreements do not fall within the scope of the responsibilities that § VIII(a) gives to NAAG. Nor are they within the States' power, as parties to the MSA, to assign to NAAG. The General, Farmers and Premier Agreements neither "implement" nor "enforce" the MSA. Indeed, those Agreements willfully ignore the clear language of the MSA (by, for example, failing to comply with MSA amendment requirements and failing to apply the MFN). As such, they effectively *contradict* the terms of the MSA. Nowhere is NAAG authorized to enter into agreements that violate the express terms of the MSA.[28]

A court would find the States have breached their duty under the MSA to provide Bekenton with favorable terms equivalent to those granted to General, Farmers and Premier. To the limited extent Section VIII gives NAAG implementation and enforcement power,[29] the exercise of that power must take into account *all* of the MSA's terms, including the MFN provision discussed above. New York's highest court recently restated the well-settled principle that agreements must be construed "so as to give full meaning and effect to the material provisions." *Excess Ins. Co. Ltd. v. Factory Mutual Ins. Co.*, 2004 WL 2792537 * (N.Y. Dec. 2, 2004); *see also Internet East*, 553 S.E.2d at 87 (each and every part of a contract must be given effect); *1010 Potomac Assocs.*, 485 A.2d at 205 (writing in contract must be interpreted as a whole, giving reasonable, lawful, and effective meaning to all its terms). Allowing the Settling States to enter into side deals with some SPMs under more favorable terms without allowing recourse for other SPMs would violate this basic tenet of contract law and impermissibly render the MFN provision meaningless. *See Yoi-Lee Realty Corp. v. 177th St. Realty Assocs.*, 208 A.D.2d 185, 190, 626 N.Y.S.2d 61, 65 (1st Dept. 1995) (contracts should be construed to give force and effect to their provisions, and not in a manner so as to render them meaningless).

---

[28] NAAG admits as much. *See* Memorandum of National Association of Attorneys General in Support of Motion to Dismiss in *Alliance Tobacco Corp. v. NAAG*, Civil Action No. 1:03 CV-26-M (W.D. Ky. April 7, 2003) at 8 ("NAAG has only a limited role in 'provid[ing] *coordination and facilitation* for the implementation and enforcement of this Agreement on behalf of the Attorneys General of the Settling States'") (emphasis in original).

[29] NAAG is authorized to perform functions "specified" in the MSA. Neither the General, Farmers and Premier Agreements, nor the negative treatment meted out to Bekenton, are of a type specified in the MSA.

FOR SETTLEMENT PURPOSES ONLY

Furthermore, NAAG's limited authority under the MSA does not allow it to circumvent or materially alter the MSA's terms. *Cf. Fetherston v. Fetherston*, 172 A.D.2d 831, 833, 569 N.Y.S.2d 752, 755 (2d Dept. 1991) (authority to enforce settlement did not allow family court to rewrite parties' agreement); *see also DeLoach*, 2004 WL 2785104 at *5 (court cannot reject what the parties inserted or insert what the parties elected to omit); *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 775 N.Y.S.2d 765, 768 (N.Y. 2004) (courts may not add or omit terms or distort the meaning of those used to fashion a new contract on behalf of the parties); *Internet East*, 553 S.E.2d at 87 (courts cannot rewrite the plain language of a contract).

IV. The States' Breaches Have Damaged Bekenton

NAAG's activities on behalf of the States have been the proximate cause of harm to Bekenton.

Bekenton is a U.S. tobacco products manufacturer. Bekenton's one production facility, located in Mocksville, NC, is efficient and allows Bekenton to operate with very low overhead.

Despite that, Bekenton cannot economically compete if pitted against SPMs who benefit from special financial breaks. NAAG's deferred payment plans and other significant concessions have given General, Farmers and Premier an artificially extended lease on life. For example, the States are keeping General in business by financing two-thirds of its MSA arrears over 12 years at below-market rates in a manner that leaves untouched the massive market-share gain and brand recognition that General built up while flouting the MSA as a renegade NPM for four and a half years (2000 through mid-2004).

If General, Farmers and Premier were required to abide by the letter of the MSA and its enabling laws – as Bekenton has done at all times, and as Bekenton reasonably expected its competitors would also do – they would have left the market. General, Farmers and Premier are still in the market, however, and they enjoy the business for which Bekenton must be allowed to compete.

This is business that Bekenton can win – indeed *must* win to fulfill its initial business plan by taking some if not all of the NPMs' volume for itself. As

FOR SETTLEMENT PURPOSES ONLY

discussed above, this plan is rooted in Bekenton's knowledge that it can thrive over the long term in the United States as a low-cost SPM making all appropriate payments under the MSA – *if* the requirements imposed by the MSA and ancillary legislation are diligently and even-handedly enforced.

However, if those requirements continue not to be enforced fairly, and the discriminatory burden remains, Bekenton will continue to suffer financially. Under current circumstances, Bekenton may well not be able to make its next payment due in April 2005.

Putting Bekenton at such a massive disadvantage contradicts the policy of the MSA and its implementing statutes. That policy calls for the MSA parties to remain financially viable so they can make their current and potential future payments under the MSA. That policy would be served by allowing General and Farmers to join the MSA on terms that allow them to remain financially viable, but only if Bekenton receives the equivalent accommodation which it needs to remain financially viable.

However, if discriminatorily burdensome payment requirements continue to be imposed on Bekenton – which would otherwise be a long-term viable producer and substantial revenue provider – Bekenton may be forced out of business in a manner completely opposite to the core policy of the MSA.

V. Bekenton's Required Relief

In a meeting on December 3, 2004 in Miami attended by Dennis Bruce and Bekenton's attorneys (Messrs. Rubio, Bryson and Waserstein), NAAG claimed that it has discretion to make ancillary arrangements with PMs, outside the four corners of the MSA, as long as such arrangements do not adversely affect other parties to the MSA. As demonstrated immediately above, the General, Farmers and Premier Agreements *do* adversely affect Bekenton. That harm can be alleviated without injury to other parties, however, by providing Bekenton with a financial accommodation comparable to those contained in the General Agreement. This is fully consistent with NAAG's over-all approach. Responding to complaints from SPMs at a semi-annual tobacco conference in Fort Lauderdale in December 2004, NAAG's Chief Tobacco Counsel said that "anyone can have the General deal."

FOR SETTLEMENT PURPOSES ONLY

We believe that Bekenton is entitled to an arrangement equivalent to the one contained in the General Agreement:

* Adjusting Bekenton's MSA payments for five years, 2004-2008, to the same rate ($0.96 per carton) as that paid by General into escrow as an NPM for a similar period.

* Deferring the balance of Bekenton's MSA obligations that accrue during those five years until a subsequent period – 12 years, as in the General Agreement – over which Bekenton will pay such obligations on the same terms as those contained in the General Agreement.

Should an amicable resolution of the matters discussed here not be achieved, Bekenton reserves its rights to claim and prove that the MSA, as applied to it, violates the law on a number of grounds.