## UNITED STATES DISTRICT COURT
### DISTRICT OF PUERTO RICO

PEDRO ROSSELLO, et al.,

    Plaintiffs,

  v.

BROWN &  WILLIAMSON, et al.,

    Defendants

**CIVIL CASE NO.  97-1910 (JAF)**

## MEMORANDUM OF THE ORIGINAL PARTICIPATING MANUFACTURERS IN SUPPORT OF MOTION TO ENFORCE THE ARBITRATION PROVISIONS OF THE MASTER SETTLEMENT AGREEMENT

The Original Participating Manufacturers ("OPMs")[1] file this memorandum in support of their motion to enforce the arbitration provisions of the Tobacco Master Settlement Agreement ("MSA") and to compel Puerto Rico to arbitrate a dispute concerning the OPMs' April 17, 2006 annual payment under the MSA. The "Independent Auditor" that calculates the OPMs' payment obligations under the MSA refused to apply a Non-Participating Manufacturer ("NPM") Adjustment to the OPMs' April 17, 2006, annual payment. The OPMs dispute that determination; Puerto Rico defends it. This dispute plainly "aris[es] out of or relat[es] to calculations performed by, or any determinations made by, the Independent Auditor" and, as twenty-two MSA courts across the country already have found,[2] therefore is arbitrable under the MSA's Arbitration Clause. (MSA § XI(c) (Ex. A).)

---

[1] The OPMs are Defendants Philip Morris USA Inc. ("PM USA"), R.J. Reynolds Tobacco Company ("RJR"), and Lorillard Tobacco Company ("Lorillard"). In 2004, Brown & Williamson Tobacco Corporation, which was the fourth OPM, combined with R.J. Reynolds Tobacco Company. Moreover, Philip Morris Incorporated, an OPM, is now known as PM USA.

[2] *See In re Tobacco Cases*, No. JCCP 4041 (Cal. Super. Ct. Aug. 23, 2006) (Ex. B); *Colorado v. R.J. Reynolds Tobacco Co.*, No. 97CV3432 (Denver Dist. Ct. July 19, 2006) (Ex. C); *Connecticut v. Philip Morris, Inc.*, No. X02CV960148414S, 2005 WL 2081763, at *35 (Conn. Super. Ct. Aug. 3, 2005) (Ex. D), *reaffirmed*, 905 A.2d 42 (Conn. 2006) (Ex. E) (hereinafter "*Connecticut II*"); *Hawaii v. Philip Morris USA*, No. 06-1-0695 (Haw. Cir. Ct. Aug. 3, 2006) (Ex. F); *District of Columbia v. Philip Morris*

*First,* the MSA's mandatory arbitration clause, Section XI(c), requires that "*any* matter arising out of, or relating to, the subject matter of the Independent Auditor's calculations and determinations" must be arbitrated. *New York*, 813 N.Y.S.2d at 75 (emphasis in original). Here, the OPMs dispute the Independent Auditor's determination — made at the Settling States' urging — not to apply an NPM Adjustment to the OPMs' Annual Payments because the Auditor presumed each Settling State qualified for a "diligent enforcement" exemption from that Adjustment. This dispute is a direct challenge to the Independent Auditor's determinations. Even if it were not, the dispute still would be subject to mandatory arbitration because the MSA provides that all disputes "arising out of or relating to" such calculations and determinations must be arbitrated.

*Second,* the MSA provides specific examples of disputes subject to arbitration, "including, without limitation, any dispute concerning the operation or application of any of the adjustments . . . described in subsection IX(j). . . ."  Subsection IX(j) specifically includes the NPM Adjustment and the "diligent enforcement" exemption to that Adjustment invoked by the

---

*USA Inc.*, No. 2006 CA 003176B (D.C. Super. Ct. Sept. 26, 2006) (Ex. G); *Idaho v. Philip Morris, Inc.*, No. CV OC 97 03239D, at 5 (Idaho Dist. Ct. June 30, 2006) (Ex. H), *reconsideration denied* (Idaho Dist. Ct. July 28, 2006), *permission to appeal denied*, No. 99567, slip op. (Oct. 12, 2006) (hereinafter "*Idaho II*")(Ex. I); *Illinois v. Philip Morris Inc.,* No. 96 L 13146 (Cook County Cir. Ct. Aug. 8, 2006) (Ex. J); *Iowa v. Philip Morris USA Inc.,* No. CL 71048 (Iowa Dist. Ct. Aug. 16, 2006) (Ex. K); *Kentucky v. Brown & Williamson Tobacco Corp.*, 98-CI-01579, at 2 (Ky. Cir. Ct. June 13, 2006) (Ex. L); *Maine v. Philip Morris Inc.*, No. CV-97-134 (Maine Sup. Ct. Oct. 3, 2006) (Ex. M); *Massachusetts v. Philip Morris Inc.*, No. 95-7378-J, at 6 (Mass. Super. Ct. June 20, 2006) (Ex. N); *Michigan v. Philip Morris USA,* No. 06-539-CZ (Mi. Cir. Ct. Sept. 28, 2006) (Ex. O); *Nebraska v. R.J. Reynolds Tobacco Co.*, No. CI 06-1656 (Neb. Dist. Ct. Aug. 28, 2006) (Ex. P); *Nevada v. Philip Morris USA.*, No. CV06-00929 (Nev. Dist. Ct. Aug. 4, 2006) (Ex. Q); *New Hampshire v. Philip Morris USA*, No. 06-E-132, at 5 (N.H. Super. Ct. June 5, 2006) (Ex. R), *reconsideration denied* (N.H. Super. Ct. July 17, 2006) (Ex. S) (hereinafter "*New Hampshire II*"); *New York v. Philip Morris Inc.*, 813 N.Y.S.2d 71, 76 (N.Y. App. Div. 2006) (Ex. T); *Ohio v. R.J. Reynolds Tobacco Co.*, No. 97CVH05-5114 (Ohio Ct. Common Pl. Sept. 25, 2006) (Ex. U); *Oregon v. Philip Morris USA Inc.*, No. 0604-04252 (Or. Cir. Ct. Sept. 5, 2006) (Ex. V); *South Dakota v. R.J. Reynolds*, No. 06-161 (S.D. Cir. Ct. Oct. 2, 2006) (Ex. W); *Vermont v. Philip Morris USA Inc.*, No. S 0463-06-CnC (Vt. Super. Ct. July 14, 2006) (Ex. X); *Virginia v. Brown & Williamson Tobacco Corp.*, No. HJ-2241 (Richmond Cir. Ct. Aug. 9, 2006) (Ex. Y); *Washington v. Philip Morris USA, Inc.*, No. 06-2-13262-9SEA (Wash. Super. Ct. Sept. 28, 2006) (Ex. Z).  The only decision to the contrary, *North Dakota v. Philip Morris, Inc.*, No. 09-98-C-03778 (N.D. Dist. Ct. July 18, 2006) (Ex. AA), *notice of appeal* filed July 25, 2006, simply refused to give effect to the relevant language of the Arbitration Clause. *See* Section I.C, note 6, *below*.

