# EXHIBIT 1



P.O. Box 51587 Bowling Green, KY 42102  Ph. (270) 781-9100  Fax (270) 781-6728

March 16, 2006

Independent Auditor to the Master Settlement Agreement
PricewaterhouseCoopers LLP
1201 Louisiana Street, Suite 2900
Houston, Texas 77002
ATTN: Ryan Harrell
Fax number: (713) 356-6000

Re:   Notice of Dispute Regarding Independent Auditor's Notice of
      Preliminary Calculations for the Tobacco Litigation Master
      Settlement Agreement Subsection IX(c)(1) Account Payments
      Due April 15, 2006 – Notice ID: 0185

Dear Mr. Harrell:

    Commonwealth Brands, Inc. ("Commonwealth"), a Subsequent Participating Manufacturer ("SPM") under the Tobacco Litigation Master Settlement Agreement ("MSA"), submits this notice of dispute pursuant to Subsection XI(d)(3) of the MSA. Commonwealth submits this letter to preserve its rights under the MSA. Commonwealth reserves all of its rights to dispute any and all calculations and methodology used in arriving at the payment amount at any point in the payment process, and otherwise as permitted by the MSA and applicable law.

    Without limiting its rights to dispute other aspects of the Independent Auditor's calculations and methodology, Commonwealth disputes the Preliminary Calculations on the following grounds:

    1.  *Failure to Apply Appropriate NPM Adjustment for 2005 to Commonwealth's Payment.* Commonwealth disputes the Auditor's failure to apply an appropriate non-participating manufacturer adjustment (the "NPM Adjustment") to reduce Commonwealth's payment for the year 2005. The Auditor properly determined that all requirements for application of an NPM Adjustment had been met, but then improperly declined to apply that Adjustment to reduce Commonwealth's payments. Specifically:

    a.    The Independent Auditor properly recognized that a Market Share Loss to NPMs of at least 3.45472%, representing an NPM market share of approximately 5.45472%, has occurred, as required by MSA art. IX(d)(1)(B)(i)-(iii). *See* Notice ID: 0185, Attachment 4a.[1]

    b.    The Independent Auditor properly recognized that the aggregate volume of cigarettes shipped in or to the United States in 2005 by companies that became Participating Manufacturers within 14 days after the MSA execution date is smaller than the aggregate volume of cigarettes shipped in or to the United States by those companies in 1997, as required by MSA art. IX(d)(1)(D). *See* Notice ID: 0185, Attachment 4d.

    c.    The Independent Auditor properly assumed (as it has done in every other year) that the MSA is a significant factor in the Market Share Loss, in the absence of a timely determination from an economic consulting firm (the "Firm"), as required by MSA art. IX(d)(1)(C) and XI(D)(5)(A). *See* Notice ID: 0185 at 5 ("the Independent Auditor will not vary its current approach to the calculation") & Attachment 4b; Notice ID: 0139 at 4 n.1; Notice of Final Calculation, Mar. 31, 2000, at 5; PwC Presentation, Mar. 22, 2004, at 9.[2]

    d.    The MSA requires that, having so found, the Auditor must "apply" an NPM Adjustment "except" with respect to States that have had a Qualifying Statute continuously in force for the whole of the year and "diligently enforced" such statutes. MSA art. IX(d)(2)(a),(b). The Auditor improperly determined not to apply an NPM Adjustment, however. It stated that it "is not charged with the responsibility under the MSA of making a determination" with respect to diligent enforcement, and that it is "not qualified to make the legal determination as to whether any particular Settling State has 'diligently enforced' its Qualifying Statute." It

---

[1] Because so many NPM sales are illegal or go unreported, moreover, Commonwealth believes that the true NPM market share is significantly larger. Last year PwC calculated an NPM market share of 8.3%. Most of the apparent decline in NPM market share appears to be due to the States permitting certain large NPMs to join the MSA on unduly favorable and noncompliant terms rather than to a real reduction in NPM share.

