# EXHIBIT 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

STATE OF NEW YORK, ET AL.,

                              Plaintiffs,

              -against-

PHILIP MORRIS, INC. ET AL.,

                              Defendants.

---

Index No.:  400361/97

Hon. Charles E. Ramos
IAS Part 53

**MEMORANDUM IN SUPPORT OF MOTION OF
COMMONWEALTH BRANDS, INC., KING MAKER MARKETING, INC., AND
SHERMAN 1400 BROADWAY N.Y.C. INC. TO COMPEL ARBITRATION**

LEADER & BERKON LLP

630 THIRD AVENUE

NEW YORK, NY 10017

(212) 486-2400

RECEIVED

JUN 1 5 2004

IAS MOTION
SUPPORT OFFICE

Commonwealth Brands, Inc. ("Commonwealth"), King Maker Marketing, Inc. ("King Maker"), and Sherman 1400 Broadway N.Y.C., Inc. ("Sherman") (collectively, "Certain SPMs") by their attorneys, Leader & Berkon LLP and Howrey Simon Arnold & White, LLP, submit this memorandum in support of its Motion, pursuant to Section X(c) of the Tobacco Litigation Master Settlement Agreement ("MSA")[1], Sections 2 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2, 4, and New York Civil Practice Law and Rules ("CPLR") § 7503, to compel Plaintiff, the State of New York ("New York"), to arbitrate disputes arising out of calculations and determinations made by the Independent Auditor with regard to Certain SPMs' required MSA payments for the year 2003, as required by the MSA's arbitration provision.

In particular, Certain SPMs seek to compel arbitration of disputes arising out of the Independent Auditor's determination that a "non-participating manufacturer adjustment" does not apply to reduce their payments for 2003 by approximately $31 million (in the case of Commonwealth); $1.36 million (for King Maker); and $162,181 (for Sherman), as a result of the Independent Auditor's acquiescence in the Settling States' demand that it presume that New York and other Settling States had "diligently enforced" their respective Qualifying Statutes as required by the MSA to avoid an NPM Adjustment reducing their Allocated Payments under the MSA.

## INTRODUCTION

The MSA settled a variety of tobacco-related litigations brought by 46 states (and six other jurisdictions and territories) against four large tobacco companies – Brown & Williamson Tobacco Corporation, Philip Morris Incorporated, R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company – that are referred to in the MSA as "Original Participating Manufacturers" ("OPMs"). Commonwealth, King Maker, and Sherman are among the smaller

---

[1]    A complete copy of the MSA is attached to the Affidavit of Spencer A. Coates, sworn to on June 10, 2004 (hereafter "Coates Aff."), filed herewith, as Exhibit 1. A number of the other documents cited therein contain confidential business information and therefore are not attached. If the contents of such documents later are placed at issue, Certain SPMs will take appropriate steps to submit the entire documents under seal.

tobacco companies, referred to as "Subsequent Participating Manufacturers" ("SPMs"), that, although not parties to the original suits, nevertheless elected to join the MSA.  Under the MSA, all Participating Manufacturers – both OPMs and SPMs – agreed to abide by a variety of advertising and marketing restrictions.  They also agreed to make substantial annual payments to New York and the other "Settling States," in exchange for a broad release of claims.

The MSA requires an Independent Auditor to "calculate and determine" the amount of all payments owed under the MSA.  (Coates Aff. Ex. 1 § XI(a)(1).)  The Independent Auditor must also "calculate and determine...the adjustments thereto..." and must "calculate and determine ... the allocation of such payments, adjustments ... among ... the Settling States." (*Id.*)  The parties to the MSA agreed to arbitrate all disputes, controversies, and claims "arising out of or relating to" the "calculations" and "determinations" of the Independent Auditor, "including, without limitation, any dispute concerning the operation or application of any of the adjustments ... and allocations." (*Id.* § XI(c).)  The parties further agreed that any such arbitration would be governed by the Federal Arbitration Act. (*Id.*)

A dispute has arisen between Certain SPMs and other Participating Manufacturers, on the one hand, and New York and other Settling States, on the other, over whether the payment obligations of these companies for 2003 should be reduced by a non-participating manufacturer adjustment ("NPM Adjustment").  The NPM Adjustment is designed to compensate Participating Manufacturers for market share lost to companies ("Non-Participating Manufacturers" or "NPMs") that refused to join the MSA and, as a result, are not subject to either the MSA's substantial payment obligations or its advertising and marketing restrictions.

At the insistence of the Settling States, the Independent Auditor has refused to apply any NPM Adjustment to reduce the payment obligations of Commonwealth and other SPMs for 2003, even though it found that the prerequisites for such an adjustment were met, and even though it calculated a potential NPM Adjustment for Commonwealth of over $31 million and corresponding adjustments for King Maker, Sherman, and other SPMs.  The Independent Auditor determined, as required by the MSA, that the Participating Manufacturers suffered a substantial

Market Share Loss (over 6%) to NPMs;[2] it further determined, also as required by the MSA, that the disadvantages Participating Manufacturers experience as a result of the provisions of the MSA were a significant factor causing that Market Share Loss; and it determined, again as the MSA requires, that the Participating Manufacturers as a group shipped fewer cigarettes in 2003 than they did in 1997.

