EXHIBIT 1    39

such Settling State and the Participating Manufacturers (including for purposes of subsection (g)(4)), and this section VI shall be enforceable by and in such Settling State.

## VII.    ENFORCEMENT

(a)    Jurisdiction.  Each Participating Manufacturer and each Settling State acknowledge that the Court:  (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State.  Provided, however, that notwithstanding the foregoing, the Escrow Court (as defined in the Escrow Agreement) shall have exclusive jurisdiction, as provided in section 15 of the Escrow Agreement, over any suit, action or proceeding seeking to interpret or enforce any provision of, or based on any right arising out of, the Escrow Agreement.

(b)    Enforcement of Consent Decree.  Except as expressly provided in the Consent Decree, any Settling State or Released Party may apply to the Court to enforce the terms of the Consent Decree (or for a declaration construing any such term) with respect to alleged violations within such Settling State.  A Settling State may not seek to enforce the Consent Decree of another Settling State; provided, however, that nothing contained herein shall affect the ability of any Settling State to (1) coordinate state enforcement actions or proceedings, or (2) file or join any amicus brief.  In the event that the Court determines that any Participating Manufacturer or Settling State has violated the Consent Decree within such Settling State, the party that initiated the proceedings may request any and all relief available within such Settling State pursuant to the Consent Decree.

(c)  Enforcement of this Agreement.

(1)  Except as provided in subsections IX(d), XI(c), XVII(d) and Exhibit O, any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ("Declaratory Order")) with respect to disputes, alleged violations or alleged breaches within such Settling State.

(2)  Before initiating such proceedings, a party shall provide 30 days' written notice to the Attorney General of each Settling State, to NAAG, and to each Participating Manufacturer of its intent to initiate proceedings pursuant to this subsection.  The 30-day notice period may be shortened in the event that the relevant Attorney General reasonably determines that a compelling time-sensitive public health and safety concern requires more immediate action.

(3)  In the event that the Court determines that any Participating Manufacturer or Settling State has violated or breached this Agreement, the party that initiated the proceedings may request an order restraining such violation or breach, and/or ordering compliance within such Settling State (an "Enforcement Order").

(4)  If an issue arises as to whether a Participating Manufacturer has failed to comply with an Enforcement Order, the Attorney General for the Settling State in question may seek an order for interpretation or for monetary, civil contempt or criminal sanctions to enforce compliance with such Enforcement Order.

(5)  If the Court finds that a good-faith dispute exists as to the meaning of the terms of this Agreement or a Declaratory Order, the Court may in its discretion determine to enter a Declaratory Order rather than an Enforcement Order.

(6)  Whenever possible, the parties shall seek to resolve an alleged violation of this Agreement by discussion pursuant to subsection XVIII(m) of this Agreement.  In addition, in determining whether to seek an Enforcement Order, or in determining whether to seek an order for monetary, civil contempt or criminal

sanctions for any claimed violation of an Enforcement Order, the Attorney General shall give good-faith consideration to whether the Participating Manufacturer that is claimed to have violated this Agreement has taken appropriate and reasonable steps to cause the claimed violation to be cured, unless such party has been guilty of a pattern of violations of like nature.

(d)  Right of Review.  All orders and other judicial determinations made by any court in connection with this Agreement or any Consent Decree shall be subject to all available appellate review, and nothing in this Agreement or any Consent Decree shall be deemed to constitute a waiver of any right to any such review.

(e)  Applicability.  This Agreement and the Consent Decree apply only to the Participating Manufacturers in their corporate capacity acting through their respective successors and assigns, directors, officers, employees, agents, subsidiaries, divisions, or other internal organizational units of any kind or any other entities acting in concert or participation with them.  The remedies, penalties and sanctions that may be imposed or assessed in connection with a breach or violation of this Agreement or the Consent Decree (or any Declaratory Order or Enforcement Order issued in connection with this Agreement or the Consent Decree ) shall only apply to the Participating Manufacturers, and shall not be imposed or assessed against any employee, officer or director of any Participating Manufacturer, or against any other person or entity as a consequence of such breach or violation, and the Court shall have no jurisdiction to do so.

(f)  Coordination of Enforcement.  The Attorneys General of the Settling States (through NAAG) shall monitor potential conflicting interpretations by courts of different States of this Agreement and the Consent Decrees.  The Settling States shall use their best efforts, in cooperation with the Participating Manufacturers, to coordinate and resolve the effects of such conflicting interpretations as to matters that are not exclusively local in nature.

(g)  Inspection and Discovery Rights.  Without limitation on whatever other rights to access they may be permitted by law, following State-Specific Finality in a Settling

MSA Execution Date and as to which this Agreement has terminated as of the date 15 days before the payment in question is due.

(d)  Non-Participating Manufacturer Adjustment.

(1)  Calculation of NPM Adjustment for Original Participating Manufacturers.  To protect the public health gains achieved by this Agreement, certain payments made pursuant to this Agreement shall be subject to an NPM Adjustment.  Payments by the Original Participating Manufacturers to which the NPM Adjustment applies shall be adjusted as provided below:

(A)  Subject to the provisions of subsections (d)(1)(C), (d)(1)(D) and (d)(2) below, each Allocated Payment shall be adjusted by subtracting from such Allocated Payment the product of such Allocated Payment amount multiplied by the NPM Adjustment Percentage.  The "NPM Adjustment Percentage" shall be calculated as follows:

(i)  If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is less than or equal to 0 (zero), then the NPM Adjustment Percentage shall equal zero.

(ii)  If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is greater than 0 (zero) and less than or equal to 16 2/3 percentage points, then the NPM Adjustment Percentage shall be equal to the product of (x) such Market Share Loss and (y) 3 (three).

(iii)  If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is greater than 16 2/3 percentage points, then the NPM Adjustment Percentage shall be equal to the sum of (x) 50 percentage points and (y) the product of (*1*) the Variable Multiplier and (*2*) the result of such Market Share Loss minus 16 2/3 percentage points.

(B)  Definitions:

(i)  "Base Aggregate Participating Manufacturer Market Share" means the result of (x) the sum of the applicable Market Shares (the applicable Market Share to be that for 1997) of all present and former Tobacco Product Manufacturers that were Participating Manufacturers during the entire calendar year immediately preceding the year in which the payment in question is due minus (y) 2 (two) percentage points.

(ii)  "Actual Aggregate Participating Manufacturer Market Share" means the sum of the applicable Market Shares of all present and former Tobacco Product Manufacturers that were Participating Manufacturers during the entire calendar year immediately preceding the year in which the payment in question is due (the applicable Market Share to be that for the calendar year immediately preceding the year in which the payment in question is due).

(iii)  "Market Share Loss" means the result of (x) the Base Aggregate Participating Manufacturer Market Share minus (y) the Actual Aggregate Participating Manufacturer Market Share.

(iv)  "Variable Multiplier" equals 50 percentage points divided by the result of (x) the Base Aggregate Participating Manufacturer Market Share minus (y) 16 2/3 percentage points.

