EXHIBIT 6

DOCKETED
DEC 1 2 2006
K. GALLAGHER

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL

COPIES SENT
PURSUANT TO Pa. R.C.P. 236(b)
DEC 1 2 2006
First Judicial District of Pa.
User I.D.: KG

| | | |
|---|---|---|
| COMMONWEALTH OF PA | : | APRIL TERM, 1997 |
| | : | |
| VS. | : | |
| | : | NO. 2443 |
| PHILIP MORRIS, INC., ET AL | : | CONTROL #042118, 051569 |

## MEMORANDUM OPINION

MANFREDI, WILLIAM J., J.                           DECEMBER /2th, 2006

Before the Court is Defendants' Motion to Compel Arbitration. For the reasons fully set forth below, said Motion is granted.

### BACKGROUND

This action arises out of the ultimate settlement of a lawsuit brought by numerous governmental entities against major tobacco producers to recoup health-care costs associated with tobacco use. The resulting settlement was a product of extensive negotiations and was memorialized in a written agreement, called the "Master Settlement Agreement" ("MSA"). The MSA set forth in detail the rights and responsibilities of the parties, including the amounts to be paid by the tobacco companies and the formulae used to compute the various payments. The tobacco companies which first signed the MSA are known as Original Participating Manufacturers ("OPMs"). The MSA provided a mechanism for additional companies to join the settlement, even if they were not part of the original suit. Those companies are referred to in the MSA as "Subsequent Participating Manufacturers" ("SPMs"). Collectively, the entire group of settling tobacco companies are referred to as the "Participating Manufacturers" ("PMs"). The 52 governmental entities are known as the "Settling States", albeit they are not all states.

The MSA provides for each PM to make an annual lump-sum payment and also imposes certain agreed upon marketing restrictions and other requirements. The payment obligations under the MSA are calculated annually and allocated among the settling governmental entities. These payments are subject to several adjustments. One such adjustment is designed to compensate all PMs for any loss of market share that may be attributable to the competitive disadvantage they face, as against companies which are not parties to the MSA, i.e., nonparticipating manufacturers ("NPMs"). This adjustment, known as the "NPM Adjustment", is calculated by an independent auditor on a nationwide basis, utilizing a procedure set forth in the MSA.

The term "Independent Auditor" is defined in the MSA. The role of the Independent Auditor is set forth in § XI (a) (1) of the MSA, which provides, in pertinent part, that the "Independent Auditor shall calculate and determine the amount of all payments owed pursuant to [the MSA], the adjustments . . . thereto . . . the allocation of such payments [and] adjustments . . . among the [PMs] and among the Settling States . . . ." Section IX (j) provides how the PM's payments should be calculated, including how and when the NPM Adjustment should be applied.[1] If information necessary to calculate the annual payments is missing, § XI (d) (5) of MSA explicitly directs the Independent Auditor to calculate the annual payments by employing an assumption or best estimate for the missing information.

For each year, the Independent Auditor is also required to compare the PM's aggregate

---

[1] The sixth step in the calculation provides that "the [NPM Adjustment]...shall be applied to the results of [the fifth step] pursuant to subsections IX (d) (1) and (d) (2) (or, in the case of payments due from the [SPMs], pursuant to subsection IX [d] [4])." (Emphasis added.) Section IX (j) further instructs that "[i]n the event a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the [step] in question shall be deemed to be equal to the result of the immediately preceding [step]." (Emphasis added.)

2

market share with their aggregate market share for the base year 1997 to determine if there has been a "Market Share Loss." For each year the Market Share Loss is greater than zero, § IX [d][1][C] of MSA provides that "a nationally recognized firm of economic consultants (the 'Firm') shall determine whether the disadvantages experienced as a result of the [MSA] were a significant factor contributing to the Market Share Loss for the year in question" The determination of the Firm is final and non-appealable. Only if the Firm determines that the MSA was a "significant factor" contributing to the Market Share Loss will the NPM adjustment apply. The Firm found this to be the case with respect to 2003, the year at issue.

However the inquiry does not end there. Under the MSA, the NPM Adjustment is reallocated if a "Settling State continuously had a Qualifying Statute... in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during the entire calendar year."[2] MSA § IX(d)(2). If a Settling State falls within this exception, then the burden of the NPM adjustment to the PMs payment is reallocated among the other Settling States on a *pro rata* basis.

