Not Reported in A.2d                                                    Page   1
Not Reported in A.2d, 2005 WL 2081763 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Connecticut,Judicial District of
Hartford.
**STATE of Connecticut**
v.
**PHILIP MORRIS, INC. et al.**
**No. X02CV960148414S.**

Aug. 3, 2005.

Silver Golub & Teitell, David Golub, Emmett &
Glander, Stamford, AAG William Rubenstein, AAG
Mark Kohler, Atty Gen-Special Litig, Dinah Bee,
AG-Collection/Child Supp, AAG Joseph Rubin, Ass
Atty Gen-Admin, Robert Clark, AG-Special
Litigation, Hartford, Carmody & Torrance, New
Haven, Carmody & Torrance, Waterbury, for State
of Connecticut.
Tyler Cooper & Alcorn, New Haven, for Philip
Morris Inc.
RJ Reynolds Tobacco Co, Washington, pro se.
Robinson & Cole LLP, Day Berry & Howard,
Hartford, for RJ Reynolds Tobacco Co.
Day Berry & Howard, Hartford, for Brown and
Williamson Tobacco Corp.
B A T Industries PLC, New York, pro se.
Murtha Cullina LLP, Hartford, for B A T Industries
PLC.
Danaher Lagnese & Neal PC, Hartford, for
Lorillard Tobacco Company.
Paul O. Connor Jr., O'Mara, LLC of Counsel,
Greenwich, for Liggett Group Inc.
Cummings & Lockwood, Robert Dolian, John
McKinney, Stamford, William Narwold, Hartford,
for United States Tobacco Co.
Levett Rockwood PC, Westport, for Hill AMD
Knowlton Inc.
Tobacco Research-USA Inc., New York, pro se.
Tyler Cooper & Alcorn, David Belt, Jacobs
Grudberg Belt Dow & Katz PC, New Haven, for
Council for Tobacco Research-USA Inc.
Updike Kelly & Spellacy, Hartford, for Tobacco
Institute Inc.
Brown & Williamson Tobacco Corp., New York,
pro se.
Brown & Williamson Tobacco Corp., Chicago, pro
se.
Murtha Cullina LLP, Hartford, for British-
American Tobacco Co. Ltd.

MICHAEL R. SHELDON, J.
**\*1** This action is now before the Court on the post-
judgment Petition of Commonwealth Brands, Inc.
("Commonwealth"), King Maker Marketing, Inc.
("King Maker"), and Sherman 1400 Broadway
N.Y.C., Inc. ("Sherman")-three American tobacco
companies which agreed, after judgment by Consent
Decree was entered herein, to sign and be bound by
the Tobacco Litigation Master Settlement Agreement
("MSA"), under which the Consent Decree was
approved-to compel the plaintiff State of
Connecticut ("State"), another party to the action to
which they all must make substantial annual
payments under the MSA, to arbitrate their current
dispute as to whether such payments were properly
calculated for calendar year 2003.FN1 The
Petitioners assert, more particularly, that as
Subsequent Participating Manufacturers ("SPMs")
under the MSA, they are entitled, under MSA §
XI((c), Sections 2 and 4 of the Federal Arbitration
Act, 9 U.S.C. §§ 2, 4, and General Statutes § 52-
410, to arbitrate their claim that
PricewaterhouseCoopers, LLP-the Independent
Auditor jointly selected by the original signatories to
the MSA to calculate and determine the amounts of
all payments due thereunder-miscalculated their
annual payments for 2003 by refusing to reduce the
amounts of those payments by applying the "Non-
Participating Manufacturer Adjustment" ("NPM
Adjustment") FN2 thereto.

FN1. As used in the text of this Memorandum of
Decision, all capitalized words are terms defined in
the MSA.

FN2. See Part I.A.4 of this Memorandum of
Decision, *infra* at 9-15.

The instant dispute arose initially, and has since
been briefed and argued, in the following
contractual, factual and procedural context.

I. CONTRACTUAL, FACTUAL AND
PROCEDURAL CONTEXT OF THE INSTANT
DISPUTE

A. *Contractual Context-Controlling Provisions of
the MSA*

1. *Judicial Approval of Consent Decree Under the
MSA*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: Not Reported in A.2d)

This action was originally brought by the plaintiff State of Connecticut to obtain monetary, equitable and injunctive relief against the major American tobacco companies and other related defendants based upon alleged wrongdoing by the defendants in the advertising and marketing of cigarettes and other tobacco products within this State. The action was finally resolved, without admission of liability, by this Court's approval of a Consent Decree and Final Judgment ("Consent Decree") which the parties submitted to it under the terms of the Tobacco Litigation Master Settlement Agreement ("MSA").

In the MSA, Connecticut and thirty-nine other American states which had brought similar actions against the defendants in their own state courts jointly agreed to the dismissal of all such actions and to the release of all related past and future claims against the defendants in exchange, *inter alia,* for several major concessions and agreements by the defendants, including: (1) an agreement by the manufacturer defendants, designated the "Original Participating Manufacturers" ("OPMS"),FN3 that they would henceforth comply with significant restrictions upon the manner in which they advertised and marketed cigarettes and other tobacco products FN4 within the Settling States; FN5 and (2) a further agreement by the OPMs that thereafter, in perpetuity, they would make substantial annual payments to the Settling States, in amounts to be calculated and determined by the Independent Auditor under detailed rules and procedures set forth in the MSA.

FN3. The OPMs are Philip Morris USA, Inc. ("Philip Morris"), R.J. Reynolds Tobacco Company ("RJR"), Lorillard Tobacco Company ("Lorillard"), and Brown & Williamson Tobacco Corporation (n/ k/a Brown & Williamson Holdings, Inc.).

FN4. Among other things, the MSA: (a) prohibits the advertising or marketing of tobacco products to children; (b) eliminates outdoor and transit advertising; (c) bans brand name merchandise; (d) bans the distribution of free cigarettes or free tobacco products to children; and (e) prohibits material misrepresentations of fact regarding the health consequences of smoking. See MSA § III.

FN5. Under MSA § II(qq), the term "Settling State" means any State that signs this Agreement on or before the MSA Execution Date.

Provided, however, that the term "Settling State" shall not include (1) the States of Mississippi, Florida, Texas and Minnesota and (2) any State as to which this Agreement has been terminated.

As used in the foregoing definition and throughout the MSA, the term "State" means "any state of the United States, the District of Columbia, Guam, the Virgin Islands, American Samoa, and the Northern Marianas." *Id.* § II(rr); and the designated "MSA Execution Date" is November 23, 1998. *Id.,* § II(aa).

### 2. Role and Responsibilities of the Independent Auditor Under the MSA

**\*2** The MSA provides that "[t]he Independent Auditor shall be a major, nationally recognized, certified public accounting firm jointly selected by agreement of the Original Participating Manufacturers and those Attorneys General of the Settling States who are members of the [executive committee of the National Association of Attorneys General ("NAAG") ];" MSA § XI(b); to perform the following functions:

(1) Beginning with payments due in the year 2000, [the] Independent Auditor shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing (including, but not limited to, determining Market Share, Relative Market Share, Base Aggregate Participating Manufacturer Market Share and Actual Aggregate Participating Manufacturer Market Share).

MSA § XI(a)(1). Furthermore, because many such calculations and determinations depend upon information available only to the parties, the MSA requires the Independent Auditor to deliver timely, itemized notice of its need for such information to all other "Notice Parties;" FN6 *Id.,* § XI(d)(1); to "promptly collect" such information from the Notice Parties and others; *id.,* § XI(a)(1); and, on the basis of such information, to comply with the MSA's exacting timetable for the preparation and delivery of its Preliminary and Final Calculations.

FN6. The MSA defines the term "Notice Parties" to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



mean "each Participating Manufacturer, each Settling State, the Escrow Agent, the Independent Auditor and NAAG[;]" MSA § II(ee). The term "Escrow Agent" denotes the escrow agent under the "Escrow Agreement." *Id.,* § II(r); while the term "Escrow Agreement" is defined as "an escrow agreement substantially in the form of Exhibit B." *Id.,* § II(s).

The mandatory timetable for the Independent Auditor's preparation and delivery of its Preliminary and Final Calculations to the other Notice Parties is set forth as follows in subsection XI(d)(1)-(4) of the MSA:

(d) General Provisions as to Calculation of Payments.

(1) Not less than 90 days prior to the scheduled date of any payment due pursuant to this Agreement ("Payment Due Date"), the Independent Auditor shall deliver to each other Notice Party a detailed itemization of all information required by the Independent Auditor to complete its calculation of (A) the amount due from each Participating Manufacturer with respect to such payment, and (B) the portion of such amount allocable to each entity for whose benefit such payment is to be made. To the extent practicable, the Independent Auditor shall specify in such itemization which Notice Party is requested to produce which information. Each Participating Manufacturer and each Settling State shall use its best efforts to promptly supply all of the required information that is within its possession or is readily available to it to the Independent Auditor, and in any event not less than 50 days prior to such Payment Due Date. Such best efforts obligation shall be continuing in the case of information that comes within the possession of, or becomes readily available to, any Settling State or Participating Manufacturer after the date 50 days prior to such Payment Due Date.

**\*3** (2) Not less than 40 days prior to the Payment Due Date, the Independent Auditor shall deliver to each other Notice Party (A) detailed preliminary calculations ("Preliminary Calculations") of the amount due from each Participating Manufacturer and of the amount allocable to each entity for whose benefit such payment is to be made, showing all applicable offsets, adjustments, reductions and carry-forwards and setting forth all the information on which the Independent Auditor relied in preparing such Preliminary Calculations, and (B) a statement of any information still required by the

Independent Auditor to complete its calculations.

(3) Not less than 30 days prior to the Payment Due Date, any Participating Manufacturer or any Settling State that disputes any aspect of the Preliminary Calculations (including, but not limited to, disputing the methodology that the Independent Auditor employed, or the information on which the Independent Auditor relied, in preparing such calculations) shall notify each other Notice Party of such dispute, including the reasons and basis therefore.

(4) Not less than 15 days prior to the Payment Due Date, the Independent Auditor shall deliver to each other Notice Party a detailed recalculation (a "Final Calculation") of the amount due from each Participating Manufacturer, the amount allocable to each entity for whose benefit such payment is to be made, and the Account to which such payment is to be credited, explaining any changes from the Preliminary Calculation. The Final Calculation may include estimates of amounts in the circumstances described in subsection (d)(5).

Significantly, as the final sentence of the last above-quoted paragraph confirms, the MSA requires the Independent Auditor to comply strictly with the foregoing timetable in performing and delivering its Preliminary and Final Calculations even if all information necessary to the performance of such calculations is unavailable to it. When information necessary for the performance of a calculation is missing, the MSA directs the Independent Auditor to "employ an assumption as to the missing information producing the minimum amount that is likely to be due with respect to the payment in question, and [then to] set forth its assumption as to the missing information in its Preliminary Calculation or Final Calculation, whichever is at issue." MSA § XI(d)(5)(A).

One predictable consequence of requiring the timely performance of all MSA payment calculations based upon assumptions about missing information is that the amounts of some payments will be miscalculated. To rectify the results of such miscalculations, the MSA establishes detailed procedures for: (1) correcting any overpayment or underpayment that results from a miscalculation, by applying an offset to a future payment or requiring a supplemental payment with interest, as appropriate, at any time within four years of the Payment Due Date; *Id.,* § XI(I); and (2) disputing the Independent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Auditor's calculations on any basis-including, but not limited to, any alleged error in the methodology it employed or the information it relied upon in performing such calculations-at any time within that same four-year period after the Payment Due Date. *Id.,* § XI(d)(6).

**\*4** The mandatory process by which the Independent Auditor must perform all calculations required of it under the MSA, once it collects all necessary information available to it for that purpose and makes all appropriate assumptions about missing information, is no less exacting than the above-described timetable for performing such calculations. That process is outlined in detail in MSA § IX(j), which provides in part as follows:

### (j) Order of Application of Allocations, Offsets, Reductions and Adjustments

*The payments due under this Agreement shall be calculated as set forth below.* The "base amount" referred to in clause "First" below shall mean (1) in the case of payments due from Original Participating Manufacturers, the base amount referred to in the subsection establishing the payment obligation in question; and (2) in the case of payments due from a Subsequent Participating Manufacturer, the base amount referred to in subsection (i)(2) for such Subsequent Participating Manufacturer. *In the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause.* (If clause "First" is inapplicable, the result of clause "First" will be the base amount of the payment in question prior to any offsets, reductions or adjustments.)
First: the Inflation Adjustment shall be applied to the base amount of the payment being calculated;
Second: the Volume Adjustment (other than the provisions of subsection (B)(iii) of Exhibit E) shall be applied to the result of clause "First";
Third: the result of clause "Second" shall be reduced by the Previously Settled States Reduction;
Fourth: the result of clause "Third" shall be reduced by the Non-Settling States Reduction;
Fifth: in the case of payments due under subsections IX(c)(1) and IX(c)(2), the results of clause "Fourth" for each such payment due in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective

Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together to form such Settling State's Allocated Payment. In the case of payments due under subsection IX(i) that correspond to payments due under subsections IX(c)(1) or IX(c)(2), the results of clause "Fourth" for all such payments due from a particular Subsequent Participating Manufacturer in the calendar year in question shall be apportioned among the Settling States pro rata in proportion to their respective Allocable Shares, and the resulting amounts for each particular Settling State shall then be added together. (In the case of all other payments made pursuant to this Agreement, this clause "Fifth" is inapplicable.);
*Sixth: the NPM Adjustment shall be applied to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2) (or, in the case of payments due from the Subsequent Participating Manufacturers, pursuant to subsection IX(d)(4))[.]*

\* \* \* \*

**\*5** (Emphasis added.) Under the highlighted portions of the foregoing provisions, one essential task that must be performed by the Independent Auditor in "calculat[ing]" the "payments due under th[e MSA]" is to "appl[y]" the "NPM Adjustment ... to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2) (or, in the case of payments due from the Subsequent Participating Manufacturers, pursuant to subsection IX(d)(4))."

