EXHIBIT 16

COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO
CIVIL DIVISION

RECEIVED
SEP 2  2006
BY: ------------------

State of Ohio, *ex rel* Attorney General       :
Jim Petro, *et al*,

                                               :

          Plaintiffs,                          :     CASE NO. 97CVH05-5114

     -vs-                                       :     JUDGE FAIS

R.J. Reynolds Tobacco Co., *et al*,            :

          Defendants.                          :

2006 SEP 25  PM 4: 56
CLERK OF COURTS
COMMON PLEAS COURT
FRANKLIN CO. OHIO
FILED

## DECISION AND ENTRY DENYING STATE OF OHIO'S APRIL 18, 2006 RELEASE MOTION

### &

## DECISION AND ENTRY DENYING AS MOOT STATE OF OHIO'S APRIL 18, 2006 DILIGENT ENFORCEMENT MOTION

### &

## DECISION AND ENTRY GRANTING THE WITHHOLDING MANUFACTURER'S APRIL 28, 2006 MOTION TO COMPEL

Rendered this 25 day of September, 2006

**FAIS, JUDGE.**

This matter is before the Court on three Motions. The first two are: the April 18, 2006 Motion of the State of Ohio for an Enforcement Order Compelling R.J. Reynolds Tobacco Company (hereinafter "RJR") and Lorillard Tobacco Company (hereinafter "Lorillard") to Make Their Full Annual MSA Payments Required Under the Master Settlement Agreement (hereinafter "Release Motion") and the April 18, 2006 Motion of the State of Ohio for a Declaratory Order

Regarding Diligent Enforcement (hereinafter "Diligent Enforcement Motion"). On May 10, 2006, the State of Ohio filed a Supplement to its Release Motion in which it added Philip Morris USA Inc. (hereinafter "Philip Morris") to its Release Motion. On May 5, 2006, the Defendants Original Participating Manufacturers (hereinafter individually referred to as "OPM") filed their Memorandum Contra the State's April 18, 2006 Motions. On May 15, 2006, the State of Ohio filed its Reply to the OPMs' Memorandum Contra.

The third Motion is the April 28, 2006 Motion of the OPMs to Compel Arbitration and to Dismiss, or, in the Alternative, Stay This Litigation (hereinafter "Motion to Compel"). On May 8, 2006, certain Subsequent Participating Manufacturers (hereinafter individually referred to as "SPM") filed their Joinder in the OPMs' Motion to Compel. On May 22, 2006, the State of Ohio filed its Memorandum in Opposition. On June 8, 2006, the OPMs filed their Reply. On June 9, 2006, the SPMs filed their Joinder in the OPMs' Reply.

All three of these Motions concern a dispute that has arisen between the OPMs and certain SPMs and the State of Ohio concerning the fact that the Independent Auditor, PriceWaterhouseCoopers (hereinafter "Independent Auditor" or "PWC"), did not apply the Non-Participating Manufacturers (hereinafter individually referred to as "NPM") Adjustment (hereinafter "NPM Adjustment") in its calculation of the amount due from the OPMs and SPMs for the year 2003.

The Court held a hearing on the Release Motion and the Motion to Compel on Wednesday July 19, 2006. At the hearing, counsel for RJR asserted the position of the OPMs and supplied the Court with case law supportive of that position. On July 25, 2006, the State of Ohio filed a Supplemental Memorandum in Response to Submissions by the OPMs During Oral Hearing. On

August 2, 2006, RJR filed its Memorandum Contra to the Supplemental Memorandum filed by the State of Ohio.

For the reasons that follow, the Court denies the State of Ohio's Release Motion, denies as moot the State of Ohio's Diligent Enforcement Motion, and grants the Withholding Manufacturers' Motion to Compel.

## FACTUAL BACKGROUND

**I.    The Parties Enter Into the MSA and Consent Decrees To Resolve Their Disputes.**

In 1998, forty-six states, the District of Columbia, the Commonwealth of Puerto Rico, and four territories (hereinafter "Settling States") and four major tobacco manufacturers, specifically Philip Morris, Lorillard, Brown & Williamson Tobacco Corp. (hereinafter "Brown & Williamson"), and RJR entered into a Master Settlement Agreement (hereinafter "MSA" or "Agreement").[1]  The MSA settled the parties' disputes concerning the Settling States' charges that the tobacco companies had conspired to conceal from the American public health risks associated with smoking and that they had intentionally targeted minors through their marketing and promotional efforts.  Ohio Attorney General Betty Montgomery signed the MSA on behalf of the State of Ohio on December 2, 1998.  Since that time, forty additional tobacco-manufacturing companies, referred to in the MSA as SPMs, have signed on to the MSA.  Among other things, the MSA restricts the advertising, promotion, marketing, and other practices of the OPMs and SPMs and requires them to make substantial yearly payments into perpetuity to the Settling States.  Additionally, MSA §XIII provides for the execution of Consent Decrees between the parties that had been engaged in litigation at the time of the signing of the MSA.

---

[1] In July of 2004, RJR and Brown & Williamson merged.  As part of the merger, RJR assumed Brown & Williamson's obligations under the MSA.

The MSA requires all tobacco product manufacturers who are signatories to the MSA (hereinafter a "Participating Manufacturer" will be referred to as "PM") to make annual lump-sum payments to an escrow agent. The calculation of the amount owed by each PM is made annually by the Independent Auditor, and the payments are allocated among the Settling States according to the percentages established in Exhibit A of the MSA. The Independent Auditor begins its calculation with an agreed upon annual aggregate payment established under MSA §IX(b) and (c). The amount paid by each PM depends upon their market share, which is calculated by that company's share of the total number of cigarettes sold nationally. The PM's amount due is then subject to certain Allocations, Offsets, Reductions, and Adjustments which are summarized under MSA §IX(j).

## II. The MSA Contains an NPM Adjustment to Neutralize the Cost Disadvantages Suffered by PMs in Relation to the NPMs as a Result of Implementation of the MSA.

### A. The NPM Adjustment

The NPM adjustment was designed to address the PMs' concern that they would suffer a competitive disadvantage compared with those cigarette manufacturers that did not participate in the MSA and did not have to restrict their advertising or to pay for health costs. The NPM Adjustment allows PMs to reduce the amount they pay into the fund for any year in which they lose market share to the NPMs. As a part of the NPM Adjustment, the MSA permits participating Settling States to enact "Qualifying Statutes." These statutes are designed to neutralize any cost disadvantage suffered by the PMs in relation to the NPMs as a result of implementation of the provisions of the MSA. MSA §IX(d)(2)(E). The Qualifying Statutes require the NPMs to either become a PM in the Agreement and "generally perform its financial obligations under the MSA" or

to place a certain amount of money for every cigarette sold annually into an escrow account. MSA Exhibit T.

