EXHIBIT 17

Westlaw.

813 N.Y.S.2d 71                                                                                  Page 1
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635
**(Cite as: 813 N.Y.S.2d 71)**

H

Supreme Court, Appellate Division, First
Department, New York.
The STATE of New York, et al., Plaintiffs-
Respondents,
v.
PHILIP MORRIS INCORPORATED, et al.,
Defendants.
Commonwealth Brands, Inc., et al., Nonparty
Appellants.
Philip Morris USA Inc., R.J. Reynolds Tobacco
Company, Brown & Williamson Tobacco
Corporation, Lorillard Tobacco Company, and
settling States: Alabama, Alaska, Arizona, Arkansas,
California, Connecticut, Delaware, District of
Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana,
Iowa, Kansas, Kentucky, Louisiana, Maine,
Maryland, Massachusetts, Michigan, Missouri,
Montana, Nebraska, Nevada, New Hampshire, New
Mexico, North Carolina, North Dakota, Northern
Mariana Islands, Ohio, Oklahoma, Oregon,
Pennsylvania, Rhode Island, South Carolina, South
Dakota, Tennessee, Utah, Vermont, Virgin Islands,
Washington, West Virginia, Wisconsin and
Wyoming, Amici Curiae.
April 6, 2006.

**Background:** Following settlement of a lawsuit
brought by numerous governmental entities against
major tobacco manufacturers to recoup health-care
costs associated with tobacco use, tobacco
manufacturers who were not part of original suit
joined settlement to avoid future litigation, and
moved to compel arbitration. The Supreme Court,
New York County, Charles E. Ramos, J., denied
motion, and movants appealed.

4**Holding:** The Supreme Court, Appellate Division,
Sweeny, J., held that issue of whether to apply
"nonparticipating manufacturers adjustment" to
compensate participating tobacco manufacturers for
any loss of market share attributable to competitive
disadvantage they faced as a result of settlement
agreement, which set forth in detail parties' rights and
responsibilities, including amounts to be paid by
tobacco manufacturers and the formulae used to
compute the various payments to be made, was
committed to arbitration, pursuant to arbitration
clause in master settlement agreement.

Reversed.

West Headnotes

**[1] Arbitration 33 ☞1.2**

33 Arbitration
Arbitration is strongly favored under New York law.

**[2] Arbitration 33 ☞7.1**

33 Arbitration
Any doubts as to whether an issue is arbitrable will
be resolved in favor of arbitration.

**[3] Arbitration 33 ☞23.13**

33 Arbitration

**Arbitration 33 ☞23.14**

33 Arbitration
It is for the court in the first instance to determine
whether parties have agreed to submit their disputes
to arbitration, and, if so, whether the disputes
generally come within the scope of their arbitration
agreement; the court's inquiry ends, however, when
the requisite relationship is established between the
subject matter of the dispute and the subject matter of
the underlying agreement to arbitrate.

**[4] Arbitration 33 ☞7.5**

33 Arbitration
Issue of whether to apply "nonparticipating
manufacturers adjustment" to compensate
participating tobacco manufacturers for any loss of
market share attributable to competitive disadvantage
they faced as a result of master settlement agreement
in lawsuit brought by numerous governmental
entities against major tobacco manufacturers to
recoup health-care costs associated with tobacco use,
which set forth in detail parties' rights and
responsibilities, including amounts to be paid by
tobacco manufacturers and the formulae used to
compute the various payments to be made, was
committed to arbitration, pursuant to arbitration

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 N.Y.S.2d 71                                                                                                    Page 2
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635
**(Cite as: 813 N.Y.S.2d 71)**

clause in master settlement agreement covering "any dispute concerning the operation or application of any of the adjustments."