Auditor. "Therefore, as the arbitration clause specifically covers determinations and calculations relative to those items in Subsection IX(j) . . . and the NPM Adjustment is specifically mentioned in IX(j), a dispute over the application of the NPM Adjustment" must be arbitrated. *New Hampshire,* at 5.

**Third,** the structure of the MSA's payment provisions compels arbitration. The MSA imposes a single, unitary payment obligation on each Participating Manufacturer[3] based on its nationwide sales. "The avoidance of fifty or more separate actions, and fifty or more varying outcomes, was a key rationale for the parties entering into the MSA." *Colorado*, at 7. The Independent Auditor must make its determinations subject to a single set of rules applicable to all Settling States. This is precisely why the MSA expressly carves out an exception to the jurisdiction of this Court (and the other MSA courts) for the NPM Adjustment and other payment-related disputes (MSA § XI(c)) and expressly constrains the province of any particular state court to "disputes . . . ***within*** such Settling State." (MSA § VII(c)(1) (emphasis added).)

These concerns are particularly acute with respect to a claim, like Puerto Rico's, that it is exempt from the NPM Adjustment because it diligently enforced its Qualifying Statute. Each Settling State has a vital—and conflicting—interest in whether other Settling States are subject to the NPM Adjustment or are exempt from it because they diligently enforced their Qualifying Statutes: "[U]nder § IX(d)(2)(C), if the NPM Adjustment is determined not to apply to a given state because it diligently enforced its Qualifying Statute, the amount by which its allocated share would have been reduced is reallocated *pro rata* to other Settling States to which the NPM Adjustment does apply." *Idaho*, at 11 (quoting *New Hampshire*, at 7). Accordingly, the determination regarding diligent enforcement with respect to one Settling State can affect the payments of all other Settling States.

**Finally,** were there any doubt regarding the arbitrability of the present dispute (which there is not), it would be resolved by the well-settled presumption in favor of arbitration. Both

---

[3] The term "Participating Manufacturer" refers collectively to the OPMs and the Subsequent Participating Manufacturers, or "SPMs", other tobacco manufacturers who also joined the MSA.

the Federal Arbitration Act, which the parties expressly agreed would govern, and Puerto Rico law require that any doubts be resolved in favor of arbitration. Application of that presumption is particularly warranted here to avoid the risk of conflicting judgments from litigation in 52 different jurisdictions regarding the OPMs' unitary, national payment obligations.

## I.     FACTUAL BACKGROUND

### A.     The Master Settlement Agreement

The MSA released past and future claims by 46 states, the District of Columbia, Puerto Rico, and four U.S. territories (collectively, the "Settling States") against the OPMs for the recovery of health care costs that the Settling States attributed to smoking-related illnesses. (*See* MSA § II(nn).) In exchange for these releases, Participating Manufacturers agreed to a variety of marketing restrictions and other obligations. (*See* MSA §§ III, IV, V, VI.) In addition, Participating Manufacturers agreed to make substantial annual payments. (*See* MSA § IX.) The MSA imposes a single, unitary payment obligation on each Participating Manufacturer. That single payment is then allocated among the Settling States. The Participating Manufacturers' payment obligation is calculated and determined annually on a nationwide basis by an "Independent Auditor" (currently PricewaterhouseCoopers).  (MSA §§ IX(c)(2), IX(i)(2).)

### 1.     The MSA's Payment Provisions

The starting point for determining the Participating Manufacturers' annual payment obligations is the aggregate payment obligation for all OPMs set forth in the Agreement (*e.g.*, $8.0 billion for 2005). (MSA § IX(c)(1).) This aggregate amount is subject to various adjustments, including the NPM Adjustment at issue here.  (*See* MSA § IX(j).) The Participating Manufacturers' payment obligations are calculated on a nationwide basis based on their nationwide sales of cigarettes.  (MSA §§ II(m), IX(c)(1), (d)(1).)

Once the Auditor determines the payment obligations of all Participating Manufacturers, it then allocates these Annual Payments among the Settling States according to "Allocable Shares" previously agreed to by the States.  (*See* MSA § II(f).) Participating Manufacturers do not make payments to individual Settling States nor do they owe any individual State any

specific amount. Rather, each Participating Manufacturer makes a single, unitary payment, which is calculated and determined on a uniform, nationwide basis by the Independent Auditor. (MSA §§ IX(a), (c).)

### a.     The NPM Adjustment

The drafters of the MSA recognized that the MSA's payment obligations and marketing restrictions might put Participating Manufacturers at a competitive disadvantage—and cause them to lose market share—to manufacturers who did not join the MSA and were not subject to its costs and restrictions. To account for this possibility, the drafters included a "Non-Participating Manufacturer Adjustment" to reduce the annual payment obligations of Participating Manufacturers if, collectively, they lost market share to manufacturers that had not joined the MSA ("Non-Participating Manufacturers" or "NPMs"). (*See* MSA § IX(d).) Section IX(d) of the MSA thus provides for an NPM Adjustment in a particular year if: (a) Participating Manufacturers' aggregate nationwide market share decreased by more than two percentage points as compared to 1997 levels; and (b) an independent firm of economic consultants finds that the MSA was a "significant factor" contributing to that market share loss. (*See* MSA § IX(d)(1).) The MSA provides that where these requirements are satisfied, the NPM Adjustment "shall apply." *Id.*

The MSA also contains provisions governing how the Independent Auditor will allocate any payment reduction resulting from an NPM Adjustment among the Settling States. (*See* MSA § IX(d)(2).) The drafters of the MSA anticipated that, unless Settling States enacted and diligently enforced legislation imposing similar payment obligations on NPMs, the MSA would place Participating Manufacturers at a significant cost disadvantage vis-à-vis NPMs and cause Participating Manufacturers to lose market share, with the result that their payment obligations— and the Settling States' payments—would be reduced.  (*See, e.g.,* MSA Exhibit T at T-1.)