[2] There are several reasons why the States may not insist on a Firm determination whether the MSA was a significant factor in the Market Share Loss for 2005 in order for the Auditor to apply an NPM Adjustment to 2006 payments. First, the States are estopped from insisting on such a Firm determination because they have entered into a side agreement that improperly modifies the MSA and purports to deprive the SPMs of their MSA right to a Firm determination by February 2 of every year following a year in a Market Share Loss occurred – i.e., by February 2, 2006. In a "Significant Factor Procedures Agreement" to which only the States and the OPMs are parties, the States have agreed that (1) the Firm will make a significant factor determination *only* if an OPM requests one and (2) even assuming an OPM requests a determination, the Firm may not even start the determination process until the year after the year in which the NPM Adjustment should be applied. The Procedures Agreement also improperly creates and imposes a number of procedural steps in the Firm's determination not required by the MSA, including for instance a procedure by which the Firm issues a preliminary determination with a period of time for comment before the final determination, providing the States with the opportunity improperly to seek judicial intervention if they disagree with the preliminary determination. The Settling States improperly have insisted that SPMs sign the Procedures Agreement as a condition to participating in the Firm's determination. Second, the Settling States also are estopped from insisting on a Firm determination because the States have violated the MSA by never taking the required steps to ensure that a significant factor determination is timely performed, and they did not take those steps this year. Finally, as the SPMs' March 31, 2004 letter to the Independent Auditor and other correspondence pointed out, and as the Settling States have repeatedly conceded, there is no legitimate dispute that the MSA *is* a significant factor in NPM growth.

concluded the Auditor "will not modify its current approach to the calculation." Notice ID: 0185 at 5.[3]

The Auditor, last year and in previous years, has concluded that because NAAG has represented that "all Settling States have enacted Model Statutes and represent [them] to have been in full force and effect continuously since the indicated effective date," "no possible NPM Adjustment is allocated to PMs." Notice ID: 0153 at 2 n.2; Notice ID: 0185 at 5; *id.* at 7; NAAG letter to Auditor, Mar. 6, 2006 (urging the Auditor to continue to apply this approach). There are a number of reasons why the Auditor's determination not to apply an NPM Adjustment is improper:

- First, the Independent Auditor's determination to equate enactment of the statutes with their diligent enforcement rewrites the MSA by deleting one of its explicit requirements. It also improperly relieves the States of their obligation to demonstrate that they have diligently enforced Qualifying Statutes in order to avoid application of an NPM Adjustment. MSA art. IX(d)(2)(A) and (B) provide that an NPM Adjustment "*shall apply* to the Allocated Payments of the Settling States *except* ... if such Settling State continuously had a Qualifying Statute ... in full force and effect ... *and diligently enforced the provisions of such statute*" during the entire calendar year preceding the year in which payment is due. (Emphasis added.) Because the MSA provides that the NPM Adjustment "shall apply" to every State unless the State meets the requirements of MSA art. IX(d)(2)(B), it is the States' burden to demonstrate that they have both enacted and diligently enforced Qualifying Statutes.

- Second, the Independent Auditor's determination to equate enactment of the statutes with their diligent enforcement improperly ignores substantial evidence that States have not diligently enforced their Qualifying Statutes. As you know, the States have consistently refused to provide either the Auditor or the Participating Manufacturers with any detailed information describing their diligent enforcement efforts. *See, e.g.,* SPMs' March 31, 2004 letter brief, at 10-11.[4] The limited public information that is available, however, indicates that diligent enforcement has not occurred. NPM market share has increased since the MSA was signed from less than 1% to 5.45% (by PwC's calculations) and by many reports even more. That increase would not have occurred if States had diligently enforced their statutes. Moreover (before all

---

[3] The Auditor also noted the existence of "certain litigation that is ongoing related to this issue." Notice ID: 0185 at 5. In 2004, the Auditor, after requesting and receiving extensive briefing with respect to the application and allocation of an NPM Adjustment for 2003, determined that the 2003 NPM Adjustment was disputed and directed the parties to arbitrate the dispute as required by MSA art. XI(c). Notice ID: 140 at 2. After the States categorically refused to participate in the required arbitration, Commonwealth and other SPMs moved to compel arbitration. The Connecticut Superior Court compelled arbitration; the New York Superior court declined to do so. Both opinions are on appeal.