The Independent Auditor refused, however, to apply any portion of the $31 million NPM Adjustment it calculated to Commonwealth's payment obligation, or to apply the NPM adjustments it calculated for other SPMs to those SPMs' obligations, because it determined that New York and every other Settling State had "diligently enforced" its "Qualifying Statute." The MSA requires each state to "enact" *and* "diligently enforce" such a Qualifying Statute in order to avoid a disproportionate reallocation of the Allocated Payments it receives under the MSA by an NPM Adjustment. The Independent Auditor based its determination on the fact that New York and the other Settling States "represent[ed]" that their Qualifying Statutes "have been in full force and effect continuously since the indicated effective date; therefore no possible NPM Adjustment is allocated to PMs," and on the States' argument that a "presumption" of diligent enforcement of the statutes should arise from the fact of their enactment.

Certain SPMs dispute this determination, as well as the Independent Auditor's refusal to apply an NPM Adjustment to reduce their required payments for 2003. This is precisely the kind of dispute over the "calculations" and "determinations" of the Independent Auditor that the parties to the MSA agreed would be arbitrated. Accordingly, the Independent Auditor recommended that the parties resolve this dispute by arbitration. However, New York and the other Settling States categorically refuse to arbitrate and have repeatedly stated that this dispute should be resolved in litigation.

---

[2]    The Market Share Loss of over 6% determined by the Independent Auditor equates to an aggregate NPM market *share*, as found by the Independent Auditor, of over 8%.

-4-

Both the Federal Arbitration Act and New York's CPLR Article 75 require courts to enforce written agreements to arbitrate, 9 U.S.C. § 2; CPLR 7501; to compel arbitration if the parties have agreed to arbitrate the dispute, 9 U.S.C. § 4; CPLR 7503; and to resolve any doubt or ambiguity in favor of arbitration, *e.g.*, *Moses H. Cone Memorial Hospital*, 460 U.S. 1, 24 (1983); *Nationwide General Insurance Co. v. Investors Insurance Co. of America*, 37 N.Y.2d 91, 96, 371 N.Y.S.2d 463, 467 (1975); *Exercycle Corp. v. Maratta*, 9 N.Y.2d 329, 334, 214 N.Y.S.2d 353, 355 (1961); *Pepsi-Cola Metropolitan Bottling Co. v. Columbia-Oxford Beverages, Inc.*, 100 A.D.2d 868, 869, 474 N.Y.S.2d 127, 128 (2d Dep't 1984). Accordingly, Certain SPMs respectfully request that the Court compel New York to arbitrate the disputes between the parties concerning the application of an NPM Adjustment to Certain SPMs' required payments for 2003.

## FACTUAL BACKGROUND

### A.     The Relevant MSA Provisions

#### 1.     The Independent Auditor Must Calculate Payment Obligations and Determine the Applicability and Amount of Various Adjustments, Including the NPM Adjustment

Under the MSA, an Independent Auditor (here, PricewaterhouseCoopers) is required to collect all information necessary to calculate and allocate annual payments, and to make all the determinations necessary for such calculations, including determining both the applicability and the amount of an NPM Adjustment:

> Beginning with payments due in the year 2000, *an Independent Auditor shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments*, reductions and offsets thereto (and all resulting carry-forwards, if any), *the allocation of such payments, adjustments*, reductions, offsets and carry-forwards *among the Participating Manufacturers and among the Settling States*, and shall perform all other calculations in connection with the foregoing (including, but not limited to, determining Market Share, Relative Market Share, Base Aggregate Participating Manufacturer Market Share and Actual Participating Manufacturer Market Share).

(Coates Aff. Ex. 1 § IX(a)(1) (emphasis added).)  The methodology for calculating the NPM Adjustment is set forth in great detail in § IX(d) of the MSA.  The order of application of allocations, offsets reductions and adjustments, including the NPM Adjustment, is set forth in § IX(j) of the MSA.

> **2.    The Parties Agreed to Arbitrate All Disputes Arising Out of or Relating to the Calculations and Determinations and Allocations of the Independent Auditor**

The MSA provides that "any dispute . . . arising out of or relating to" the Independent Auditor's "calculations" and "determinations" must be submitted to mandatory, binding arbitration:

> *Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments,* reductions, offsets, carry-forwards and *allocations described in subsection IX(j)* or subsection XI(i)) *shall be submitted to binding arbitration* before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

(*Id.* § IX(c) (emphasis added).)  In particular, the parties agreed to arbitrate disputes "arising out of or relating to" the Independent Auditor's determinations with regard to "the operation or application of any of the adjustments . . . described in subsection IX(j)."  One of the adjustments "described in" subsection IX(j) is the NPM Adjustment.  (*Id.*, Clause Sixth.)