(C)  On or before February 2 of each year following a year in which there was a Market Share Loss greater than zero, a nationally recognized firm of economic consultants (the "Firm") shall determine whether the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question.  If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were a

significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment described in subsection IX(d)(1) shall apply. If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were not a significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment described in subsection IX(d)(1) shall not apply. The Original Participating Manufacturers, the Settling States, and the Attorneys General for the Settling States shall cooperate to ensure that the determination described in this subsection (1)(C) is timely made. The Firm shall be acceptable to (and the principals responsible for this assignment shall be acceptable to) both the Original Participating Manufacturers and a majority of those Attorneys General who are both the Attorney General of a Settling State and a member of the NAAG executive committee at the time in question (or in the event no such firm or no such principals shall be acceptable to such parties, National Economic Research Associates, Inc., or its successors by merger, acquisition or otherwise ("NERA"), acting through a principal or principals acceptable to such parties, if such a person can be identified and, if not, acting through a principal or principals identified by NERA, or a successor firm selected by the CPR Institute for Dispute Resolution). As soon as practicable after the MSA Execution Date, the Firm shall be jointly retained by the Settling States and the Original Participating Manufacturers for the purpose of making the foregoing determination, and the Firm shall provide written notice to each Settling State, to NAAG, to the Independent Auditor and to each Participating Manufacturer of such determination. The determination of the Firm with respect to this issue shall be conclusive and binding upon all parties, and shall be final and non-appealable. The reasonable fees and expenses of the Firm shall be paid by the Original Participating

Manufacturers according to their Relative Market Shares. Only the Participating Manufacturers and the Settling States, and their respective counsel, shall be entitled to communicate with the Firm with respect to the Firm's activities pursuant to this subsection (1)(C).

(D) No NPM Adjustment shall be made with respect to a payment if the aggregate number of Cigarettes shipped in or to the fifty United States, the District of Columbia and Puerto Rico in the year immediately preceding the year in which the payment in question is due by those Participating Manufacturers that had become Participating Manufacturers prior to 14 days after the MSA Execution Date is greater than the aggregate number of Cigarettes shipped in or to the fifty United States, the District of Columbia, and Puerto Rico in 1997 by such Participating Manufacturers (and any of their Affiliates that made such shipments in 1997, as demonstrated by certified audited statements of such Affiliates' shipments, and that do not continue to make such shipments after the MSA Execution Date because the responsibility for such shipments has been transferred to one of such Participating Manufacturers). Measurements of shipments for purposes of this subsection (D) shall be made in the manner prescribed in subsection II(mm); in the event that such shipment data is unavailable for any Participating Manufacturer for 1997, such Participating Manufacturer's shipment volume for such year shall be measured in the manner prescribed in subsection II(z).

(2) Allocation among Settling States of NPM Adjustment for Original Participating Manufacturers.

(A) The NPM Adjustment set forth in subsection (d)(1) shall apply to the Allocated Payments of all Settling States, except as set forth below.

(B) A Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such Settling State continuously had a Qualifying

Statute (as defined in subsection (2)(E) below) in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year; or (ii) if such Settling State enacted the Model Statute (as defined in subsection (2)(E) below) for the first time during the calendar year immediately preceding the year in which the payment in question is due, continuously had the Model Statute in full force and effect during the last six months of such calendar year, and diligently enforced the provisions of such statute during the period in which it was in full force and effect.

(C)  The aggregate amount of the NPM Adjustments that would have applied to the Allocated Payments of those Settling States that are not subject to an NPM Adjustment pursuant to subsection (2)(B) shall be reallocated among all other Settling States pro rata in proportion to their respective Allocable Shares (the applicable Allocable Shares being those listed in Exhibit A), and such other Settling States' Allocated Payments shall be further reduced accordingly.

(D)  This subsection (2)(D) shall apply if the amount of the NPM Adjustment applied pursuant to subsection (2)(A) to any Settling State plus the amount of the NPM Adjustments reallocated to such Settling State pursuant to subsection (2)(C) in any individual year would either (i) exceed such Settling State's Allocated Payment in that year, or (ii) if subsection (2)(F) applies to the Settling State in question, exceed 65% of such Settling State's Allocated Payment in that year.  For each Settling State that has an excess as described in the preceding sentence, the excess amount of NPM Adjustment shall be further reallocated among all other Settling States whose Allocated Payments are subject to an NPM Adjustment and that do not have such an excess, pro rata in proportion to

their respective Allocable Shares, and such other Settling States' Allocated Payments shall be further reduced accordingly. The provisions of this subsection (2)(D) shall be repeatedly applied in any individual year until either (i) the aggregate amount of NPM Adjustments has been fully reallocated or (ii) the full amount of the NPM Adjustments subject to reallocation under subsection (2)(C) or (2)(D) cannot be fully reallocated in any individual year as described in those subsections because (x) the Allocated Payment in that year of each Settling State that is subject to an NPM Adjustment and to which subsection (2)(F) does not apply has been reduced to zero, and (y) the Allocated Payment in that year of each Settling State to which subsection (2)(F) applies has been reduced to 35% of such Allocated Payment.

(E) A "Qualifying Statute" means a Settling State's statute, regulation, law and/or rule (applicable everywhere the Settling State has authority to legislate) that effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of this Agreement. Each Participating Manufacturer and each Settling State agree that the model statute in the form set forth in Exhibit T (the "Model Statute"), if enacted without modification or addition (except for particularized state procedural or technical requirements) and not in conjunction with any other legislative or regulatory proposal, shall constitute a Qualifying Statute. Each Participating Manufacturer agrees to support the enactment of such Model Statute if such Model Statute is introduced or proposed (i) without modification or addition (except for particularized procedural or technical requirements), and (ii) not in conjunction with any other legislative proposal.

(F)  If a Settling State (i) enacts the Model Statute without any modification or addition (except for particularized state procedural or technical requirements) and not in conjunction with any other legislative or regulatory proposal, (ii) uses its best efforts to keep the Model Statute in full force and effect by, among other things, defending the Model Statute fully in any litigation brought in state or federal court within such Settling State (including litigating all available appeals that may affect the effectiveness of the Model Statute), and (iii) otherwise complies with subsection (2)(B), but a court of competent jurisdiction nevertheless invalidates or renders unenforceable the Model Statute with respect to such Settling State, and but for such ruling the Settling State would have been exempt from an NPM Adjustment under subsection (2)(B), then the NPM Adjustment (including reallocations pursuant to subsections (2)(C) and (2)(D)) shall still apply to such Settling State's Allocated Payments but in any individual year shall not exceed 65% of the amount of such Allocated Payments.

(G)  In the event a Settling State proposes and/or enacts a statute, regulation, law and/or rule (applicable everywhere the Settling State has authority to legislate) that is not the Model Statute and asserts that such statute, regulation, law and/or rule is a Qualifying Statute, the Firm shall be jointly retained by the Settling States and the Original Participating Manufacturers for the purpose of determining whether or not such statute, regulation, law and/or rule constitutes a Qualifying Statute.  The Firm shall make the foregoing determination within 90 days of a written request to it from the relevant Settling State (copies of which request the Settling State shall also provide to all Participating Manufacturers and the Independent Auditor), and the Firm shall promptly thereafter provide written notice of such determination to the relevant Settling State, NAAG,

all Participating Manufacturers and the Independent Auditor.  The determination of the Firm with respect to this issue shall be conclusive and binding upon all parties, and shall be final and non-appealable; provided, however, (i) that such determination shall be of no force and effect with respect to a proposed statute, regulation, law and/or rule that is thereafter enacted with any modification or addition; and (ii) that the Settling State in which the Qualifying Statute was enacted and any Participating Manufacturer may at any time request that the Firm reconsider its determination as to this issue in light of subsequent events (including, without limitation, subsequent judicial review, interpretation, modification and/or disapproval of a Settling State's Qualifying Statute, and the manner and/or the effect of enforcement of such Qualifying Statute).  The Original Participating Manufacturers shall severally pay their Relative Market Shares of the reasonable fees and expenses of the Firm.  Only the Participating Manufacturers and Settling States, and their respective counsel, shall be entitled to communicate with the Firm with respect to the Firm's activities pursuant to this subsection (2)(G).