The dispute here involves the calculation of the payment due in 2004, and whether an NPM adjustment, as calculated from the 2003 Market Share Loss, should have been applied. In arriving at the annual payments due under the MSA for the time period at issue, the Independent Auditor did not apply the NPM adjustment based on the assumption that all Settling States had

---

2 The "Qualifying Statute" provides for enforcement and sanctions against NPMs. The goal of the Qualifying Statute is to level the playing field between the PMs and the NPMs. Theoretically, diligent enforcement of the Qualifying Statute will insure that NPMs do not profit from their failure to settle, at the expense of the settling PMs, who are not only paying money as part of the settlement, but who have also agreed to marketing restrictions and other requirements as part of their settlement. Thus, the Qualifying Statute serves both as incentive for those manufacturers who settle, and as disincentive to those tobacco manufacturers who eschew settlement.

enacted Qualifying Statutes and that all such statutes were in full force and effect since their effective date. The Independent Auditor did not make an explicit finding regarding whether the Settling States diligently enforced the Qualifying Statute during 2003. The PMs disagreed with this assumption.[3]

Thereafter, the Commonwealth filed a Motion for Enforcement or Declaratory Order, seeking a declaration from the court that it diligently enforced Pennsylvania's Qualifying Statute during 2003. The PMs filed the instant Motion, arguing that this case should proceed to arbitration, pursuant to the MSA.

## **DISCUSSION**

42 Pa.C.S.A. § 7303, which governs such arbitration matters, states:

> A written agreement to subject any existing controversy to arbitration or a provision in a written agreement to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity relating to the validity, enforceability or revocation of any contract.

42 Pa.C.S.A. § 7303. Judicial inquiry in determining whether a suit must proceed to arbitration requires a determination as to whether: (1) a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration

---

3 In response to the Independent Auditor's request for information, the PMs requested that the Independent Auditor recognize a substantial NPM Adjustment for that year. The PMs took issue with the Independent Auditor's failure to apply such an adjustment in the prior year based, in part, on the Settling States representation that they had enacted Qualifying Statutes. The PMs rejected the assumption that just because a Settling State enacted a Qualifying Statute, that it was being diligently enforced. In response, the Settling States argued that the NPM Adjustment should not be applied until a significant factor determination had been made and that, even if such a determination has been made in favor of the PMs, the Independent Auditor should presume, in the absence of substantial evidence to the contrary, that the states were diligently enforcing their Qualifying Statutes. The two sides also disagreed as to whether the NPM Adjustment should be applied even if every Settling State was diligently enforcing their Qualifying Statutes. After receiving letters from both sides, the Independent Auditor released its preliminary calculations of the 2003 annual payments, as discussed above.

4

provision. Smith v. Cumberland Group Ltd., 455 Pa. Super. 276, 284, 687 A.2d 1167, 1171 (1997); Messa v. State Farm Insurance Company, 433 Pa. Super. 594, 597, 641 A.2d 1167, 1168 (1994); PBS Coal, Inc. v. Hardhat Mining, Inc., 429 Pa. Super. 372, 376-77, 632 A.2d 903, 905 (1993).

The MSA speaks to the issues of jurisdiction and arbitration under the MSA. Each individual state court retains jurisdiction for purposes of implementing and enforcing the MSA. However, § XI(c) of the MSA, entitled "Resolution of Disputes" (hereinafter, "Arbitration Provision"), provides:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(I) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.

Based on the foregoing, it is clear that the MSA contains a valid agreement to arbitrate.

The court must next determine if the instant dispute falls within the Arbitration Provision. It is well-settled that the issue of whether a particular dispute falls within a contractual arbitration provision is a matter of law for the court to decide. Shadduck v. Christopher J. Kaclik, Inc., 713 A.2d 635, 637 (Pa. Super. 1998). Pennsylvania law advocates strict construction of arbitration agreements and dictates that any doubts or ambiguity as to arbitrability be resolved in favor of arbitration. Smith v. Cumberland Group, Ltd., 455 Pa. Super. 276, 687 A.2d 1167, 1171 (1997). The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. Lower Frederick Township v. Clemmer, 518 Pa. 313, 543 A.2d 502, 510 (1988). In order to determine the meaning of the agreement, the court must examine the entire

5

contract, taking into consideration " . . . the surrounding circumstances, the situation of the parties when the contract was made, the objects they apparently had in view and the nature of the subject matter." Huegel v. Mifflin Const. Co., Inc., 796 A.2d 350 (Pa. Super. 2002).