*Id.*

### 3. Payment Obligations of the SPMs Under the MSA

The original parties to the MSA sought to reduce smoking and promote public health by promoting industry-wide compliance with the restrictions on future advertising and marketing of cigarettes set forth therein. To that end, they included provisions in the MSA that offered significant financial incentives to other Tobacco Product Manufacturers FN7 to sign and agree to be bound by the MSA as SPMs. In addition to assuring each potential SPMs that, if it signed the MSA, the Settling States would release it as to all past and future claims against it of the kinds as to which they had previously released the OPMs, the MSA guaranteed it that, if it signed the MSA within sixty days of the MSA Execution Date, it would have no annual payment obligations under the MSA unless "its Market Share FN8 in any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



calendar year exceeds the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share ..." MSA § X(I). If the Market Share of an SPM in a particular calendar year exceeds the greater of its 1998 Market Share or 125 percent of its 1997 Market Share, then the base amount due from it on April 15 of the following year is determined by

FN7. As used in the MSA, the term "Tobacco Product Manufacturer" means
an entity that after the MSA Execution Date directly (and not exclusively through any Affiliate):
(1) manufactures Cigarettes anywhere that such manufacturer intends to be sold in the States through an importer (except where such importer is an Original Participating Manufacturer that will be responsible for the payments under this Agreement with respect to such Cigarettes as a result of the provisions of subsections II(mm) and that pays the taxes specified in subsection II(z) on such Cigarettes, and provided that the manufacturer of such Cigarettes does not market or advertise such Cigarettes in the States);
(2) is the first purchaser anywhere for resale in the States of Cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the States; or
(3) becomes a successor of an entity described in subsection (1) or (2) above. The term "Tobacco Product Manufacturer" shall not include an Affiliate of a Tobacco Product Manufacturer unless such Affiliate itself falls within any of subsections (1)-(3) above.

FN8. The term "Market Share," as used in the MSA, means "a Tobacco Product Manufacturer's respective share (expressed as a percentage) of the total number of individual cigarettes sold in the fifty United States, the District of Columbia and Puerto Rico during the applicable calendar year, as measured by excise taxes collected by the federal government and, in the case of Puerto Rico, arbitrios de cigarillos collected by the Puerto Rican taxing authority." *Id.*, § II(z).

multiplying (A) the corresponding base amount due on the same date from all of the Original Participating Manufacturers (as such base amount is specified in the corresponding subsection of this Agreement and is adjusted by the Volume Adjustment ... but before such base amount is

modified by any other adjustments, reductions or offsets) by (B) the quotient produced by dividing (I) the result of (x) such Subsequent Participating Manufacturer's applicable Market Share (the applicable Market Share being that for the calendar year immediately preceding the year in which the payment in question is due) minus (y) the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share, by (ii) the aggregate Market Shares of the Original Participating Manufacturers (the applicable Market Shares being those for the calendar year immediately preceding the year in which the payment in question is due).
MSA § IX(i)(2). After this base amount is calculated as aforesaid, it is subject to the modification, under MSA § IX(i)(3), by the application of all other adjustments, reductions and offsets that are applicable, under MSA § IX(j), to corresponding payments due from the OPMs.

4. *The Non-Participating Manufacturer Adjustment*

a. *Nature and Purpose of the Adjustment*

*6 Although it was anticipated that many smaller Tobacco Product Manufacturers would join the MSA, it was expected that many others, designated Non-Participating Manufacturers ("NPMs"), would not do so in order to spare themselves the significant financial burden that compliance with the MSA's tight restrictions on advertising and marketing would predictably place upon them. Accordingly, the drafters of the MSA included special provisions in the Agreement to level the competitive playing field between NPMs and Participating Manufacturers, to induce the Settling States to act vigorously to maintain that level playing field, and to account for and lessen the negative financial impact of compliance with the MSA upon Participating Manufacturers if, despite the foregoing measures, they still experienced a loss in aggregate Market Share to the NPMs in any given year. In particular, the MSA provides that when the Participating Manufacturers experience a Market Share Loss FN9 in any calendar year for which they owe payments to the Settling States, the amounts of such payments are subject to reduction by the application of a Non-Participating Manufacturer Adjustment ("NPM Adjustment"). MSA § IX(d)(1). The NPM Adjustment is to be applied, where appropriate, by subtracting from the amount of each Settling State's Allocated Payment for the year in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: Not Reported in A.2d)**

question "the product of such Allocated Payment amount multiplied by the NPM Adjustment Percentage." *Id.,* § IX(d)(1)(A). The NPM Adjustment Percentage, in turn, is to be calculated as follows:

FN9. The term "Market Share Loss," as used in the MSA, means "the result of (x) the Base Aggregate Participating Manufacturer Market Share minus (y) the Actual Aggregate Participating Manufacturer Market Share;" MSA. § IX(d)(1)(B)(iii); where the term "Base Aggregate Participating Manufacturer Market Share" means "the result of (x) the sum of the applicable Market Shares (the applicable Market Share to be that for 1997) of all present and former Tobacco Product Manufacturers that were Participating Manufacturers during the entire calendar year immediately preceding the year in which the payment in question is due minus (y) 2(two) percentage points[;]" *id.,* § IX(d)(1)(B)(i); and the term "Actual Aggregate Participating Manufacturer Market Share" means "the sum of the applicable Market Shares of all present and former Tobacco Product Manufacturers that were Participating Manufacturers during the entire calendar year immediately preceding the year in which the payment in question is due (the applicable Market Share to be that for the calendar year immediately preceding the year in which the payment in question is due)." *Id.,* § IX(d)(1)(B)(ii).

(I) If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is less than or equal to 0 (zero), then the NPM Adjustment Percentage shall equal zero.
(ii) If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is greater than 0 (zero) and less than or equal to 16 2/3 percentage points, then the NPM Adjustment Percentage shall be equal to the product of (x) such Market Share Loss and (y) 3 (three).
(iii) If the Market Share Loss for the year immediately preceding the year in which the payment in question is due is greater than 16 2/3 percentage points, then the NPM Adjustment Percentage shall be equal to the sum of (x) 50 percentage points and (y) the product of (1) the Variable Multiplier and (2) the result of such Market Share Loss minus 16 2/3 percentage points.

*Id.,* § IX(d)(1)(A)(i)-(iii).

b. *Threshold Determinations of Fact Affecting Applicability of the NPM Adjustment to Payments Owed by the Participating Manufacturers to the Settling States for a Given Year*

Whether an NPM Adjustment, calculated as aforesaid, is applicable to the Allocated Payments owed by the Participating Manufacturers to the Settling States for any calendar year in which such Participating Manufacturers have experienced a Market Share Loss depends initially, under the MSA, upon two threshold determinations of fact. One such determination is whether the aggregate number of cigarettes shipped in or to the fifty United States, the District of Columbia and Puerto Rico in the year in question, by those Participating Manufacturers that had become Participating Manufacturers prior to 14 days after the MSA Execution Date, was greater than the aggregate number of cigarettes shipped by such Participating Manufacturers, in or to those jurisdictions, in 1997. MSA § IX(d)(2)(D). The MSA flatly prohibits the application of an NPM Adjustment to reduce the amounts of the Participating Manufacturers' annual payments to the Settling States for any year in which the aggregate number of cigarettes they shipped, as aforesaid, exceeded the aggregate number shipped by them in 1997, even if their aggregate Market Share has since decreased. *Id.*

**\*7** The other threshold determination upon which the applicability of the NPM Adjustment depends for any year in which the Participating Manufacturers experience a Market Share Loss is "whether the disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to the Market Share Loss for the year in question." *Id.,* § IX(d)(1)(C). The MSA provides that this "significant factor determination" must be made "[o]n or before February 2 of each year following a year in which there was a Market Share Loss greater than zero ... [by] a nationally recognized firm of economic consultants ("the Firm") ..." It further specifies that the consequences of that determination, which "shall be binding and conclusive upon the parties, and shall be final and non-appealable[;]" *id.;* shall be as follows:
If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the Market Share Loss for the year in question, the NPM Adjustment described in subsection IX(d)(1) shall apply. If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were not a significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment described in subsection IX(d)(1) shall not apply.

*Id.* Upon making its determination, the Firm is required to "provide written notice [thereof] to each Settling State, to NAAG, to the Independent Auditor and to each Participating Manufacturer[.]" *Id.*

The MSA requires the OPMs, the Settling States, and their Attorneys General to "cooperate to ensure that the significant factor determination is timely made." MSA § IX(d)(1)(C). One important focus of such cooperation must be on the selection of the Firm, for the MSA provides that both the Firm and its principals responsible for making the significant factor determination "shall be acceptable to ... both the O[PM]s and a majority of those Attorneys General who are both the Attorney General of a Settling State and a member of the NAAG executive committee at the time in question[.]" *Id.* The MSA further provides, however, that if no mutually acceptable firm, with mutually acceptable principals responsible for making the significant factor determination, is so identified by the parties, the determination shall be made by "National Economic Research Associates Inc. ("NERA") Inc., or its successors by merger, acquisition or otherwise ("NERA"), acting through a principal or principals acceptable to such parties, if such a person can be identified and, if not, acting through a principal or principals identified by NERA, or a successor firm selected by the CPR Institute for Dispute Resolution." *Id.* The obvious purpose of the latter provision is to ensure that, even if the parties cannot agree as to which nationally recognized firm of economic consultants, or which principals of the firm, should make the significant factor determination, the determination will nonetheless be made by a qualified neutral party.

### c. *Specific Determinations Affecting Applicability of the NPM Adjustment to Individual Settling States for a Given Year*

**\*8** Even if it is established, on the basis of the foregoing threshold determinations, that an NPM Adjustment is generally applicable to the Allocated Payments owed by the Participating Manufacturers to the Settling States for a given year, the MSA exempts from the application of the Adjustment any individual Settling State that can meet the following requirements:
A Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such Settling State continuously had a Qualifying Statute (as defined in subsection (2)(E) below) in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year[.]

MSA § IX(d)(2)(B). As used in this provision, the term "Qualifying Statute" meansa Settling State's statute, regulation, law and/or rule (applicable everywhere the Settling State has authority to legislate) that effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of this Agreement. Each Participating Manufacturer and each Settling State agree that the model statute in the form set forth in Exhibit T (the "Model Statute"), if enacted without modification or addition (except for particularized state procedural or technical requirements) and not in conjunction with any other legislative or regulatory proposal, shall constitute a Qualifying Statute.

MSA § IX(d)(2)(E). So written, these provisions establish two requirements for gaining an exemption from the application of the NPM Adjustment to an Allocated Payment due for any year in which the Adjustment would otherwise be applicable: first, that the Settling State seeking to qualify for the exemption had a Qualifying Statute in full force and effect throughout the year for which the Allocated Payment is due; and second, that the Settling State diligently enforced the provisions of its Qualifying Statute throughout that year.

Once it is established, under these provisions, that a Settling State is exempt from the application of the NPM Adjustment for a given year, that portion of the Adjustment that would have been applied to reduce the amount of its Allocated Payment for that year is reallocated to all other non-exempt Settling States, pro rata in proportion to their Allocable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: Not Reported in A.2d)**

Shares, as set forth in Exhibit A to the MSA. Such reallocated sums are then applied as further reductions to the Allocated Payments due to such non-exempt Settling States for the year in question. This feature of the NPM Adjustment gives a powerful incentive to all Settling States not only to enact their own Qualifying Statutes, but to diligently enforce them every year.

### 5. Enforcement of the MSA

#### a. This Court's Continuing Jurisdiction to Implement and Enforce the MSA as to the State of Connecticut

**\*9** The MSA describes as follows the manner in which its provisions and those of the Consent Decree are to be enforced:

(a) *Jurisdiction.* Each Participating Manufacturer and each Settling State acknowledge that the Court: (1) has jurisdiction over the subject matter of th [is] action ... in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State. Provided, however, that notwithstanding the foregoing, the Escrow Court (as defined in the Escrow Agreement) shall have exclusive jurisdiction, as provided in section 15 of the Escrow Agreement, over any suit, action or proceeding seeking to interpret or enforce any provision of, or based on any right arising out of, the Escrow Agreement.

(b) *Enforcement of Consent Decree:* Except as expressly provided in the Consent Decree, any Settling State or Released Party may apply to the Court to enforce the terms of the Consent Decree (or for a declaration construing any such term) with respect to alleged violations within such Settling State. A Settling State may not seek to enforce the Consent Decree of another Settling State; provided, however, that nothing contained herein shall affect the ability of any Settling State to (1) coordinate state enforcement actions or proceedings, or (2) file or join any amicus brief. In the event that the Court determines that any Participating Manufacturer or Settling State has violated the Consent Decree within such Settling State, the party that initiated the

proceedings may request any and all relief available within such Settling State pursuant to the Consent Decree.

#### (c) Enforcement of this Agreement

(1) Except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ("Declaratory Order")) with respect to disputes, alleged violations or alleged breaches within such Settling State.

MSA § VII(a)-(c). Because the term "Court," as used in the MSA, means "the respective Court in each Settling State to which this Agreement and the Consent Degree are presented for approval and/or entry as to that Settling State;" MSA § II(p); these provisions establish, *inter alia,* that, *except as provided* in subsections IX(d), XI(c) and XVII(d) and Exhibit O of the MSA, this Court is the only court to which a non-Escrow dispute arising under the MSA as to the State of Connecticut can properly be presented.

#### b. The Exception in MSA § XI(c) to this Court's Exclusive Power to Hear and Decide Non-Escrow Disputes Arising Under the MSA as to the State of Connecticut

**\*10** One expressly delineated exception to this Court's exclusive power to hear and decide non-Escrow disputes arising under the MSA as to the State of Connecticut is set forth as follows in MSA § XI(c):

(c) *Resolution of disputes.* Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection XI(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



The Petitioners have invoked this provision in support of their claim that the State must now arbitrate the dispute that has arisen between them as to the propriety of the Independent Auditor's refusal to apply the NPM Adjustment to reduce the amounts of their annual payments to the State for calendar year 2003.