To calculate whether or not a PM has lost market share, the Independent Auditor first compares the aggregate market share of the PMs for the year in question with their aggregate market share for the base year, which was 1997. If the aggregate market share has decreased by more than 2%, then the PM has suffered a "market share loss." MSA §IX(d)(1)(A) and (B)(iii). When the market share loss is greater than zero, the MSA provides that a nationally recognized firm of economic consultants (hereinafter "Firm") must determine whether or not the disadvantages experienced as a result of the provisions of the MSA were a "significant factor" contributing to the loss for the year in question. MSA §IX(d)(1)(C). The Firm's determination of whether or not the losses were a significant factor is made on a nationwide basis and is final and non-appealable. *Id.*

If the Firm determines that the implementation of the MSA was a significant factor, then MSA §IX(d)(2)(A) provides that the Independent Auditor must apply the NPM Adjustment, which reduces the PM's amount due, unless a Settling State:

> (i) . . . continuously had a Qualifying Statute . . . in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year; or (ii) if such Settling State enacted the Model Statute . . . for the first time during the calendar year immediately preceding the year in which the payment in question is due, continuously had the Model Statute in full force and effect during the last six months of such calendar year, and diligently enforced the provisions of such statute during the period in which it was in full force and effect. Emphasis added.

MSA §IX(d)(2)(B). If a Settling State satisfies one of these statutory conditions, then the NPM Adjustment is not applied to that State. Instead, it is reallocated among the other Settling States on a pro-rata basis.

**B.**     **Jurisdiction**

MSA §VII provides for jurisdiction over and enforcement of the MSA and Consent

Decrees, the right of appeal, the applicability of the MSA and Consent Decrees, for coordination of

enforcement, and for inspection and discovery rights. §VII(a) and §VII(c) read as follows:

(a)     Jurisdiction.    Each Participating Manufacturer and each Settling State acknowledge that the Court: (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State.

. . .

(c)     Enforcement of this Agreement.

(1)     Except as provided in subsections IX(d), XI(c), XVII(d) and Exhibit O, any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ("Declaratory Order")) with respect to disputes, alleged violations or alleged breaches within such Settling State.  Emphasis added.

§XI(c) provides for the resolution of disputes as follows:

Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the Adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.  Each of the two sides to the dispute shall select one arbitrator.  The two arbitrators so selected shall select the third arbitrator.  The arbitration shall be governed by the United States Federal Arbitration Act.

**III.    The Issue in This Case is Whether This Court or a MSA §XI(c) Arbitration Panel Should Decide Whether or Not the NPM Adjustment Should Have Been Applied to the Payment Due for the PMs' 2003 Sales.**

The dispute in this case concerns whether or not an NPM Adjustment should have been applied to the Independent Auditor's calculations for sales by the PMs in 2003 that became due on April 15, 2004.    Two of the three conditions for application of the Adjustment have indisputably occurred.    Namely, the Independent Auditor has determined that the PMs experienced a market share loss in 2003, and the economic consulting firm, The Battle Group, on March 27, 2006, determined that the implementation of the MSA had been a significant factor contributing to that loss.

The dispute between the parties concerns the third factor, specifically whether or not Ohio had diligently enforced its Model Statute, codified at R.C. §1346.01 to §1346.10. If it had diligently enforced its Statute, as the State asserts, then the PMs would not be entitled to the NPM Adjustment.    If it had not, as the PMs assert, then the PMs would be entitled to the Adjustment.    The Independent Auditor attempted to make this determination by requesting diligent enforcement information from the parties.    After receiving this information, the Independent Auditor took the position of presuming that the States had diligently enforced their Statutes because they all had enacted a Qualifying Statute.  As a result, the Independent Auditor concluded that the NPMs were not entitled to their claimed 2003 NPM Adjustment.

The PMs contested the Independent Auditor's presumption.  On April 17, 2006, claiming an entitlement to the NPM Adjustment and disputing the Independent Auditor's presumption, RJR and Lorillard withheld approximately $755,000,000.00 from their annual MSA payments owed to Ohio and other states.  Philip Morris subsequently joined RJR and Lorillard in claiming

7

an entitlement to the NPM Adjustment.    Aff. Susan C. Jensen ¶2.  Ohio's share of this amount is approximately $38,000,000.00. Id.

The Independent Auditor's presumption of diligent enforcement resulted in its not applying the NPM Adjustment.  The PMs' response of withholding amounts allegedly due under the MSA led to the filing of the aforementioned Motions.  In support of its Motion to Compel, the PMs first assert that the present dispute should be arbitrated because it involves a direct challenge to the Independent Auditor's calculations and/or determinations.    The PMs state that when the Independent Auditor decided to presume diligent enforcement that it had rendered a "calculation" or "determination."    They assert that MSA §XI(c) requires that disputes over calculations or determinations be arbitrated.  The PMs state that even if the dispute did not involve a direct challenge to a calculation or determination made by the Independent Auditor, the arbitration provision still requires that all disputes "arising out of or relating to" calculations or determinations made by the Independent Auditor are required to be submitted to arbitration.

Secondly, the PMs assert that the unitary payment structure of the MSA requires arbitration of this dispute because disputes of this nature should be decided by only one set of rules that apply to all parties in a process in which everyone fully participates.  The PMs assert that these concerns are even more acute in the diligent enforcement arena because a determination concerning one State also affects the other Settling States.  This is due to the fact that under MSA §IX(d)(2)(C), an exemption granted to one State will necessarily lead to "the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt Settling States."

Thirdly, the PMs argue that if there is a question as to whether or not the present dispute is arbitrable, it should be resolved by the well-settled presumption in both federal and Ohio law that favors arbitration.  The PMs assert that the Federal Arbitration Act, which is incorporated

into the MSA by §XI(c), requires that arbitration provisions be construed broadly and that any doubts concerning whether or not an issue is arbitrable must be resolved in favor of arbitration. The PMs also cite Ohio appellate court decisions which indicate a strong public policy in favor of arbitration.

Finally, the PMs cite the decisions from the New York Appellate Division and Connecticut Superior Court which both found that the referral to arbitration of the parties' dispute in those states concerning the NPM Adjustment was mandated by the arbitration provision contained in MSA §11(c).

The State of Ohio responds that MSA §XI(c) strictly limits arbitrable disputes to those involving calculations or determinations made by the Independent Auditor. The State asserts that the intent of MSA §XI(c) was to provide a mechanism for reviewing accounting-related calculations or determinations performed by the Independent Auditor. It asserts that the arbitration provision provides an aggrieved party the ability to appeal the decisions of the Independent Auditor to the arbitration panel. Because the State asserts that the Independent Auditor's decision to presume diligent enforcement was neither a "calculation" nor a "determination," the PMs have nothing to appeal. The State asserts that the Independent Auditor has never made a determination on the merits concerning whether or not Ohio has diligently enforced its Qualifying Statute.