**\*72** Leader & Berkon LLP, New York (Joshua K. Leader and Joseph G. Colao of counsel), for appellants.
Eliot Spitzer, Attorney General, New York (David M. Nocenti, Caitlin J. Halligan, Daniel Smirlock and Richard Dearing of counsel), for respondents.
DLA Piper Rudnick Gray Cary US LLP, New York (Alexander Shaknes of counsel), for Philip Morris USA Inc., amicus curiae.
Kirkland & Ellis LLP, New York (Peter A. Bellacosa of counsel), for R.J. Reynolds Tobacco Company and Brown & Williamson Tobacco Corporation, amici curiae.
Brooks, Pierce, McLendon, Humphrey & Leonard LLP, Greensboro, NC (Andrew J. Haile of counsel), for Lorillard Tobacco Company, amicus curiae.
Robert J. Spagnoletti, Attorney General, District of Columbia (Bennett Rushkoff and Edward E. Schwab of counsel), for settling States, amici curiae.

GEORGE D. MARLOW, J.P., EUGENE NARDELLI, MILTON L. WILLIAMS, JOHN W. SWEENY, JR., JJ.
SWEENY, J.
The case before us arises out of the ultimate settlement of a lawsuit brought by numerous governmental entities against major tobacco producers to recoup health-care costs associated with tobacco use. The negotiations leading up to this settlement were extensive and exhaustive. The result was a written agreement between the states and the tobacco companies, called the "Master Settlement Agreement" (MSA), which set forth in detail the rights and responsibilities of the parties, including the amounts to be paid by the tobacco companies and the formulae used to compute the various payments to be made. In an attempt to obviate future litigation concerning certain computations and payments to be made by the tobacco companies, the agreement contained an arbitration clause which could be invoked under certain circumstances. The interpretation**\*73** of that clause is the subject of this litigation. The issue before us is whether the arbitration clause in the MSA applies to determinations concerning specific application of downward adjustments to payments due from appellants. For the following reasons, we hold that it does.

Only the four largest tobacco companies were the

original participating manufacturers (OPMs) in the settlement. The MSA permitted other companies to join the settlement, even if they were not part of the original suit, to avoid future litigation. Approximately 40 additional tobacco companies, including the three nonparty appellants herein, joined in the settlement and are referred to in the MSA as "subsequent participating manufacturers" (SPMs).

The MSA provides for each settling manufacturer to make an annual lump-sum payment, as well as to agree to certain marketing restrictions and other obligations. The payment obligation is calculated annually and allocated among the settling governmental entities. The calculation of how much is owed is made by an Independent Auditor. The calculation begins with an agreed upon annual aggregate payment as set forth in the MSA ($4.9 billion in 2002, rising to $9 billion in 2018). The aggregate amount is allocated to the OPMs and SPMs based on market share, which is calculated by the percentage share of the total number of cigarettes sold nationally, and is then subject to certain adjustments. One such adjustment is designed to compensate all participating manufacturers for any loss of market share that may be attributable to the competitive disadvantage these companies face as a result of the MSA, as against nonparticipating manufacturers (NPMs). This "NPM Adjustment" is calculated by the Independent Auditor on a nationwide basis utilizing a procedure set forth in the MSA.

The Auditor first compares the aggregate market share of the participating manufacturers with their aggregate market share for the base year 1997. If the aggregate market share has decreased by more than 2%, there is a "Market Share Loss." For each year where the Market Share Loss is greater than zero, the MSA provides that "a nationally recognized firm of economic consultants (the 'Firm') shall determine whether the disadvantages experienced as a result of the [MSA] were a significant factor contributing to the Market Share Loss for the year in question" (§ IX [d][1][C] ). Only if the Firm determines that the MSA was a significant factor contributing to the Market Share Loss will the NPM adjustment apply. The determination of the Firm is final and nonappealable.

Section IX(d)(2) provides that the NPM adjustment shall apply to the allocated payments of all settling states, except that a Settling State will not be subject to the NPM adjustment "if such Settling State continuously had a Qualifying Statute ... in full force

813 N.Y.S.2d 71                                                                                                        Page 3
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635
**(Cite as: 813 N.Y.S.2d 71)**

and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during the entire calendar year," or if the Settling State enacted a Model Statute and diligently enforced it. If a Settling State fell within this exception, then the NPM adjustment would be reallocated among all other Settling States, on a pro rata basis.

Each individual state court retains jurisdiction for purposes of implementing and enforcing the MSA. However, § XI(c) of the MSA, entitled "Resolution of Disputes," provides:
"Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including,**\*74** without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(I) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge). Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act."