To create an incentive for individual States to enact and enforce such "Qualifying Statutes," the MSA provides that a Settling State's "Allocated Payment" shall not be subject to an NPM Adjustment if "such Settling State continuously had a Qualifying Statute . . . in full

force and effect . . . and diligently enforced the provisions of such statute . . . ." (MSA § IX(d)(2)(B).) If a Settling State had a Qualifying Statute in effect and diligently enforced it, the Independent Auditor is to reallocate that State's share of the NPM Adjustment among other Settling States that either did not have Qualifying Statutes or did not enforce such statutes diligently "pro rata in proportion to their respective Allocable Shares." (MSA § IX(d)(2)(C).) Consequently, the diligent enforcement determination in any one Settling State will impact the Annual Payments received by every other Settling State. Moreover, the issue of diligent enforcement can determine whether and to what extent there will be an NPM Adjustment. Under MSA Section IX(d)(2)(C), for example, if *every* Settling State demonstrated diligent enforcement, there would be no NPM Adjustment for the year in question.[4]

Under Section IX(d)(2)(A), the Settling States bear the burden of demonstrating that they are diligently enforcing their respective Qualifying Statutes. That provision states that "[t]he NPM Adjustment set forth in subsection (d)(1) *shall apply* to the Allocated Payments of all Settling States, except as set forth below." (MSA § IX(d)(2)(A) (emphasis added).) Section IX(d)(2)(B) provides that, to avoid an adjustment, a Settling State must establish that it "continuously had a Qualifying Statute . . . in full force and effect . . . , and diligently enforced the provisions of such statute . . . ." (MSA § IX(d)(2)(B).) Thus, the presumption under Section IX(d)(2) is that the NPM Adjustment will be allocated to each State; the burden is on the *States* to rebut this presumption by demonstrating that they are diligently enforcing their respective Qualifying Statutes.

### b.    The Role Of The Independent Auditor

Section XI(a)(1) of the MSA provides that the Independent Auditor shall make all calculations and determinations that are required to determine the amount of payments due under the MSA, including the amount and allocation of any adjustments. (MSA § XI(a)(1).) Section IX(j) specifies the manner in which payments "shall be calculated" and the thirteen specific steps

---

[4] If only a few Settling States are unable to prove diligent enforcement, then the NPM Adjustment would be limited to those Settling States' share of the given year's annual payment.

that the Auditor must follow in applying various offsets, reductions and adjustments to the base payment. (MSA § IX(j).) The sixth step in this payment calculation specifies that the "NPM Adjustment ***shall*** be applied . . . pursuant to subsections IX(d)(1) and (d)(2) . . . ." *Id.* (emphasis added). The Independent Auditor therefore not only has the authority, but is required, to determine whether to apply an NPM Adjustment and how that Adjustment should be allocated among the Settling States based on the diligent enforcement exemption set forth in Section IX(d)(2). (*See* MSA §§ IX(d)(1), XI(d)(2), XI(d)(5).)

> 2.     **The MSA's Arbitration Provision**

Consistent with the MSA's establishment of a single, nationwide payment obligation for each Participating Manufacturer, Section XI(c) of the MSA, entitled "Resolution of Disputes," requires that "any controversy or claim arising out of or relating to" the Independent Auditor's calculations and determinations "shall be submitted to binding arbitration" before a nationwide panel of three former federal judges:

> (c)  <u>Resolution of Disputes</u>.  Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

(MSA § XI(c).)

Significantly, this clause is not limited to "appeals" from calculations and determinations made by the Independent Auditor. Rather, it includes "any dispute . . . ***arising out of or relating to***" such calculations and determinations. *Id*. (emphasis added). Moreover, the Arbitration Clause encompasses "any dispute ***concerning*** the operation or application of any of the adjustments" set forth in Section IX(j) of the MSA, which specifically includes Section IX(d)(1)'s NPM Adjustment and Section IX(d)(2)'s "diligent enforcement" exemption to the NPM Adjustment. *Id.* (emphasis added).

In sum, the MSA's unitary, nationwide payment system necessitated a unitary, nationwide dispute resolution mechanism to ensure that issues relating to payments would be decided in a uniform fashion. This mechanism is found in the MSA's dispute resolution provisions, which broadly require arbitration of any dispute that relates to or arises out of the Independent Auditor's payment-related calculations and determinations.

### B.    The Present Dispute Over The Participating Manufacturers' April 17, 2006 Payment Obligations

The present dispute concerns the Independent Auditor's refusal to apply an NPM Adjustment to the Participating Manufacturers' April 17, 2006 annual payments — a determination that the Participating Manufacturers dispute and the Settling States defend.

Pursuant to the MSA's NPM Adjustment provision, Section IX(d)(2), the economic consulting firm (the "Firm") found in March 2006 that the MSA was a "significant factor" contributing to the Participating Manufacturers' 2003 qualifying Market Share Loss. Because the MSA provides that "[i]f the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment described in subsection IX(d)(1) *shall apply,*" the OPMs requested that the Independent Auditor offset the amount of the 2003 NPM Adjustment against their April 17, 2006 payments.  (MSA § IX(d)(1)(C) (emphasis added).)

In response, the Settling States urged the Independent Auditor to reject the OPMs' request on the same grounds on which it had determined not to apply the NPM Adjustment in prior years, namely, that the Settling States' diligent enforcement of their Qualifying Statutes should be "presumed." March 6, 2006 Settling Letter ("[N]othing the Firm has done or may do requires or authorizes the Independent Auditor to alter its established and entirely correct treatment of any potential 2003 NPM Adjustment.") (Ex. BB).

On March 7, 2006, the Independent Auditor issued its preliminary calculation of the payments due April 17, 2006, in which it refused to apply the NPM Adjustment.  March 7, 2006 Notice of Preliminary Calculation at 5 (Ex. CC).  The Independent Auditor subsequently

reaffirmed this preliminary determination in its March 29, 2006 final calculation. *See* March 29, 2006 Notice of Final Calculation (Ex. DD).