[4] Indeed, in April 2005 a list of enforcement actions that various States had brought since the MSA was signed were removed from NAAG's "Tobacco Project" website, along with other valuable types of information previously available to MSA parties. NAAG's now-unavailable website provided the only easily accessible central list of State enforcement actions. NAAG – which is supposed to coordinate and facilitate "implementation and enforcement" of the MSA on behalf of the Settling States, MSA art. VII(a) – has never restored the information, notwithstanding repeated representations that the information would soon be made publicly available again.

Independent Auditor
March 16, 2006
Page 4

information about State diligent enforcement was recently removed from NAAG's website), NAAG reported that a number of States have brought very few, or no, enforcement actions, including New York, Virginia, Connecticut, Arkansas, and New Mexico, among others. Finally, some States now claim that they have *no* intention or obligation to enforce Model Statutes with respect to sales of product that the State chooses not to tax stamp, including sales over the Internet and/or by Native American sellers, and even have chosen not to enforce laws on the books requiring tax stamps on such products. *E.g.*, Reply Memorandum of the State of New York in Opposition to Motion to Compel Arbitration at 27-28; CSP Daily News, *Pataki-ism? Law requiring collection of cigarette taxes from Indian retailers kicks in, enforcement doesn't* (Mar. 2, 2006). The Connecticut Superior Court recently noted that an allegation of "virtually no enforcement activity" and "the substantial nationwide increase in aggregate NPM Market Share" casts "serious doubt on the claim that ... [the Model Statute] has been diligently enforced." *Connecticut v. Philip Morris, Inc.*, 2005 Conn. Super. LEXIS 2067, at *33 (Aug. 3, 2005) (on appeal).

- Third, as the SPMs explained to you in extensive correspondence and briefing in 2004, the inquiry whether Model Statutes are enacted and diligently enforced is irrelevant in any event to whether an NPM Adjustment is applicable to the SPMs' MSA payment obligations. That inquiry relates *only* to the allocation and reallocation of that Adjustment among the States. *See, e.g.*, SPMs' March 31, 2004 letter brief at 7-8.

- Fourth, it is not correct that the Auditor has no authority under the MSA to address diligent enforcement. The MSA requires the Auditor in every year to "calculate and determine" all "adjustments" and the "allocation" of such adjustments, including the NPM Adjustment. MSA art. XI(1)(a), IX(j). Addressing diligent enforcement is a necessary step in that required determination. *See* MSA art. IX(d)(1), (d)(2). Indeed, the MSA requires the Auditor in every year to "calculate" payments "pursuant to [MSA art.] IX(d)(1) and [MSA art.] IX(d)(2)." MSA art. IX(j). As the Connecticut court recently explained, "one essential task that must be performed by the Independent Auditor in 'calculating' the 'payments due under th[e MSA]' is to 'apply the NPM Adjustment ....'" *See Connecticut v. Philip Morris, Inc.*, 2005 Conn. Super. LEXIS 2067, at *13; *see also id.* at *108 ("an important part of the Independent Auditor's task ... is to determine, at least preliminarily, if a particular ... adjustment ... listed in the MSA is in fact 'applicable' to the payment at issue."). The MSA assigns the responsibility to address the diligent enforcement question initially to the Auditor and ultimately (if there is a dispute) to the three-judge panel of arbitrators assigned to determine disputes "arising out of or relating to" the Auditor's calculations and determinations. Moreover, as stated above, the burden to demonstrate diligent enforcement rests on the States, who have made no effort to provide any information on the issue. The Auditor cannot consistent with the MSA avoid the diligent enforcement question.