The parties' agreement to arbitrate is broad ("any dispute arising out of or related to …" the calculations and determinations of the Independent Auditor) and mandatory ("shall be submitted to binding arbitration").  Further, the parties agreed that any such "arbitration shall be governed by the Federal Arbitration Act" (*id.* § IX(c)), thereby adopting the strong federal policy and New York's same liberal policy in favor of arbitration.

### 3.    The NPM Adjustment for Market Share Lost to
### Companies that Refused to Join the MSA

The NPM Adjustment is critical to the intended operation of the MSA.  It ensures that manufacturers who refused to join the MSA do not receive an unfair competitive advantage over those manufacturers that did by (1) providing an incentive for the Settling States to adopt and diligently enforce legislation that helps level the playing field, and (2) reducing Participating Manufacturers' payments to reflect market share loss to NPMs connected to the MSA.  If a Settling State enacts and diligently enforces the required legislation, its payments under the MSA will not be disproportionately reduced by an NPM Adjustment.  On the other hand, if the State fails to do either of these things, its payments will be dramatically reduced.  Without this mechanism to insure that the Settling States create a level playing field for manufacturers who signed the MSA (or face severe penalties for failing to do so), SPMs such as Commonwealth would not have agreed to join the MSA.

The MSA sets forth a multi-step process for the Independent Auditor to determine the amount and availability of an NPM Adjustment to reduce payments owed by SPMs, and to determine whether the payments a particular State is allocated should be reduced to reflect an NPM Adjustment.

### a.    *Determination of Market Share Loss and NPM*
### *Adjustment Percentage*

The first step in determining the NPM Adjustment is for the Independent Auditor to calculate whether there has been a "Market Share Loss," as defined by the MSA.  (Coates Aff. Ex. 1 § IX(d)(1)(A)-(B).)  The Independent Auditor does this by subtracting the Aggregate Market Share of Participating Manufacturers for the year in question from their Aggregate Market share in 1997 (reduced by two percentage points).  (*Id.*)

If the resulting Market Share Loss is greater than zero but less than 16 2/3 percent, the NPM Adjustment Percentage applicable to Allocated Payments is three times the Market Share Loss.  (*Id.* § IX(d)(1)(A)(ii).)

###### b.    *The Significant Factor Determination*

If the Market Share Loss is greater than zero, a nationally recognized firm of economic consultants (the "Firm") must then determine whether the "disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to the Market Share Loss." (Coates Aff. Ex. 1 § IX (d)(1)(C ).)  If so, the NPM Adjustment "shall apply"; if not, the NPM Adjustment "shall not apply."  (*Id.*)

The MSA requires the Settling States and the OPMs to select the Firm "as soon as practicable" after signing the MSA.  (*Id.*)  The MSA also requires the Settling States and the OPMs to ensure that the "significant factor" determination is timely made.  The Firm must make this determination by February 2 of "each year" after "a year in which there was a Market Share Loss greater than zero."  (*Id.*)

###### c.    *The Determination That Aggregate Number of Cigarettes Sold By Participating Manufacturers Has Decreased Since 1997*

The MSA provides that no NPM Adjustment "shall be made" with respect to any payments if the "aggregate number of Cigarettes shipped in or to the 50 United States, the District of Columbia and Puerto Rico in the year immediately proceeding the year in which payment in question is due by those Participating Manufacturers that have become Participating Manufacturers prior to 14 days after the MSA Execution Day is greater than" the aggregate number of cigarettes shipped by such Participating Manufacturers in 1997.  This determination is meant to ensure that the total aggregate number of cigarettes sold by the companies who were Participating Manufacturers when the MSA was signed (or joined very shortly thereafter) is less in the year for which the NPM Adjustment will be applied (here, 2003) than in 1997.

###### d.    *Enactment and Diligent Enforcement of Qualifying Statutes.*

The MSA provides that "the NPM Adjustment…*shall apply* to the Allocated Payments of Settling States, *except*" under certain enumerated conditions.  (Coates Aff. Ex. 1 § IX (d)(1) (emphasis added).)

Central to the dispute at issue here is the exception related to the adoption and diligent enforcement by a Settling State of a "Qualifying Statute." A Qualifying Statue is a statute that "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such state as a result of the provisions of" the MSA. (Coates Aff. Ex. 1 § IX(d)(2)(E).)

Under the MSA, "a Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such Settling State continuously had a Qualifying Statute . . . in full force and effect … *and* diligently enforced the provisions of such statute during such entire calendar year." (Coates Aff. Ex. 1 § IX(d)(2)(B) (emphasis added.) In other words, in order to avoid a reduction to its Allocated Payments as a result of an NPM Adjustment for a particular year, a State must do two things: it must have a Qualifying Statute "in full force and effect" during that year, and it must have "diligently enforced the provisions" of that Statute during that year. The MSA defines "Allocated Payment" to include payments from OPMs to Settling States. (Coates Aff. Ex. 1 § II(g).)