(H)  Except as provided in subsection (2)(F), in the event a Qualifying Statute is enacted within a Settling State and is thereafter invalidated or declared unenforceable by a court of competent jurisdiction, otherwise rendered not in full force and effect, or, upon reconsideration by the Firm pursuant to subsection (2)(G) determined not to constitute a Qualifying Statute, then such Settling State's Allocated Payments shall be fully subject to an NPM Adjustment unless and until the requirements of subsection (2)(B) have been once again satisfied.

(3)  Allocation of NPM Adjustment among Original Participating Manufacturers.  The portion of the total amount of the NPM Adjustment to which the Original Participating Manufacturers are entitled in any year that can be applied in such year consistent with subsection

IX(d)(2) (the "Available NPM Adjustment") shall be allocated among them as provided in this subsection IX(d)(3).

(A)  The "Base NPM Adjustment" shall be determined for each Original Participating Manufacturer in such year as follows:

(i)  For those Original Participating Manufacturers whose Relative Market Shares in the year immediately preceding the year in which the NPM Adjustment in question is applied exceed or are equal to their respective 1997 Relative Market Shares, the Base NPM Adjustment shall equal 0 (zero).

(ii)  For those Original Participating Manufacturers whose Relative Market Shares in the year immediately preceding the year in which the NPM Adjustment in question is applied are less than their respective 1997 Relative Market Shares, the Base NPM Adjustment shall equal the result of (x) the difference between such Original Participating Manufacturer's Relative Market Share in such preceding year and its 1997 Relative Market Share multiplied by both (y) the number of individual Cigarettes (expressed in thousands of units) shipped in or to the United States, the District of Columbia and Puerto Rico by all the Original Participating Manufacturers in such preceding year (determined in accordance with subsection II(mm)) and (z) $20 per each thousand units of Cigarettes (as this number is adjusted pursuant to subsection IX(d)(3)(C) below).

(iii)  For those Original Participating Manufacturers whose Base NPM Adjustment, if calculated pursuant to subsection (ii) above, would exceed $300 million (as this number is adjusted pursuant to subsection IX(d)(3)(C) below), the Base NPM Adjustment shall equal $300 million (or such adjusted number, as provided in subsection IX(d)(3)(C) below).

(B)  The share of the Available NPM Adjustment each Original Participating Manufacturer is entitled to shall be calculated as follows:

(i)  If the Available NPM Adjustment the Original Participating Manufacturers are entitled to in any year is less than or equal to the sum of the Base NPM Adjustments of all Original Participating Manufacturers in such year, then such Available NPM Adjustment shall be allocated among those Original Participating Manufacturers whose Base NPM Adjustment is not equal to 0 (zero) pro rata in proportion to their respective Base NPM Adjustments.

(ii)  If the Available NPM Adjustment the Original Participating Manufacturers are entitled to in any year exceeds the sum of the Base NPM Adjustments of all Original Participating Manufacturers in such year, then (x) the difference between such Available NPM Adjustment and such sum of the Base NPM Adjustments shall be allocated among the Original Participating Manufacturers pro rata in proportion to their Relative Market Shares (the applicable Relative Market Shares to be those in the year immediately preceding such year), and (y) each Original Participating Manufacturer's share of such Available NPM Adjustment shall equal the sum of *(1)* its Base NPM Adjustment for such year, and *(2)* the amount allocated to such Original Participating Manufacturer pursuant to clause (x).

(iii)  If an Original Participating Manufacturer's share of the Available NPM Adjustment calculated pursuant to subsection IX(d)(3)(B)(i) or IX(d)(3)(B)(ii) exceeds such Original Participating Manufacturer's payment amount to which such NPM Adjustment applies (as such payment amount has been determined pursuant to step B of clause "Seventh" of subsection IX(j)), then *(1)* such Original Participating Manufacturer's share of the Available NPM Adjustment shall equal such payment amount, and *(2)* such excess shall be reallocated among the other Original Participating Manufacturers pro rata in proportion to their Relative Market Shares.

(C)  Adjustments:

(i)  For calculations made pursuant to this subsection IX(d)(3) (if any) with respect to payments due in the year 2000, the number used in subsection

IX(d)(3)(A)(ii)(z) shall be $20 and the number used in subsection

IX(d)(3)(A)(iii) shall be $300 million.  Each year thereafter, both these numbers

shall be adjusted upward or downward by multiplying each of them by the

quotient produced by dividing (x) the average revenue per Cigarette of all the

Original Participating Manufacturers in the year immediately preceding such

year, by (y) the average revenue per Cigarette of all the Original Participating

Manufacturers in the year immediately preceding such immediately preceding

year.

(ii)  For purposes of this subsection, the average revenue per Cigarette

of all the Original Participating Manufacturers in any year shall equal (x) the

aggregate revenues of all the Original Participating Manufacturers from sales of

Cigarettes in the fifty United States, the District of Columbia and Puerto Rico

after Federal excise taxes and after payments pursuant to this Agreement and the

tobacco litigation Settlement Agreements with the States of Florida, Mississippi,

Minnesota and Texas (as such revenues are reported to the United States

Securities and Exchange Commission ("SEC") for such year (either

independently by the Original Participating Manufacturer or as part of

consolidated financial statements reported to the SEC by an Affiliate of the

Original Participating Manufacturers) or, in the case of an Original Participating

Manufacturer that does not report income to the SEC, as reported in financial

statements prepared in accordance with United States generally accepted

accounting principles and audited by a nationally recognized accounting firm),

divided by (y) the aggregate number of the individual Cigarettes shipped in or to

the United States, the District of Columbia and Puerto Rico by all the Original

Participating Manufacturers in such year (determined in accordance with

subsection II(mm)).

(D)  In the event that in the year immediately preceding the year in which the

NPM Adjustment in question is applied both (x) the Relative Market Share of Lorillard

Tobacco Company (or of its successor) ("Lorillard") was less than or equal to 20.0000000%, and (y) the number of individual Cigarettes shipped in or to the United States, the District of Columbia and Puerto Rico by Lorillard (determined in accordance with subsection II(mm)) (for purposes of this subsection (D), "Volume") was less than or equal to 70 billion, Lorillard's and Philip Morris Incorporated's (or its successor's) ("Philip Morris") shares of the Available NPM Adjustment calculated pursuant to subsections (3)(A)-(C) above shall be further reallocated between Lorillard and Philip Morris as follows (this subsection (3)(D) shall not apply in the year in which either of the two conditions specified in this sentence is not satisfied):

(i)  Notwithstanding subsections (A)-(C) of this subsection (d)(3), but subject to further adjustment pursuant to subsections (D)(ii) and (D)(iii) below, Lorillard's share of the Available NPM Adjustment shall equal its Relative Market Share of such Available NPM Adjustment (the applicable Relative Market Share to be that in the year immediately preceding the year in which such NPM Adjustment is applied).  The dollar amount of the difference between the share of the Available NPM Adjustment Lorillard is entitled to pursuant to the preceding sentence and the share of the Available NPM Adjustment it would be entitled to in the same year pursuant to subsections (d)(3)(A)-(C) shall be reallocated to Philip Morris and used to decrease or increase, as the case may be, Philip Morris's share of the Available NPM Adjustment in such year calculated pursuant to subsections (d)(3)(A)-(C).