As previously stated, "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments...described in subsection IX(j)" are subject to arbitration. Subsection IX(j) specifically includes the NPM adjustment. Thus, based on the plain language of the MSA, the underlying dispute is arbitrable because it concerns both the operation and application of the NPM Adjustment. The MSA is an extensive and exhaustive agreement that was the result off lengthy negotiations between sophisticated parties. This court sees no reason to disregard this language.

The language of the Arbitration Provision supports the conclusion that the parties intended the Independent Auditor to make the initial determinations regarding the applicability of the NPM Adjustments. The MSA provides that the Independent Auditor, in calculating the annual payments due, is not only empowered to, but is required to make an initial determination regarding the applicability of any adjustments, including the NPM Adjustment. The parties dispute whether the Independent Auditor was warranted in making the assumption that the Settling States had enacted Qualifying Statutes which they were diligently enforcing. Any challenge to the propriety of the Independent Auditor's initial determination is an issue that the MSA expressly reserves for arbitration.

It has been argued that arbitration also makes sense from a public policy standpoint. Of

6

this the court is not persuaded. To the contrary, whether there was diligent enforcement of the Qualifying Statute is a dispute which the courts of the various settling states, generally, and this court, in particular, are most qualified to address. In an arbitration proceeding under the MSA, as many as 52 separate "Settling States", with competing interests, will be compelled to join in the selection of a single arbitrator, to sit with an arbitrator selected by the PMs, who share a unity of interest, and a third arbitrator selected by the first two. Moreover, the issue of "diligence" in enforcement of the Qualifying Statute is very much a local one. The vagaries of population size and distribution, geography, market penetration by NPMs, to name but a few factors, must be taken into account in determining whether a state has been diligent. Simply put: that which constitutes diligence in our sister state of North Dakota will assuredly be far different from diligence in our neighbor New York.

That being said, the court reluctantly finds that the scale nonetheless tips in favor of arbitration. As noted, these were highly sophisticated parties, with the assistance and counsel of armies of highly paid lawyers. Under the circumstances presented, the hereinbefore cited legal authorities compel the court to leave the parties to their bargain, however, flawed and ill-conceived it may be.[4]

---

4 Lest there be any doubt: This court finds it almost inconceivable that a mechanism for determining activity so integral to the agreement – diligence of enforcement of a qualifying statute – upon which question so many millions of dollars hang in the balance, was neither adequately defined in the MSA, nor the subject of specific, well-

## CONCLUSION

Based on the foregoing, Defendants' Motion to Compel Arbitration is granted.

An appropriate Order is being entered contemporaneous with this Opinion.

BY THE COURT:

_____
MANFREDI, WILLIAM J. P.J.

---

delineated means of ascertainment.



*FIRST JUDICIAL DISTRICT OF PENNSYLVANIA*
*COURT OF COMMON PLEAS*
*TRIAL DIVISION - CIVIL*
510 CITY HALL
PHILADELPHIA, PA 19107
http://courts.phila.gov

WILLIAM J. MANFREDI                                  TEL: (215) 686-4216
SUPERVISING JUDGE                                    FAX: (215) 686-7376
TRIAL DIVISION - CIVIL

# FAX TRANSMISSION

DATE: 12/12/06

TO: Vernon Francis, Esq

FROM: Hon. William Manfredi

FAX NO.: (215) 994-2222

RE: Com. v. Philip Morris

NUMBER OF PAGES:
(including this cover sheet)   10

If you do not receive any of the pages or the copy is not clear, please call (215) 686-4216

COMMENTS/INSTRUCTIONS:

CONFIDENTIALITY NOTICE: *This facsimile transmission may contain information that is confidential or privileged. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately at the above number (collect) to arrange for the return of the documents to us at no cost to you. Thank you.*