### B. *Factual Context-Nature and Origin of the Parties' Underlying Dispute*

### 1. *The Petitioners Join the MSA, Experience Increases in Individual Market Shares, and Incur Annual Payment Obligations Under the MSA Despite Overall Loss of Aggregate Market Share By The Participating Manufacturers*

After this Court approved the Consent Decree, over forty smaller American Tobacco Product Manufacturers, including the Petitioners, joined the MSA as SPMs. As anticipated, however, many other Tobacco Product Manufacturers did not join the MSA, choosing instead to remain NPMs. The NPMs have experienced a substantial increase in their aggregate Market Share each year since the MSA Execution Date, while the Participating Manufacturers have experienced a correspondingly substantial decrease in their aggregate Market Share in that same period.

Notwithstanding the overall loss in aggregate Market Share experienced by the Participating Manufacturers since the MSA Execution Date, each of the present Petitioners-Commonwealth, King Maker and Sherman-has experienced a significant increase in its individual Market Share since that time. Indeed, because each Petitioner's individual Market Share has consistently exceeded "the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share;" MSA § IX(i)(1); all have incurred substantial annual payment obligations to the Settling States under the MSA.

### 2. *No Determination Has Been Made for any Year Since the MSA Execution Date that Disadvantages Experienced as a Result of the MSA Were a Significant Factor Contributing to the Market Share Loss by the Participating Manufacturers in That Year*

Despite the overall loss of aggregate Market Share experienced by the Participating Manufacturers

every year since the MSA Execution Date, it has never been determined for any such year, by a nationally recognized firm of economic consultants, by NERA or its successors or otherwise, "whether the disadvantages experienced as a result of th[e MSA] were a significant factor contributing to the [Participating Manufacturers'] Market Share Loss for the year in question." Cf. MSA § IX((d)(1)(C). Not surprisingly, then, although the Participating Manufacturers have consistently claimed that the amounts of their annual payments for each of those years should be reduced by the application of an NPM Adjustment, no such Adjustment has ever been applied to any of those payments.

**\*11** In July of 2003, the Settling States and all Participating Manufacturers, including the Petitioners, entered into a binding side agreement entitled the "NPM Adjustment Settlement Agreement," under which they resolved all claims by the Participating Manufacturers for the application of NPM Adjustments to payments owed by them for calendar years 1999 through 2002. Letter from Mark E. Greenwold to Independent Auditor (2/27/04) (Ex. B to Affidavit of Robert W. Clark (12/13/04), State's Initial Opposition Memorandum (12/13/04)), p. 2. No such settlement has been agreed to, however, with respect to any later year. Instead, in contemplation of obtaining a belated significant factor determination for each such later year in which an NPM Adjustment may have been applicable due to loss in aggregate Market Share by the Participating Manufacturers to the NPMs, the Settling States and the OPMs have entered into a separate side agreement entitled the "Significant Factor Procedures Agreement," under which the signatories agreed, *inter alia,* to a longer timetable than that established by MSA § IX(d)(1)(C) for making that significant factor determination as to calendar year 2003. The Petitioners have never been parties to, and thus are not bound by, the Significant Factor Procedures Agreement.

### 3. *Model Statutes Have Been Enacted in This and Every Other Settling State*

To avoid the possible application of an NPM Adjustment to its Allocated Payments from the Participating Manufacturers for any year in which the Participating Manufacturers experience a Market Share Loss to the NPMs, the State passed a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Qualifying Statute of the sort described in MSA § IX(d)(2)(E). Enacted as part of Public Act 00-208, substantially in the form of the Model Statute set forth in MSA, Exhibit T, the new statute, now codified at General Statutes § 4-28h et seq ("the Model Statute"), became effective on July 1, 2000 and has remained in full force and effect ever since. The Model Statute requires each NPM whose cigarettes are sold in Connecticut to establish and annually fund an escrow account in an amount determined by its annual sales volume in Connecticut.

By the middle of calendar year 2002, each of the Settling States had enacted a Qualifying Statute, substantially in the form of the Model Statute set forth in MSA, Exhibit T. Each such statute was in full force and effect throughout calendar year 2003.

The State claims that it has diligently enforced its Model Statute ever since it was first enacted. It argues, moreover, that in the absence of substantial and credible information to the contrary, it and each of the other Settling States must be presumed to be diligently enforcing their Model Statutes. The Petitioners dispute both of these contentions, insisting that there has been virtually no enforcement activity against NPMs in Connecticut and noting trenchantly that the substantial nationwide increase in aggregate NPM Market Share, notwithstanding the universal enactment of Model Statutes, casts serious doubt on the claim that each such statute has been diligently enforced.

### 5. The Independent Auditor's Calculation of Annual Payments Due From the Participating Manufacturers to the Settling States for 2003

**\*12** Since shortly after the MSA Execution Date, the annual payment obligations of all Participating Manufacturers under the MSA have been calculated and determined by PricewaterhouseCoopers, LLC, a nationally recognized certified public accounting firm. The Independent Auditor's current engagement with respect to the MSA is memorialized in an engagement letter dated May 25, 2000. Throughout its engagement, the Independent Auditor has taken all steps necessary to perform all calculations and determinations required of it under the MSA. These steps have included: giving itemized notice to all other Notice Parties of its need for particular information to perform such calculations and

determinations; promptly collecting all such necessary information from them and other sources; and, finally, on the basis of all such information and appropriate assumptions about missing information, performing all Preliminary and Final Calculations of payments owed pursuant to the MSA, on the schedule set forth therein, in light, inter alia, of all adjustments, reductions and offsets applicable to those payments.

### a. The Independent Auditor's Request for Information to All Notice Parties and their Responses Thereto

In anticipation of its need to calculate and determine the amount of all annual payments owed by the Participating Manufacturers to the Settling States for calendar year 2003, which would become due and payable on April 15, 2004, the Independent Auditor notified all other Notice Parties of its need for particular information to perform those calculations on or about January 16, 2004. In response to that notice, on January 30, 2004, John C. Poling II, the CEO of Petitioner Commonwealth, wrote a letter to the Independent Auditor on behalf of his own company, co-Petitioners King Maker and Sherman and certain other SPMs, to request that the Independent Auditor "recognize a substantial Market Share Loss [by the Participating Manufacturers for 2003], as well as a corresponding substantial NPM Adjustment." Poling Letter to Independent Auditor (1/30/04) (Ex. A to Clark Affidavit (12/13/04), State's Initial Opposition Memorandum (12/13/04), p. 1. In support of this request, Mr. Poling took issue as follows with what he claimed to have been the Independent Auditor's approach to this issue for calendar year 2002:

Last year, the Independent Auditor gave two reasons for declining to recognize a Market Share Loss. First, the Independent Auditor did not recognize the Loss due to the purported inaccuracy of data supporting the calculations. Subsequently, the Independent Auditor declined to recognize the Loss, this time on the grounds that "all Settling States have enacted Model Statutes (prior to July 1, 2002), [thus] no NPM reduction can be applied to the amounts due in this Final Calculation." Neither of those justifications permits the Independent Auditor to decline to recognize a Market Share loss this year.

The purported lack of accurate data is insufficient to justify a refusal to calculate the NPM Adjustment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

because the MSA requires the Independent Auditor to use the best information available, making assumptions and estimates where necessary. It may later revise its conclusions if better information becomes available, but there is no basis for it to decline to recognize a Market Share Loss solely on the basis of insufficient data. Indeed, since all indications are that the data available to the Independent Auditor substantially understate, rather than overstate, the NPM market share, it is particularly important that the Auditor recognize such Loss as it can based on currently available data, and adjust, if necessary, when more accurate data becomes available.

*13 Similarly, the fact that the States have "enacted" Model Statutes does not permit the Independent Auditor to decline to recognize a Market Share Loss. Individual states may avoid reduction of their Allocable Share to reflect the NPM Adjustment due to the manufacturers if the State "diligently enforce[s]" the Model Statute during the whole of a calendar year. Nothing in the MSA, however, permits the Auditor to assume, as a basis for declining to engage in its required determination of Market Share Loss, that a State's enactment of a statute is a proxy for enforcing it, that each and every State has engaged in diligent enforcement efforts, or that such diligent enforcement means that no NPM Adjustment is appropriate.

For these reasons, the Independent Auditor must recognize a Market Share Loss for 2003.

*Id.,* at pp. 1-2. (Footnotes omitted.)

Thereafter, on February 27, 2004, Attorney Mark B. Greenwold, Chief Counsel for Tobacco for NAAG, wrote a letter to the Independent Auditor to dispute several assertions in Mr. Poling's letter and to clarify the Settling States' joint position on the issues raised therein. Characterizing the Petitioners' proposal, as communicated by Mr. Poling, as "a fundamental and far-reaching change in established procedures that [the Independent Auditor] has consistently followed for five years," Attorney Greenwold accused the Petitioners of attempting to "lay a predicate for SPMs to withhold or pay into a disputed payments account monies allegedly attributable to a potential NPM Adjustment long before conditions precedent to such an adjustment have been satisfied." Greenwold Letter to Independent Auditor (2/27/04) (Ex. B to Clark Affidavit (12/13/04), State's Initial Opposition

Memorandum (12/13/04), p. 1.

Initially, after dismissing certain suggestions made by Mr. Poling as to possible sources of more complete and accurate data with respect to NPM Market Shares, Attorney Greenwold expressed surprise at Mr. Poling's suggestion that the Independent Auditor had declined to recognize a Market Share Loss for calendar year 2002. To the contrary, he noted that "[t]he Independent Auditor expressly calculated Market Share Loss (for that year) of 4.25860%." *Id.,* at p. 2. "Moreover," he observed,

[t]he Independent Auditor proceeded to calculate the Maximum NPM Adjustment that would potentially flow from that Market Share Loss and ... calculated how much of that Potential Adjustment would be available to each Subsequent Participating Manufacturer if the conditions predicate for giving effect to the Adjustment were met. Whether the Market Share Loss calculation understated sales in 2002 by Non-Participating Manufacturers is not at all clear, but in any event the NPM Adjustment Settlement Agreements entered into by the Settling States and most Participating Manufacturers-including the signatories to the SPM letter [from Mr. Poling]-essentially mooted that issue for 2002 and prior years.

*14 *Id.*

Turning to the Independent Auditor's impending calculations for calendar year 2003, Attorney Greenwold expressed confidence that the Independent Auditor would "analyze[ ] the best available Federal Excise Tax data ... [to] determine [if] ... there was a Market Share Loss as that term is defined in the MSA." *Id.,* at p. 2. Then, he suggested,

[f]ollowing the practice reflected in ... prior year calculations, the Independent Auditor would presumably ... also calculate the Maximum NPM Adjustment that could flow from the calculated Market Share Loss as well as the amounts of that Adjustment potentially available to each Participating Manufacturer.

*Id.*

Against this background, Attorney Greenwold explained as follows the Settling States' views as to the applicability of an NPM Adjustment to payments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

owed to them by the Participating Manufacturers for calendar year 2003:

The Settling States do not agree ... that having calculated a Market Share Loss and a Maximum Potential NPM Adjustment the Independent Auditor should go farther than that. The Settling States particularly do not understand the apparent suggestion [by Mr. Poling] that an NPM Adjustment would be "appropriate" even if "each and every state has engaged in diligent enforcement efforts." Clearly no potential NPM Adjustment could be given effect in such circumstances.

As you know, it is the position of the Settling States that unless and until there has been a Significant Factor determination, it would be wholly inappropriate for the Independent Auditor to give any effect to any potential NPM Adjustment in making its calculations. In this regard, there is ... now in place a detailed Significant Factor Procedures Agreement governing the timing and conduct of the Significant Factor determination and providing strict deadlines that ensure its timely completion.

The Settling States emphatically disagree with the suggestion in [Mr. Poling's] letter that the Independent Auditor should change its prior practice and now somehow "assume" that there has not been diligent enforcement of the Model Statute on the part of any State and then "recognize a corresponding NPM Adjustment." ... [T]here is a legal presumption that state officials are enforcing state laws that must be given effect absent substantial and credible evidence to the contrary. Application of this presumption is particularly appropriate given that the Independent Auditor, retained because of its expertise in performing calculations based on the submission of numerical data, is not equipped to define what constitutes "diligent enforcement" or to make a determination as to whether a State has diligently enforced its Model Statute. This recognition of the presumption of enforcement and the role of the Independent Auditor has led to the consistent past practice of not recognizing an NPM Adjustment applicable to States that have enacted a Model Statute, and [Mr. Poling's] letter points to no change in circumstance or other basis upon which that past practice should now be changed.

*15 *Id.,* at pp. 2-3.

On March 4, 2004, Mr. Poling responded to

Attorney Greenwold's letter with a second letter of his own on behalf of Commonwealth, King Maker, Sherman, and certain other SPMs. Letter from John C. Poling II to Independent Auditor (3/4/04) (Ex. A to Affidavit of John Conway (1/3/05), Petitioners' Reply Memorandum (1/3/05)). In his second letter, Mr. Poling presented additional arguments in support of Commonwealth's and the other SPMs' position that an NPM Adjustment should be applied to their respective payments to the Settling States for calendar year 2003. To begin with, he noted that the SPMs were not parties to the Significant Factor Procedures Agreement by which the Settling States and the OPMs had agreed to change the timetable for making the significant factor determination required by the MSA. Therefore, he argued,

the Settling States, having failed to live up to their contractual duties to appoint the Economic Consulting Firm and having entered into the side agreement improperly attempting to alter the SPMs' rights under the MSA, are estopped to claim that a significant factor determination is necessary before an NPM Adjustment is applied to the SPM payments. The MSA provides that the significant factor determination shall be made each year by February 2. This has never happened. The Settling States cannot assert that the significant factor determination is a precondition to an NPM Adjustment, then claim that no NPM Adjustment is due because they have prevented that precondition from occurring.

*Id.,* at p. 2.