Secondly, the State of Ohio asserts that the New York and Connecticut decisions cited by the OPMs involved different issues and that these Courts' decisions do not apply to the facts of this case. The State asserts that both of these cases involved a dispute between certain SPMs and the Settling States concerning a request by the SPMs to the Independent Auditor to recognize a 2003 NPM Adjustment. The State argues that the issue in those cases was not whether the

9

Adjustment would ultimately be allowed which is the issue directly raised by the State's Diligent Enforcement Motion in this case. The State asserts that its Release Motion also would determine whether or not a 2003 NPM Adjustment ultimately would be allowed.

Thirdly, the State contests the OPMs' position that a single, nationwide dispute resolution mechanism is preferable to having each individual Settling State render a decision as to whether or not it had diligently enforced its own statute. The State asserts that having such a nationwide proceeding does not make sense for several reasons. It states that it would take a nationwide arbitration panel years to review all of the briefings submitted by the parties, the briefings would involve different substantive laws and State-specific evidence, and the panel's decision would not be subject to review.

Fourthly, the State cites the jurisdictional provisions contained in MSA §VII(a) and §VII(c)(1), which state that with the exceptions provided by MSA §IX(d), §XI(c) and §XVII(d) and Exhibit O, the State Court is the exclusive forum for resolving all disputes concerning the MSA. The State also contends that MSA §XI(c) is a narrow arbitration provision. Accordingly, the State asserts that §XI(c) is an express *exception* to the overarching general grant of jurisdiction and that it is designed to play only a specific, narrow role in addressing accounting-related disputes between the parties.

## LAW AND ANALYSIS

**I.    The Dispute Over Application of the NPM Adjustment Falls Within the Arbitration Clause of the MSA.**

The Court will first consider the OPMs' April 28, 2006 Motion to Compel. The issue presented by this Motion is whether the dispute concerning the NPM Adjustment should be arbitrated or heard by this Court.

The MSA vests jurisdiction for the implementation and enforcement of the Agreement with the Settling State Courts. MSA §VII(a) and §VII(c).  Except as provided under MSA §IX(d), §XI(c), §XVII(d) and Exhibit O, the State Courts are the only ones in which disputes concerning the implementation or enforcement of the MSA are to be heard.  Therefore, although the MSA gives this Court a broad grant of exclusive jurisdiction, it does not grant this Court jurisdiction over §IX(d), which concerns the NPM Adjustment.

MSA §XI(c) provides that disputes, controversies or claims "arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the Adjustments . . . described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration . . ." Emphasis added.  §IX(j) provides the order in which the Independent Auditor is to apply the Allocations, Offsets, Reductions, and Adjustments to the payments due under the Agreement.  The first clause provides that the calculations are to begin with the "base amount".  Following this, the MSA provides a formula for the Independent Auditor from which it is to calculate items such as the Inflation Adjustment, Volume Adjustment, and in clause six, the NPM Adjustment.  Clause six reads:

> Sixth: the NPM Adjustment shall be applied to the results of clause "Fifth" pursuant to subsections IX(d)(1) and (d)(2) (or, in the case of payments due from the Subsequent Participating Manufacturers, pursuant to subsection IX(d)(4));

§IX(d)(1) outlines the calculation of the NPM Adjustment for OPMs, §IX(d)(4) outlines the calculation of the NPM Adjustment for SPMs and §IX(d)(2) allocates the NPM Adjustment of the OPMs and SPMs among the Settling States.

The Ada, Idaho District Court of the Fourth Judicial District succinctly summarized the progressive nature of analysis required by the above terms of the MSA as follows:

Thus, in sum, Section XI(c) – the MSA Arbitration clause, which is carved out from the general jurisdiction of state courts – references Section IX(j), which in turn refers to the NPM Adjustment and determinations under Sections IX(d)(1) and (d)(2). Following the bread crumbs back to Section IX(d)(1), we find that this section discusses the calculation of the NPM Adjustment for the OPMs, including the significant factor determination. Meanwhile, and most importantly, Section IX(d)(2) discusses how the NPM Adjustment is to be allocated among the Settling States and describes, in particular, how the diligent enforcement determination is to be conducted and applied. MSA Section IX(d)(2)(B). The result being that the NPM Adjustment, its functioning, allocation, and application are all matters falling directly within the purview of – and specifically included within – the NPM mandatory arbitration mechanism.

State of Ohio v. Philip Morris, Inc., _et al._ (2006), CV OC 97 03239D at 7-8. Therefore, according to the combination of these provisions of the MSA, disputes such as the current one involving whether or not the Independent Auditor should or should not have applied the NPM Adjustment, are required to be resolved through the MSA arbitration procedure.

## II.     The Auditor Has Made a "Calculation" or "Determination".

The State of Ohio asserts that the arbitration provision in MSA §XI(c) does not apply because in deciding to not apply the NPM Adjustment, the Independent Auditor did not make a calculation or determination. The State asserts that because the Independent Auditor presumed that the States had diligently enforced their statutes that it did not actually "calculate" or "determine" anything. The Court disagrees.

First, in PWC's March 5, 2004 Notice of Preliminary Calculations for Payments Due, PWC provides "detailed preliminary calculations . . . of the amount due from each Participating Manufacturer . . . to be paid into the Subsection IX(c)(1) Account and setting forth all the information on which the Independent Auditor relied in preparing such Preliminary Calculations . . . ." Under the Heading "Calculations", PWC states that the calculation for the OPMs is based upon their "Relative Market Share of the base amount of $8,000,000,000, subject to the allocations, offsets, reductions and Adjustments listed in subsection IX(c)(1) and applied in the order set forth in

clauses `First' through `Thirteenth' of subsection IX(j), as follows . . ." PWC then applies each of the thirteen clauses included in MSA §IX(j) in order to arrive at the amounts due from the PMs. With respect to the NPM Adjustment, the Auditor states:

- `Sixth,' the NPM Adjustment: The Non Participating Manufacturer (`NPM') Adjustment, performed in accordance with subsection IX(d), is shown in Attachments 4a, 4b, 4c and 4d.[fn]

The footnote reads: "NAAG has responded to the 1/16/04 Information Request (Notice ID: 00128) stating that all Settling States have enacted Model Statutes and represent (*sic*) to have been in full force and effect continuously since the indicated effective date; therefore, no possible NPM Adjustment is allocated to PMs."

PWC includes 33 attachments to the Preliminary Calculations, four of which are calculations of the NPM Adjustment. Those four attachments include:

Attachment 4a:  Calculation of the NPM Adjustment – Market Share Loss

Attachment 4b:  Calculation of the NPM Adjustment – Aggregate Available Adjustment

Attachment 4c:  Calculation of the NPM Adjustment – By Original Participating Manufacturers (3 pages)

Attachment 4d:  Calculation of the NPM Adjustment – 14 Day Rule.

Emphasis added. PWC's statements that it is providing "detailed preliminary calculations," that it "performed" the NPM Adjustment "in accordance with subsection IX(d)," and that it "performed" a "Calculation of the NPM Adjustment" as indicated on the four attachments indicates that in fact PWC did calculate and/or determine the NPM Adjustment at least on its Preliminary Calculation.