Subsection IX(j) specifically includes the NPM adjustment and subsection XI(I) is captioned "Miscalculated or Disputed Payments."

The dispute here involves the calculation of the payment due in 2004, and whether an NPM adjustment, as calculated from the 2003 Market Share Loss should have been applied. During the computation process for that year, the nonparty appellants requested that the Independent Auditor apply an NPM adjustment, based on the calculation that the OPMs had suffered a Market Share Loss in 2003. The states, including New York, opposed such an adjustment, arguing that each state enacted a "Model Statute" within the meaning of § IX(d)(2), and that there is a presumption that the statutes are being diligently enforced. As a result, they claim that unless there has been a "significant factor" determination (i.e., that the MSA was a significant factor in the market share loss of the SPMs), and that the Model Statutes were not being enforced, the Independent Auditor should not use any NPM adjustment in making its calculations. In effect, they argue that both a "significant factor" determination and a finding that the Model Statutes are not being

enforced are conditions precedent to the Independent Auditor applying an NPM adjustment in its calculations.

When the Independent Auditor issued its preliminary calculations on March 5, 2004, it determined the potential NPM adjustments were applicable to the SPMs, including appellants herein. However, based upon an explicit finding that all settling states had enacted Model Statutes that are in full force and effect, it did not apply the NPM adjustment in arriving at the final amount due for that year.

A notice of dispute was filed by the SPMs, and the Independent Auditor solicited and received input, including oral argument, from all parties. On March 31, 2004, it issued its final calculations and report. It assumed the MSA was a "significant factor," although no such determination had been made by the "Firm." The loss was calculated at approximately $31 million. Nevertheless, it did not apply the NPM adjustment on the basis that the states had enacted proper statutes and asserted that they were being diligently enforced.

The Independent Auditor thereafter attempted to informally resolve the dispute, without result. It issued a letter on April 13, 2004, setting forth the attempts to resolve the dispute and noted that "the dispute is to be submitted to binding arbitration in accordance with subsection XI(c) of the MSA." When appellants asked the states to arbitrate the dispute, they refused.

Since the settling state courts, including New York, retained jurisdiction pursuant to the terms of the MSA, appellants moved to compel arbitration. Plaintiffs opposed the motion, arguing that the MSA does not provide for arbitration of this issue. Moreover, they reiterated their position that both a determination that the MSA was a "significant factor" in market share loss and a judicial determination that the **\*75** Model Statute was not being enforced were conditions precedent that must be met before the Independent Auditor had authority to apply the NPM adjustment. They further argued that since each state court, not the Independent Auditor, has the authority to determine whether the state had been diligently enforcing the model statute, the matter was not arbitrable under § XI(c).

The IAS court found that the dispute was not arbitrable under the provisions of the MSA and denied the motion without elaboration.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 N.Y.S.2d 71
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635
(Cite as: 813 N.Y.S.2d 71)

[1][2] Arbitration is strongly favored under New York law (*Matter of Nationwide Gen. Ins. Co. v. Investors Ins. Co. of Am.,* 37 N.Y.2d 91, 95, 371 N.Y.S.2d 463, 332 N.E.2d 333 [1975] ). Any doubts as to whether an issue is arbitrable will be resolved in favor of arbitration (*Matter of Smith Barney Shearson v. Sacharow,* 91 N.Y.2d 39, 49-50, 666 N.Y.S.2d 990, 689 N.E.2d 884 [1997] ).

[3] "It is of course for the court in the first instance to determine whether parties have agreed to submit their disputes to arbitration and, if so, whether the disputes generally come within the scope of their arbitration agreement. The court's inquiry ends, however, where the requisite relationship is established between the subject matter of the dispute and the subject matter of the underlying agreement to arbitrate" (*Sisters of St. John the Baptist, Providence Rest Convent v. Geraghty Constructor,* 67 N.Y.2d 997, 998, 502 N.Y.S.2d 997, 494 N.E.2d 102 [1986] ).

[4] While § VII(a) of the MSA clearly provides that the individual states retain jurisdiction over implementation and enforcement of the MSA, that same section expressly limits such jurisdiction "as provided in subsections IX(d), XI(c) and XVII(d)." Section XI(c) is the arbitration provision at issue here.