In response to the OPMs' request that it clarify certain language in its Notice of Preliminary Calculation, March 16, 2006 RJR Letter (Ex. EE), the Independent Auditor confirmed that it would not change its "current approach to application of the NPM Settlement Adjustment," March 29, 2006 Notice of Final Calculation at 5 (Ex. DD), which has been to "presume" diligent enforcement and to direct the parties "that the dispute is to be submitted to binding arbitration in accordance with subsection XI(c) of the MSA." *New York*, 813 N.Y.S.2d at 74 (quotation marks omitted). *See also* March 5, 2004 Notice of Preliminary Calculation (Notice ID: 0130) at 2 n.1 (Ex. FF) (adopting States' request for a presumption of diligent enforcement); February 27, 2004 Settling States letter to Independent Auditor at 3 (Ex. GG) (requesting a "presumption of enforcement" resulting in Auditor "not recognizing an NPM Adjustment"); April 13, 2004 Notice Regarding Disputes of Final Calculation at 2 (Ex. HH) (recognizing the dispute over the Auditor's decision to adopt a presumption of diligent enforcement and observing that "if any party disagrees with the dispute resolution process as determined by the Independent Auditor," then the "dispute [over the issue] is to be submitted to binding arbitration in accordance with subsection XI(c) of the MSA"); March 6, 2002 Notice of Preliminary Calculation (Ex. II); June 10, 2002 NAAG Letter at 2-3 (Ex. JJ) (arguing that "a legal presumption" of enforcement arises when a statute is "in full force and effect").

On April 10, 2006, the OPMs timely served notice that they disputed the Independent Auditor's final calculation. On April 17, 2006, the MSA payment date, the OPMs paid the full amounts calculated by the Independent Auditor. Because the parties disputed the applicability of the 2003 NPM Adjustment, however, RJR and Lorillard paid the sums attributable to that disputed amount into the "Disputed Payments Account" as provided in MSA Sections XI(d)(7)-(8). Pursuant to the MSA Escrow Agreement, this account is maintained in escrow by a national Escrow Agent in New York agreed to by the parties (Citibank). (MSA Exhibit B, at B-1 to B-2.)

On September 13, 2006, the OPMs requested that Puerto Rico arbitrate the parties' dispute, as provided by Section XI(c) of the MSA. Ex. KK. On September 29, 2006, Puerto Rico refused the OPMs' demand for arbitration, claiming that it had diligently enforced its Qualifying Statute and, therefore, was exempt from any NPM Adjustment. Ex. LL.

**C.    Recent MSA Court Rulings Regarding The Arbitrability Of This Dispute**

Twenty-two MSA courts have found that this dispute "clearly falls within the scope of the MSA's arbitration clause." *Hawaii*, at 6; *see also Colorado*, at 6 ("plain and unambiguous language of the MSA" requires arbitration); *Connecticut*, 2005 WL 2081763, at *34 (arbitrability "not a close case")[5]; *Idaho*, at 12 (arbitration required not only by "plain language" but also the "structure, logistics and intent of the MSA"); *Illinois*, at 4 ("the language of section XI(c) is clear, and this dispute must be compelled to arbitration"); *Kentucky*, at 2 (denial of arbitration "would promote chaos"); *Massachusetts*, at 7 ("compelling logic" in requiring arbitration); *Michigan*, at 2 ("clear and unambiguous" language of MSA compels arbitration); *New Hampshire*, at 6 (need for arbitration "abundantly clear"); *New York*, 813 N.Y.S.2d at 76 ("plain language" of MSA "clearly" requires arbitration); *Vermont*, at 5 (parties' agreement to arbitrate "very clear"); *Washington*, at 2 (MSA "clearly and without ambiguity" compels arbitration).

1.    ***Section XI(c)'s "Arising Out Of or Relating To" Standard.***

These courts found this dispute arbitrable because it "arises out of or relates to" calculations and determinations made by the Independent Auditor. *Colorado*, at 5-6. "The plain and ordinary meaning of the term 'relating to' suggests that the parties intended to subject to arbitration a broad field of issues having connection with or referring to the Independent Auditor's determinations." *Hawaii*, at 6; *see also Connecticut*, 2005 WL 2081763, at *35;

---

[5] The Connecticut and New York decisions arose out of an earlier challenge by certain "Subsequent Participating Manufacturers" ("SPMs"), which sought an immediate adjustment to their payments in 2004. As they have here, "[t]he states . . . opposed such an adjustment, arguing that each state enacted a 'Model Statute' within the meaning of § IX(d)(2), and that there is a presumption that the statutes are being diligently enforced." *New York*, 813 N.Y.S.2d at 74. Moreover, as here, the Independent Auditor adopted the Settling States' "presumption" of diligent enforcement and refused to apply the NPM Adjustment. Both the New York and Connecticut courts thereafter held this dispute arbitrable.

*District of Columbia*, at 2; *Kentucky*, at 2; *Massachusetts,* at 6; *Michigan*, at 2-3; *New Hampshire,* at 5-8; *New York*, 813 N.Y.S.2d at 76; *Ohio*, at 10; *Vermont*, at 5-6; *Washington*, at 2.

### 2.    *The "Including Without Limitation" Clause.*

These MSA courts further recognized that this dispute falls within a specific category of disputes expressly recognized in the Arbitration Clause's "including without limitation" provision.  Because that clause "specifically covers determinations and calculations relative to those items in Subsection IX(j), and the claims and controversies relating to or arising out of them, and the NPM Adjustment is specifically mentioned in Subsection IX(j)," it follows that disputes over the NPM Adjustment must "be submitted to arbitration in accordance with the MSA."  *New Hampshire*, at 5; *see also Colorado,* at 5-6; *Connecticut,* 2005 WL 2081763, at *34, *40; *District of Columbia*, at 2; *Hawaii*, at 5-6; *Massachusetts,* at 6-7; *Nebraska*, at 9-10; *New Hampshire,* at 5-6; *New York*, 813 N.Y.S.2d at 76; *Ohio*, at 11-12; *Vermont,* at 6.

### 3.    *Diligent Enforcement.*

These MSA courts expressly rejected the States' effort to evade arbitration by claiming the parties' dispute is limited to diligent enforcement and does not involve the NPM Adjustment. To the contrary, "[t]he diligent enforcement determination is mentioned in the MSA only as a part of the NPM Adjustment mechanism—it serves no other role. Indeed, it is inextricably linked with the NPM Adjustment because the diligent enforcement determination necessarily controls the outcome of any NPM Adjustment." *Idaho*, at 8; *see also Colorado*, at 6; *Massachusetts*, at 6-7; *New Hampshire*, at 6-7; *Oregon*, at 6; *Vermont*, at 4-5.