- Fifth, if the Auditor lacks necessary information to address diligent enforcement, it must treat that information as "missing information" and calculate the minimum amount due under MSA art. XI(d)(5)(A). Indeed, the Auditor itself requested that in order to "perform the Final Calculation," it receive "*information*" related to

Independent Auditor<br>
March 16, 2006<br>
Page 5

"[r]esolution of the question related to diligent enforcement" of the Qualifying Statutes. Notice ID: 0185 at 6 (emphasis added); *id.* Attachment 4b ("*[i]nformation regarding whether or not the Settling States ... have diligently enforced*" their Qualifying Statutes" is necessary for the NPM Adjustment determination) (emphasis added). Accordingly, the MSA requires the Auditor to "employ an assumption" that will result in "the minimum amount that is likely to be due" for the payment year in question. *See Connecticut v. Philip Morris, Inc.*, 2005 Conn. Super. LEXIS 2067, at **9-10 (Auditor must comply with MSA timetable "even if all information necessary to the performance of such calculations is unavailable to it."; in such circumstance it must employ assumption as to minimum amount likely to be due). It has not done so, instead calculating the maximum amount due without application of the NPM Adjustment.

For all these reasons, and for the additional reasons reflected in letters from Commonwealth and other SPMs to the Auditor dated January 30, 2004, March 4, 2004, March 15, 2004, March 31, 2004, April 15, 2004, March 16, 2005, April 8, 2005, and April 15, 2005, the MSA requires the Independent Auditor to reduce Commonwealth's payment obligation to reflect an NPM Adjustment for 2005 of at least $23,989,455.88. In addition, for the reasons stated herein and in previous correspondence, Commonwealth continues to dispute the Auditor's determination not to apply an NPM Adjustment for 2004 and 2003. The MSA also requires the Independent Auditor to reduce Commonwealth's payment obligation to reflect an NPM Adjustment for 2004 of at least $31,689,563.80 and for 2003 of at least $31,103,574.73.[5]

2. *Failure to Apply Offset for Appropriate NPM Adjustment for 2003 to Commonwealth's Payment.* Commonwealth is informed that the Firm has recently determined (well after the date on which the Firm's determination was required to occur) that the MSA was a significant factor in the Market Share Loss to NPMs for 2003. Section IX(d)(1)(C) of the MSA provides that if the Firm determines that the MSA was a significant factor for Market Share Loss for the year in question, the NPM Adjustment "shall apply." In April 2004, Commonwealth made a full payment (under dispute) of the Auditor's calculated amount, without deduction for the applicable NPM Adjustment. Without conceding that the Firm's determination was timely (it was not) or that the Procedures Agreement under which the determination occurred was authorized by the MSA (it was not), Commonwealth notes that the Firm's determination confirms that Commonwealth overpaid in April 2004. The MSA provides that if the Auditor learns that a Participating Manufacturer has overpaid, that manufacturer "shall be entitled to a

---

[5] PwC has also improperly failed to seek appropriate information from the States regarding diligent enforcement. In 2003 and 2004, the Auditor asked the States only whether their Qualifying Statutes were in full force and effect, an inquiry that completely ignored the MSA's diligent enforcement requirement. In 2005 and again in 2006, the Auditor asked States to confirm whether they were diligently enforcing the Statutes, but required them to substantiate their answers only if they conceded that diligent enforcement had *not* taken place. *See* Notice ID: 0181 at Attachment 1, page 2; Notice ID: 0151 at Attachment 1, page 2. As Commonwealth pointed out in its responses to that information request submitted on February 24, 2006 and February 25, 2005, PwC is asking the States the wrong question. The Auditor should ask each State that contends that an NPM Adjustment should not apply to it to demonstrate that it had a Qualifying Statute in full force and effect and that it diligently enforced such Statute during the year in question. Information that States should be asked to provide about diligent enforcement should include, among other information, the State's estimate of the volume of complying and non-complying NPM sales in the State in each year, a detailed description of enforcement actions taken and their outcomes, and identification of resources expended on enforcement efforts.