**B.      The Dispute Arising Out of the Independent Auditor's Determination Not to Apply an NPM Adjustment for 2003.**

Since the MSA was signed in 1998, the market share of NPMs has grown dramatically from virtually nothing to over 8%, at a minimum. The growth in NPM market share continues to increase.[3] This has resulted in a continuing dispute between the Settling States, on the one hand, and Certain SPMs and other Participating Manufacturers, on the other, concerning the application of an NPM Adjustment to the payment obligations of the SPMs.

At the strenuous insistence of the Settling States, the Independent Auditor has refused to apply an NPM Adjustment to the payments of any SPM during any of the years in which the

---

[3]    The Independent Auditor has calculated an NPM market share of 0.37%, 0.54%, 3.3%, 1.37%, and 6.49% for the years 1997-2002 respectively.

Independent Auditor has found a Market Share Loss.[4]  Effectively reading the "diligent

enforcement" requirement out of the MSA altogether, the Settling States have advised the

Independent Auditor that it "must" conclude that a Settling State's Allocated Payment is not

subject to an NPM Adjustment in any year in which the State has a Qualifying Statute in "full

force and effect."  As the National Association of Attorneys General[5] recently informed the

Independent Auditor:

> [W]here a statute has been duly enacted, a legal presumption exists that the
> highest law enforcement officer of the State is faithfully enforcing the statute.
> The Independent Auditor *must* defer to this presumption.

(March 31, 2004 Letter from Peter Levin, National Association of Attorneys General' Tobacco

Project, to Independent Auditor (emphasis added).  *See also* June 10, 2002 Letter from Attorney

General Sorrell, Chairman of the NAAG Tobacco Project, to Independent Auditor (the

Independent Auditor must presume diligent enforcement from enactment and continuation in

effect of Qualifying Statute); February 27, 2004 Letter from Mark Greenwold, Chief Counsel,

NAAG Tobacco Project, to Independent Auditor ("there is a legal presumption that state officials

are enforcing state laws that must be given effect absent substantial evidence to the contrary").)

Commonwealth and other SPMs dispute this position.  Instead, they contend that the

enactment and diligent enforcement provision of the MSA does not affect an SPM's entitlement

to an NPM Adjustment of its required payments but relates only to the manner in which the NPM

Adjustment is allocated and reallocated among the Settling States who do not satisfy these

requirements.  (*See* Coates Aff. Ex. 1 § IX(d)(2).)  Further, the fact that a Settling State has a

Qualifying Statute "in effect" satisfies only the first prong of the MSA's two-part requirement

that the State must both enact and also "diligently enforce" that Qualifying Statute.  Moreover, as

---

[4]    In July 2003, the OPMs, a number of the SPMs, and the Settling States settled their disputes over the NPM
Adjustment for the years 1999, 2000, 2001, and 2002.

[5]    Under the MSA, the National Association of Attorneys General ("NAAG") is required to "provide coordination
and facilitation for the implementation and enforcement of this [MSA] on behalf of the Attorneys General of the
Settling States" in a variety of ways.  (MSA § VIII(a)-(c).)  The NAAG Tobacco Project is the vehicle by which
NAAG discharges this responsibility.

the party seeking an exception from the NPM Adjustment that otherwise "shall apply" to its Allocated Payments under the MSA, it is the Settling State's burden to demonstrate that it has diligently enforced its Qualifying Statute, rather than a Participating Manufacturer's obligation to prove that the State has not done so.[6] (*See, e.g.*, March 4, 2004 Letter of John Poling, CEO, Commonwealth Brands, to Independent Auditor; March 15, 2004 Letter of John Poling, CEO, Commonwealth Brands, to Independent Auditor; March 31, 2004 Letter, John Poling, CEO, Commonwealth Brands, to Independent Auditor (all expressing this position to Independent Auditor).)

In addition, Commonwealth and other SPMs dispute that the Settling States, including New York, have "diligently enforced" their Qualifying Statutes. Had the Settling States done so, the market share of NPMs would not have risen from virtually nothing in 1997 to 8% or more, as the Independent Auditor has determined for 2003. Further, while there were very few NPMs in existence in 1997, there are a significant number of NPMs (at least 70-80) operating in the marketplace today. Moreover, to the limited extent (almost none) that Settling States make information about enforcement activity publicly available, there is, in general, a manifest lack of such activity, a noticeable disparity in the apparent enforcement efforts of different states, and an obvious inconsistency between the claimed diligence of these enforcement efforts and the ever-growing share of the market captured by NPMs. New York, for example, identifies no enforcement actions against an NPM selling product in New York without escrowing on the NAAG Tobacco Project web site.