(ii)  In the event that in the year immediately preceding the year in which the NPM Adjustment in question is applied either (x) Lorillard's Relative Market Share was greater than 15.0000000% (but did not exceed 20.0000000%), or (y) Lorillard's Volume was greater than 50 billion (but did not exceed 70 billion), or both, Lorillard's share of the Available NPM Adjustment calculated pursuant to subsection (d)(3)(D)(i) shall be reduced by a percentage equal to the greater of (*1*) 10.0000000% for each percentage point (or fraction thereof) of excess of such Relative Market Share over 15.0000000%

(if any), or (2) 2.5000000% for each billion (or fraction thereof) of excess of

such Volume over 50 billion (if any).  The dollar amount by which Lorillard's

share of the Available NPM Adjustment is reduced in any year pursuant to this

subsection (D)(ii) shall be reallocated to Philip Morris and used to increase

Philip Morris's share of the Available NPM Adjustment in such year.

In the event that in any year a reallocation of the shares of the

Available NPM Adjustment between Lorillard and Philip Morris pursuant to this

subsection (d)(3)(D) results in Philip Morris's share of the Available NPM

Adjustment in such year exceeding the greater of (x) Philip Morris's Relative

Market Share of such Available NPM Adjustment (the applicable Relative

Market Share to be that in the year immediately preceding such year), or (y)

Philip Morris's share of the Available NPM Adjustment in such year calculated

pursuant to subsections (d)(3)(A)-(C), Philip Morris's share of the Available

NPM Adjustment in such year shall be reduced to equal the greater of (x) or (y)

above.  In such instance, the dollar amount by which Philip Morris's share of the

Available NPM Adjustment is reduced pursuant to the preceding sentence shall

be reallocated to Lorillard and used to increase Lorillard's share of the Available

NPM Adjustment in such year.

(iv)  In the event that either Philip Morris or Lorillard is treated as a

Non-Participating Manufacturer for purposes of this subsection IX(d)(3)

pursuant to subsection XVIII(w)(2)(A), this subsection (3)(D) shall not be

applied, and the Original Participating Manufacturers' shares of the Available

NPM Adjustment shall be determined solely as described in subsections (3)(A)-

(C).

(4)  NPM Adjustment for Subsequent Participating Manufacturers.

Subject to the provisions of subsection IX(i)(3), a Subsequent Participating

Manufacturer shall be entitled to an NPM Adjustment with respect to payments

due from such Subsequent Participating Manufacturer in any year during which

an NPM Adjustment is applicable under subsection (d)(1) above to payments due from the Original Participating Manufacturers. The amount of such NPM Adjustment shall equal the product of (A) the NPM Adjustment Percentage for such year multiplied by (B) the sum of the payments due in the year in question from such Subsequent Participating Manufacturer that correspond to payments due from Original Participating Manufacturers pursuant to subsection IX(c) (as such payment amounts due from such Subsequent Participating Manufacturer have been adjusted and allocated pursuant to clauses "First" through "Fifth" of subsection IX(j)). The NPM Adjustment to payments by each Subsequent Participating Manufacturer shall be allocated and reallocated among the Settling States in a manner consistent with subsection (d)(2) above.

(e) Supplemental Payments. Beginning on April 15, 2004, and on April 15 of each year thereafter in perpetuity, in the event that the sum of the Market Shares of the Participating Manufacturers that were Participating Manufacturers during the entire calendar year immediately preceding the year in which the payment in question would be due (the applicable Market Share to be that for the calendar year immediately preceding the year in which the payment in question would be due) equals or exceeds 99.0500000%, each Original Participating Manufacturer shall severally pay to the Escrow Agent (to be credited to the Subsection IX(e) Account) for the benefit of the Foundation its Relative Market Share of the base amount of $300,000,000, as such payments are modified in accordance with this subsection (e). Such payments shall be utilized by the Foundation to fund the national public education functions of the Foundation described in subsection VI(f)(1), in the manner described in and subject to the provisions of subsections VI(g) and VI(h). The payments made by the Original Participating Manufacturers pursuant to this subsection shall be subject to the Inflation Adjustment, the Volume Adjustment, the Non-Settling States Reduction, and the offset for miscalculated or disputed payments described in subsection XI(i).

(f) Payment Responsibility. The payment obligations of each Participating Manufacturer pursuant to this Agreement shall be the several responsibility

Manufacturers (the applicable Market Shares being those for the calendar year immediately preceding the year in which the payment in question is due).

(3)  Any payment due from a Subsequent Participating Manufacturer under subsections (1) and (2) above shall be subject (up to the full amount of such payment) to the Inflation Adjustment, the Non-Settling States Reduction, the NPM Adjustment, the offset for miscalculated or disputed payments described in subsection XI(i), the Federal Tobacco Legislation Offset, the Litigating Releasing Parties Offset and the offsets for claims over described in subsections XII(a)(4)(B) and XII(a)(8), to the extent that such adjustments, reductions or offsets would apply to the corresponding payment due from the Original Participating Manufacturers.  Provided, however, that all adjustments and offsets to which a Subsequent Participating Manufacturer is entitled may only be applied against payments by such Subsequent Participating Manufacturer, if any, that are due within 12 months after the date on which the Subsequent Participating Manufacturer becomes entitled to such adjustment or makes the payment that entitles it to such offset, and shall not be carried forward beyond that time even if not fully used.

(4)  For purposes of this subsection (i), the 1997 (or 1998, as applicable) Market Share (and 125 percent thereof) of those Subsequent Participating Manufacturers that either (A) became a signatory to this Agreement more than 60 days after the MSA Execution Date or (B) had no Market Share in 1997 (or 1998, as applicable), shall equal zero.

(j)  <u>Order of Application of Allocations, Offsets, Reductions and Adjustments</u>. The payments due under this Agreement shall be calculated as set forth below.  The "base amount" referred to in clause "First" below shall mean (1) in the case of payments due from Original Participating Manufacturers, the base amount referred to in the subsection establishing the payment obligation in question; and (2) in the case of payments due from a Subsequent Participating Manufacturer, the base amount referred to in subsection (i)(2)

for such Subsequent Participating Manufacturer.  In the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause.  (If clause "First" is inapplicable, the result of clause "First" will be the base amount of the payment in question prior to any offsets, reductions or adjustments.)