As for the Settling States' argument that no NPM Adjustment should apply to any Settling State's payments because each Settling State had a Model Statute in full force and effect throughout the year, Mr. Poling made two counter-arguments. First he claimed that the SPMs are entitled to the full benefit of the NPM Adjustment whenever it is applicable, whether or not any Model Statutes have been enacted. The only purpose of the Model Statutes provision of the MSA, he asserted, was to allocate and reallocate the total amount of the Adjustment among the Settling States, not to eliminate the Adjustment altogether in the event of universal compliance. Hence, even if all Settling States have Model Statutes, and cannot have any other Settling States' portions of the NPM Adjustment allocated or reallocated to them, the SPMs assertedly remain entitled to a reduction of their payments by the full

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



NPM Adjustment. *Id.*

Secondly, after reiterating his earlier argument that mere enactment of a Model Statute is not enough to exempt a Settling State from the NPM Adjustment, because both enactment and diligent enforcement are essential elements of an exemption claim, Mr. Poling argued that the burden of proving "diligent enforcement" must rest upon the Settling State, for it is the would-be beneficiary of the exemption.

### b. *The Independent Auditor's Preliminary Calculations for 2003*

On March 5, 2004, the day after Mr. Poling sent his second letter, the Independent Auditor delivered to all other Notice Parties its Notice of Preliminary Calculations of annual payments owed by the Participating Manufacturers to the Settling States for calendar year 2003. As part of its Preliminary Calculations, the Independent Auditor performed all calculations necessary for the application of an NPM Adjustment to all such 2003 payments, FN10 just as it had done for all payments owed for calendar year 2002 and earlier years. It declined, however, to apply the NPM Adjustment to reduce the amounts of such payments for the following reason:

FN10. On this subject, the Petitioners pleaded and the State admitted as follows:
For Commonwealth's MSA payments for 2003 (due April 15, 2004), the Independent Auditor calculated a potential NPM Adjustment of approximately $31 million ... For King Maker's payments, the Independent Auditor calculated a potential NPM Adjustment of approximately $1.36 million ... For Sherman, the Independent Auditor calculated a potential NPM Adjustment of $162,181 ...
Petition, ¶ 13; Amended Answer, ¶ 13.

**\*16** NAAG has responded to the 1/16/04 Information Request (Notice ID: 00128) stating that all Settling States have enacted Model Statutes and represent to have been in full force and effect continuously since the indicated effective date; therefore, no possible NPM adjustment is allocated to PMs.
Independent Auditor's Notice of Preliminary Calculations for [MSA § ] IX(c)(1) Account Payments Due April 15, 2004–NOTICE ID: 0130 (3/5/04) (Ex. C to Clark Affidavit (12/13/04), State's Initial Opposition Memorandum (12/13/04)),

p. 2 n. 1.FN11 No other reason was set forth in the Independent Auditor's Notice of Preliminary Calculations for not applying the NPM Adjustment to payments owed by Participating Manufacturers to the Settling States for calendar year 2003.

FN11. The above-referenced "[i]nformation from the National Association of Attorneys General related to the status of the Model Statutes enacted by the Settling States" was also listed by the Independent Auditor in that portion of its Notice of Preliminary Calculations labeled "Information Relied Upon," as required by MSA § XI(d)(2).

### c. *Commonwealth's Notice of Dispute as to the Independent Auditor's Preliminary Calculations for 2003*

On March 15, 2004, Commonwealth formally objected to the Independent Auditor's Preliminary Calculations, insofar as they proposed not to apply an NPM Adjustment to payments owed by the Participating Manufacturers to the Settling States for calendar year 2003. See Notice of Dispute Regarding Preliminary Calculation (3/15/04) (Ex. B to Conway Affidavit (1/3/05), Petitioners' Reply Memorandum (1/3/05)). In its Notice of Dispute, Commonwealth challenged the Preliminary Calculations of the Independent Auditor, *inter alia,* on the grounds set forth by Mr. Poling in his March 4, 2004 letter. In addition, it asked the Independent Auditor to determine that there was a dispute regarding the availability and amount of an NPM Adjustment with respect to at least $31,103,574.73 of Commonwealth's calculated payment for calendar year 2003. FN12

FN12. This request appears to have been made under the provisions of the NPM Adjustment Agreement.

After Commonwealth delivered its Notice of Dispute to all Notice Parties, the Independent Auditor solicited and received input regarding the dispute from all affected parties. Its efforts included collecting information from the parties regarding various aspects of the NPM Adjustment, obtaining outside counsel to assist it in determining its proper role in resolving disputes under the MSA, submitting extensive questions to the parties regarding various issues relating to the NPM Adjustment, receiving and reviewing extensive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

briefs from the parties in response to its questions, and convening a meeting of the parties to hear their respective arguments on March 22, 2004.

*d. The Independent Auditor's Final Calculation for 2003 and Follow-up Notice Concerning Its Limited Role in Resolving the Parties' Disputes Under the MSA*

Thereafter, on March 31, 2004, the Independent Auditor delivered written notice to all other Notice Parties of its Final Calculation of payments due from the Participating Manufacturers to the Settling States for calendar year 2003. In its Final Calculation, the Independent Auditor did not change the approach it had taken to the NPM Adjustment in its Preliminary Calculations, although it expressly noted as follows that it was then conducting a detailed inquiry as to the parties' dispute on that issue on which it would soon report:

*17 The Independent Auditor has ... received dispute letters related to the application of the NPM Adjustment. Additionally, the Independent Auditor received a significant amount of input with respect to this issue, primarily as a result of a meeting on this subject held on March 22, 2004. Written positions with respect to this issue are being submitted by the settling parties and the Independent Auditor is seeking the advice of outside counsel to assist in the interpretation of the relevant portions of the MSA pursuant to the terms of our engagement letter. This additional information will be analyzed and considered upon its receipt, and upon completion of a thorough review process, revisions may be made to this Final Calculation, if deemed appropriate. *At this time, the Independent Auditor is treating the NPM Adjustment in the Final Calculation in the same way it was treated in the Preliminary Calculation.* Furthermore, the Independent Auditor's methodology with respect to the application of the NPM Adjustment has remained unchanged and has been consistently applied over time for the reasons discussed at the March 22, 2004 meeting.

Notice of Final Calculation (Ex. D to Clark Affidavit (12/13/04), State's Initial Opposition Memorandum (12/13/04)), pp. 3-4. (Emphasis added.)

In a footnote to the above-quoted paragraph, the Independent Auditor added the following

observations:

Certain settling parties have indicated that the presentation of the NPM Adjustment in the IX(c)(1) calculations for the years 1999 and 2000 varies from the presentation used in the current calculation in that the Participating Manufacturers' payment obligations were reflected both net of the NPM Adjustment and on a gross basis. As described in detail in the March 31, 2000 letter (Notice ID: 0027), this presentation was driven by the absence of information, i.e., a determination by the economics firm related to whether or not the MSA was a significant factor in the Market Share Loss, and not the result of disputed information. The Notice ID: 0027 letter references Subsection XI(d)(5)(A), which directs the Independent Auditor to employ an assumption that would produce the minimum amount "likely" to be due. The Independent Auditor states in its letter that it had no knowledge of whether the firm would be likely or not likely to deem the NPM Adjustment appropriate. Hence, the Independent Auditor showed the calculation both including and excluding the NPM Adjustment for 1999 and 2000.

*Id.,* at p. 4.1. This footnote is cited by the Petitioners for the proposition that, in making its Final Calculation of payments due from the Participating Manufacturers for calendar year 2003, the Independent Auditor treated the as-yet-unmade significant factor determination as "missing information" under MSA § XI(d)(5)(A), and thus employed an assumption about the results of that determination which "produce[ed] the minimum amount that is likely to be due [as a result thereof]." *Id.* That assumption, claim the Petitioners, was that the disadvantages experienced as a result of the provisions of the MSA were a significant factor contributing to the Market Share Loss of the Participating Manufacturers for 2003. Affidavit of Spencer A. Coates (Petitioners' Original Memorandum), ¶ 28. The State disputes this assertion, arguing that the Independent Auditor neither made any such assumption in making its challenged calculations, nor had any power to do so under the MSA. State's Sur-Reply Memorandum (1/24/05), p. 6. On the latter point, in particular, the State argues that only the Firm has the power to make a significant factor determination, and that in any event, the absence of such a determination cannot be considered "missing information" within the meaning of MSA § XI(d)(5)(A). State's Sur-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Reply Memorandum (1/24/05), pp. 6-7.

**\*18** Two weeks after delivering its Notice of Final Calculation to the other Notice Parties, the Independent Auditor delivered a follow-up Notice to them concerning the role it had played and expected to play in the future in resolving their ongoing dispute about the applicability of an NPM Adjustment to payments due under the MSA for calendar year 2003. In that Notice, it first noted that, under the terms of its engagement letter of May 25, 2000, it was required, "in the event of a dispute among one or more parties to the MSA, ... [to] determine and administer the initial dispute resolution process." Notice re: Disputes of Final Calculation for Payments Due April 15, 2004 (Ex. E to Clark Affidavit (12/13/04), State's Initial Opposition Memorandum (12/13/04)), p. 1. In light of such language of that letter, the Independent Auditor concluded that it was not authorized to play any role at all in resolving disputes arising under side agreements among them, for unless such side agreements were incorporated into the MSA, any matters concerning them were beyond the limited scope of its engagement. As for disputes arising under the MSA itself, moreover, the Independent Auditor observed that the language of its engagement letter confined its role to determining and administering the "initial dispute resolution process," and thus did not permit it to go further to resolve the dispute itself. On that basis, although noting that it had "endeavored to provide information to all parties with the ... 2004(sic) Final Calculation which would enable a P[articipating] M[anufacturer] to provide a notice of dispute pursuant to MSA subsection XI(d)(6) with respect to a claim of entitlement to an NPM Adjustment;" *id.;* it declined to make any substantive determination with respect to that claim. Instead, it urged the parties either to continue trying to resolve the dispute through the initial dispute resolution process it had initiated or to submit their dispute to arbitration under subsection XI(c) of the MSA *Id.,* at pp. 1-2.

In light of the foregoing observations and conclusions, the Independent Auditor did not modify its treatment of the NPM Adjustment in its Final Calculation.

C. *Procedural Context: The Evolution of The Parties' Current Dispute as to the Arbitrability of*

*their Underlying Dispute Under MSA § XI(c)*

After the Independent Auditor declined to modify its Final Calculation of payments due from the Participating Manufacturers to the Settling States for calendar year 2003, counsel for Petitioner Commonwealth requested the Settling States, through Vermont Attorney General William H. Sorrell, Chairman of the NAAG Tobacco Project, to arbitrate their dispute as to the applicability of the NPM Adjustment to those payments. As part of that request, counsel specifically asked the Settling States to arbitrate "the Independent Auditor's determination that the Settling States had satisfied the diligent enforcement requirement necessary to avoid reduction of their payments to reflect an NPM Adjustment." Coates Affidavit (6/15/04) (Petitioners' Original Memorandum (6/15/04)), ¶ 43. The Settling States, through Attorney General Sorrell, refused this request. *Id.*

**\*19** Thereafter, on June 15, 2004, the Petitioners filed the instant Petition to Compel Arbitration together with a supporting legal memorandum ("Petitioners' Original Memorandum (6/15/04)") and a sworn affidavit from Spencer A. Coates, the Chairman of Commonwealth ("Coates Affidavit (6/15/04)"). Contemporaneously therewith, the Petitioners filed virtually identical petitions or motions, seeking identical relief on identical grounds against four other Settling States-Arkansas, New Mexico; New York and Virginia-in the Courts of those States wherein Consent Decrees identical to that which resolved this action had been entered under the MSA.

Shortly after this Petition was filed, the parties conferred with the Court about establishing a schedule for answering the Petition and briefing and arguing the issues raised therein. At that time, the Court voiced two threshold concerns: first, that all potentially interested parties be notified of these proceedings, so that so they could participate meaningfully herein, as their separate interests dictated; and second, that this Court not be pressed to engage in an unseemly race with the Court of any other Settling State to adjudicate these issues first. The parties agreed that notice of these proceedings, and of any briefing schedule established therein, would be given to all Participating Manufacturers, OPMs and SPMs alike, as well as to NAAG. They jointly suggested, however, that all further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



proceedings on the Petition be postponed until continuing efforts by the Petitioners and NAAG to negotiate a global resolution of their underlying dispute either bore fruit or broke down completely. Accordingly, the Court postponed the start of the briefing schedule until the parties advised it that their negotiations were at an end.

On November 22, 2004, the parties informed the Court that all efforts to resolve their dispute short of litigation had failed, and thus the time had come for the State to file a responsive pleading and for pre-argument briefing to begin. Thus, on December 13, 2004, the State filed its original Answer to the Petition and initial Memorandum in Opposition, accompanied by an opposing Affidavit, with attached exhibits, from Assistant Attorney General Robert W. Clark ("Clark Affidavit (12/13/04)").

Over the ensuing six weeks, before oral argument was finally held on January 31, 2005, the Court received the State's Amended Answer dated January 24, 2005 and the following additional legal memoranda and materials in support of and in opposition to the Petition: (1) Petitioners' Reply Memorandum dated January 3, 2005, together with the Affidavit of their Connecticut counsel, Attorney John Conway ("Conway Affidavit (1/3/05)"), and attached exhibits; (2) an Initial Supporting Memorandum from the OPMs dated January 5, 2005; (3) a Brief of Amici Curiae in Support of the State dated January 24, 2005, which was ultimately joined in by 38 Settling States; (4) the State's Sur-Reply memorandum dated January 24, 2005; and (5) the OPMs' Reply Memorandum dated January 28, 2005, together with the Affidavit of one of their out-of State counsel, Attorney Douglas G. Smith, and attached exhibits. Following oral argument, moreover, the State, the Petitioners and the OPMs all filed supplemental briefs on points essential to their arguments. The State filed its Supplemental Brief on February 22, 2005; the Petitioners filed their Reply to the State's Supplemental Brief on February 25, 2005; and the OPMs filed their Response to the State's Supplemental Brief on February 28, 2005.

**\*20** On March 1, 2005, just one day after all briefing on the merits of the instant Petition was completed, a hearing was held on the Petitioners' parallel motion to compel arbitration against the State of New York in Part 53 of the Supreme Court

of New York, in and for New York County, before the Honorable Charles E. Ramos. At the end of that hearing, after a brief oral argument, Justice Ramos denied the New York motion, without opinion, from the bench.