In PWC's March 31, 2004 Notice of Final Calculation of Payments Due April 14, 2004, it states under the "Disputes" section that it has received dispute letters related to the application of the NPM Adjustment. PWC states that the parties are submitting their positions with respect to this

issue, and if, after consultation with outside counsel PWC determines a revision or revisions need to be made to the Final Calculation, PWC may make them. At the time of the writing of its Notice, however, PWC states that it:

> is treating the NPM Adjustment in the Final Calculation in the same way it treated it in the Preliminary Calculation. Furthermore, the Independent Auditor's methodology with respect to the application of the NPM Adjustment has remained unchanged and has been consistently applied over time for the reasons discussed at the March 22, 2004 meeting. Emphasis added.

This language also suggests that in its decision-making process, which culminated in its not applying the Adjustment, PWC "calculated," or "computed mathematically," or "estimated or reckoned," or "intended," or "undertook after careful forethought". Definitions 1, 2 and 3 of "calculate" and Definition 1 of "calculated" from The American Heritage Dictionary, Third Edition. The fact that PWC did not change its NPM Adjustment calculation in its Final Calculation from its Preliminary Calculation indicates that the language cited earlier, which was contained in the Preliminary Calculation and which indicates a deliberative process, also applies to the Final Calculation.

In PWC's March 7, 2006 Preliminary Calculation, PWC includes the same Calculation of the NPM Adjustment contained in Clause Six as it used in the 2004 Preliminary Calculation. PWC also states that it had received information from the PMs denying that some Settling States have "'continuously had a Qualifying Statute in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due [1999-2005], and diligently enforced the provisions of such statute during such entire calendar year[.]'" PWC March 7, 2006 Notice of Preliminary Calculations citing MSA §IX(d)(2)(B). The Settling States asserted that they did have Qualifying Statutes that met these requirements. As of its writing of the Preliminary Calculation, PWC finds that the MSA does not charge it with the responsibility of making a

determination about this issue and also that it is not qualified to make the legal determination as to whether or not any particular Settling State had "diligently enforced" its Qualifying Statute. PWC concludes that until the parties resolve the issue, or a trier of fact resolves the issue, "the Independent Auditor will not modify its current approach to the calculation." PWC March 7, 2006 Notice of Preliminary Calculations at 5.

In its March 29, 2006 Final Calculation, PWC removes the language concerning it not having the responsibility of making a determination about the NPM Adjustment issue and it not having the qualifications to make the legal determination. Instead, PWC concludes that until the issue has been resolved, it would not modify its current approach to the calculation. PWC March 29, 2006 Notice of Final Calculation.

Notwithstanding PWC's question concerning whether or not it has been engaged to make the NPM Adjustment determination, as previously stated, it nevertheless did make such a calculation or determination in its Calculations. In its Preliminary and Final Calculations, PWC analyzes the sixth criteria but ultimately decides, based upon its presumption, not to apply the Adjustment. PWC undertook a decision-making process to arrive at this conclusion. Based upon the information then available to it, PWC decided that it was probable that since the Settling States had statutes in effect that they were "presumed to be enforcing their own laws...." Therefore, PWC made a calculation. In the event PWC wanted to avoid making a "calculation," then it could have avoided the issue altogether by not addressing it.

The American Heritage Dictionary of the English Language, Fourth Edition, defines "determination" as follows: "1a. The act of making or arriving at a decision. . . . The decision reached." PWC's Notices of Preliminary and Final Calculations indicate that PWC made a decision based upon the information it had to not apply the Adjustment. Accordingly, PWC's decision to not

15

apply the NPM Adjustment in both its Preliminary and Final Calculations constituted a "determination" as well as a "calculation."

Accordingly, the Court finds that PWC's decision to not apply the NPM Adjustment, as recorded in its Preliminary and Final Calculations, was a calculation and/or a determination.

**III.     Federal and Ohio Policies, as well as the Structure of the MSA, Indicate that This Dispute Should be Arbitrated.**

MSA §XI(c) requires this dispute to be submitted to binding arbitration.  The MSA is specific as to the number of arbitrators (three), their qualifications (former Article III federal judges), and the fact that the arbitration is to be governed by the United States Federal Arbitration Act.  Not only does the MSA require arbitration of this dispute, but federal policy also favors arbitration.  For example, in Volt Information Sciences, Inc. v. Bd of Trustees of Leland Stanford Junior University, (1989), 489 U.S. 468, 475, citing Moses H. Cone Memorial Hospital v. Mercury Construction Corp. (1983), 460 U.S. 1, 24-25, the United States Supreme Court stated:

> . . . (§2 of the FAA `create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act,' which requires that `questions of arbitrability . . . be addressed with a healthy regard for the federal policy favoring arbitration,' and that `any doubts concerning the scope of arbitrable issues . . . be resolved in favor of arbitration').

The Court went on to state:

> These cases of course establish that, in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, see Perry v. Thomas, 482 U.S. 483, 393, n.9 (1987), due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.

Volt, *supra*, 489 U.S. at 475-76.

> Further, as stated by the New York Supreme Court, Appellate Division, First Department:
>
> there is a compelling logic to having these disputes handled by a single arbitration panel of three federal judges, rather than numerous state and territorial courts.  It saves all parties to the agreement from having to relitigate the Independent Auditor's

16

determinations 'on multiple occasions, with potentially conflicting decisions by multiple tribunals' (*State of Connecticut v. Philip Morris, Inc., 2005 Conn Super LEXIS 2067, *115, 2005 WL 2081763, *39)*. The chaos that can result from numerous tribunals addressing identical issues with varying results is underscored by the fact that the Connecticut court reached the opposite conclusion from that of the IAS court here. Since the granting of an exemption by one settling state will automatically lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt settling states, each governmental signatory has its own self-interest at stake in the outcome of this issue, which is necessarily in conflict with every other state. Such a result defeats the whole purpose of having a Master Settlement Agreement. The mechanism of submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA. To hold otherwise is contrary to both the spirit and the plain language of the Master Settlement Agreement.

State of New York, *et al.*, v. Philip Morris Incorporated, *et al.* (2006), 813 N.Y.S.2d 71, 76.

Ohio courts also encourage arbitration as a method of dispute resolution. ABM Farms, Inc. v. Woods (1998), 81 Ohio St.3d 498. In Council of Smaller Enterprises v. Gates, McDonald & Co. (1998), 80 Ohio St.3d 661, 665-66, the Supreme Court of Ohio set forth four principles to guide courts in determining whether or not a particular dispute is arbitrable. The four principles are:

(1)     that 'arbitration is a matter of contract and a party cannot be required to so submit to arbitration any dispute which he has not agreed to so submit';

(2)     that 'the question of arbitrability – whether an * * * agreement creates a duty for the parties to arbitrate the particular grievance – is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'

(3)     'in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.'