Plaintiffs' assertion that the arbitration clause here is "narrow and limited" is not supported by the plain language of the clause. The terms "arising out of," and most particularly "relating to," certainly evince a broad arbitration clause (*see Matter of Trump [Carmel Fifth],* 303 A.D.2d 287, 755 N.Y.S.2d 618 [2003]; *Metalink Marine Corp. v. Ned Chartering & Trading, Inc.,* 207 A.D.2d 688, 689, 616 N.Y.S.2d 361 [1994], *lv. denied* 84 N.Y.2d 812, 622 N.Y.S.2d 914, 647 N.E.2d 120 [1995] ). While plaintiffs correctly note that the arbitration clause does not encompass the entire MSA, it does not lessen the clear intent of the parties as embodied in § XI(c) that *any* matter arising out of, or relating to, the subject matter of the Independent Auditor's calculations and determinations is a proper subject of arbitration.

Plaintiffs' opposition to arbitration rests on the assertion that the Independent Auditor has no authority to determine whether the MSA was a "significant factor" in the Market Share Loss, or to determine whether the State was diligently enforcing the statute enacted. Plaintiff argues these determinations represent conditions precedent to any determination by the Independent Auditor regarding the application of the NPM adjustment.

By the plain language of the broad arbitration agreement, the issue of whether to apply the NPM adjustment is clearly related to the Independent Auditor's determinations. Nothing in the MSA indicates that these issues are conditions precedent or beyond the scope of the Independent Auditor's authority to determine. To the contrary, subsection XI(a)(1) provides that "an Independent Auditor *shall* calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments,**76** reductions and offsets thereto ..., the allocation of such payments, [and] adjustments ... and *shall* perform all other calculations in connection with the foregoing" (emphases added).

Here, the Independent Auditor determined not to apply the NPM adjustment. Although it made a finding that the MSA was a "significant factor" in the Market Share Loss, it nevertheless adopted plaintiffs' position that qualifying statutes had been enacted, that such statutes were "in full force and effect" and were being enforced by the states. The Independent Auditor's decision not to apply the NPM adjustment, and the dispute over whether that adjustment should have been applied, clearly "arises out of" that decision and is certainly "related to it," thus making it a proper subject for arbitration pursuant to the plain terms of the MSA.

We note, as did the Connecticut Superior Court when it addressed this identical issue on a motion to compel arbitration in that state, that there is a compelling logic to having these disputes handled by a single arbitration panel of three federal judges, rather than numerous state and territorial courts. It saves all parties to the agreement from having to relitigate the Independent Auditor's determinations "on multiple occasions, with potentially conflicting decisions by multiple tribunals" (*State of Connecticut v. Philip Morris, Inc.,* 2005 Conn. Super LEXIS 2067, *115, 2005 WL 2081763, *39). The chaos that can result from numerous tribunals addressing identical issues with varying results is underscored by the fact that the Connecticut court reached the opposite conclusion from that of the IAS court here. Since the granting of an exemption by one settling state will automatically lead to the reallocation of its allocated portion of the NPM adjustment to all other non-exempt settling states, each governmental signatory has its own self-interest at stake in the outcome of this issue, which is necessarily in conflict with every other state. Such a result defeats the whole purpose of having a Master Settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 N.Y.S.2d 71
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635
**(Cite as: 813 N.Y.S.2d 71)**

Agreement. The mechanism of submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA. To hold otherwise is contrary to both the spirit and the plain language of the Master Settlement Agreement.

The motion to compel arbitration should therefore have been granted.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered March 25, 2005, which denied nonparty appellants' motion to compel arbitration, should be reversed, on the law, with costs, and the motion granted.

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered March 25, 2005, reversed, on the law, without costs, and the nonparty appellants' motion to compel arbitration granted. Motion seeking leave to enlarge record granted.

All concur.
N.Y.A.D. 1 Dept.,2006.
State v. Philip Morris Inc.
813 N.Y.S.2d 71, 2006 N.Y. Slip Op. 02635

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.