### 4.    *The Structure of the MSA.*

These decisions also found that the structure of the MSA compels arbitration because, under the MSA's reallocation provision (Section IX(d)(2)(C)), the diligent enforcement determination as to any one State will impact the payments of all the other States. *California,* at 3; *Colorado,* at 7; *Connecticut,* 2005 WL 2081763, at *38, *39; *District of Columbia*, at 3; *Illinois*, at 6; *Massachusetts,* at 7, 9; *New Hampshire,* at 7; *New York*, 813 N.Y.S.2d at 73;

*Vermont,* at 3. Finally, these decisions held that the drafters of the MSA wisely committed such payment-related disputes to arbitration before a single, nationwide panel in order to promote uniformity, equity, and efficiency. *Colorado,* at 7; *Connecticut,* 2005 WL 2081763, at *38, *39; *Hawaii,* at 7; *Massachusetts,* at 7; *New Hampshire,* at 7; *New York*, 813 N.Y.S.2d at 73; *Vermont,* at 3; *Virginia*, at 6-7.

5.    ***The Presumption of Arbitrability.***

Finally, while the MSA courts found the MSA clear and unambiguous in requiring arbitration of this dispute, they also noted that any doubts must be resolved in favor of arbitration under the well-established "public policy favoring arbitration." *Colorado*, at 7; *see also Connecticut*, 2005 WL 2081763, at *32; *District of Columbia*, at 3; *Hawaii*, at 4; *Massachusetts*, at 5; *New Hampshire*, at 5; *New York*, 813 N.Y.S.2d at 74; *Ohio*, at 16-19; *Oregon*, at 6.[6]

---

[6] The sole decision denying arbitration—North Dakota—simply ignored the controlling language of MSA Section XI(c). In particular, the North Dakota court did not even address the critical "arising out of or relating to" language. Similarly, the North Dakota court did not attempt to reconcile its interpretation with the plain language of Section XI(c)'s "including without limitation" clause, which cites as specific examples of arbitrable issues "any dispute concerning the operation or application of any of the adjustments . . . and allocations in subsection IX(j) . . ." Since Section IX(j) indisputably includes the NPM Adjustment and the diligent enforcement exemption, the North Dakota court's failure to address this language was crucial. In fact, the court sought to justify *not* giving the "including without limitation" clause its "natural and ordinary" meaning—instead finding arbitrable only certain of the examples that clause provides—by citing a contract interpretation principle (*ejusdem generis*) that says nothing of the sort and does not even apply here. *North Dakota*, at 7. The doctrine of *ejusdem generis* applies to "general words" that follow specific examples, not specific examples that follow general words (as found in the Arbitration Clause at issue here). *See Kmart Corp. v. TJAC (Vega Baja), S.E.*, 2001 WL 34394665, *4 (D.P.R. Oct. 12, 2001); *United States v. McElvey*, 203 F.3d 66, 71 (1st Cir. 2000). Moreover, *ejusdem generis* "is only applicable in construction of words where there is some uncertainty as to their proper meaning, . . . and never where the context of the words manifests a contrary intent." *Vazquez v. Eastern Air Lines, Inc.* 1977 WL 58, *3 (D.P.R. 1977), *rev'd on other grounds*, 579 F.2d 107 (1st Cir. 1978). This is particularly true where, as here, the specific examples are preceded by the phrase "including without limitation," because such language makes clear the parties did not intend for the specified examples to be limiting or exclusive. *See Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 280 (3d Cir. 1995); *Cintech Indus. Coatings, Inc. v. Bennett Indus.*, 85 F.3d 1198, 1202 (6th Cir. 1996). Here, the MSA drafters plainly intended to require arbitration of the specific examples identified in Section IX(j), including the NPM Adjustment and diligent enforcement exemption to that adjustment. Where *ejusdem generis* does apply (and it does not here), its purpose is to stress the

## II.    ARGUMENT

### A.    The Plain Language Of The MSA Requires Arbitration Of This Dispute

This dispute should be arbitrated because it involves a direct challenge to the Independent Auditor's calculations and determinations. Indeed, the MSA's Arbitration Clause sweeps far beyond the present dispute. It requires not only that disputes like this one directly challenging the Independent Auditor's determinations be subject to arbitration, but also all disputes "arising out of or relating to" the Auditor's determinations and calculations. (MSA § XI(c).) Puerto Rico's refusal to arbitrate this dispute is flatly inconsistent with the MSA's plain language.

### 1.    The Present Dispute Should Be Arbitrated Because It Concerns A Direct Challenge To The Independent Auditor's Calculations And Determinations

The Independent Auditor determined that it would not apply an NPM Adjustment because of a determination, sought by the Settling States, that it should presume diligent enforcement. The OPMs dispute this determination; Puerto Rico defends it. The present dispute therefore falls squarely within the MSA's Arbitration Clause, which provides that "[a]ny dispute, controversy or claim" arising out of or relating to "calculations performed by, or any determinations made by" the Independent Auditor "shall be submitted to binding arbitration." (MSA § XI(c).)

As twenty-two MSA courts have held, this dispute "involves a direct challenge to the Independent Auditor's determination not to apply the Adjustment to payments owed by the Petitioners and other Participating Manufacturers" and therefore "clearly" falls within the scope of the Arbitration Clause. *Connecticut*, 2005 WL 2081763, at *35; *New York*, 813 N.Y.S.2d at 76; *Colorado*, at 6 ("the plain and unambiguous language of the MSA provides that disputes related to determinations by the Independent Auditor are subject to arbitration if the dispute relates to an NPM adjustment."); *District of Columbia*, at 2 (the "instant dispute involves a direct

---

importance of the parties' most specific language, making it especially ironic that the North Dakota court improperly invoked this doctrine as an excuse for ignoring Section IX(c)'s explicit identification of the NPM Adjustment and diligent enforcement as specific examples of disputes as to which the MSA requires arbitration.

challenge to calculations and determinations of the Independent Auditor" and thus "must be arbitrated" under the "plain language of the MSA"); *Iowa*, at 5 ("[t]he MSA expressly provides for arbitration of the current controversy.  Plain and Simple."); *New Hampshire*, at 5-8 (finding it "abundantly clear" that this dispute must be arbitrated); *Vermont*, at 5 (finding the language of the MSA "very clear" and ordering arbitration); *Idaho*, at 7-8; *Kentucky*, at 2; *Massachusetts*, at 6.