Independent Auditor
March 16, 2006
Page 6

continuing dollar-for-dollar offset" against future payments. MSA art. XI(i)(2)(B). The Participating Manufacturer is entitled to interest on that offset at the prime rate. MSA art. XI(i)(2)(B)(iii). Accordingly, the Auditor should have reflected an offset due to Commonwealth for its 2003 NPM Adjustment in the amount of $31,103,574.73, plus interest at the prime rate.

3.  *Failure to Provide Commonwealth With Same Favorable Payment Treatment Accorded to General Tobacco.* Commonwealth also disputes the failure to provide the Participating Manufacturers with the same favorable treatment provided to newly-joined SPM General Tobacco, as required by MSA art. XVIII(b)(4). Among other things, the Settling States have agreed to permit General Tobacco to make payments on April 15, 2005 based on only half of its 2004 sales, and have agreed to permit General Tobacco to finance the other half of its required 2005 payment over twelve years on very favorable terms. The Settling States also agreed to provide General Tobacco with a credit for payments made to Previously Settled States. No such credit is provided to the other SPMs.

4.  *Failure to Provide Commonwealth With Appropriate Adjustment for Payments to Previously Settled States.* One of the Previously Settled States, Minnesota, has enacted a statute requiring distributors for all tobacco companies not already paying Minnesota under an existing settlement agreement to pay approximately $3.50 a carton on sales in Minnesota. As a result, Commonwealth and most other SPMs are now making payments for their sales in Minnesota twice, once to Minnesota and again to the Settling States under the MSA. The OPMs receive a 12.45% reduction in MSA payments under the Previously Settled States Reduction to permit them to avoid precisely such a double payment obligation. The States have acknowledged that it would be appropriate for SPMs to receive "the same Previously Settled States Reduction accorded to the OPMs." Miller & Wasden, Letter of December 29, 2004, at 1. Accordingly, the SPMs' payments should be reduced by 12.45%, or an amount that would provide each SPM with an equivalent benefit to that received by OPMs.

5.  *Change of Methodology in Relying on Net, Rather than Gross, Unit Volumes, to Calculate Payment Obligations.* Commonwealth also disputes the Auditor's change in methodology in computing MSA payments based on net, rather than gross, unit volumes of cigarettes. There are a number of reasons why the change in methodology is impermissible, including among others the fact that the change has no basis in the MSA; is contrary to the established methodology that the Auditor has used since the MSA was signed in 1998; and was made without the consent of all affected parties to the MSA.

6.  *Information Underlying Calculation Of Total Market Volume.* Commonwealth also disputes the Auditor's determination of the total market volume in 2005. The Auditor's report reflects a decline of 4.1% in total market volume from 2004 levels. Commonwealth understands that the Auditor relied primarily on information provided by the Alcohol and Tobacco Tax and Trade Bureau ("TTB") for this determination. Notice ID: 0185 at 1. Other industry sources show a significantly lower reduction in the total market volume from 2004 levels. Commonwealth requests that the Auditor take steps to ensure that its determinations reflect the most current and correct information. In particular Commonwealth requests that if the TTB information is subsequently updated or corrected, the Auditor promptly issue revised calculations based on that updated or corrected information.

Independent Auditor<br>
March 16, 2006<br>
Page 7

We note that there may be other errors in the calculations and methodology not outlined here, and we reserve the right to dispute the calculations on other grounds not cited in this letter. Commonwealth also adopts and incorporates herein the dispute letters it has sent in previous payment years, as well as its correspondence to the Independent Auditor in previous years regarding the NPM Adjustment issue, including its letters of January 30, 2004, March 4, 2004, March 15, 2004, March 31, 2004, April 15, 2004, March 16, 2005, April 8, 2005, and April 15, 2005. The undersigned certifies that this Notice of Dispute is the 30 day notice pursuant to Subsection XI(d)(3) of the MSA, and has been delivered to the Independent Auditor and Notice Parties via facsimile this 16th day of March 2006.

Sincerely,

*[signature: John C. Poling II]*

John C. Poling, II CEO
Commonwealth Brands, Inc.

Cc:   All MSA Notice Parties