On March 31, 2004, the Independent Auditor notified the parties of its Final Calculation of the payment obligations of the Participating Manufacturers for 2003. Although the Auditor calculated a maximum potential NPM Adjustment for Commonwealth of over $31 million, it did not apply any portion of this adjustment to reduce Commonwealth's payment obligations. (See

---

[6]    This is particularly so because the Settling States generally refuse to release information to the Participating Manufacturers or even to the Independent Auditor concerning their enforcement activities.

Notice of Final Calculation, Notice ID: 0139, at Attachment 6d.)  Similarly, it did not apply the

potential $1.36 million adjustment it calculated to King Maker's payment, nor did it apply the

$162,181 adjustment it found to Sherman's.

The Independent Auditor failed to apply the NPM Adjustment even though it determined

that there had been a Market Share Loss, as defined by the MSA, of over 6%.[7]  It also determined

that the disadvantages experienced as a result of the provisions of the MSA were a significant

factor contributing to the Market Share Loss.  Noting that there had been no "significant factor"

determination by the Economic Consulting Firm, the Independent Auditor determined that "in

the absence of a determination by the Economic Consulting Firm, the Independent Auditor is

required to 'employ an assumption that would produce the minimum amount 'likely' to be due.'"

(Notice of Final Calculation, Notice ID: 0139, at n 1.)  It assumed, therefore, that the MSA was a

significant factor contributing to the Market Share Loss.[8]  And, finally, the Independent Auditor

determined that the aggregate number of cigarettes sold in the U.S. in 2003 by the Participating

Manufacturers joining the MSA within 14 days of its execution did not exceed those sold by the

same Manufacturers in 1997.

Notwithstanding these determinations that prerequisites to application of an NPM

Adjustment were met, the Independent Auditor declined to apply any NPM Adjustment to reduce

Certain SPMs' payments.  The sole reason for its decision not to do so was its acquiescence in

---

[7]    Under the MSA, "Market Share Loss" is defined as the aggregate shares of the Participating Manufacturers in
the applicable year, minus aggregate share in 1997, minus two percentage points. (MSA § IX(d)(1)(B).)  Thus, a
Market Share Loss of over 6% equates to a total NPM market share of over 8%.

[8]    The MSA requires the Independent Auditor to "employ an assumption as to the missing information producing
the minimum amount that is likely to be due. . . ."  (MSA § XI(d)(5)(A).)  The failure of the Firm to make any
significant factor determination is "missing information."  The MSA specifies that an NPM Adjustment applies "if
the Firm determines that the disadvantages experienced as a result of the provisions of [the MSA] were a significant
factor contributing to the Market Share Loss."  (Id. § IX(d)(1)(C).)  Conversely, the MSA specifies that an NPM
Adjustment does not apply if the Firm determines that the "disadvantages of [the MSA] were not a significant factor
contributing to the Market Share Loss."  (Id.)  Since the Firm made no determination one way or the other with
respect to the Market Share Loss for 2003, the lack of a determination was "missing information" that triggered the
Independent Auditor's obligation to "employ an assumption ...producing the minimum amount that is likely to be
due."  That assumption was that the disadvantages experienced by Participating Manufacturers as a result of the
MSA were a significant factor contributing to the Market Share Loss.

the Settling States' position that each Settling State had diligently enforced its respective

Qualifying Statute because each Settling State had such a statute in effect during 2003. As the

Independent Auditor stated in its March 5, 2004 Preliminary Calculation:

> NAAG has responded to the January 16, 2004 Information Request (Notice ID: 000128) stating that all Settling States have enacted Model Statutes and represent to have been in full force and effect continuously since the indicated effective date; therefore, no possible NPM Adjustment is allocated to PMs.

(Notice of Preliminary Calculation at 2, n.1.)  The Independent Auditor's March 31, 2004 Final

Calculation reflects the same determination: "the Independent Auditor is treating the NPM

Adjustment in the Final Calculation in the same way it was treated in the Preliminary

Calculation."  (Notice of Final Calculation at 3.)

Although it refused to apply an NPM Adjustment, the Independent Auditor nevertheless

recognized the existence of a dispute over its determination and recommended that this dispute

be submitted to arbitration as required by the MSA:

> We are aware that certain Participating Manufacturers ("PM") believe that they are entitled to an NPM Adjustment for the calendar year 2003.  Likewise, we are aware that the Settling states disagree that any NPM Adjustment is applicable for 2003.  The MSA contains dispute resolution provisions should the parties be unable to resolve any such disagreements among themselves . . . .

> If any party disagrees with dispute resolution process as determined by the Independent Auditor or the parties are unable to otherwise resolve the dispute, *the MSA provides that the dispute is to be submitted to binding arbitration in accordance with subsection XI(c) of the MSA.*

(April 13, 2004 Notice of Disputes from Independent Auditor (Notice ID: 0140) (attached as Ex.

2 to Affidavit of Spencer A. Coates, filed herewith) (emphasis added.)