First:  the Inflation Adjustment shall be applied to the base amount of the payment being calculated;

Second:  the Volume Adjustment (other than the provisions of subsection (B)(iii) of Exhibit E) shall be applied to the result of clause "First";

Third:  the result of clause "Second" shall be reduced by the Previously Settled States Reduction;

Fourth:  the result of clause "Third" shall be reduced by the Non-Settling States Reduction;

Fifth:  in the case of payments due under subsections IX(c)(1) and IX(c)(2), the results of clause "Fourth" for each such payment due in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together to form such Settling State's Allocated Payment.  In the case of payments due under subsection IX(i) that correspond to payments due under subsections IX(c)(1) or IX(c)(2), the results of clause "Fourth" for all such payments due from a particular Subsequent Participating Manufacturer in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together.  (In the case of all other payments made pursuant to this Agreement, this clause "Fifth" is inapplicable.);

Sixth:  the NPM Adjustment shall be applied to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2) (or, in the case of payments due from the Subsequent Participating Manufacturers, pursuant to subsection IX(d)(4));

Seventh:  in the case of payments due from the Original Participating Manufacturers to which clause "Fifth" (and therefore clause "Sixth") does not apply, the result of clause "Fourth" shall be allocated among the Original Participating Manufacturers according to their Relative Market Shares.  In the case of payments due from the Original Participating Manufacturers to which clause "Fifth" applies:  (A) the Allocated Payments of all Settling States determined pursuant to clause "Fifth" (prior to reduction pursuant to clause "Sixth") shall be added together; (B) the resulting sum shall be allocated among the Original Participating Manufacturers according to their Relative Market Shares and subsection (B)(iii) of Exhibit E hereto (if such subsection is applicable); (C) the Available NPM Adjustment (as determined pursuant to clause "Sixth") shall be allocated among the Original Participating Manufacturers pursuant to subsection IX(d)(3); (D) the respective result of step (C) above for each Original Participating Manufacturer shall be subtracted from the respective result of step (B) above for such Original Participating Manufacturer; and (E) the resulting payment amount due from each Original Participating Manufacturer shall then be allocated among the Settling States in proportion to the respective results of clause "Sixth" for each Settling State.  The offsets described in clauses "Eighth" through "Twelfth" shall then be applied separately against each Original Participating Manufacturer's resulting payment shares (on a Settling State by Settling State basis) according to each Original Participating Manufacturer's separate entitlement to such offsets, if any, in the calendar year in question.  (In the case of payments due from Subsequent Participating Manufacturers, this clause "Seventh" is inapplicable.)

Eighth:  the offset for miscalculated or disputed payments described in subsection XI(i) (and any carry-forwards arising from such offset) shall be applied to the results of clause "Seventh" (in the case of payments due from the Original Participating Manufacturers) or to the results of clause "Sixth" (in the case of payments due from Subsequent Participating Manufacturers);

Ninth:  the Federal Tobacco Legislation Offset (including any carry-forwards arising from such offset) shall be applied to the results of clause "Eighth";

Tenth:  the Litigating Releasing Parties Offset (including any carry-forwards arising from such offset) shall be applied to the results of clause "Ninth";

Eleventh:  the offset for claims over pursuant to subsection XII(a)(4)(B) (including any carry-forwards arising from such offset) shall be applied to the results of clause "Tenth";

Twelfth:  the offset for claims over pursuant to subsection XII(a)(8) (including any carry-forwards arising from such offset) shall be applied to the results of clause "Eleventh"; and

Thirteenth:  in the case of payments to which clause "Fifth" applies, the Settling States' allocated shares of the payments due from each Participating Manufacturer (as such shares have been determined in step (E) of clause "Seventh" in the case of payments from the Original Participating Manufacturers or in clause "Sixth" in the case of payments from the Subsequent Participating Manufacturers, and have been reduced by clauses "Eighth" through "Twelfth") shall be added together to state the aggregate payment obligation of each Participating Manufacturer with respect to the payments in question.  (In the case of a payment to which clause "Fifth" does not apply, the aggregate payment obligation of each Participating Manufacturer with respect to the payment in question shall be stated by the results of clause "Eighth.")

67

## X.    EFFECT OF FEDERAL TOBACCO-RELATED LEGISLATION

(a)  If federal tobacco-related legislation is enacted after the MSA Execution Date and on or before November 30, 2002, and if such legislation provides for payment(s) by any Original Participating Manufacturer (whether by settlement payment, tax or any other means), all or part of which are actually made available to a Settling State ("Federal Funds"), each Original Participating Manufacturer shall receive a continuing dollar-for-dollar offset for any and all amounts that are paid by such Original Participating Manufacturer pursuant to such legislation and actually made available to such Settling State (except as described in subsections (b) and (c) below).  Such offset shall be applied against the applicable Original Participating Manufacturer's share (determined as described in step E of clause "Seventh" of subsection IX(j)) of such Settling State's Allocated Payment, up to the full amount of such Original Participating Manufacturer's share of such Allocated Payment (as such share had been reduced by adjustment, if any, pursuant to the NPM Adjustment and has been reduced by offset, if any, pursuant to the offset for miscalculated or disputed payments).  Such offset shall be made against such Original Participating Manufacturer's share of the first Allocated Payment due after such Federal Funds are first available for receipt by such Settling State.  In the event that such offset would in any given year exceed such Original Participating Manufacturer's share of such Allocated Payment:  (1) the offset to which such Original Participating Manufacturer is entitled under this section in such year shall be the full amount of such Original Participating Manufacturer's share of such Allocated Payment, and (2) all amounts not offset by reason of subsection (1) shall carry forward and be offset in the following year(s) until all such amounts have been offset.

(b)  The offset described in subsection (a) shall apply only to that portion of Federal Funds, if any, that are either unrestricted as to their use, or restricted to any form of health care or to any use related to tobacco (including, but not limited to, tobacco education, cessation, control or enforcement) (other than that portion of Federal Funds, if any, that is specifically applicable to tobacco growers or communities dependent on the

production of tobacco or Tobacco Products).  Provided, however, that the offset described in subsection (a) shall not apply to that portion of Federal Funds, if any, whose receipt by such Settling State is conditioned upon or appropriately allocable to:

(1)  the relinquishment of rights or benefits under this Agreement (including the Consent Decree); or

(2)  actions or expenditures by such Settling State, unless:

(A)  such Settling State chooses to undertake such action or expenditure;

(B)  such actions or expenditures do not impose significant constraints on public policy choices; or

(C)  such actions or expenditures are both:  (i) related to health care or tobacco (including, but not limited to, tobacco education, cessation, control or enforcement) and (ii) do not require such Settling State to expend state matching funds in an amount that is significant in relation to the amount of the Federal Funds made available to such Settling State.

(c)  Subject to the provisions of subsection IX(i)(3), Subsequent Participating Manufacturers shall be entitled to the offset described in this section X to the extent that they are required to pay Federal Funds that would give rise to an offset under subsections (a) and (b) if paid by an Original Participating Manufacturer.

(d)  Nothing in this section X shall (1) reduce the payments to be made to the Settling States under this Agreement other than those described in subsection IX(c) (or corresponding payments under subsection IX(i)) of this Agreement; or (2) alter the Allocable Share used to determine each Settling State's share of the payments described in subsection IX(c) (or corresponding payments under subsection IX(i)) of this Agreement.  Nothing in this section X is intended to or shall reduce the total amounts payable by the Participating Manufacturers to the Settling States under this Agreement by an amount greater than the amount of Federal Funds that the Settling States could elect to receive.

### XI.   CALCULATION AND DISBURSEMENT OF PAYMENTS

(a) <u>Independent Auditor to Make All Calculations</u>.

(1)  Beginning with payments due in the year 2000, an Independent Auditor shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing (including, but not limited to, determining Market Share, Relative Market Share, Base Aggregate Participating Manufacturer Market Share and Actual Aggregate Participating Manufacturer Market Share).  The Independent Auditor shall promptly collect all information necessary to make such calculations and determinations.  Each Participating Manufacturer and each Settling State shall provide the Independent Auditor, as promptly as practicable, with information in its possession or readily available to it necessary for the Independent Auditor to perform such calculations.  The Independent Auditor shall agree to maintain the confidentiality of all such information, except that the Independent Auditor may provide such information to Participating Manufacturers and the Settling States as set forth in this Agreement.  The Participating Manufacturers and the Settling States agree to maintain the confidentiality of such information.