On March 21, 2005, in the wake of the New York ruling, counsel for the State advised this Court and opposing counsel in writing that, as soon as the New York Supreme Court issued a written order memorializing Justice Ramos' oral ruling, the State would move this Court for permission to file certified or sworn documentation of the proceedings in New York, along with a supplemental brief supporting the claim that the instant Petition is now barred by the doctrine of collateral estoppel. Thereafter, on March 28, 2005, the New York Supreme Court published a written order simply confirming Justice Ramos' prior ruling as follows: "Motion denied as reflected in the Court's transcript."

Notwithstanding the lack of clarifying detail in the New York Supreme Court's written order, the State persisted in its previously announced plan of filing a motion for permission to submit a Supplemental Brief in opposition to the instant Petition under the doctrine of collateral estoppel ("State's Supplemental Brief (4/4/05)"), together with supplemental materials supporting that claim on April 4, 2005. Upon the granting of that motion, without objection by the Petitioners, the Court scheduled a second round of briefing and argument devoted exclusively to the State's collateral estoppel claim. Under that schedule, the Court received the following additional legal memoranda and materials in support of and in opposition to the State's collateral estoppel claim before oral argument was held on that claim on May 2, 2005:(1) the Petitioners' Memorandum in Opposition to the State's Claim of Collateral Estoppel dated April 13, 2005 ("Petitioners' Collateral Estoppel Memorandum (4/13/05)"); (2) the OPMs' Response to Supplemental Brief of the State Re: Collateral Estoppel dated April 13, 2005 ("OPMs' Collateral Estoppel Memorandum (4/13/05)"); and (3) the State's Reply Brief Regarding Collateral Estoppel dated April 26, 2005 ("State's Reply Brief re: Collateral Estoppel (4/26/05)"). Following oral argument, moreover, both the State and the Petitioners, the latter joined by the OPMs, filed final Supplemental Briefs dated May 9, 2005.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

## II. THE STATE'S CLAIM OF COLLATERAL ESTOPPEL

### A. *The New York Hearing and Ruling*

The March 1, 2005 hearing on the Petitioners' motion to compel arbitration before the New York Supreme Court began with a brief description by their lead counsel, Attorney Robert Brookhiser, of his clients' pending claim for relief. The Petitioners, he said, sought an order under MSA § XI(c) compelling the State to arbitrate a dispute concerning the determination by the Independent Auditor not to apply an NPM Adjustment to payments due from them to the Settling States for calendar year 2003. Transcript at New York Hearing (3/1/05), p. 4. The "crux" of the motion, explained Attorney Brookhiser, was the "plain and unequivocal terms of the parties' arbitration agreement [.]" *Id.* Accordingly, after reading the operative language of the arbitration agreement to the Court, counsel began to explain the operation of the MSA's payment provisions, focusing particularly, as he did so, on the role of the Independent Auditor in calculating and applying the NPM Adjustment under those provisions.

**\*21** Not long after his presentation began, however, counsel was interrupted by the Court with basic questions as to the procedural posture of the motion, the existence of similar proceedings in other States, the availability of controlling precedent, and similar matters. In the ensuing colloquy, in which Attorney David Nocenti for the State of New York and Attorneys Stephen Patton and Albert Shaknes for the OPMs all joined, the Court was informed, *inter alia,* of the following relevant facts: (1) the motion before it was one of five similar motions or petitions that the Petitioners had filed contemporaneously in the Courts of five Settling States, including New York and Connecticut; (2) the Connecticut Petition had already been briefed and argued in this Court, where it had been taken under advisement; (3) no arbitration had ever been ordered or conducted under the MSA in any Settling State, although an order to compel one had previously been sought and denied in California; (4) although the New York motion only involved the State of New York, the Court's disposition of that motion could have nationwide consequences, for the parties' underlying dispute concerned all the Settling States, as evidenced by the filing of an *amicus curiae* brief on

behalf of most of them; and (5) the State's position on the motion was that arbitration could not be ordered because the Independent Auditor had no power even to consider applying an NPM Adjustment when two "conditions precedent" to the application of the Adjustment had not been met.

Keying on the foregoing description of the State's position on the motion, the Court first confirmed that position, FN13 then refocused the inquiry before it upon the language of the MSA that establishes and controls the operation of the two allegedly unmet "conditions precedent."

FN13. THE COURT: Now I understand a little bit more because of what Mr. Nocenti told me. Essentially what the State of New York is intending I am sure I will not characterize it correctly, but they are contending there is a hurdle over which your client must bound.
MR. BROOKHISER: Right.
THE COURT: To get to the point w[h]ere arbitration provision can be [ ] implicated.
MR. BROOKHISER: That's their argument.
THE COURT: There has to be some failure on the part of the State to comply with certain portions of the MSA.
MR. BROOKHISER: But that is the subject of the dispute, and the arbitration. It goes to the merits.
THE COURT: Hold the phone. It is one thing to say any dispute involving a particular calculation or an omission or refusal to calculate when a matter is sent to the auditors that's a pretty easy decision to make. It's another thing to say entirely that there are certain contractual requirements that have to be met, or failed to be met that would then trigger the calculation that subsequently is arbitrable.
MR. BROOKHISER: But all of those things your Honor are determinations that the auditor makes each year. He has to go through the two that are at issue here are significant-
Transcript (3/1/05), pp. 16-17.

The first requirement for the application of an NPM Adjustment, which the State characterized as a "condition precedent" to the making of any determination concerning the applicability of the Adjustment, is the making of a "significant factor determination" for the year in question by "the Firm." In light of the clear statement in MSA § IX(d)(1)(C) that, "[i]f the Firm determines that the disadvantages experienced as a result of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment ... shall apply[,]" the Court initially commented that the State's position on that issue was a "logical argument." Transcript (3/1/05), p. 28. Later, however, the Court was constrained to take a different view of the matter when it learned that the very next sentence in MSA § IX(d)(1)(C) states the opposite proposition, to wit: "If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were *not* a significant factor contributing to the Market Share Loss for the year in question, the NPM Adjustment ... *shall not apply.*" (Emphasis added.) The Court was thus required to refocus its inquiry once again upon the particular situation before it, in which the Firm had made no determination on this issue, one way or the other.

*22 At first, the Court suggested that if the Firm had made no significant factor determination, the Independent Auditor would be required to take no action at all with respect to the application of an NPM Adjustment, but simply to remain mute on that subject. In that event, the Court proposed, it might reasonably be concluded that there had been no determination by the Independent Auditor as to which an arbitrable dispute could have arisen under the MSA. FN14 Again, however, the Court's tentative approach was undermined when it learned not only that the MSA contained provisions permitting the Independent Auditor to employ assumptions about missing information when it made its annual payment calculations, but that in this very case, for the year in question, the Independent Auditor had in fact employed such an assumption about the likely results of the Firm's as-yet-unmade significant factor determination. *Id.*, at pp. 32-34. Although the Court initially responded, with encouragement from the State, that the significant factor determination could not appropriately be considered "missing information" within the meaning of MSA § XI(d)(5), it had no response at all to the undisputed fact that the Independent Auditor had made such an assumption and based a determination upon it. Thus, without further commenting about the first allegedly unmet "condition precedent" to the application of an NPM Adjustment, much less making any ruling with respect to it, the Court immediately redirected the State's attention to the second alleged "condition

precedent" it claimed to be unsatisfied-the "diligent enforcement" provision set forth in MSA § IX(d)(2).

FN14. On this score, the Court made the following relevant comments when first informed that the Independent Auditor had made no significant factor determination at all:

THE COURT: Hang on, let me read it again with that thought in mind. Well, actually, everybody is wrong. It is silent.

THE COURT: Silence is golden because you can't enforce silence.

THE COURT: Everybody be quiet for a second. It's very logical this is the way we construe documents. It says if one thing happens then this occurred. If another thing happened then another thing occurred. If nothing happens and the agreement is silent on that subject being silent there is noting that I can do to move this along. If it is a pre-condition that a certain determination be made, and the determination is not made, it's not made.

THE COURT: The auditor didn't make the decision. The only thing you can dispute is the failure or refusal of the firm to make the determination called for. But the agreement is silent as to whether or not it has to be done.

THE COURT: ... The firm can say yes there is a public connection to the MSA, or no there is no connection, or he can say nothing. Nothing is nothing.

THE COURT: The auditor has it real easy if the auditor has a pre-condition to the satisfaction of this provision requires the firm to make a determination in a particular way then he can do nothing, then the auditor must simply stay moot (sic) on that subject. It is just like a motion in Court. Whatever is not granted is denied. Why? Because it is not granted. Transcript (3/1/05), pp. 29-32.

Upon finding the relevant text of the "diligent enforcement" provision, apparently for the first time, the Court read it aloud, then engaged counsel in colloquy, as follows:

THE COURT: I will read it because I read more slowly. A settling state allocated payments that's what they get every year. Shall not be subject to an [N]PM adjustment, the issue we have here. One, if such settling state continuously had a disqualifying statute yada yada yada in full force and effect.

MR. NOCENTI: We all agreed that occurred.

MR. BROOKHISER: And the next during the entire calendar year and then and diligently enforced the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



provision of such statute during such entire calendar year.

THE COURT: So you want to make arbitrable whether or not the State has complied with the provisions of the statute during the entire calendar year. That's not even a close argument.

MR. BROOKHISER: The auditor decided that they-that we are entitled, that we were not entitled to this adjustment. The auditor said both of these conditions were satisfied. The states urged the a[uditor] to say from the mere fact we have a statute in full force and effect you must presume we have been diligently enforcing it. They said that over and over again. They said it every year, and the auditor in its calculations said because there is a statute in full force and effect there will be no [N]P[M] adjustment.

*23 THE COURT: Were you folks contending to the contrary?

MR. BROOKHISER: Yes. Your Honor, we said the auditor-there can't-possibly be enforcement otherwise the market would have gone from nothing to over 8 percent. We think it is more than that. How can that have happened if the statute that should equalize the playing field?

Transcript (3/1/05), pp. 36-38.

Attorney Nocenti, for the State, then interjected the following response to the Petitioners' argument:

MR. NOCENTI: There is a simple answer to that question. I want to correct something Mr. Brookhiser said. The SPM went to the independent a[uditor] and said you should apply an [N]PM adjustment across the country and reduce every state['s] annual payment because you should assume that nobody is diligently enforcing the statute. These are statute[s] that are passed by fifty legislatures in fifty states, and the individual trial court in each state has exclusive jurisdiction in that state. Whether a state is diligently enforcing its statute in that State has to be determined by that state. They went to the independent a[uditor] and said you should assume even if everybody is diligently enforcing you should still apply an [N]PM adjustment, and I say that is absurd. The independent a[uditor] is an accounting firm it is Price Waterhouse, they are not a Court of law. They don't make judicial determinations, they don't look at the facts of enforcement in a particular state to decide-

*Id.,* at pp. 38-39. Prompted by this argument, the

Court issued the following challenge to Petitioners' counsel:THE COURT: Tell me why he is wrong[,] I think he is right.

*Id.,* at p. 39. Instead, however, of waiting for counsel's reply, the Court heard a half-sentence preliminary argument from the OPMs' counsel, Attorney Patton, then cut off further discussion by answering its own question and ruling as follows:MR. PATTON: He has not pointed you to a single piece of language that says that determination of diligent enforcement is supposed to be made by this Court, and there is a good reason for that-

THE COURT: We have three possibilities who is supposed to make that determination. One is the auditor that makes no sense at all. We all know that makes no sense. We can't in good faith argue an accountant is to make that kind of legal determination.

The second is the arbitrator who you want to say does it except the agreement does not provide-

MR. PATTON: It does.

THE COURT: I disagree. The third is the Court makes that determination. That's my ruling. That's my ruling. That's my ruling. Get a copy of it and get an appeal. The State wins on this one. We are done. This is not an arbitrable dispute under the MSA, not even close.

Transcript (3/1/05), pp. 39-40. Counsel for the Petitioners was never even heard from before the Court answered its own question by ruling as aforesaid.

### B. *The Evolution of the Parties' Positions*

#### I. *The State's Initial Claim*

*24 In support of its claim that the instant Petition to Compel Arbitration must be denied under the doctrine of collateral estoppel, the State argued initially, in its opening brief on that issue, that this Court should be guided by the general formulation of the doctrine set forth in Section 27 of the Restatement of the Law (Second), *Judgments* (1982). Section 27 provides that:
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Page 20

*Id.* (*quoted in* State's Supplemental Brief (4/4/05)), p. 3. "This concept," claimed the State, "has been adopted by virtually every jurisdiction in the United States." *Id.*

"It is also settled law in most jurisdictions[,]" the State continued, "that '[a] party precluded from relitigating an issue with an opposing party[ under the foregoing rule] is also precluded from doing so with another person unless the fact that he lacked a full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.' " State's Supplemental Brief (4/4/05) (*quoting* Restatement of the Law, *Judgments* § 29). The doctrine, so modified, is known as the doctrine of "non-mutual collateral estoppel."

Under the doctrine of non-mutual collateral estoppel, described as aforesaid, the State argued that the Petitioners are barred from pursuing their instant Petition in this Court because "the sole issue raised by the Petition"-assertedly, "whether the SPM Petitioners are entitled to an order compelling Connecticut to arbitrate the Independent Auditor's refusal to apply an NPM Adjustment to their 2004 Annual Payments"-was "conclusively settled and determined" against the Petitioners by the final judgment of the New York Supreme Court denying their parallel motion to compel arbitration against the State of New York. State's Supplemental Brief (4/4/05), p. 4.