(4)     that 'where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.''

Council of Smaller Enterprises, *supra*, 80 Ohio St.3d at 665-66, citing AT&T Technologies Inc. v. Communications Workers of America, *et al.* (1986), 475 U.S. 643, 648-50, quoting United Steelworkers of America v. Warrior & Gulf Navigation Co. (1960), 363 U.S. 574, 582-83. The Court has already resolved the first issue, whether or not the parties agreed to submit the dispute to arbitration, through its examination of the jurisdictional and enforcement provisions of the MSA. The Court has concluded that the parties did manifest their intention to arbitrate the issue of the NPM Adjustment through the MSA §IX(d) and §XI(c) exceptions to the State Courts' jurisdiction provided for by MSA §VII.

Principles two and three do not require further discussion as the Court is deciding this issue, and in so doing, it is not ruling on the potential merits of the applicability or non-applicability of the NPM Adjustment.

Principle four states that where the contract contains an arbitration clause, there is a presumption of arbitrability. The Court's examination of the clause in this Decision, along with the analyses provided by the Courts in California, Colorado, Connecticut, Hawaii, Idaho, Illinois, Iowa, Kentucky, Massachusetts, Nebraska, Nevada, New Hampshire, New York, Oregon, Vermont and Virginia that all come to the conclusion that the MSA requires the matter to be arbitrated, lead this Court to conclude that it is proper to grant the Motion to Compel Arbitration because it cannot state with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Council of Smaller Enterprises, *supra*, 80 Ohio St.3d at 666. On the contrary, the Court is well convinced that the clause does cover this dispute about the applicability of the NPM Adjustment.

Because Federal and Ohio law and policy encourage arbitration as a dispute resolution mechanism, because the decision concerning whether or not Ohio has diligently enforced its statute

18

has nationwide ramifications in terms of payment allocation among Settling States, and because it is desirable to have consistent adjudications among Settling States concerning this issue, the Court finds that the appropriate dispute resolution mechanism for this issue is arbitration.

Accordingly, the Court Grants the OPM's April 28, 2006 Motion to Compel.

## IV.    The State of Ohio's Release Motion is Denied.

In the State of Ohio's April 18, 2006 Release Motion, the State moves the Court for an order enforcing the MSA payment obligations of RJR and Lorillard[2] and requiring them to make their full annual MSA payments to Ohio as required by MSA §IX(c). In this Motion, the State indicates that the OPMs and Settling States entered into Settlement Agreements in June 2003 that released Ohio from any and all claims for an NPM Adjustment under MSA §IX(d) with respect to cigarettes shipped or sold in calendar years 1999-2002. The State asserts that "because under the express terms of Ohio's Qualifying Statute any conceivable diligent enforcement in calendar year 2003 relates solely to cigarettes shipped or sold in 2002 and prior years, the Withholding Manufacturers settled and released Ohio from any claim for a 2003 NPM Adjustment." Release Motion at 6. The OPMs dispute this interpretation of the Agreement.

Philip Morris paid its amount due for 2003 notwithstanding its dispute over the NPM Adjustment. RJR and Lorillard paid the disputed amount into the Disputed Payments Account. This amount is to be held in escrow and only distributed to the appropriate payee once the dispute has been "resolved with finality." MSA §IX(f)(2).

The OPMs assert that the Court's analysis of whether or not the parties agreed to submit the dispute over the Settlement Agreements to arbitration must include reference to the test established by the Sixth Circuit Court of Appeals in Fazio v. Lehman Brothers, Inc. (6th Cir. 2003), 340 F.3d 386. In Fazio, the Court held: "A proper method of analysis . . . is to ask if an

---

[2]In its May 10, 2006 Supplement to its Motion, the State of Ohio added Philip Morris to its Release Motion.

action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." Fazio, *supra*, 340 F.3d at 395, citing Ford v. NYLCare Health Plans of Gulf Coast, Inc. (5th Cir. 1998), 141 F.3d 243, 250-251.

In Academy of Medicine of Cincinnati, *et al.* v. Aetna Health, Inc., *et al.* (2006), 108 Ohio St.3d 185, the Supreme Court of Ohio considered the Hamilton County Appellate Court's use of the Fazio test. The Academy of Medicine case involved a claim by the Academy of Medicine of Cincinnati, the Butler County Medical Society, and numerous physicians that United Healthcare of Ohio, a large provider of group health-insurance policies, and other similar providers, had engaged in a conspiracy to maintain artificially low reimbursement rates paid to physicians in the Hamilton, Warren, Clermont and Butler County region in violation of the antitrust provisions of the Valentine Act, R.C. Chapter 1331. In reliance upon the arbitration clause in Plaintiffs-Appellees' provider agreements with Defendants-Appellants, which required disputes about the parties' business relationship to be arbitrated, Defendants-Appellants moved to stay the proceedings and to compel arbitration of Plaintiffs-Appellees' antitrust claims. The trial court had denied the motion finding that the antitrust claims were not within the scope of the arbitration provisions in the provider agreements.

In deciding whether or not the dispute was subject to arbitration, the appellate court relied upon the four tests cited in Council of Smaller Enterprises. In its assessment of the first principle, namely whether or not the parties intended to submit the matter to arbitration, the Court relied on the test established in the Fazio case. The Court found that the Plaintiffs-Appellees' cause of action could be maintained without reference to the provider agreements. The Court went on to hold that the antitrust claims were not subject to the arbitration provision in the provider agreements. The Supreme Court of Ohio granted Defendants-Appellants

jurisdictional motion on a limited basis.  The Court only considered the following issue:  "`In determining whether a cause of action is within the scope of an arbitration agreement, may a state court in Ohio base that determination on a federal standard that inquires whether the `action could be maintained without reference to the contract or relationship at issue?'" Academy of Medicine, *supra*, 108 Ohio St.3d at 187 citing Fazio, *supra*, 340 F.3d at 395 citing Ford, *supra*, 141 F.3d at 250-51.

The Court inquired into whether or not anything in the Valentine Act limited arbitrability. The Court found that nothing in the Act restricted the parties' right to waive judicial remedies for the rights created by the Act.  The Court also considered whether or not the arbitration provision limited arbitration to only certain aspects of the parties' contract.

The Court's preliminary inquiry was whether the clause was broad or narrow.  The Court stated:  "[a]n arbitration clause that contains the phrase `any claim or controversy arising out of or relating to the agreement' is considered `the paradigm of a broad clause.'" Academy of Medicine, *supra*, 108 Ohio St.3d at 188-89, citing, Collins & Aikman Prods. Co. v. Bldg. Sys. Inc. (2nd Cir. 1995), 58 F.3d 16, 20.  The Court found that the clause in the Agreement, which covered disputes about the parties' business relationship, to be a broad clause.