Section XI(c) also provides that the arbitration agreement specifically covers "any dispute concerning the operation or application of any of the adjustments . . . described in subsection IX(j) . . . ."  (MSA § XI(c).)  MSA Section IX(j) expressly includes application of the NPM Adjustment and the "diligent enforcement" exemption to that Adjustment.  (MSA § IX(j).)  As other MSA courts have held, the Arbitration Clause's "including without any limitation" provision expressly encompasses disputes, like this one, relating to the "operation or application of such adjustments":

> Focusing on the language of the narrower, parenthetical phrase, one notes at the outset that such language includes, and thus makes arbitrable, "any dispute concerning the operation or application of any of the adjustments . . . described in subsection IX(j)[.]" One such adjustment, which is listed and described in 'clause Sixth' of subsection IX(j), is the NPM Adjustment. It therefore follows that "any dispute concerning the operation or application" of the NPM Adjustment is arbitrable under MSA § XI(c).

*Connecticut*, 2005 WL 2081763, at *35; *see also District of Columbia*, at 2 ("Since subsection IX(j) specifically includes the NPM Adjustment and the 'diligent enforcement' exemption to that adjustment that the District invokes here, the MSA clearly mandates that the present dispute over the 'application' of the NPM Adjustment must be arbitrated."); *Idaho*, at 7 (dispute is arbitrable because "the MSA Arbitration clause, which is carved out from the general jurisdiction of state courts[,] references Section IX(j), which in turn refers to the NPM Adjustment and determinations under Sections IX(d)(1) and (d)(2)"); *Ohio*, at 12 (same); *Massachusetts*, at 6 (because "[s]ubsection IX(j) includes the NPM Adjustment . . . , a dispute as to the Independent Auditor's calculation and determination of the NPM Adjustment must be submitted to

arbitration"); *Oregon*, at 15 ("[t]he dispute described in the complaint has directly to do with 'calculations performed by, or any determinations made by, the Independent Auditor.' It is a 'dispute concerning the operation or application of [an] …adjustment[]…described in subsection IX(j)."); *New Hampshire*, at 5 (same); *Vermont*, at 6 (same).

In short, this is exactly the sort of dispute over the Participating Manufacturers' payment obligations that the MSA expressly mandates is subject to arbitration.

> **2.      The Present Dispute Should Be Arbitrated Because It "Aris[es] Out Of Or Relat[es] To" Determinations And Calculations Made By The Independent Auditor**

Even if this dispute did not involve a direct challenge to a determination by the Independent Auditor, it still would fall within the broad scope of the MSA's Arbitration Clause, which requires that all disputes "arising out of or relating to" determinations made by the Auditor shall be submitted to arbitration. Courts consistently have held that provisions like Section XI(c), which provide for arbitration of any dispute "arising out of or relating to" a particular subject matter, are the "paradigm of a broad [arbitration] clause," *Ohio*, at 22; *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995), and "constitute[] the broadest language the parties could reasonably use," *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997). *See also Cellu-Beep, Inc. v. Telecorp, Inc.*, 322 F.Supp.2d 122, 125 (D.P.R. 2004) (recognizing breadth of arbitration clause using "arising out of or relating to"); *Ross Bros. Constr. Co., Inc. v. Int'l Steel Servs., Inc.*, 283 F.3d 867, 876 (7th Cir. 2002) (arbitration clause that contained the phrase "arising out of or relating to" used "the broadest conceivable language").[7]

---

[7] This includes clauses that are limited to a particular subject matter. *See, e.g., CD Partners, LLC v. Grizzle*, 424 F.3d 795, 800 (8th Cir. 2005) (clause making arbitrable disputes "arising out of or relating to" operation of business was "broadly worded"); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 396 (6th Cir. 2003) (clause requiring arbitration of disputes "arising

The parties to the MSA incorporated this broad language to ensure that disputes relating to "any aspect" of the Independent Auditor's calculations or determinations would be resolved through arbitration in a single, nationwide forum. (*See* MSA § XI(d)(3).) As the New York appellate court observed, "[t]he terms 'arising out of,' and most particularly 'relating to,' certainly evince a broad arbitration clause." *New York*, 813 N.Y.S.2d at 75. While the clause "does not encompass the entire MSA," it does manifest the "clear intent of the parties" that "*any* matter arising out of, or relating to, the subject matter of the Independent Auditor's calculations and determinations is a proper subject of arbitration." *Id.* (emphasis in original). *See Idaho*, at 6-7 ("the MSA arbitration clause, while not so broad as to encompass the entire agreement, is quite broad within its determined confines.").

Accordingly, "[b]y the plain language of the broad arbitration agreement, the issue of whether to apply the NPM adjustment is clearly related to the Independent Auditor's determinations," and thus subject to arbitration. *New York*, 813 N.Y.S.2d at 75; *see also District of Columbia*, at 2 (same); *Massachusetts*, at 6 (same); *New Hampshire*, at 6-7 (same); *Virginia*, at 4. As twenty-two courts to have addressed this issue have held, this specifically includes the "diligent enforcement" exemption to the NPM Adjustment that Puerto Rico invokes here. *See, e.g., New Hampshire*, at 6-7 ("[t]he application of adjustments, including the NPM Adjustment, is a matter specifically reserved to the Independent Auditor and the Independent Auditor determined that it should not apply. A challenge to that determination, and the indispensable underlying determination of whether the State diligently enforced its Qualifying Statute, belongs before the arbitration panel contemplated by the MSA."); *Kentucky*, at 2 ("Under the arbitration clause, MSA § XI(c), the determination that must be made as to the due diligence, or lack thereof, of the state in enforcing [its Qualifying Statute] must be made by the arbitration panel

out of or relating to" customer accounts was "quite broad"); *Martek Biosciences Corp. v. Zuccaro*, No. 04-3349, 2004 WL 2980741, at *1 (D. Md. Dec. 23, 2004) (arbitration clause that contained the language "any dispute, controversy or claim arising out of or relating to Section 1.5 of this Agreement" constituted a "broad arbitration clause").

. . . ."); *Colorado*, at 6 (same); *Idaho*, at 8-9 (same); *Massachusetts*, at 6 (same); *Nebraska*, at 10 (same).