### C.    New York Has Refused To Arbitrate This Dispute.

New York and the other Settling States have adamantly insisted that disputes about the

application of an NPM Adjustment are not subject to arbitration but must be resolved by

litigation.  On April 8, 2004, for example, the Settling States notified the Independent Auditor

and Commonwealth (as well as all other Notice Parties) that:

> [T]he Settling States strongly disagree that whether any Settling State is diligently enforcing its Model Statute is a proper matter for arbitration under the MSA.

(April 8, 2004 Letter, Peter Levin, NAAG Tobacco Project, to Independent Auditor. *See also* February 27, 2004 Letter, Mark Greenwold, Chief Counsel, NAAG Tobacco Project, to Independent Auditor ("the Independent Auditor . . . is not equipped to define what constitutes 'diligent enforcement' or to make a determination whether a State has diligently enforced its Model Statute"); March 31, 2004 Letter, Peter Levin, Economic Counsel, NAAG Tobacco Project, to Independent Auditor ("Whether the Model Statute of any Settling State is being diligently enforced is a legal judgment to be made by the MSA court of that State pursuant to the applicable law of that state").)

At the most recent (May 3, 2004) required semi-annual meeting of all MSA parties, *see* Coates Aff. Ex. 1 § VIII(a)(2), Commonwealth specifically asked the Settling States to arbitrate the application of an NPM Adjustment for 2003. In particular, it asked the Settling States to arbitrate the Independent Auditor's determination that the Settling States had satisfied the diligent enforcement requirement necessary to avoid reduction of their payments by an NPM Adjustment. (Coates Aff. ¶ 43.) The Settling States categorically refused. Indeed, when asked by counsel for Commonwealth whether the Settling States would agree to arbitrate, Attorney General Sorrell, Chairman of the NAAG Tobacco Project, provided a short but unequivocal response: "No." (*Id.*)

## ARGUMENT

The plain language of the MSA requires arbitration of this dispute because it clearly arises out of or relates to the calculations and determinations of the Independent Auditor with respect to Certain SPMs' payment obligations and the applicability of the NPM Adjustment to those payments. Both federal and New York state law require enforcement of agreements to arbitrate and direct courts to resolve any ambiguity in favor of arbitration.

-14-

A.   **By Agreeing that Arbitration Under the MSA Would Be Governed by the Federal Arbitration Act, The Parties Expressly Adopted the "Strong Federal Policy" Favoring Arbitration**

When the parties to the MSA agreed that arbitrations "shall be governed by the United States Federal Arbitration Act," (Coates Aff. Exh. 1, § XI(c)), they expressly adopted the "strong federal policy favoring arbitration" and "the enforcement of arbitration agreements." *Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir. 2001). As the U.S. Supreme Court has held, the FAA "was intended to revers[e] centuries of judicial hostility to arbitration agreements," substituting in its place a "federal policy favoring arbitration" that requires courts to "rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225-26.[9] "Because of this federal policy, . . . courts must 'construe arbitration clauses as broadly as possible.'" *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995). *See also Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union, ALF-CIO*, 430 U.S. 243, 254 (1977) ("[T]his Court has established a strong presumption favoring arbitrability."); *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir.) ("The federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible."), *cert. dismissed*, 501 U.S. 1267 (1991).[10]

New York has the same liberal policy in favor of enforcing arbitration agreements. *See Nationwide General Insurance Co. v. Investors Insurance Co. of America,* 37 N.Y.2d 91, 95, 371 N.Y.S.2d 463, 466 (1975) ("the announced policy of this state favors and encourages arbitration"); *Weinrott v. Carp*, 32 N.Y.2d 190, 199, 344 N.Y.S.2d 848, 856 (1973) ("The CPLR arbitration provisions (CPLR 7501 et seq.) evidence a legislative intent to encourage

---

9    The United States Supreme Court has held that federal arbitration law governs in state courts. *Moses H. Cone*, 460 U.S. at 26 (the federal arbitration law set out in the FAA "governs the issue in either state or federal court"). When Congress enacted section 2 of the FAA, it "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).

10   *See also MeMahun Sec. Co. v. Forum Capital Markets*, 35 F.3d 82, 88 (2d Cir. 1999) (same); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) (same); *S.A. Mineracuo dn Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir. 1984) (same).

arbitration"); *Pepsi-Cola Metropolitan Bottling Co. v. Columbia-Oxford Beverages, Inc.*, 100 A.D.2d 868, 869, 474 N.Y.S.2d 127, 128 (2d Dep't 1984) ("The provisions of the CPLR relative to arbitration … cogently evince a legislative intent to encourage arbitration…. Broadly and generally phrased arbitration clauses should therefore be afforded the full import of their wording in order to implement the intention of the parties"); *Blatt v. Sochet*, 199 A.D.2d 451, 453, 606 N.Y.S.2d 11, 13 (2d Dep't 1993) ("There is a strong state policy of giving broad full effect to arbitration clauses"); *Praetorian Realty Corp. v. Presidential Towers Residence, Inc.*, 49 A.D.2d 816, 817, 373 N.Y.S.2d 151, 153 (1st Dep't 1975) ("Broad arbitration clauses should therefore be given the full effect of their wording").