(2)  Payments due from the Original Participating Manufacturers prior to January 1, 2000 (other than the first payment due pursuant to subsection IX(b)) shall be based on the 1998 Relative Market Shares of the Original Participating Manufacturers or, if the Original Participating Manufacturers are unable to agree on such Relative Market Shares, on their 1997 Relative Market Shares specified in Exhibit Q.

(b)  <u>Identity of Independent Auditor</u>.  The Independent Auditor shall be a major, nationally recognized, certified public accounting firm jointly selected by agreement of the Original Participating Manufacturers and those Attorneys General of the Settling States who are members of the NAAG executive committee, who shall jointly retain the power to replace the Independent Auditor and appoint its successor.  Fifty percent of the costs and fees of the Independent Auditor (but in no event more than $500,000 per annum), shall be paid by the Fund described in Exhibit J hereto, and the balance of such costs and fees shall be paid by the Original Participating Manufacturers, allocated among them according to their Relative Market Shares.  The agreement retaining the Independent Auditor shall provide that the Independent Auditor shall perform the functions specified for it in this Agreement, and that it shall do so in the manner specified in this Agreement.

(c)  <u>Resolution of Disputes</u>.  Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.  Each of the two sides to the dispute shall select one arbitrator.  The two arbitrators so selected shall select the third arbitrator.  The arbitration shall be governed by the United States Federal Arbitration Act.

(d)  <u>General Provisions as to Calculation of Payments</u>.

(1)  Not less than 90 days prior to the scheduled due date of any payment due pursuant to this Agreement ("Payment Due Date"), the Independent Auditor shall deliver to each other Notice Party a detailed itemization of all information required by the Independent Auditor to complete its calculation of (A) the amount due from each Participating Manufacturer with respect to such payment, and (B) the portion of such amount allocable to each entity for whose benefit such payment is to be made.  To the extent practicable, the Independent Auditor shall

specify in such itemization which Notice Party is requested to produce which information.  Each Participating Manufacturer and each Settling State shall use its best efforts to promptly supply all of the required information that is within its possession or is readily available to it to the Independent Auditor, and in any event not less than 50 days prior to such Payment Due Date.  Such best efforts obligation shall be continuing in the case of information that comes within the possession of, or becomes readily available to, any Settling State or Participating Manufacturer after the date 50 days prior to such Payment Due Date.

(2)  Not less than 40 days prior to the Payment Due Date, the Independent Auditor shall deliver to each other Notice Party (A) detailed preliminary calculations ("Preliminary Calculations") of the amount due from each Participating Manufacturer and of the amount allocable to each entity for whose benefit such payment is to be made, showing all applicable offsets, adjustments, reductions and carry-forwards and setting forth all the information on which the Independent Auditor relied in preparing such Preliminary Calculations, and (B) a statement of any information still required by the Independent Auditor to complete its calculations.

(3)  Not less than 30 days prior to the Payment Due Date, any Participating Manufacturer or any Settling State that disputes any aspect of the Preliminary Calculations (including, but not limited to, disputing the methodology that the Independent Auditor employed, or the information on which the Independent Auditor relied, in preparing such calculations) shall notify each other Notice Party of such dispute, including the reasons and basis therefor.

(4)  Not less than 15 days prior to the Payment Due Date, the Independent Auditor shall deliver to each other Notice Party a detailed recalculation (a "Final Calculation") of the amount due from each Participating Manufacturer, the amount allocable to each entity for whose benefit such payment is to be made, and the Account to which such payment is to be credited, explaining any changes

from the Preliminary Calculation. The Final Calculation may include estimates of amounts in the circumstances described in subsection (d)(5).

(5) The following provisions shall govern in the event that the information required by the Independent Auditor to complete its calculations is not in its possession by the date as of which the Independent Auditor is required to provide either a Preliminary Calculation or a Final Calculation.

(A) If the information in question is not readily available to any Settling State, any Original Participating Manufacturer or any Subsequent Participating Manufacturer, the Independent Auditor shall employ an assumption as to the missing information producing the minimum amount that is likely to be due with respect to the payment in question, and shall set forth its assumption as to the missing information in its Preliminary Calculation or Final Calculation, whichever is at issue. Any Original Participating Manufacturer, Subsequent Participating Manufacturer or Settling State may dispute any such assumption employed by the Independent Auditor in its Preliminary Calculation in the manner prescribed in subsection (d)(3) or any such assumption employed by the Independent Auditor in its Final Calculation in the manner prescribed in subsection (d)(6). If the missing information becomes available to the Independent Auditor prior to the Payment Due Date, the Independent Auditor shall promptly revise its Preliminary Calculation or Final Calculation (whichever is applicable) and shall promptly provide the revised calculation to each Notice Party, showing the newly available information. If the missing information does not become available to the Independent Auditor prior to the Payment Due Date, the minimum amount calculated by the Independent Auditor pursuant to this subsection (A) shall be paid on the Payment Due Date, subject to disputes pursuant to subsections (d)(6) and (d)(8) and without prejudice to a later final determination of the correct amount. If the missing information becomes

available to the Independent Auditor after the Payment Due Date, the Independent Auditor shall calculate the correct amount of the payment in question and shall apply any overpayment or underpayment as an offset or additional payment in the manner described in subsection (i).

(B) If the information in question is readily available to a Settling State, Original Participating Manufacturer or Subsequent Participating Manufacturer, but such Settling State, Original Participating Manufacturer or Subsequent Participating Manufacturer does not supply such information to the Independent Auditor, the Independent Auditor shall base the calculation in question on its best estimate of such information, and shall show such estimate in its Preliminary Calculation or Final Calculation, whichever is applicable. Any Original Participating Manufacturer, Subsequent Participating Manufacturer or Settling State (except the entity that withheld the information) may dispute such estimate employed by the Independent Auditor in its Preliminary Calculation in the manner prescribed in subsection (d)(3) or such estimate employed by the Independent Auditor in its Final Calculation in the manner prescribed in subsection (d)(6). If the withheld information is not made available to the Independent Auditor more than 30 days prior to the Payment Due Date, the estimate employed by the Independent Auditor (as revised by the Independent Auditor in light of any dispute filed pursuant to the preceding sentence) shall govern the amounts to be paid on the Payment Due Date, subject to disputes pursuant to subsection (d)(6) and without prejudice to a later final determination of the correct amount. In the event that the withheld information subsequently becomes available, the Independent Auditor shall calculate the correct amount and shall apply any overpayment or underpayment as an offset or additional payment in the manner described in subsection (i).

(6)  Not less than five days prior to the Payment Due Date, each Participating Manufacturer and each Settling State shall deliver to each Notice Party a statement indicating whether it disputes the Independent Auditor's Final Calculation and, if so, the disputed and undisputed amounts and the basis for the dispute.  Except to the extent a Participating Manufacturer or a Settling State delivers a statement indicating the existence of a dispute by such date, the amounts set forth in the Independent Auditor's Final Calculation shall be paid on the Payment Due Date.  Provided, however, that (A) in the event that the Independent Auditor revises its Final Calculation within five days of the Payment Due Date as provided in subsection (5)(A) due to receipt of previously missing information, a Participating Manufacturer or Settling State may dispute such revision pursuant to the procedure set forth in this subsection (6) at any time prior to the Payment Due Date; and (B) prior to the date four years after the Payment Due Date, neither failure to dispute a calculation made by the Independent Auditor nor actual agreement with any calculation or payment to the Escrow Agent or to another payee shall waive any Participating Manufacturer's or Settling State's rights to dispute any payment (or the Independent Auditor's calculations with respect to any payment) after the Payment Due Date.  No Participating Manufacturer and no Settling State shall have a right to raise any dispute with respect to any payment or calculation after the date four years after such payment's Payment Due Date.