Notwithstanding the foregoing, Restatement-based introduction, the State expressly acknowledged that the substantive law of New York is binding and controlling with respect to its collateral estoppel claim. On that score, the State quoted and relied principally upon Section 95 of the Restatement of the Law (Second), *Conflict of Laws* (1989), which provides: "What issues are determined by a valid State judgment is determined, subject to constitutional limitations, by the local law of the State where the judgment was rendered." State's Supplemental Brief (4/4/05), p. 4. Thereafter, the State offered, without qualification or comment, the following general description of the issues purportedly determined, under the rule of collateral estoppel, by a valid New York judgment: "Where a pending issue was raised, necessarily decided and material in a prior action, and where the party to be estopped had a full and fair opportunity to litigate

the issue in the earlier action, fairness and efficiency dictate that the party should not be permitted to try the issue again." State's Supplemental Brief (4/4/05), p. 6 (quoting *Bansbach v. Zinn,* 1 N.Y.3d 1, 10 (N.Y.2003)).

**\*25** Turning to matters of procedure, the State further noted that New York has adopted the "full and fair opportunity test" for applying collateral estoppel. Under that test, as New York articulates it, "there must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and second, there must have been a full and fair opportunity to contest the decision now said to be controlling." State's Supplemental Brief (4/4/05), p. 6 (quoting *Schwartz v. Public Administrator of the County of Bronx,* 24 N.Y.2d 65, 71 (N.Y.1969). Alternatively, in the case of non-mutual collateral estoppel, the party against whom the doctrine is invoked may avoid its application to him by demonstrating that "other circumstances justify affording him an opportunity to relitigate the issue." Restatement of the Law, *Judgments* § 29. Although "the burden rests upon the proponent of collateral estoppel to demonstrate the identicality and decisiveness of the issue, ... the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in the prior proceeding." State's Supplemental Brief (4/4/05), pp. 6-7 (quoting *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 349 (quoting *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 501 (N.Y.1984))).

In this proceeding, claimed the State, the issue raised by the Petitioners is identical to that which they raised in their New York motion to compel arbitration, because the relief sought in their Petition is identical to that which they sought in their New York motion, to wit: an order "compelling the State to arbitrate disputes arising out of or relating to calculations made by the Independent Auditor to the MSA of payments due on April 15, 2004 under the MSA and the Independent Auditor's determination that [the Petitioners] are not entitled to a Non-Participating Manufacturer Adjustment for 2003, as required by the arbitration agreement contained in the MSA[.]" The "evidence" submitted by the Petitioners in support of their New York motion and this Petition, moreover, is also identical, for it consists only of the Affidavit of Commonwealth Chairman Spencer E. Coates. Against this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



background, concluded the State, the final decision on the New York motion bars further prosecution of the instant Petition in Connecticut under the doctrine of non-mutual collateral estoppel:

In ruling in the New York Motion, and ultimately finding that the "dispute" in question was not arbitrable, the New York MSA Court, therefore, necessarily resolved the only issue before this Court-whether the Independent Auditor's refusal to apply an NPM Adjustment to the NPM Petitioners' 2004 Annual Payments is arbitrable. The New York MSA Court ruled that it was not. Under New York law, that ruling, as embodied in the March 1, 2005 transcript and the written order entered on March 25, 2005, represents a final judgment on the merits. As such, it also has the effect of collaterally estopping the SPM Petitioners from relitigating that issue in this proceeding.

**\*26** State's Supplemental Brief (4/4/05), p. 8.

### 2. The Petitioners' Initial Response

The Petitioners, with support from the OPMs, initially responded to the State's Supplemental Brief with three basic arguments of their own as to why the State's collateral estoppel claim must be rejected. First, although they agreed with the State that the law of New York is controlling as to the preclusive effects, if any, of the New York judgment on the issues raised by the instant Petition, they insisted that the State's description of that law is materially misleading in one critical respect. In particular, they noted that New York, unlike jurisdictions adhering strictly to rule of Restatement (Second), *Judgments* § 27, does *not* give preclusive effect to prior judicial determinations of pure questions of law, such as the interpretation of unambiguous contract provisions. Petitioners' Collateral Estoppel Memorandum (4/13/05), pp. 5-7; OPMs' Collateral Estoppel Memorandum (4/13/05), pp. 2-5. Hence, they argued, because Justice Ramos' ruling, however unexplicated, cannot reasonably be characterized as anything other than the interpretation of unambiguous contract provisions, the State's collateral estoppel claim must be denied.

Second, the Petitioners assert that the issues actually litigated and finally determined in New York are not identical to those raised by their instant Petition, because it is impossible to tell from the New York judge's ruling and order exactly how, or by what

legal standards, he ruled as he did. On the latter point, the Petitioners argue that the law governing the interpretation of arbitration provisions in New York is materially different than that governing the interpretation of such provisions in Connecticut, and thus it would be unfair and inappropriate to bar the Petitioners from litigating that issue under Connecticut law.

Third and finally, the Petitioners assert that under the MSA-a multi-jurisdictional agreement pursuant to which they are subject to the jurisdiction of fifty-two different State trial courts, but they cannot join all fifty-two Settling States in a single action or proceeding before one of those trial courts-it would be fundamentally unfair to permit the State to invoke collateral estoppel as a basis for defeating their right to litigate separately in the Court of each Settling State. This, they reiterate, is especially so under present circumstances, where the New York judge's oral ruling was unexplicated and unclear.

### 3. The State' Modified Position in its Reply Brief

In its Reply Brief re: Collateral Estoppel dated April 26, 2005, the State conceded that several New York appellate decisions do indeed state the general rule that the doctrine of collateral estoppel does not apply to pure questions of law. It persisted, however, in pressing its claim that the instant Petition must be denied under the doctrine of collateral estoppel. First, it attempted to show that all such statements were merely *dicta,* for each was assertedly made in a case where it did not become the analytical basis for denying preclusive effect to a prior judicial determination involving a pure question of law.

**\*27** Second, the State argued that the question determined by the New York Supreme Court was not a pure question of law, but a mixed question of law and fact, to which collateral estoppel clearly does apply in New York. On this score, the State described the relevant law as follows:

As the SPM Petitioners and the OPMs observe, the interpretation of even ambiguous contract language can be a question of law if the interpretation of the contract language does not require the resort to extrinsic evidence. *Stainless, Inc. Employers Fire Ins. Co.,* 418 N.Y.S.2d 76, 79 (N.Y.A.D.1979), aff'd mem., 49 N.Y.2d 924 (1980); *Levine v. Advest,* 244 Conn. 732, 746-47 (1998) (applying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



New York law). By contrast "when 'the intent [of the parties to a contract] must be determined by disputed evidence or inferences outside the written words of the instrument ... a question of fact [is] presented." *Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395, 401-02 (1993) (*quoting Mallard v. County Fed. Sav. & Loan Ass'n,* 32 N.Y.2d 285, 291 (1973)).

State's Reply Brief re: Collateral Estoppel (4/26/05), p. 3. Under these authorities, the State argued that both in Connecticut and in New York, the parties had submitted and disputed the significance of extensive extrinsic evidence to support their respective positions, including, assertedly, evidence tending to establish: "(a) the nature of the "dispute" that was properly before the Independent Auditor; (b) the actual substance of the Independent Auditor's decision; (c) the nature of the "dispute" that the SPM Petitioners claim is arbitrable; and (d) the past practices of the Independent Auditor, including in particular what issues it had actually decided and in what manner." *Id.,* at p. 4. In addition, it claimed, both sides had disputed the significance of the Independent Auditor's statement that the dispute was subject to arbitration under MSA § XI(c). *Id.* In conclusion, the State argued that "the parties did not seek, nor does the New York Judgment represent, an interpretation of the MSA provisions limited to the four corners of the document. The resolution of the issue of arbitrability included a review of disputed extrinsic evidence. As such, it is a mixed question of law and fact." *Id.*

The State concluded its Reply Brief by arguing, simply, that New York's and Connecticut's standards for interpreting arbitration clauses are substantially similar, and that there is nothing unfair about applying the New York ruling, however unexplicated, to the extent that it obviously decided an essential issue common to the New York motion and this Petition.

### 4. The Parties' Positions at Oral Argument

At oral argument on the State's collateral estoppel claim, the State conceded once again that this Court's inquiry is governed by New York law; Hearing Transcript (5/2/05), p. 4; and acknowledged that "a number of New York cases say collateral estoppel doesn't apply to questions of law." *Id.,* at pp. 7-8, 21. Even so, it claimed, as it

had in its Reply Brief: (1) that no New York case had actually refused to give preclusive effect to a prior judicial determination because the determination involved a pure question of law; *Id.,* at pp. 8, 21-29; and (2) that even if New York's collateral estoppel rule does not apply to pure questions of law, the ruling here at issue involved a mixed question of law and fact, not a pure question of law.

**\*28** On the latter claim, in particular, the State initially observed that, while the question here presented involves the interpretation of a contract which is undoubtedly a question of law, "the Court has to look only at the stacks of affidavits that have been provided in New York and Connecticut ... to see that there are numerous facts before the Court too." *Id.,* at p. 8. Therefore, it argued, the question is a mixed question of law and fact, not a pure question of law. When, however, the State's legal counsel was pressed by the Court to point to "any evidence [he knew of] ... that any issue [Justice Ramos] actually decided was decided on the basis of any fact other than the actual four corners ... of the MSA;" *id.,* at p. 9; he had nothing to offer apart from a single reference to a single fact mentioned by the Petitioners in oral argument, which Justice Ramos had summarily dismissed as irrelevant to the issues before him. Hence, although the State had argued, based upon Justice Ramos' comments in the Transcript of the March 1, 2005 hearing and oral ruling, that he had denied the New York motion based upon conclusions that the MSA does not empower the Independent Auditor to apply an NPM Adjustment to payments due for any year as to which no significant factor determination has been made by the Firm or no diligent enforcement determination has been made by this Court, it candidly conceded that Justice Ramos "did not elucidate his reasoning" for those conclusions, and thus that it "c[ould]n't be certain exactly what he relied on." *Id.,* at p. 17. In sum, although counsel repeatedly noted that the parties' briefs and affidavits had been filed with the Court before Justice Ramos made his oral ruling, he conceded that: "It's true that there is nothing in the words of [Justice Ramos'] comments that would show that he did rely on those arguments ... I cannot point to anything specific in his argument to show he relied on them." *Id.,* at p. 18.

Apart from disagreeing with the State's arguments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



that New York case law does not forbid the application of collateral estoppel to pure questions of law and that, in any event, the question common to the New York motion and the instant Petition is a mixed question of law and fact, the Petitioners made several additional arguments in opposition to the State's collateral estoppel claim which the State disputed. First, they argued that collateral estoppel is an equitable doctrine that should be flexibly enforced, and should not be enforced where the consequences of enforcing it would be unfair. *Id.,* at p. 50. Here, it claimed, the enforcement of collateral estoppel cannot possibly serve its principal purposes, which are assertedly to give plaintiffs the incentive to join all possible defendants in a single action and to achieve consistency in results. Under MSA § VII, they rightly noted, each state can only be sued in its own State court, and no other State can be joined in that action. For the same reason, they claimed, achieving consistent results is impossible if each State court entering a Consent Decree under the MSA is empowered to retain the exclusive power to implement and enforce the MSA as to its own State. Indeed, it argued, the very structure of the MSA was designed to ensure that anticipated disputes among jurisdictions, born of conflicting judicial interpretations of MSA provisions, would be resolved by cooperation and negotiation among them. Finally, they claimed, allowing the States to plead and rely upon collateral estoppel gives the States a powerful advantage over the Participating Manufacturers in enforcing the MSA, for they have no such option. This Court, it concluded, should make its own decision as to how to resolve this important dispute, leaving it to the parties, as contemplated by MSA § VII(f), to "use their best efforts ... to coordinate and resolve the effects of [any] conflicting interpretations" to which it may lead among the decisions of other State courts.

### C. *The Court's Analysis*

**\*29** The dispositive issue on the State's claim of collateral estoppel is whether the determination made by Justice Ramos in denying the Petitioners' New York motion to compel arbitration involved a pure question of law, as the Petitioners have argued, or a mixed question of law and fact as argued by the State. This is so because, as the Petitioners have correctly noted, it is well established in New York that "the rule of collateral estoppel does not apply to

pure questions of law." *People v. Federal Builders & Modernization Corp.,* 317 N.Y.S.2d 942, 944 (N.Y.Sup.1971) (citing and relying upon the United States Supreme Court's decision in *United States v.. Moser,* 266 U.S. 236, 242 (1924)). Cf. Restatement of the Law (Second), *Judgments* § 28, p. 286 (noting that the rule of the Restatement (Second), which the State urges this Court to follow, does not follow the rule of *United States v. Moser, supra* ). See also *McGrath v. Gold,* 36 N.Y.2d 406, 411 (N.Y.1979) ("[C]ollateral estoppel does not apply to an unmixed question of law."); and *Avon Development Corp. v. Samnick,* 730 N.Y.S.2d 295, 297 (N.Y.A.D.2001) ("[D]efendant may not rely on the doctrine of collateral estoppel to preclude litigation of this action. The doctrine does not apply to bar relitigation of a pure question of law.")

Under New York law, interpretation of an unambiguous contract or contract provision presents a pure question of law. See, e.g., *Stone v. Goodson,* 8 N.Y.2d 8, 13 (1960). Similarly, interpretation of an ambiguous contract or contract provision has been held to present a pure question of law in New York whenever "[the] ambiguity in the terminology used" by the parties to form the contract "[is] resolved wholly without reference to extrinsic evidence." *Stainless, Inc. v. Employers Fire Ins. Co.,* 69 A.D.2d 27, 32 (1st Dep't, 1979), aff'd, 49 N.Y.2d 924 (1986) (quoting *Hartford Acc. & Ind. Co. v. Wesolowski,* 33 N.Y.2d 169, 172). Hence, under New York's law of collateral estoppel, no such purely legal, "four-corners" interpretation of disputed language in a contract or contract provision, finally determined in an earlier action involving a party, can be given preclusive effect against that party in any later action. See, e.g., *Mazzocki v. State Farm Mut. Ins. Co.,* 1 A.D.3d 9, 12 (2003) (where the court refused to give collateral estoppel effect to a prior judicial interpretation of language in an insurance policy, adverse to the party later sought to be bound thereby, because that interpretation was a pure question of law).