With regard to the Fazio test, the Court stated that it assists a court in determining "whether the contractual relationship between the parties is irrelevant or controlling." Academy of Medicine, *supra*, 108 Ohio St.3d at 190.  The Court held:

> The Fazio test is consistent with Ohio law and is not contrary to federal law on the issue of arbitrability.  We therefore find that in determining whether a cause of action is within the scope of an arbitration agreement, a state court in Ohio may base that determination on a federal standard that inquires whether the action could be maintained without reference to the contract or relationship at issue.

Academy of Medicine, *supra*, 108 Ohio St.3d at 191.

Applying the first prong of the Supreme Court of Ohio's analysis of the first issue of the Council of Small Enterprises test, namely whether or not the parties intended to arbitrate the issue, the Court finds that nothing in the statutes at issue in this case, namely R.C. §1346.01 through §1346.10, contains limitations on arbitrability.   Secondly, the arbitration provision contained in MSA §XI(c) contains the language:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subjection XI(i)) shall be submitted to binding arbitration . . .

Emphasis added.  The word "any," used four times in this provision, is a broad term, not narrow or specific.  It means any in the sense of *every or all* disputes, controversies or claims, and *every or all* determinations made by the Independent Auditor, and concerning *every or all* disputes concerning the operation or application of *every or all* of the adjustments, reductions, offsets, carry-forwards and allocations described in MSA §IX(j).  American Heritage Dictionary, Third Edition, Definition of "any."  It also states in the parenthetical portion that it includes "*without limitation*, any dispute concerning the operation or application of any of the adjustments."  Emphasis added.  This also is a broad, not a narrow phrase.  The use of plurals, such as adjustments, reductions and offsets also indicates broadness, not a narrow or specific focus.  The provision does not say, for example, *Only* disputes relating to *a certain calculation* performed by the Independent Auditor (including *only* disputes concerning the application of *the volume adjustment*).  In addition, the phrase "arising out of or relating to" is the same language cited by the Supreme Court of Ohio in the Academy of Medicine case that constitutes "'the paradigm of a broad clause.'" Academy of Medicine, *supra*, 108 Ohio St.3d at 188-89, citing, Collins, *supra*. The Court will therefore construe MSA §XI(c) broadly

22

Applying Fazio to this case, the Court cannot construe the June 2003 Settlement Agreements without reference to the underlying MSA because the Settlement Agreements refer to portions of the MSA or documents attached to the MSA. For example, Paragraph 1 of the Settlement Agreement between R.J.R. and the Settling States indicates that the capitalized terms in the Settlement Agreement have the same definition and meaning as they do in Exhibit T of the MSA. Several of the other paragraphs also refer to different sections of the MSA or to other documents generated at the direction of the MSA. For example, Paragraph 4 of the same Agreement states that RJR would be provided "a credit against its payment due under Section IX(c) of the MSA on April 15, 2004," which is the amount shown on Attachment 4b of Notice 77. Also, the State's argument that through the Settlement Agreement the OPMs settled and released Ohio from any claim for a 2003 NPM Adjustment requires review of the MSA and its provisions concerning the NPM Adjustment, including a review of the terms "diligent enforcement." As previously discussed, MSA §XI(c) requires disputes concerning application of the NPM Adjustment to be arbitrated. Therefore, the Court finds that principle one of the Counsel of Smaller Enterprises case, namely that the parties have agreed to submit this matter to arbitration, has been satisfied.

Further, principles two and three are satisfied because the Court is deciding this issue, and in so doing, it is not ruling on the potential merits of the applicability or non-applicability of the NPM Adjustment. Principle four presumes arbitrability, and with regard to these Settlement Agreements, the Court cannot state "with positive assurance that the arbitration clause contained in MSA §XI(c) is not susceptible of an interpretation that covers the asserted dispute." Therefore, under the tests established by Counsel of Smaller Enterprises, Academy of Medicine and Fazio, the Court finds the appropriate remedy for addressing the dispute over the

23

interpretation of the Settlement Agreements is to refer the matter to arbitration pursuant to MSA §XI(c).

Accordingly, the State of Ohio's Release Motion is Denied.

**V.    The State of Ohio's Diligent Enforcement Motion is Denied as Moot.**

The State of Ohio's Diligent Enforcement Motion requests the Court to issue a Declaratory Order that for calendar year 2003, it diligently enforced its Qualifying Statute resulting in the PMs not being entitled to an NPM Adjustment. The State further argues that upon making this diligent enforcement declaration, the Court should order all PMs withholding or offsetting any MSA payments to Ohio on this basis to immediately pay all sums owed, plus any accrued interest. The Court has already concluded that the MSA §XI(c) arbitration panel will make the diligent enforcement determination, not this Court. Further, MSA §IX(d)(8) indicates that the disputed monies will remain in the disputed payments account in escrow until the matter has been resolved. Therefore, the State's Diligent Enforcement Motion is Denied as Moot.

## CONCLUSION

The Court's review of the MSA, Settlement Agreements, and submissions of the parties indicates that the proper avenue for resolving the parties' disputes concerning the Settlement Agreements and the application of the NPM Adjustment is to refer the matter to arbitration pursuant to MSA §XI(c). Accordingly, the PM's Motion to Compel is **Granted**. The State of Ohio's Release Motion is **Denied**. The State of Ohio's Diligent Enforcement Motion is **Denied as Moot**.

**So Ordered.**



DAVID W. FAIS, JUDGE

24

Copies to:

**Plaintiff**

Kevin R. McDermott, Esq.
Schottenstein, Zox & Dunn Co., L.P.A.
250 West Street
Columbus, Ohio 43215

John C. Murdock, Esq.
Murdock, Goldenberg, Schneider & Groh, LPA
35 East Seventh Street, Suite 600
Cincinnati, Ohio 45202

Susan Walker, Assistant Attorney General
Tobacco Counsel
Constitution Offices Section – Tobacco Unit
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
*Counsel for Plaintiffs State of Ohio, ex rel.*
*Jim Petro, Attorney General of Ohio, et al.*

**Defendants -- USA**

Paul G. Crist, Esq.
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114

Elizabeth P. Kessler, Esq.
Jones Day
P.O. Box 165017
Columbus, Ohio 43116
*Counsel for R.J. Reynolds Tobacco Co.*

James S. Oliphant, Esq.
Ralph F. Gildenhaus, Esq.
James B. Hadden, Esq.
Porter Wright Morris & Arthur, LLP
41 South High Street
Columbus, Ohio 43215

Hugh E. McKay, Esq.
Porter Wright Morris & Arthur, LLP
925 Euclid Avenue, Suite 1700

Cleveland, Ohio 44115-1483
*Counsel for Philip Morris USA*

Thomas J. Frederick, Esq.
Kevin J. Narko, Esq.
Luck A. Palese, Esq.
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, Illinois 60601

Alexander Shaknes, Esq.
James Mathias, Esq.
Brett Ingerman, Esq.
DLA Piper Rudnick, Gray, Cary
1251 Avenue of the Americas
New York, New York 10020-1104
*Of counsel*