### B.    The Structure Of The MSA And Its Payment Provisions Compels Arbitration

Arbitration likewise is compelled by the single, unitary payment structure of the MSA, which requires that disputes relating to the Independent Auditor's calculations and determinations be decided by "one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate." *New York*, 813 N.Y.S.2d at 76. If the rule were otherwise, the result would be "chaos" because the potentially conflicting decisions of "numerous state and territorial courts" would render the calculation of Participating Manufacturers' payment obligations impossible. *Id.*

Although state MSA courts generally have "exclusive jurisdiction for the purpose of implementing and enforcing" the MSA (MSA § VII(a)), the MSA excludes from this Court's jurisdiction disputes over the NPM Adjustment and other payment-related disputes, providing that "***except as provided in subsection[] … XI(c)*** . . . [the State Court] shall be the only court to which disputes under this Agreement . . . are presented as to such Settling State."  (MSA § VII(a) (emphasis added); MSA § VII(c).) *See also Massachusetts*, at 6 ("The NPM Adjustment is . . . clearly excluded from state court jurisdiction."); *New Hampshire*, at 6 (The exclusion for subsection XI(c) in § VII(c) makes it "abundantly clear that the Court does not have jurisdiction to hear disputes over the applicability of the NPM Adjustment"); *Virginia*, at 7 ("Subsection XI(c) is the section governing the Adjustment at issue here, and is clearly exempt from the state courts' jurisdiction."); *Iowa*, at 4.

This is further made clear by Section VII's limitation of this Court's enforcement jurisdiction to "disputes, alleged violations or alleged breaches ***within such Settling State***." (MSA § VII(c) (emphasis added).); *Idaho*, at 5-6 (same). This is not such a dispute. The NPM Adjustment is a single, nationwide adjustment to a Participating Manufacturer's single, nationwide annual payment obligation, based on changes in nationwide market share. The

Independent Auditor must apply a single uniform rule: either the Adjustment applies to a given nationwide payment or it does not.

The nationwide nature of the payment forecloses separate determinations on a state-by-state basis. Leaving such determinations to the courts of each Settling State would pose the risk of conflicting directions that would render the Independent Auditor's job impossible and the MSA's single, nationwide payment system unenforceable. *See Idaho*, at 11 ("[T]he need for uniformity is of paramount concern. . . . The risk of inconsistent judgments is simply overwhelming . . . where . . . the subject of these disputes is a contract that requires uniform application and interpretation."); *New York*, 813 N.Y.S.2d at 76 ("There is compelling logic to having these disputes handled by a single arbitration panel of three federal judges, rather than numerous state and territorial courts. . . . It saves all parties to the agreement from having to relitigate the Independent Auditor's determinations on multiple occasions, with potentially conflicting decisions by multiple tribunals.") (internal quotation marks omitted); *Virginia*, at 7 ("The Adjustment at issue is a single, nationwide adjustment applied to a Settling Tobacco Company's nationwide payment obligation. It is not a dispute involving only one individual state but rather is a dispute affecting all states. Individual determinations are not contemplated by the Agreement and are unenforceable."); *Kentucky*, at 19 (same); *Massachusetts*, at 7 (same); *Connecticut*, 2005 WL 2081763, at *39 (same).

These concerns are "even more acute" in disputes, such as this, that concern a State's "diligent enforcement" of its Qualifying Statute. *Connecticut*, 2005 WL 2081763, at *39. *See also Kentucky*, at 2; *Massachusetts*, at 7; *New Hampshire*, at 7; *New York*, 813 N.Y.S.2d at 76; *Virginia*, at 6. Under Section IX(d)(2)(c)'s reallocation provision, "if the NPM Adjustment is determined not to apply to a given state because it diligently enforced its Qualifying Statute, the amount by which its allocated share would have been reduced is reallocated *pro rata* to other Settling States to which the NPM Adjustment does apply." *New Hampshire*, at 7. Thus, where "it is claimed that an individual Settling State is exempt from the NPM Adjustment for a given year because it diligently enforced a Model Statute . . . , the decision of the tribunal deciding that

issue will not only affect the interests of the Settling State seeking to qualify for the exemption, but those of all other Settling States as well." *Connecticut*, 2005 WL 2081763, at *39. *See also Idaho*, at 11 (same); *New Hampshire*, at 7 (same).

"The mechanism for submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA." *New York*, 813 N.Y.S.2d at 76. *See also California*, at 4; *Massachusetts*, at 7. It is precisely to avoid the spectacle of the Settling States "rac[ing] to their respective courthouses for a declaration that they had diligently enforced their Qualifying Statutes so that the NPM Adjustment would not apply to them" that the parties to the MSA agreed "to have issues of nationwide concern, such as the application of nationwide adjustments and reductions, determined on a nationwide basis." *New Hampshire*, at 7. *See also Colorado*, at 7 ("The avoidance of fifty or more separate actions, and fifty or more varying outcomes, was a key rationale for the parties entering into the MSA."); *Idaho*, at 11; *Oregon*, at 6-7.

The drafters of the MSA recognized that payments must be determined in a uniform fashion by a single entity—the Independent Auditor. So, too, any disputes regarding the Independent Auditor's payment calculations and determinations must be resolved on a nationwide basis by a single entity—an arbitration panel. Puerto Rico's refusal to arbitrate threatens to throw that carefully crafted system into chaos.

**C.     Were There A Question As To Arbitrability, It Would Be Resolved By The Well-Settled Presumption In Favor Of Arbitration**

Finally, were there any question as to arbitrability of the present dispute, it would be resolved by the well-settled presumption in favor of arbitration. The FAA requires that arbitration provisions be construed "as broadly as possible," *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998), and "that questions of arbitrability must be addressed with a

healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In Puerto Rico, "any analysis of a party's challenge to the enforcement of an arbitration agreement must begin by recognizing the FAA's strong policy in favor of rigorously enforcing arbitration agreements." *Cellu-Beep*, 322 F.Supp.2d at 124. Accordingly, "any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration." *Codecom, Inc. v. Alcatel Standard, S.A.*, 103 F. Supp.2d 65, 68 (D.P.R. 2000); *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989).