Reflecting this policy, there is a strong presumption in favor of arbitrability under both federal and New York State law. As the United States Supreme Court repeatedly has explained, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25. *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 n.8 (1995) (describing "presumption in favor of arbitration"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (noting the "liberal federal policy favoring arbitration agreements" and concluding that "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989) ("[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.").

Similarly, the New York Court of Appeals has explained: "A broad arbitration clause should be given the full effect of its wording in order to implement the intention of the parties." *Weinrott*, 32 N.Y.2d at 199, 344 N.Y.S.2d at 856; *see also Nationwide General Insurance Co.*, 37 N.Y.2d at 96, 371 N.Y.S.2d at 467 ("Penetrating definitive analysis of the scope of the

-16-

agreement must be left to the arbitrators whenever the parties have broadly agreed that any dispute involving the interpretation and meaning of the agreement should be submitted to arbitration"); *Exercycle Corp.*, 9 N.Y.2d at 334, 214 N.Y.S.2d at 355 ("It has long been this State's policy that, where parties enter into an agreement and, in one of its provisions, promise that any dispute arising out of or in connection with it shall be settled by arbitration, any controversy which arises between them and is within the compass of the provision must go to arbitration"); *Pepsi-Cola Metropolitan Bottling Co.*, 100 A.D.2d at 870, 474 N.Y.S.2d at 129 (there is a "strong presumption in favor of arbitrability of disputes in the commercial sector and the tenet that doubts with respect to arbitrability should be resolved in favor of coverage"); *Fitzgerald v. General Electric Co.*, 23 A.D.2d 288, 290, 260 N.Y.S.2d 470, 472 (1st Dep't 1965) ("if there were doubt [about arbitrability], it would be 'resolved in favor of coverage'").

Thus, a motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Tech. v. Communications Works of Am.* 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). "By its terms," the FAA "leaves no place for the exercise of discretion," but rather "mandates" that the court compel arbitration "on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

**B.    The Plain Language of the MSA Requires Arbitration**

The plain language of the MSA requires arbitration of the dispute between Certain SPMs and New York (and the other Settling States) regarding the Independent Auditor's determination not to apply an NPM Adjustment to Commonwealth's payment obligations for 2003.

Section XI(c) of the MSA broadly requires that "any dispute, controversy or claim arising out of or relating to calculations performed by, or any determination made by the Independent Auditors . . . . shall be submitted" to binding arbitration. (Coates Aff. Ex. 1 § XI(c).)  Moreover, the parties expressly agreed that arbitrable disputes "includ[e], without limitation, any dispute

concerning the operation or application of any of the adjustments . . . described in IX(j)," including the NPM Adjustment. (*Id.*)

Here, there is a dispute concerning the operation and application of the NPM Adjustment that is described in MSA IX(j), Clause Sixth. In calculating Certain SPMs' payment obligations for 2003, the Independent Auditor determined the amount of the NPM Adjustment potentially applicable for Certain SPMs but did not apply any portion of that Adjustment in the payment calculated for Certain SPMs because the Auditor determined that all Settling States, including New York, had "diligently enforced" their respective Qualifying Statutes by virtue of the fact that these statutes were in full force and effect during 2003. Certain SPMs dispute that determination and contend that they are entitled to an NPM Adjustment for payments relating to 2003 sales. New York (and other Setting States) disagree and contend that Certain SPMs are not entitled to any NPM Adjustment.

Clearly, this dispute "relates to" or "arises out of" the "determinations" and "calculations" of Commonwealth's payment obligations by the Independent Auditor. Specifically, this dispute "relates to" or "arises out of" the Independent Auditor's determination not to apply an NPM Adjustment to Certain SPMs' payment obligations.

Interpreting similar arbitration provisions, courts have held repeatedly that "the term 'related to' [i]s clear, unambiguous, and quite broad." *Coregis Ins. Co. v. American Health Foundation, Inc.*, 241 F.3d 123, 128 (2d Cir. 2001).[11] In fact, an arbitration clause like the one in the MSA, which "mandates arbitration of 'any dispute or controversy between the parties arising out of or relating to'" a particular matter, "is the paradigm of a broad arbitration clause." *Id.* In such case, "'the strong presumption in favor of arbitrability applies with even greater force.'" *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2d Cir. 1995)

---

[11]  *See also Olyroyd v. Elmira Savings Bank, FSB*, 134 72, 76 (2d Cir. 1998) ("[a]ny dispute, controversy or claim arising under or in connection with [the agreement]" is a broad arbitration clause); *Vern v. Saks & Co.*, 218 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) ("any dispute . . .arising out of or relating to this Agreement" found to be broad clause).

(quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991)). Such a broad-worded arbitration clause makes disputes "'presumptively arbitrable.'" *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 50 (2d Cir. 2000), *cert. denied*, 533 U.S. 911 (2001).

This dispute plainly falls within the MSA's broad arbitration provision. It is clearly "related to" and/or "arises out of" the Independent Auditor's determination and calculation of Certain SPMs' payment obligations, including, specifically, the determination not to apply an NPM Adjustment to Certain SPMs' payment obligation. Indeed, the Independent Auditor has explicitly recognized that arbitration of this dispute is appropriate, in its April 13, 2004 Notice of Disputes Regarding the Final Calculation of the Tobacco Litigation Master Settlement Agreement:

> If any party disagrees with the dispute resolution process as determined by the Independent Auditor or the parties are unable to otherwise resolve the dispute, the MSA provides that the dispute is to be submitted to binding arbitration in accordance with subsection XI(c) of the MSA.

(Affidavit of Spencer A., Ex. 2, at 2.)

## CONCLUSION

For the reasons stated, Certain SPMs respectfully pray that this Court direct New York to arbitrate all disputes regarding the Independent Auditor's determination not to apply an NPM Adjustment for 2003, as required by the MSA provision directing arbitration. Certain SPMs also request that the Court enjoin New York from pursuing any litigation inconsistent with the order compelling arbitration.

Dated: New York, New York
June 15, 2004

Respectfully submitted,

HOWREY SIMON ARNOLD & WHITE, LLP
Robert J. Brookhiser, Esq.
Elizabeth B. McCallum, Esq.
Thomas J. Dillickrath, Esq.
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 783-0800

-and-

LEADER & BERKON LLP

BY:

JOSEPH G. COLAO
JOSHUA K. LEADER
630 Third Avenue
New York, New York 10017
(212) 486-2400

*Attorneys for Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman 1400 Broadway N.Y.C., Inc.*

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK     )
                            : ss.:
COUNTY OF NEW YORK )

        **TANYA FACEY**, being duly sworn, deposes and says: deponent is not a party to the action, is over 18 years of age, and resides in Brooklyn, New York.  That on the 15th day of June, 2004, deponent served by **Hand**, the within **Notice Of Motion of Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman 1400 Broadway N.Y.C. Inc. to Compel Arbitration and Memorandum of Law**, upon:

Ari Schick, Esq.
David Nocenti, Esq.
Office of the Attorney General of the State of New York
120 Broadway
New York, NY 10271
(212) 416-8000
*Attorneys for the State of New York*

TANYA FACEY

Sworn to before me this
15th day of June, 2004

Notary Public

JOANNE C. WESSEL
Notary Public, State of New York
No. 31 - 4714889
Qualified in New York County
Commission Expires January 31, 20 07

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                                              : ss.:
COUNTY OF NEW YORK  )

       **TANYA FACEY,** being duly sworn, deposes and says: deponent is not a party to the action, is over 18 years of age, and resides in Brooklyn, New York.  That on the 15th day of June, 2004, deponent served by **U.S. Mail,** the within **Notice Of Motion of Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman 1400 Broadway N.Y.C. Inc. to Compel Arbitration and Memorandum of Law,** upon:

Stephen R. Patton, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2406
*Attorneys for Brown & Williamson*

Aaron Marks, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 506-1721
*Attorneys for Liggett Group, Inc.*

Ronald S. Milstein, Esq.
Lorillard Tobacco Co.
714 Green Valley Road
PO Box 10529
Greensboro, NC 27404-0529
(336) 335-7718

Meyer G. Koplow, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000
*Attorneys for Phillip Morris, USA*

R. Dal Burton, Esq.
Womble Carlyle Sandridge & Rice
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 888-7372
*Attorneys for R.J. Reynolds Tobacco Company*

by depositing a true copy of same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

_TANYA FACEY_

Sworn to before me this
15th day of June, 2004

_Joanne C. Wessel_
Notary Public

JOANNE C. WESSEL
Notary Public, State of New York
No. 31 - 4714889
Qualified in New York County
Commission Expires January 31, 20 _07_

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK  )

   **TANYA FACEY,** being duly sworn, deposes and says: deponent is not a party to the action, is over 18 years of age, and resides in Brooklyn, New York.  That on the 22nd day of June, 2004, deponent served by **U.S. Mail,** the within **Notice Of Motion of Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman 1400 Broadway N.Y.C. Inc. to Compel Arbitration and Memorandum of Law,** upon:

Aaron Marks, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
(212) 506-1721
*Attorneys for Liggett Group, Inc.*

by depositing a true copy of same enclosed in a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

<br>

                TANYA FACEY

Sworn to before me this
22nd day of June, 2004

Notary Public

     JOANNE C. WESSEL
   Notary Public, State of New York
     No. 31 - 4714889
   Qualified in New York County
 Commission Expires January 31, 20 07