(7)  Each Participating Manufacturer shall be obligated to pay by the Payment Due Date the undisputed portion of the total amount calculated as due from it by the Independent Auditor's Final Calculation.  Failure to pay such portion shall render the Participating Manufacturer liable for interest thereon as provided in subsection IX(h) of this Agreement, in addition to any other remedy available under this Agreement.

(8)  As to any disputed portion of the total amount calculated to be due pursuant to the Final Calculation, any Participating Manufacturer that by the

Payment Due Date pays such disputed portion into the Disputed Payments Account (as defined in the Escrow Agreement) shall not be liable for interest thereon even if the amount disputed was in fact properly due and owing. Any Participating Manufacturer that by the Payment Due Date does not pay such disputed portion into the Disputed Payments Account shall be liable for interest as provided in subsection IX(h) if the amount disputed was in fact properly due and owing.

(9) On the same date that it makes any payment pursuant to this Agreement, each Participating Manufacturer shall deliver a notice to each other Notice Party showing the amount of such payment and the Account to which such payment is to be credited.

(10) On the first Business Day after the Payment Due Date, the Escrow Agent shall deliver to each other Notice Party a statement showing the amounts received by it from each Participating Manufacturer and the Accounts credited with such amounts.

(e) <u>General Treatment of Payments</u>. The Escrow Agent may disburse amounts from an Account only if permitted, and only at such time as permitted, by this Agreement and the Escrow Agreement. No amounts may be disbursed to a Settling State other than funds credited to such Settling State's State-Specific Account (as defined in the Escrow Agreement). The Independent Auditor, in delivering payment instructions to the Escrow Agent, shall specify: the amount to be paid; the Account or Accounts from which such payment is to be disbursed; the payee of such payment (which may be an Account); and the Business Day on which such payment is to be made by the Escrow Agent. Except as expressly provided in subsection (f) below, in no event may any amount be disbursed from any Account prior to Final Approval.

(f) <u>Disbursements and Charges Not Contingent on Final Approval</u>. Funds may be disbursed from Accounts without regard to the occurrence of Final Approval in the following circumstances and in the following manner:

(1)  Payments of Federal and State Taxes.  Federal, state, local or other taxes imposed with respect to the amounts credited to the Accounts shall be paid from such amounts.  The Independent Auditor shall prepare and file any tax returns required to be filed with respect to the escrow.  All taxes required to be paid shall be allocated to and charged against the Accounts on a reasonable basis to be determined by the Independent Auditor.  Upon receipt of written instructions from the Independent Auditor, the Escrow Agent shall pay such taxes and charge such payments against the Account or Accounts specified in those instructions.

(2)  Payments to and from Disputed Payments Account.  The Independent Auditor shall instruct the Escrow Agent to credit funds from an Account to the Disputed Payments Account when a dispute arises as to such funds, and shall instruct the Escrow Agent to credit funds from the Disputed Payments Account to the appropriate payee when such dispute is resolved with finality.  The Independent Auditor shall provide the Notice Parties not less than 10 Business Days prior notice before instructing the Escrow Agent to disburse funds from the Disputed Payments Account.

(3)  Payments to a State-Specific Account.  Promptly following the occurrence of State-Specific Finality in any Settling State, such Settling State and the Original Participating Manufacturers shall notify the Independent Auditor of such occurrence.  The Independent Auditor shall promptly thereafter notify each Notice Party of such State-Specific Finality and of the portions of the amounts in the Subsection IX(b) Account (First), Subsection IX(b) Account (Subsequent), Subsection IX(c)(1) Account and Subsection IX(c)(2) Account, respectively (as such Accounts are defined in the Escrow Agreement), that are at such time held in such Accounts for the benefit of such Settling State, and which are to be transferred to the appropriate State-Specific Account for such Settling State.  If neither the Settling State in question nor any Participating Manufacturer disputes such amounts or the occurrence of such State-Specific Finality by notice delivered

to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to make such transfer.  If the Settling State in question or any Participating Manufacturer disputes such amounts or the occurrence of such State-Specific Finality by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (f)(3), the Independent Auditor shall promptly instruct the Escrow Agent to credit the amount disputed to the Disputed Payments Account and the undisputed portion to the appropriate State-Specific Account.  No amounts may be transferred or credited to a State-Specific Account for the benefit of any State as to which State-Specific Finality has not occurred or as to which this Agreement has terminated.

(4)  <u>Payments to Parties other than Particular Settling States</u>.

(A)  Promptly following the occurrence of State-Specific Finality in one Settling State, such Settling State and the Original Participating Manufacturers shall notify the Independent Auditor of such occurrence. The Independent Auditor shall promptly thereafter notify each Notice Party of the occurrence of State-Specific Finality in at least one Settling State and of the amounts held in the Subsection VI(b) Account, Subsection VI(c) Account (First), and Subsection VIII(c) Account (as such Accounts are defined in the Escrow Agreement), if any.  If neither any of the Settling States nor any of the Participating Manufacturers disputes such amounts or disputes the occurrence of State-Specific Finality in one Settling State, by notice delivered to each Notice Party not later than ten Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to disburse the funds held in such Accounts to the Foundation or to the Fund specified in subsection VIII(c), as appropriate.  If any Settling State or Participating Manufacturer disputes such amounts or the occurrence of such State-Specific Finality by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (4)(A), the Independent Auditor shall promptly instruct the Escrow Agent to credit the amounts disputed to the Disputed Payments Account and to disburse the undisputed portion to the Foundation or to the Fund specified in subsection VIII(c), as appropriate.

(B)  The Independent Auditor shall instruct the Escrow Agent to disburse funds on deposit in the Subsection VIII(b) Account and Subsection IX(e) Account (as such Accounts are defined in the Escrow Agreement) to NAAG or to the Foundation, as appropriate, within 10

Business Days after the date on which such amounts were credited to such Accounts.

(C)  Promptly following the occurrence of State-Specific Finality in Settling States having aggregate Allocable Shares equal to at least 80% of the total aggregate Allocable Shares assigned to all States that were Settling States as of the MSA Execution Date, the Settling States and the Original Participating Manufacturers shall notify the Independent Auditor of such occurrence.  The Independent Auditor shall promptly thereafter notify each Notice Party of the occurrence of such State-Specific Finality and of the amounts held in the Subsection VI(c) Account (Subsequent) (as such Account is defined in the Escrow Agreement), if any.  If neither any of the Settling States nor any of the Participating Manufacturers disputes such amounts or disputes the occurrence of such State-Specific Finality, by notice delivered to each Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to disburse the funds held in such Account to the Foundation.  If any Settling State or Participating Manufacturer disputes such amounts or the occurrence of such State-Specific Finality by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (4)(C), the Independent Auditor shall promptly instruct the Escrow Agent to credit the amounts disputed to the Disputed Payments Account and to disburse the undisputed portion to the Foundation.