One case that well illustrates the distinction drawn in New York, for purposes of the collateral estoppel doctrine, between issues presenting pure questions of law and those presenting mixed questions of law and fact is *American Home Assurance Co. v. International Insurance Co.,* 90 N.Y.2d 433, 684 N.E.2d 14 (1997), which was decided by New York's highest court, the Court of Appeals. There,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the substantive issue presented for decision was whether or not an excess insurer could defend itself successfully against a coverage claim under an excess policy by proving late notice of the claim without an accompanying showing of prejudice. During the pendency of the action before the New York Supreme Court, a Federal District Court decided that such a defense could indeed be asserted. Considering itself bound by the District Court's decision, the trial court entered summary judgment for the insurer defendants under the doctrine of collateral estoppel. On appeal, however, the Appellate Division reversed, denying the insurers' motions for summary judgment and reinstating the complaints against them. In so doing, the Appellate Division concluded that "the salient question of the need for a prejudice showing was a purely legal one as to which collateral estoppel was inapplicable." *Id.*

**\*30** Upon reviewing the Appellate Division's reversal of the trial court's judgment, the Court of Appeals agreed as follows with the Appellate Division's resolution of the collateral estoppel question:
Contrary to the defendants' arguments, the critical issue [the] plaintiff ... proffers-whether an excess carrier must make a showing of actual prejudice when it seeks to avoid its coverage obligation because of late notice-is a pure question of law. Consequently, the doctrine of collateral estoppel does not preclude [the plaintiff] from litigating that issue again, despite the federal court's prior adverse determination on the point.

*Id.* Thereafter, moreover, the Court of Appeals usefully observed, in a related footnote, that unlike the purely legal determination as to what proof was generally required to establish a late-notice claim to a coverage action under an excess policy, the determination whether or not those requirements had been met on the facts of a given case involved a mixed question of law and fact. "We note," said the Court, "that the untimeliness of the notice the defendants received is a mixed question of law and fact and, consequently, collateral estoppel is at least theoretically available as to that issue. *Id.,* at n. 1

The *American Home* decision is important in two ways. First, it is a decision in which the Court of Appeals not only declared, as a matter of theory, that collateral estoppel does not apply to pure questions of law, but applied that rule in practice as

a basis for its decision. This, of course, contradicts the State's repeated suggestion that the New York collateral estoppel rule is mere *dictum* that has never been followed in a concrete case. Second, by dichotomizing between the declaration of a general legal principle and the application of that principle to particular facts, with the observation that collateral estoppel can apply to determinations of the latter but not to determinations of the former, the Court usefully confirmed that the doctrine gives preclusive effect *only* to prior determinations of *discrete factual issues* actually litigated and necessarily determined as parts of broader claims, *not* to the broader claims of which they are a part. Accord, *Interboro Institute, Inc. v. New York State Higher Education Services Corporation,* 256 A.D.2d 1003, 1004-05, 682 N.Y.S.2d 301 (3rd Dep't 1998) ("the doctrine of collateral estoppel will permit any discrete factual issue necessarily decided in the prior action to be given preclusive effect").

The implications of that holding for the present case cannot be overstated. To begin with, it requires the State to prove, and this Court to find, more than merely that the *claim* denied in New York-that the State should be compelled to arbitrate a dispute concerning the Independent Auditor's refusal to apply the NPM Adjustment to payments due by them to the Settling States for calendar year 2003-was identical in substance to the claim now before this Court. Instead, it must prove both that the discrete issue whose determination resulted in the denial of the New York claim is likewise essential to and determinative of the instant claim, and that it is the type of issue-one presenting a question of fact or a mixed question of law and fact-to which preclusive effect can be properly be given under New York law.

**\*31** The one discrete determination upon which Justice Ramos appears to have based his denial of the Petitioners' New York motion to compel arbitration is that under the MSA, it is the Court of each Settling State, not a panel of arbitrators convened under MSA § XI(c), that is empowered to decide whether or not the State over which it has jurisdiction under the MSA and the Consent Decree diligently enforced its Model Statute throughout any calendar year for which an NPM Adjustment is otherwise applicable. That, of course is the determination he announced in open court as part of his final, hearing-ending declaration: "The third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



[possibility] is the Court makes that determination. That's my ruling. That's my ruling. That's my ruling. Get a copy of it and take an appeal. The State wins on this one. We are done. This is not an arbitrable dispute under the MSA, not even close." Transcript (3/1/05), p. 40. It is, moreover, the only such determination he labeled a "ruling" or announced with any suggestion of finality throughout the hearing, for as previously noted, all of his tentative suggestions as to the possible disposition of the State's initial claim concerning the lack of a significant factor determination were discarded virtually as quickly as they were voiced, as new revelations were made to him concerning the relevant provisions of the MSA. In short, there was never any determination by Justice Ramos with respect to the State's initial argument, for that inquiry was temporarily set aside once it became clear to the Court that in this case, the Independent Auditor had actually made an assumption, under MSA § XI(d)(5), as to how the Firm would have made the significant factor determination, had it decided that issue.

It is completely unclear, as the State has conceded, what particular reasoning Justice Ramos employed in making his determination as to the non-arbitrability of the diligent enforcement determination. The most that can be said of that reasoning is that it appears to have been based on the notion proposed by the State of New York that the arbitrators could only review determinations which the Independent Auditor was empowered to make in the first instance, and that it was illogical to believe that the parties to the MSA had intended to so empower the Independent Auditor in light of its lack of legal expertise. In any event, however, it is clear that that determination involved a pure question of law as to the proper interpretation of the MSA, and that that determination was not based upon the consideration of any extrinsic evidence, for the Court mentioned no such extrinsic evidence, and none had been laid before it or urged upon it as a basis for deciding that issue. This aspect of the motion was argued within the four corners of the MSA both by the Petitioners, who claimed from the outset, through their counsel, that the "plain language and unequivocal terms" of the parties' arbitration agreement was "the crux of the motion[,]" and by the State. Therefore, the State has not met its burden of proving, as it must to prevail on this claim of collateral estoppel, that that ruling

was based upon the determination of a discrete factual issue, such as a mixed question of law and fact, of the sort that is entitled to preclusive effect under New York law.

**\*32** In this case, moreover, this Court is of the view that it would be inequitable to apply the collateral estoppel doctrine for two important reasons. First, the application of collateral estoppel in the context of this multi-jurisdictional agreement would be inconsistent with the parties' reasonable expectations that the Courts of the individual Settling States would make different interpretations of the MSA which all parties would have to use "best efforts" to resolve by a common process of negotiation and compromise. Permitting the application of collateral estoppel as to such interpretive issues would prevent individual State Courts from considering such matters separately, effectively undermining their exclusive power to enforce and implement the MSA as to their own States.

Such a practice, moreover, would place an undesirable premium on finding a generally favorable forum, litigating all claims of nationwide significance before it, and then transporting the results across State lines to impose them elsewhere. That of course, would afford a considerable advantage to the Settling States, which could require all Participating Manufacturers to litigate any such issue in the court of one State without themselves being exposed to the requirement of litigating issues before any one tribunal with power over all the States. This approach would utterly defeat the communal process of achieving joint resolution of common issues affecting all States and all Participating Manufacturers that the MSA expressly contemplates.

For all of the foregoing reasons, the Court rejects the State's claim that this Petition is now barred under the New York rule of collateral estoppel.

## III. THE MERITS OF THE INSTANT DISPUTE

### A. *The Petitioners' Position*

The Petitioners base their claim that the underlying dispute is arbitrable under MSA § XI(c) upon the language of that subsection. Initially, they note that in the final sentence of the subsection, the parties agreed that any arbitration thereunder "shall be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



governed by the United States Federal Arbitration
Act. ["FAA"]" *Id.* By so agreeing, claim the
Petitioners, the parties to the MSA expressly
adopted the " 'strong federal policy favoring
arbitration' that requires courts to 'rigorously
enforce agreements to arbitrate[;]' " Petitioners'
Original Memorandum (6/15/04), p. 14 (quoting
*Shearson/American Express, Inc. v. McMahon,* 482
U.S. 220, 225-26 (1987)); and to "construe
arbitration clauses as broadly as possible." *Id.*
(quoting *Collins & Aikman Prods. Co. v. Bldg.
Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995)). Under
that policy, if an arbitration clause "is ambiguous as
to whether the issue in dispute is arbitrable, the
[FAA] requires the court to resolve the ambiguity in
favor of arbitration of the issue." *Id.* at 15 (quoting
*Levine v. Advest, Inc.,* 244 Conn. 732, 749, 714
A.2d 649 (1998)). In light of the resulting
"presumption of arbitrability," the general rule has
assertedly been adopted that a motion to compel
arbitration "should not be denied unless it may be
said with positive assurance that the arbitration
clause is not susceptible of an interpretation that
covers the asserted dispute." Petitioners' Original
Memorandum (6/15/04), p. 16 (quoting *United
Steelworkers of America v. Warrior & Gulf
Navigation Co.,* 363 U.S. 574, 582-83 (1960)).

**\*33** Turning to the substance of the subsection, the
Petitioners note that it expressly makes arbitrable
"[a]ny dispute, controversy or claim arising out of
or relating to calculations performed by, or any
determinations made by, the Independent Auditor (
*including,* without limitation, *any dispute
concerning the operation or application of any of
the adjustments,* reductions, offsets, carry-forwards,
and allocations *described in subsection IX(j)) ...*"
(Emphasis added.) So worded, they further note, it
obviously extends to "any dispute concerning the
operation or application" of the NPM Adjustment,
for that Adjustment is indisputably one of the
"adjustments described in subsection IX(j)." Under
these provisions, the Petitioners continue, the
parties' underlying dispute is plainly arbitrable for
two separate but related reasons. First, it "concerns
the ... application" of the NPM Adjustment, for it
relates directly to the determination by the
Independent Auditor that the Adjustment should not
be applied to payments owed by the Participating
Manufacturers to the Settling States for calendar
year 2003. Secondly, it "concerns the operation" of
the NPM Adjustment, for it focuses, more

specifically, on the Independent Auditor's predicate
determinations that the NPM Adjustment could not
be applied at all if each Settling State diligently
enforced its Model Statute throughout the year in
question, and that based upon the information
collected by it, such diligent enforcement by each
Settling State, including Connecticut, must be
presumed.

### B. *The State's Response*

The State rejects the Petitioners' claim that the
underlying dispute is arbitrable for several
interrelated reasons. First, it reminds this Court that
arbitration is a creature of contract, and thus that
however much it may be favored under the FAA,
the scope of any arbitration agreement is necessarily
limited by the intent of the parties who entered into
it. The instant arbitration clause, it contends, is not
a broad arbitration clause, as the Petitioners have
claimed, but a very narrow one. Inserted in a
contract that confers exclusive jurisdiction upon this
Court for the purposes of implementing the MSA
and the Consent Decree as to this State, it assertedly
establishes a narrow, substantively limited exception
to this Court's exclusive power to hear and decide
disputes arising under the MSA or the Consent
Decree as to this State. Therefore, claims the State,
no presumption of arbitrability should be employed
to make this dispute arbitrable when, by agreement
of the parties, it clearly is not.

In the language of the arbitration clause itself, the
State continues, the only types of disputes, claims or
controversies which are made arbitrable are those
"arising out of or relating to calculations performed
by, or any determinations made by, the Independent
Auditor[.]" As a threshold matter, contends the
State, this language expressly limits the arbitration
rights of parties to the MSA to disputes, claims or
controversies arising out of or relating to
calculations which the Independent Auditor has
actually performed and/or determinations which it
has actually made. More importantly, it argues, it is
implicit in this language that the parties intended to
restrict the scope of arbitration thereunder to
disputes, claims and controversies arising out or
relating to calculations and determinations of the
types that the MSA actually empowers the
Independent Auditor to make. If it were otherwise,
suggests the State, a party could defeat this Court's
presumptive power to hear and decide disputes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



arising under the MSA and/or the Consent Decree as to Connecticut simply by asking the Independent Auditor to decide such a dispute, regardless of its lack of authority to do so, then seeking to compel arbitration of that dispute once the Independent Auditor determines whether or not to decide it.

**\*34** Against this background, the State argues that the parties' underlying dispute is not arbitrable under MSA § XI(c) since the Independent Auditor had no power under the MSA to apply an NPM Adjustment to the Participating Manufacturers' annual payments to the Settling States, including Connecticut, for calendar year 2003, because two mandatory conditions precedent to the application of that Adjustment had not been met. First, it argues, the Independent Auditor had no power to apply the NPM Adjustment to payments owed by the Participating Manufacturers for 2003 because a nationally recognized firm of economic consultants (the "Firm") did not determine, on or before February 2, 2004, that the disadvantages experienced as a result of the provisions of the MSA were a significant factor contributing to the Market Share Loss of the Participating Manufacturers for that year. Here, it is undisputed that no such determination has ever been made, before or after the fixed deadline established by the MSA.

Secondly, the State claims that no NPM Adjustment could be applied by the Independent Auditor because this Court had never determined, as it alone assertedly had the power to, that Connecticut did not diligently enforce its Model Statute throughout calendar year 2003. Such a determination, contends the State, is well beyond the competence of the Independent Auditor, which, of course, is a certified public accounting firm, with no expertise in law, that was selected and retained by the original signatories to the MSA because of its special competence in performing mathematical computations. Because, the State argues, the Independent Auditor's only agreed-upon function under the MSA is to make quantitative determinations within its acknowledged area of expertise rather than qualitative determinations that fall within the exclusive jurisdiction of this Court, it assertedly had no power under the MSA to make any determination, on any basis, that the legal presumption of diligent enforcement had been overcome.

### C. *The Court's Analysis*

This Court agrees with the State that the arbitration clause of MSA § XI(c) constitutes a narrow, substantively limited exception to the Court's otherwise exclusive power to hear and decide disputes as to the State of Connecticut arising under the MSA. Thus, it certainly agrees that the clause should not be extended beyond the bounds intended for it by its drafters, which can only be ascertained by carefully examining both the language and the structure of the clause itself and the broader contractual context in and for which it was adopted. Notwithstanding the strong federal policy favoring arbitration, it is axiomatic that no party should be forced to arbitrate any dispute it has not agreed to arbitrate.