Patrick McLaughlin, Esq.
McLaughlin & McCaffrey, LLP
Eaton Center, Suite 1350
1111 Superior Avenue, East
Cleveland, Ohio 44114-2500

Penny P. Reid, Esq.
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
*Counsel for Lorillard Tobacco Company*

Kenneth J. Walsh, Esq.
Tyler L. Mathews, Esq.
McDonald, Hopkins Co., L.P.A.
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

Robert J. Brookhiser, Esq.
Elizabeth B. McCallum, Esq.
Howrey, LLP
1299 Pennsylvania Avenue, Northwest
Washington, DC 20004
*Counsel for Commonwealth Brands, Inc. and Liggett Group, LLC*

Martin J. Smolik, Jr., President
*Anderson Tobacco Company, LLC*
5327 West First Street

Greeley, CO 90634

Dennis Edward Bruce, Esq.
690 Lincoln Road, Suite 303
Miami Beach, FL 33139
*Counsel for Bekenton, S.A.*

Roberto F. Fleitas, Esq.
Feleitas & Bujan
782 N.W. Lejeune Road, Suite 530
Miami, FL 33126
*Counsel for Canary Islands Cigar Co.*

John Poling, II, President/CEO
*Commonwealth Brands, Inc.*
900 Church Street
Bowling Green, KY 42101

Robert Wilkey, General Counsel
900 Church Street
Bowling Green, KY 42101
*Counsel for Commonwealth Brands, Inc.*

William Jay Hunter, Esq.
Stoll, Keenon & Park
2560 Aegon Center
400 West Market Street
Louisville, KY 40202
*Counsel for Cutting Edge Enterprises, Inc.*

Mark Sibley Ryan
P.O. Box 609
211 Mallard Road
Smithfield, NC 27577
*Counsel for Daughters & Ryan, Inc. dba
D & R Tobacco*

Barry Boren, Esq.
9350 Financial Center, Penthouse II
9350 South Dixie Highway
Miami, FL 33156
*Counsel for Dhanraj Imports, Inc.*

Sanjay Patel, President
*Dhanraj Imports, Inc.*
11731 Sterling Avenue, Suite F

Riverside, CA 92503

Robert Ammerman, President
Jennifer Straus, Office Manager
*Defendant Farmer's Tobacco Co. of Cynthiana*
636 U.S. Hwy 27 N
Cynthiana, KY 41031

J. Ronald Denman, Vice President & General Counsel
2980 NW 108 Avenue
Miami, FL 33172
*Counsel for General Tobacco*

Joseph A. Ginsburg, Esq.
Levin & Ginsburg, Ltd.
180 N. LaSalle Street, 22nd Floor
Chicago, Illinois 60601
*Counsel for House of Prince A/S*

*International Tobacco Group (Las Vegas), Inc.*
5353 Desert Inn Road #2135
Las Vegas, NV 89146

John S. Chen, General Manager
*International Tobacco Group (Las Vegas), Inc.*
6340 S. Sandhill Road, Suite 8
Las Vegas, NV 89120

Neal N. Beaton, Esq.
Holland & Knight, LLP
195 Broadway, 24th Floor
New York, NY 10007
*Counsel for Japan Tobacco International USA, Inc.*

Bhavani Parameswar
*King Maker Marketing*
12 Route 17 North, #304
Paramus, NJ 07652

Dominic Chu, President
*Konci G&D Management Group (USA) Inc.*
231 Grand Street, Suite 3F
New York, NY 10013

Stan Ching, Vice President, Operations & Finance
*Kretek International*
5449 Eneavour Court
Moorpark, CA 93021-1712

Jack Henson, Esq.
2880 Mountain Industrial Blvd.
Tucker, GA 30084
*Interim General Counsel for Lane Limited*

Barry Garner
*Liberty Brands, LLC*
9301 Old Staples Mill Road
Richmond, VA 23228

Scott Feit, Manager
*Liberty Brands, LLC*
P.O. Box 1569
555 Broad Hollow Road
Melville, NY 11747

Aaron Marks, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1301 Avenue of the Americas
New York, NY 10019
*Counsel for Liggett Group, Inc.*

John Long, Vice President & General Counsel
Liggett Group, Inc.
100 Maple Lane
Mebane, NC 27302-8160
*Counsel for Liggett Group, Inc.*

Aleli Calso, Vice President & Corporate Secretary
Casa Real, 1615 Alvarado Street
San Leandro, CA 94577
*Counsel for Lignum-2, Inc.*

Jennifer B. Healey, Esq.
3003 North Central Avenue, Suite 1850
Phoenix, AZ 85012
*Counsel for Lignum-2, Inc.*

Rodney Ott, Esq.
Bryan Cave, LLP
1 Renaissance Square, Suite 2200

Two North Central Avenue
Phoenix, AZ 85004-4406
*Counsel for Lignum-2, Inc.*

Ronald L. Milstein, General Counsel & Secretary
714 Green Valley Road
P.O. Box 10529
Greensboro, NC 27404-0529
*Counsel for Lorillard Tobacco Company*

Edward Griffith, Esq.
Silvia L. Bolatti, Esq.
45 Broadway, Suite 2300
New York, NY 10006
*Counsel for Monte Paz*
*(Compania Industrial de Tabacos Monte Paz, S.A.)*

Ralph Angiuoli, President
Ralph Angiuoli, Jr.
Emily Hellard
*NASCO Products, Inc.*
6220 Hacker's Bend Ct., Unit F
Winston-Salem, NC 27103-9778

Harry C. Roemer, III, Esq.
G.A. Avram, Esq.
Finger, Parker, Avram, Martin & Roemer
204 Northgate Park Drive
Winston-Salem, NC 27106-3480
*Counsel for P.T. Djarum*

Erik Stokkebye
*Peter Stokkebye International A/S*
6605 W. T. Harris Blvd.
P.O. Box 481938
Charlotte, NC 28269-5319

Meyer Koplow, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
*Counsel for Philip Morris*

Denise Keane, Esq.
6601 West Broad Street
Richmond, VA 23230

*Counsel for Philip Morris*

Mark Dunham, President & CEO
Steven E. Coleman, Vice President
*Premier Manufacturing, Inc.*
17998 Chesterfield Airport Road
Chesterfield, MO 63005

Thomas Veltz, Esq.
Spencer, Fane, Britt & Browne, LLP
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
*Counsel for Premier Manufacturing Inc.*

Charles A. Blixt, Executive Vice President & General Counsel
401 N. Main Street
Winston-Salem, NC 27102
*Counsel for R.J. Reynolds Tobacco Co.*

R. Dal Burton, Esq.
Womble, Carlyle, Sandridge & Rice
3500-1201 W. Peachtree Street
Atlanta, GA 30309
*Counsel for R.J. Reynolds Tobacco Co.*