A motion to compel arbitration "'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Codecom,* 103 F. Supp.2d at 68-69 (*quoting AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)); *see also Jesus-Santos v. Morgan Stanley Dean Witter, Inc.*, 2006 WL 752997, *6 (D.P.R. Mar. 22, 2006) (same).[8]  Puerto Rico cannot clear that hurdle here. As the Idaho MSA court noted: "The outcome of cited decisions in sister states preclude this Court from finding 'with positive assurance that the [MSA] arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' . . . [T]o the contrary, these decisions, while secondary authority, require recognition that the clause is susceptible of an interpretation requiring arbitration." *Idaho*, at 10 (quoting *AT&T Techs.*, 475 U.S. at 650). *See also District of Columbia*, at 3-4 (same). Because twenty-two courts have decided that the MSA arbitration

---

[8] There is likewise a strong public policy in favor of arbitration in Puerto Rico, and any doubt should be resolved in favor of arbitration.  *See McGregor Doniger v. Superior Court*, 98 D.P.R. 864, 869 (1970); *Codecom,* 103 F.Supp.2d at 68; *World Films, Inc. v. Paramount Pictures Corp*, 125 D.P.R. 352, 362 (1990); *see also Jesus-Santos v. Morgan Stanley Dean Witter, Inc.*,  2006 WL 752997, *6 (D.P.R. Mar. 22, 2006).

clause clearly applies to this dispute, the arbitration clause is, at the very least, susceptible of an interpretation that covers this dispute and thus arbitration should be ordered here.

## III.    CONCLUSION

WHEREFORE, the OPMs respectfully request that this Honorable Court enter an order enforcing the arbitration provisions of the MSA.

Respectfully submitted.

In San Juan, Puerto Rico this 27th day of October, 2006.

ss/Salvador Antonetti

Fiddler, González & Rodríguez, PSC
Salvador Antonetti-Zequeira (113910)
P.O. Box 363507
San Juan, PR 00936-3507
E-mail: santonet@fgrlaw.com
Tel: 787-759-3207 / Fax: 787-250-7545

*Attorneys for Defendants Philip Morris USA*
*Inc., R.J. Reynolds Tobacco Company and*
*Lorillard Tobacco Company*

## OF COUNSEL:

*Attorneys for RJ Reynolds Tobacco Co.*
Douglas G. Smith
Salvatore F. Bianca
Kirkland & Ellis LLP
Aon Center
200 East Randolph Drive
Chicago, IL 60601
Tel: 312-861-2000 / Fax: 312-861-2200

*Attorneys for Lorillard Tobacco Company*
Penny Reid
Idit Froim
Weil Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Tel: 212-310-8000 / Fax: 212-310-8007

*Attorneys for Philip Morris USA Inc.*
James D. Mathias
Alexander Shaknes
Brett Ingerman
DLA Piper
1251 Avenue of the Americas
New York, NY 10020-1104
Tel: 212-335-4500 / Fax: 212-335-4501

Thomas J. Frederick
Kevin J. Narko
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: 312-558-5600 / Fax: 312-558-5700

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to the following: Benjamin Acosta, Jr., Francisco A. Besosa, Edgardo Cartagena Santiago, Jose A. Fuentes Agostini, William A. Graffam, Manuel A. Guzman Rodriguez, Paul H. Hulsey, Juan A. Ramos Diaz, Hector Reichard Jr., Vicente Santori Coll, Francisco M. Troncoso, Richard Schell Asad, Eric A. Tulla. Notice will be served by regular mail to the following non registered attorneys:

Attorney General for the
Commonwealth of Puerto Rico
Department of Justice
Roberto J. Sánchez Ramos, Esq.
P.O. Box 9020192
San Juan, PR 00902
and

Scott C. Linden, Esq.
Adam E. Miller, Esq.
Michael B. Minton, Esq.
William Newbold, Esq.
Carl Rowley, Esq.
Thompson & Coburn
One Mercantile Center
St. Louis, MO 63101

Frederick C. Baker, Esq.
J. Anderson Berly, Esq.
Jerry Hudson Evans, Esq.
W. Michael Gruenloh, Esq.
Charles J. Mikhail, Esq.
Ronald L. Motley, Esq.
Ness, Motely, Loadholt, Richardson & Poole
28 Bridgeside Blvd. Suite 400
P.O. Box 1792
Mount Pleasant, SC 29465

Lee E. Young, Esq.
Charles J. Mikhail, Esq.
Ness, Motely, Loadholt,
Richardson & Poole
151 Meeting St. Suite 600
PO Box 1137
Charleston, SC 29402

Jose A. Fuentes-Agostini, Esq.
Akerman, Senterfitt & Eidson, PA - DC
801 Pennsylvania Ave. NW Suite 600
Washington, DC 20004

Juan A. Ramos-Diaz, Esq.
Ramos Diaz, Acevedo & Gonzalez CSP
359 De Diego Ave., Suite 601
San Juan, PR 00909-1740

Paul H. Hulsey
Hulsey Litigation Group, L.L.C.
Charleston Harbor
2 Wharfside 3
Charleston, SC 29401

Peter Bellacosa, Esq.
Kirkland & Ellis
153 E. 53rd Street
New York, NY 10022

Vincent Chang, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Michael S. Chernis, Esq.
Alan Kaufman, Esq.
Robert Gaffey, Esq.
Kristi L. Midboe Miller, Esq.
Jones, Day, Reavis and Pogue
599 Lexington Ave.
New York, NY 10022

Andrew T. Frankel, Esq.
David M. Moss, Esq.
Demetra Frawley, Esq.
Kathleen L. Turland, Esq.
Mark G. Cunha, Esq.
Simpson, Thacher & Bartlett
425 Lexington Ave.
New York, NY 10017-3954

Julie R. Fischer, Esq.
Aaron H. Marks, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1301 Avenue of the Americas
New York, NY 10019 6022

Douglas W. Davis, Esq.
Jack E. McClardv, Esq.
Hunton & Williams
Riverfront Plaza East Tower
951 East Byrd St.
Richmond, VA 23219 4074

Robert F. McDermott, Jr., Esq.
Jones, Day, Reavis & Pogue
Metropolitan Square
1450 G. Street, NW
Washington, DC 20005

Robert R. Merhige, Esq.
Hunton & Williams
Riverfront Plaza East Tower
951 East Byrd St.
Richmond, VA 23219 4074

Marie V. Santacroce, Esq.
Kasowitz, Benson, Torres &
Friedman,LLP
1301 Avenue of the Americas
New York, NY 10019 6022

In San Juan, Puerto Rico this 27th day of October, 2006.

ss/Salvador Antonetti
Fiddler, González & Rodríguez, PSC
Salvador Antonetti-Zequeira (113910)
P.O. Box 363507
San Juan, PR 00936-3507
E-mail: santonet@fgrlaw.com
Tel: 787-759-3207 / Fax: 787-250-7545