(5)  Treatment of Payments Following Termination.

(A)  As to amounts held for Settling States.  Promptly upon the termination of this Agreement with respect to any Settling State (whether

or not as part of the termination of this Agreement as to all Settling States) such State or any Participating Manufacturer shall notify the Independent Auditor of such occurrence.  The Independent Auditor shall promptly thereafter notify each Notice Party of such termination and of the amounts held in the Subsection IX(b) Account (First), the Subsection IX(b) Account (Subsequent), the Subsection IX(c)(1) Account, the Subsection IX(c)(2) Account, and the State-Specific Account for the benefit of such Settling State.  If neither the State in question nor any Participating Manufacturer disputes such amounts or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to transfer such amounts to the Participating Manufacturers (on the basis of their respective contributions of such funds).  If the State in question or any Participating Manufacturer disputes the amounts held in the Accounts or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (5)(A), the Independent Auditor shall promptly instruct the Escrow Agent to transfer the amount disputed to the Disputed Payments Account and the undisputed portion to the Participating Manufacturers (on the basis of their respective contributions of such funds).

(B)  <u>As to amounts held for others</u>.  If this Agreement is terminated with respect to all of the Settling States, the Original Participating Manufacturers shall promptly notify the Independent Auditor of such occurrence.  The Independent Auditor shall promptly thereafter notify each Notice Party of such termination and of the amounts held in the Subsection VI(b) Account, the Subsection VI(c) Account (First), the

Subsection VIII(b) Account, the Subsection VIII(c) Account and the Subsection IX(e) Account.  If neither any such State nor any Participating Manufacturer disputes such amounts or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to transfer such amounts to the Participating Manufacturers (on the basis of their respective contributions of such funds).  If any such State or any Participating Manufacturer disputes the amounts held in the Accounts or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (5)(B), the Independent Auditor shall promptly instruct the Escrow Agent to credit the amount disputed to the Disputed Payments Account and transfer the undisputed portion to the Participating Manufacturers (on the basis of their respective contribution of such funds).

(C)  <u>As to amounts held in the Subsection VI(c) Account (Subsequent)</u>.  If this Agreement is terminated with respect to Settling States having aggregate Allocable Shares equal to more than 20% of the total aggregate Allocable Shares assigned to those States that were Settling States as of the MSA Execution Date, the Original Participating Manufacturers shall promptly notify the Independent Auditor of such occurrence.  The Independent Auditor shall promptly thereafter notify each Notice Party of such termination and of the amounts held in the Subsection VI(c) Account (Subsequent) (as defined in the Escrow Agreement).  If neither any such State with respect to which this Agreement has terminated nor any Participating Manufacturer disputes

such amounts or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the preceding sentence, the Independent Auditor shall promptly instruct the Escrow Agent to transfer such amounts to the Participating Manufacturers (on the basis of their respective contributions of such funds).  If any such State or any Participating Manufacturer disputes the amounts held in the Account or the occurrence of such termination by notice delivered to each other Notice Party not later than 10 Business Days after delivery by the Independent Auditor of the notice described in the second sentence of this subsection (5)(C), the Independent Auditor shall promptly instruct the Escrow Agent to credit the amount disputed to the Disputed Payments Account and transfer the undisputed portion to the Participating Manufacturers (on the basis of their respective contribution of such funds).

(6)  Determination of amounts paid or held for the benefit of each individual Settling State.  For purposes of subsections (f)(3), (f)(5)(A) and (i)(2), the portion of a payment that is made or held for the benefit of each individual Settling State shall be determined:  (A) in the case of a payment credited to the Subsection IX(b) Account (First) or the Subsection IX(b) Account (Subsequent), by allocating the results of clause "Eighth" of subsection IX(j) among those Settling States who were Settling States at the time that the amount of such payment was calculated, pro rata in proportion to their respective Allocable Shares; and (B) in the case of a payment credited to the Subsection IX(c)(1) Account or the Subsection IX(c)(2) Account, by the results of clause "Twelfth" of subsection IX(j) for each individual Settling State.  Provided, however, that, solely for purposes of subsection (f)(3), the Settling States may by unanimous agreement agree on a different method of allocation of amounts held in the Accounts identified in this subsection (f)(6).

eligible payment against which the offset may be applied.  The applicable interest rate shall be the Prime Rate (except that, where the overpayment is the result of a Settling State's withholding of information as described in subsection (d)(5)(B), the applicable interest rate shall be that described in subsection IX(h)).

(iv)  an offset under this subsection (B) shall be applied up to the full amount of the Participating Manufacturer's share (in the case of payments due from Original Participating Manufacturers, determined as described in the first sentence of clause "Seventh" of subsection IX(j) (or, in the case of payments pursuant to subsection IX(c), step D of such clause)) of the eligible payment in question, as such payment has been adjusted and reduced pursuant to clauses "First" through "Sixth" of subsection IX(j), to the extent each such clause is applicable to the payment in question.  In the event that the offset to which a Participating Manufacturer is entitled under this subsection (B) would exceed such Participating Manufacturer's share of the eligible payment against which it is being applied (or, in the case where such offset arises from an overpayment applicable solely to a particular Settling State, the portion of such payment that is made for the benefit of such Settling State), the offset shall be the full amount of such Participating Manufacturer's share of such payment and all amounts not offset shall carry forward and be offset against subsequent eligible payments until all such amounts have been offset.

(j)  <u>Payments After Applicable Condition</u>.  To the extent that a payment is made after the occurrence of all applicable conditions for the disbursement of such payment to

the payee(s) in question, the Independent Auditor shall instruct the Escrow Agent to disburse such payment promptly following its deposit.

**XII.    SETTLING STATES' RELEASE, DISCHARGE AND COVENANT**

(a) <u>Release</u>.

(1)  Upon the occurrence of State-Specific Finality in a Settling State, such Settling State shall absolutely and unconditionally release and forever discharge all Released Parties from all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have.

(2)  Notwithstanding the foregoing, this release and discharge shall not apply to any defendant in a lawsuit settled pursuant to this Agreement (other than a Participating Manufacturer) unless and until such defendant releases the Releasing Parties (and delivers to the Attorney General of the applicable Settling State a copy of such release) from any and all Claims of such defendant relating to the prosecution of such lawsuit.

(3)  Each Settling State (for itself and for the Releasing Parties) further covenants and agrees that it (and the Releasing Parties) shall not after the occurrence of State-Specific Finality sue or seek to establish civil liability against any Released Party based, in whole or in part, upon any of the Released Claims, and further agrees that such covenant and agreement shall be a complete defense to any such civil action or proceeding.

(4)  (A)  Each Settling State (for itself and for the Releasing Parties) further agrees that, if a Released Claim by a Releasing Party against any person or entity that is not a Released Party (a "non-Released Party") results in or in any way gives rise to a claim-over (on any theory whatever other than a claim based on an express written indemnity agreement) by such non-Released Party against any Released Party (and such Released Party gives notice to the applicable Settling State within 30 days of the service of such claim-over (or within 30 days after the MSA Execution Date, whichever is later) and prior to entry into any settlement of such claim-over), the Releasing Party: (i) shall reduce or credit against any judgment or settlement such Releasing Party may obtain against such non-Released Party the full amount of any judgment or settlement such non-Released Party may obtain against the Released Party on such claim-over; and (ii) shall, as part of any settlement with such non-Released Party, obtain from such non-Released Party for the benefit of