Notwithstanding this conclusion, however, the Court has no difficulty agreeing with the Petitioners that this is not a close case, in which the arbitrability of the underlying dispute claimed for arbitration is unclear, and thus can only be determined by application of a presumption. To the contrary, for the following reasons, it is a dispute that is clearly covered by the subject arbitration clause.

**\*35** Under the operative language of MSA § XI(c), to reiterate, a "dispute, controversy or claim" is arbitrable if it "aris[es] out of or relat[es] to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i))[.]" Under the language of this clause, it is immediately apparent that the broader phrase with which the clause begins, "any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor," delimits the substantive scope of the right to arbitrate under MSA § XI(c), while the narrower, parenthetical phrase that immediately follows it, ("including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection XI(i) or subsection XI(i) [,]") describes a subset of disputes that clearly fall within that scope and usefully illustrate the full range of disputes, controversies or claims that are made arbitrable thereunder. In this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



case, the significance of this language and structure is twofold.

First, of course, it usefully affords this Court a clear analytical framework for deciding whether or not the parties' underlying dispute is arbitrable under MSA § XI(c). Focusing on the language of the narrower, parenthetical phrase, one notes at the outset that such language includes, and thus makes arbitrable, "any dispute concerning the operation or application of any of the adjustments ... described in subsection IX(j)[.]" One such adjustment, which is listed and described in "clause Sixth" of subsection IX(j), is the NPM Adjustment. It therefore follows that "any dispute concerning the operation or application" of the NPM Adjustment is arbitrable under MSA § XI(c).

In light of this construction, the parties' underlying dispute clearly appears to be arbitrable under MSA § XI(c) for three reasons. First, the dispute "concerns the ... application" of the NPM Adjustment, for it involves a direct challenge to the Independent Auditor's determination not to apply the Adjustment to payments owed by the Petitioners and other Participating Manufacturers to Connecticut and other Settling States for calendar year 2003. Second, the dispute "concerns the operation" of the NPM Adjustment, for it involves a two-part challenge to the methodology by which the Independent Auditor made its foregoing determination not to apply that Adjustment to payments owed for 2003:(1) a challenge to the Independent Auditor's general analytical determination that the MSA forbids the application of the NPM Adjustment to payments owed by Participating Manufacturers for *any* year, throughout which all Settling States had Model Statutes in full force and effect; and (2) a challenge to the Independent Auditor's specific determination in this case that no NPM Adjustment could be applied to payments owed by the Participating Manufacturers to the Settling States, including Connecticut, for calendar year 2003, based upon NAAG's representation, in response to the Independent Auditor's annual request for information prior to performing its calculations, that all Settling States had enacted Model Statutes that were in full force and effect throughout that year. Third, there is no other language in the clause or the MSA that further narrows or creates exceptions to the substantive scope of the clause as written or establishes conditions precedent to invoking the

right to arbitrate thereunder. Cf. *Levine v. Advest,* 244 Conn. 732, 754 (1998) (stating that the arbitration portion of the agreement was "unqualified by any language explicitly carving out disputes regarding eligibility for arbitration, such as timeliness, for resolution by the courts"); *White v. Kampner,* 229 Conn. 465, 473 (1994) (finding that the express language of the arbitration clause "require[d] satisfaction of the provisions of the mandatory negotiation clause as a condition precedent to arbitration"); *Welch Group, Inc. v. Creative Drywall, Inc.,* 215 Conn. 464, 468 (1990) (concluding that the "qualifying language" within the arbitration clause limited the scope of arbitrable claims to those disputes involving a certain amount of money); *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 832 (2d Cir.1988) (noting the fact that the "parties agreed to refer their disputes to a tax counsel rather than to an arbitrator of more general expertise" indicated that only matters regarding tax issues were to be arbitrated).

**\*36** The second reason why the structure of the arbitration clause is especially significant in this case is that it provides clear evidence of the parties' mutual understanding that in performing the calculations and making the determinations required of it under the MSA, the Independent Auditor is not simply, as the State has argued, to make mathematical computations of the sort it routinely performs as a certified public accounting firm, but to make and act upon preliminary determinations as to the operation and application of the many adjustments, reductions, offsets, carry-forwards and allocations it must apply, if appropriate, in completing those calculations and determinations. In particular, by expressly treating any "dispute concerning the operation or application of any [such] adjustments, reductions, offsets, carry-forwards and allocations" as a "dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor," the drafters unambiguously acknowledged that making determinations about the operation and application of such adjustments, reductions, offsets, carry-forwards and allocations is an integral part of the Independent Auditor's assigned task in performing calculations and making determinations with respect to payments owed pursuant to the MSA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



This conclusion, in fact, is supported by other provisions of the MSA which describe the Independent Auditor's role and responsibilities for calculating and determining the amount of payments owed pursuant thereto. MSA § XI(a), to reiterate, expressly empowers the Independent Auditor to "calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States[.]" This provision confirms the obvious linkage between the final amounts of all payments owed pursuant to the MSA and the amounts of all adjustments, reductions and offsets applicable to those payments.

Other provisions of the MSA, however, go further than subsection XI(a), by expressly providing that the "application" of each applicable adjustment, reduction and offset to the amount of any payment owed pursuant to the MSA, including both the threshold determination of its applicability and the ultimate computation of its amount, is an essential step in calculating and determining the amount of that payment. In MSA § IX(j), for example, although the mandatory process by which "[t]he payments due under this Agreement shall be calculated" is set forth in a list of 13 sequentially numbered clauses, each of which describes or references a particular adjustment, reduction or offset that "shall be applied to" the results of the clause immediately preceding it, the preface provides that, "[i]n the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause ." This clause plainly requires the Independent Auditor, as the party responsible for performing the calculation in question, to make a threshold determination whether or not the adjustment is applicable before computing its amount and modifying the amount of the subject payment by applying it.

*37 In MSA § XI(d), moreover, the Preliminary Calculations which the Independent Auditor must deliver to each other Notice Party are described as "detailed preliminary calculations ... [of] the amount due from each Participating Manufacturer ... and of such amount allocable to each entity for whose benefit such payment is to be made, showing all *applicable* offsets, adjustments, reductions and carry-forwards and setting forth all the information on which the Independent Auditor relied in preparing such Preliminary Calculations[.]" (Emphasis added.) This language expressly confirms that an important part of the Independent Auditor's task in preparing its Preliminary Calculations of any payment is to determine, at least preliminarily, if a particular offset, adjustment, reduction or carry-forward listed in the MSA is in fact "applicable" to the payment at issue. That, in turn, will naturally depend both on the Independent Auditor's interpretation of the language of the MSA that describes the circumstances under which the particular offset, adjustment, reduction or carry-forward is applicable and on its determination, based on the information it has received from all sources, whether or not those circumstances have been shown to exist.

The essential conclusion that follows from the foregoing observations about the language and structure of the arbitration clause and the other provisions of the MSA that form its contractual context is that, in performing any calculation or making any determination of the amount of a payment pursuant to the MSA, the Independent Auditor *is* empowered to determine, as part of that calculation or determination, whether or not any particular offset, adjustment, reduction or carry-forward described in the MSA is applicable to that payment. Hence, even if the State were correct in its basic argument that, notwithstanding its plain language, MSA § XI(c) does not make arbitrable any dispute about a determination that the Independent Auditor has no power to make, any dispute about the Independent Auditor's predicate determination as to the applicability or inapplicability of a particular offset, adjustment, reduction or carry-forward to a given payment is plainly arbitrable, because that is exactly the kind of determination that the Independent Auditor *is* empowered to make.

This, of course, is not to say that the Independent Auditor will not make mistakes in reading the provisions of the MSA, in evaluating data, and/or in making assumptions about missing information. After all, as the State has argued and the Petitioners

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



concede, the Independent Auditor is a certified public accounting firm, not a law firm or a court. Even so, the parties' purposes in requiring the Independent Auditor to comply strictly with the MSA's fast-paced timetable for making and delivering its Preliminary and Final Calculations is to ensure that, even if those Calculations are in some ways inaccurate, at least the uncontested portions of them can be timely paid so that most of the benefits of the MSA can be realized even while disputes as to contested portions of such payments are fully and fairly adjudicated. There is nothing illogical about the parties' decision to assign these predicate determinations to the Independent Auditor, subject to each party's plenary right to have them reviewed.

**\*38** In reviewing such determinations, moreover, there is no risk that the Independent Auditor's lack of legal inexperience will somehow prejudice the parties. This is so not only because the Independent Auditor's predicate determinations as to which offsets, adjustments, reductions and carry-forwards are applicable to a given payment are not final and unappealable, but because when a dispute arises about them such determinations are accorded no presumption of correctness, as is typically the case when the factual findings of a court or an administrative agency are later challenged. Instead, when such a dispute is brought to arbitration before a panel of former Article III federal judges, the panel will decide the disputes *de novo* with what must be presumed to be outstanding legal competence and consummate neutrality. The State's suggestion that the inexperience of the Independent Auditor makes it an unlikely choice for making of the predicate determinations clearly assigned to it by the MSA is unpersuasive.

Nothing in the foregoing discussion is intended to suggest that the State has weak or unpersuasive arguments on the *merits* of the matters here sought to be arbitrated. Indeed, subject to the Petitioners' interesting claim of estoppel, the State's argument that there can be no application of the NPM Adjustment to payments owed by the Participating Manufacturers for any year as to which there has not been a timely significant factor determination by a nationally recognized firm of economic consultants (or NERA) is well supported, if not conclusively established, by the language of the MSA.FN15 Similarly, its alternative claim, that there can be no application of an NPM Adjustment to payments due

to any State for any year throughout which it had a Model Statute in full force and effect, and diligently enforced that Model Statute, appears to be well supported by the relevant provisions of the MSA. These observations about the merits, however, like the State's lengthy arguments that prompted them, are quite beside the point on the arbitrability inquiry now before the Court on the instant Petition. It will be for the arbitrators to determine whether or not the Independent Auditor correctly decided that the NPM Adjustment should not be applied to reduce the amount of the Petitioners' annual payments to the State for calendar year 2003.

FN15. Just as MSA § IX(d)(1)(C) provides that the NPM Adjustment "shall apply" if the Firm determines that the disadvantages experienced as a result of the provisions of the MSA "were a significant factor contributing to the Market Share Loss for the year in question," it provides that the NPM Adjustment "shall not apply" if such disadvantages "were not a significant factor contributing to th[at] Market Share Loss [.]" In the present case, there has been no determination on this issue one way or the other.

It must finally be noted that the State has expressed concern about this Court's loss, if arbitration is ordered, of its power to implement and enforce the Consent Decree and the MSA as to Connecticut. To this argument the Court has two responses. First, the Court takes seriously its responsibility, on behalf of the parties now before it and the citizens of Connecticut, to exercise the full range of its authority to oversee, administer and resolve disputes arising under the MSA with respect to this State. Here, however, because the parties have clearly chosen to submit disputes like the parties' underlying dispute to arbitration, the Court must honor that choice unless it violates public policy to do so.

**\*39** Second, far from violating public policy, however, the Court believes that the parties' referral of disputes of this kind to binding arbitration before a panel of former Article III federal judges was a very wise choice indeed. This is not so because of any special competence of former Article III federal judges to interpret contractual provisions or to determine if state statutes have been diligently enforced. Nor is it because of any superior commitment by or ability of such former federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

judges to practice neutrality in their adjudication of disputes affecting the potentially conflicting interests of multiple states. Instead, in this Court's judgment, it was one particularly effective way of ensuring, as the Petitioners and other Participating Manufacturers have all argued, that all disputes, controversies and claims concerning the calculation and determination of payments under this massive, vitally important settlement agreement be resolved under one clear set of rules that apply with equal force to every Settling State and are fairly articulated after a process in which all affected such parties can meaningfully participate. If interpretations of such rules were left exclusively to the Courts of the individual Settling States, each of which has jurisdiction over its own State but no other for the purposes of implementing and enforcing the MSA, fifty-two different sets of payment rules might emerge, sowing confusion, holding up disputed payments, depriving Settling States of monies needed for smoking cessation and other essential public health programs, and causing wave after costly wave of new litigation. Such a course would ensure full employment for lawyers but little else.

By referring all disputes arising out of or relating to calculations performed by, and other determinations made by, the Independent Auditor to a panel of competent neutral arbitrators, however, much unnecessary duplication can be avoided and a single decision on all commonly contested issues could be resolved on a single analytical basis. The obvious benefit of this approach when the disputed determination made by the Independent Auditor has had exactly the same effect on each and every Settling State is that it saves the parties from relitigating that issue on multiple occasions, with potentially conflicting decisions by multiple tribunals.

The problem is even more acute, however, when the resolution of a dispute as to calculations and determinations by the Independent Auditor will necessarily have different effects on different Settling States. Unless such disputes are presented to and decided by tribunals that have the power to hear from and bind each affected Settling State as a party, great mischief can be done and substantial unfairness can result. Where, for example, as in this case, it is claimed that an individual Settling State is exempt from the NPM Adjustment for a given year because it diligently enforced a Model Statute that was in

full force and effect throughout that year, the decision of the tribunal deciding that issue will not only affect the interests of the Settling State seeking to qualify for the exemption, but those of all other Settling States as well. This is so because the granting of an exemption to one Settling State will inexorably lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt Settling States. Each Settling State thus has a vital interest in the granting or denial of each other Settling State's individual claim for exemption, and for obvious reasons, their interests are conflicting. Submitting such a dispute to a neutral panel of competent arbitrators affords all interested parties the right to be heard on a level playing field where no interested party enjoys an apparent home-field advantage.

*IV. CONCLUSION*

**\*40** For the foregoing reasons, the Court concludes that the referral of the parties' underlying dispute to arbitration is not only mandated by the clear language of the arbitration clause in MSA § XI(c) and other relevant provisions of the MSA, but it is supported by the overall purpose of its drafters, which was to create a fair and workable multi-jurisdictional agreement.

Conn.Super.,2005.
State v. Philip Morris, Inc.
Not Reported in A.2d, 2005 WL 2081763 (Conn.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