Michael O. Johnson, Senior Vice President & General Counsel
1 Plaza La Presnsa
Santa Fe, NM 87507
*Counsel for Santa Fe Natural Tobacco Company, Inc.*

C. Randall Nuckolls, Esq.
McKenna, Long & Aldridge LLP
1900 K Street, NW
Washington, D.C. 20006
*Counsel for Santa Fe Natural Tobacco Company, Inc.*

Louis Carbone, Vice President, CFO
2200 Fletcher Avenue
Fort Lee, NJ 07024
*Sherman 1400 Broadway N.Y.C., Inc.*

Stanley D. Friedman, Esq.
McAloon & Friedman, PC
123 William Street, 25th floor
New York, NY 10038
*Sherman 1400 Broadway N.Y.C., Inc.*

Jean V. MacHarg, Esq.
Latham & Watkins LLP
2550 M. Street NW
Washington, D.C. 20037-1350
*Counsel for Top Tobacco, LP*

Seth I Gold
*Top Tobacco, LP*
2301 Ravine Way
Glenview, IL 60025

Nicholas W. Allard, Esq.
Patton Boggs, LLP
2550 M. Street NW
Washington D.C. 20037-1350
*Counsel for Top Tobacco, LP*

L. Arnold Hamm, Secretary
*U.S. Flue-Cured Tobacco Growers, Inc.*
1304 Annapolis Drive
Raleigh, NC 27608

E. Stephen Daniel, Plant Manager
*U.S. Flue-Cured Tobacco Growers, Inc.*
250 Crown Blvd.
Timberlake, N.C. 27583

Mark N. Bell, Senior Vice President and General Counsel
*Vector Tobacco, Inc.*
100 S.E. Second Street, 32nd Floor
Miami, FL 33131

Aaron Marks, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broadway
New York, NY 10019
*Counsel for Vector Tobacco, Inc.*

Assad Hark, President
*VIP Tobacco USA, Ltd.*
763 Kasota Avenue, SE
Minneapolis, MN 55414

Michael E. Ojile, Esq.
100 South Fourth Street
Cannon Falls, MN 55009

*Counsel for VIP Tobacco USA, Ltd.*

Jesse Hodges, President
Matt Lynn, CFO
Peter Keyser
*Virginia Carolina Corporation, Inc.*
P.O. Box 1660
Conway, NC 29526

Henry C. Roemer, III, Esq.
Finger, Parker, Avram & Roemer, LLP
204 Northgate Park Drive
Winston-Salem, NC 27106
*Counsel for Von Eicken Group*

William Jay Hunter, Jr., Esq.
Stoll, Keenon & Park
2650 AEGON Center
400 West Market Street
Louisville, KY 40202
*Counsel for Wind River Tobacco Company, LLC*

Brandon R. Abrams, Managing Member
*Wind River Tobacco Company, LLC*
P.O. Box 4600
1180 Gregory lane, Suite 5
Jackson Hole, WY 83001

Aaron J. Gerwitz VL
*ZNF International, LLC*
19495 Biscayne Blvd., #300
Aventura, FL 33180

Philip L. Graham, Esq.
Sullivan & Cromwell
125 Broad Street
New York, New York 10004-2498

Richard A. Kohlberger, Esq.
Senior Vice President & General Counsel
Chris Athanasia, Esq.
STMSA
100 W. Putman Avenue
Greenwich, CT 06830
*Counsel for U.S. Smokeless*

Ryan Harrell
Dana Pappillon
Cyrus Bahrami
*Pricewaterhouse Coopers LLP*
1201 Louisiana Street, Suite 2900
Houston, TX 77002

Mark Greenwold, Esq.
Chief Counsel for Tobacco
NAAG
750 First Street, N.E., Suite 1100
Washington, D.C. 20002
*Counsel for National Association of Attorneys General*

**Defendants -- Overseas**

Frederico Gonzalez de Aledo y Burego
*Canary Islands Cigar Co*
Fabrica Record
Barrio Chamberi S/N
Santa Cruz De Tenerife
Canary Islands, Spain

Maxwell Stephen Irvin, Managing Director
Clive Lane Taylor, Secretary
*Chancellor Tobacco Company, PLC*
Galleon House, 12 Lion & Lamb Yard
Farnham, Surrey GU9 712041, England

Per Buch, Director
Annette Hedgaard Boye, Secretary to Management
Michael Madsen
*Mac Baren Tobacco Company A/S*
Porthusvej 100
DK-57 Svendborg, Denmark

Manuel Moldes
San Ramon 716 – C.P. 11800
Montevideo, Uruguay
*Monte Paz (Compania Industrial de Tabacos Monte Paz, S.A.)*

Rachman Satya, Head of International Sales
Bunjoto Astono, International Sales Manager
*PT Djarum*
J1 Aipda KS Tubun 2C/57
Jakarta 11410, Indonesia

Daisy P. Arce, Counsel
6805 Ayala Avenue
Makati City, 1227, Philippines
*Counsel for Pacific Stanford Manufacturing Corp.*

Preben Anderson
*Peter Stokkebye International A/S*
Tobaksvej 1
5610 Assens, Denmark

Delia Spitzer, Counsel
Proskauer, Rose, Goetz & Mendelsohn
68 Rue Du Faubourg Saint-Honore
75008 Paris, France
*Counsel for Societe National d'Exploitation Industrielle
des Tabacs et Allumettes (SEITA)*

Jean-Dominique Comolli, CEO
*Societe National d'Exploitation Industrielle des Tabacs et Allumettes (SEITA)*
182-188 Avenue de France
75639 Paris, France
CEDEX 13

Claus Bagger
Peter Schnettler Kirstensen
*House of Prince A/S*
Tobaksvejen 4
DK-2860 Soborg, Denmark

Juan Lopez Moreira
*Tabacalera del Este, S.A. (TABESA)*
Concepcion Leyes De Chavez y Calle 4
Parque Industrial Alberto Barrail e Hijos
Asuncion, Paraguay

Dirk Umbreit, Esq.
Joh. Wilh. Von Eicken GMBH
Drechslerstr. 1-3
23556 Lubeck, Germany
*Counsel for Von Eicken Group*

Mohamed Sadek Ragb, Chairman & Managing Director
*Eastern Company, S A E*
450 Ahram Street, Giza
P.O. Box 1543

Giza, Egypt

Manon Grand-Maitre, Regulatory Counsel
3711 Saint-Antoine Street West
Montreal, QC, Canada H4C 1B5
*Counsel for Imperial Tobacco Limited/ITL (USA) Limited*

Gerd Wiesenbutter, Export Manager
*Planta Tabak-Manufaktur Gmbh & Co.*
PLANTA of Berlin
Hagelberger Strasse 52
D-10965 Berlin, Germany

Robert Engles, President & CEO
*Poschl Tabak GmbH & Co. KG*
Dieselstr. 1
84144 Geisenhausen b. Lanshut, Germany