# THE STATE OF NEW HAMPSHIRE
## Merrimack County Superior Court
163 N. Main Street
P. O. Box 2880
Concord, NH 03301 2880
603 225-5501

## NOTICE OF DECISION

EXHIBIT 20

RECEIVED

JUN 0 8 2006

R MATTHEW CAIRNS ESQ
RANSMEIER & SPELLMAN
PO BOX 600
CONCORD NH 03302-0600

06-E-0132 The State of NH v. Philip Morris USA et al

Enclosed please find a copy of the Court's Order dated 6/05/2006 relative to:

### Court Order

06/05/2006

William McGraw
Clerk of Court

cc: Richard W. Head, Esq.
David Rienzo, Esq.
Steven E. Hengen, Esq.
Penny Reid, Esq.
Marjorie Press Lindblom, Esq.
Stephen R. Patton, Esq.
Marc W. McDonald, Esquire
Thomas J. Frederick
Kevin J. Narko
Brett Ingerman, Esq.
James D. Mathias, Esq.

AOC Form SUCP050 (Rev. 09/27/2001)

THE STATE OF NEW HAMPSHIRE

MERRIMACK, SS.                                                           SUPERIOR COURT

JUN 06 2006

State of New Hampshire

v.

Philip Morris USA, R.J. Reynolds Inc., and Lorillard Tobacco Company

No. 06-E-132

### ORDER

The State of New Hampshire brought this action seeking an expedited declaratory order that it performed various actions under the parties' Master Settlement Agreement. Before the Court is the respondents' motion to compel arbitration and to dismiss, or in the alternative, to stay this proceeding. The State objects. The Court held a hearing on the matter on April 24, 2006. Considering the parties' arguments and the relevant law, the Court finds and rules as follows.

In November 1998, the Attorneys General of 46 states, the District of Columbia, the Commonwealth of Puerto Rico and four United States Territories ("Settling States") entered into the Tobacco Master Settlement Agreement ("MSA") with four domestic cigarette manufacturers, known as the Original Participating Manufacturers ("OPMs")[1]. See generally, Motion to Compel Arbitration, Appendix, Ex. A, Master Settlement Agreement. Under the MSA the OPMs were released from certain past, present and future claims by the Settling States in exchange for the assumption of various obligations. Among the OPMs' obligations under the MSA is that they make certain annual payments, in perpetuity, to the Settling States. MSA § IX(c). Since the execution of the MSA,

---

[1] In 2004, Brown & Williamson Tobacco Corporation, an OPM, merged with another OPM, R.J. Reynolds Tobacco Company, to form R.J. Reynolds, Inc. Thus, there are currently three OPMs, all named as respondents in this action.

1

various other cigarette manufacturers, known as Subsequent Participating Manufacturers ("SPMs") have also joined in the MSA and are subject to the same payment obligations as the OPMs. The OPMs and SPMs collectively are known as Participating Manufacturers ("PMs").

The payments required of the PMs by the MSA are made as part of a unitary payment scheme where the sums due are tied to the amount of cigarettes sold by each PM nationwide in a given year and not merely sales on a state-by-state basis. The amounts due as a result of the PMs' sales are subject to various adjustments, reductions and offsets. MSA § IX(c). Once paid, the funds are then allocated to the various Settling States according to a formula established by the MSA. The actual amounts of the PMs' payments and the amounts due each Settling State are calculated by an entity referred to as the Independent Auditor, currently the public accounting firm PricewaterhouseCoopers LLP.

As a result of the requirements of the MSA, including the annual payment obligation, the PMs were forced to raise the prices of their cigarettes. This shift in price placed the PMs at a competitive disadvantage relative to those cigarette manufacturers that elected not to join the MSA. These manufacturers are known as Non-Participating Manufacturers ("NPMs"). In order to counteract, at least to some degree, the competitive disadvantage created by the MSA, the Settling States agreed to enact legislation aimed at leveling the marketplace. The various Settling States' statutes, if enacted in a form substantially similar to a model statute set out in the MSA, are referred to as Qualifying Statutes. New Hampshire's Qualifying Statute is RSA chapter 541-C. RSA chapter 541-C, requires NPMs doing business in New Hampshire to establish escrow accounts into

which various amounts must be paid, depending on the amount of cigarettes sold in New Hampshire.

The MSA provides incentives for the Settling States to both enact and enforce their Qualifying Statutes. Most relevant to this controversy is that, should a Settling State fail to enact or enforce a Qualifying Statute, it risks losing a portion of the money due it under the MSA. The adjustment made to the amount of money a Settling State would receive, should it fail to enact or enforce a Qualifying Statute, is known as the NPM Adjustment. MSA § IX(d)(1).

In order for the NPM Adjustment to apply certain factors must be present. First, it must be determined whether the PMs lost a certain minimum amount of market share in a Settling State to the NPMs. MSA § IX(d)(1)(A). Second, it must be determined whether the MSA imposes a competitive disadvantage on the PMs and whether that disadvantage was a significant factor in the PMs' loss of market share. MSA § IX(d)(1)(C). This determination is made by an entity referred to as the Firm, a nationally recognized firm of economic consultants, currently the Brattle Group. If the PMs lost market share to the NPMs and if the MSA was a significant factor in the loss of market share, then the application of the NPM Adjustment depends on the third factor. Under the third factor, even if the PMs lost market share as a result of the MSA, the NPM Adjustment will not apply to a Settling State if that state had a Qualifying Statute in effect and diligently enforced the Qualifying Statute for the entire year in question. MSA IX(d)(2).

The present dispute concerns the parties' disagreement about the amounts due New Hampshire as a result of sales for the year 2003, the payments for which were due

3

April 17, 2006. In the execution of its duties under the MSA, the Independent Auditor issued detailed preliminary calculations of the amounts due from the OPMs on March 7, 2006. In those calculations, the Independent Auditor did not apply the NPM Adjustment or the corresponding reduction in the OPMs' payment obligations. The OPMs disputed the Independent Auditor's calculations arguing that the NPM Adjustment should apply. Nonetheless, the Independent Auditor did not apply the NPM Adjustment in its final calculations issued March 29, 2006. Because the OPMs disputed the applicability of the NPM Adjustment, R.J. Reynolds and Lorillard, rather than pay the full amounts due, paid sums attributable to the NPM Adjustment into a disputed payments account.

The State brings this action seeking a declaration that that it had a Qualifying Statute in effect and that it diligently enforced that statute during 2003. The state also seeks an order requiring the OPMs to release all money due New Hampshire from the disputed payments account. The OPMs point out that determinations have already been made that they lost market share in 2003 and that the MSA was a significant factor in that market share loss and that therefore, the application of the NPM Adjustment turns on whether the Settling States have enacted and enforced Qualifying Statutes in the manner required by the MSA. According to the OPMs the issue of New Hampshire's diligent enforcement is not properly the subject of an action in this Court, and that the matter ought to be submitted to arbitration in accordance with § XI(c) of the MSA.

"The scope of an arbitration provision contained in a contract presents a question of law for this court." John A. Cookson Co. v. N.H. Ball Bearings, Inc., 147 N.H. 352, 355 (2001). "Such a clause is to be interpreted so as to make it speak the intention of the parties at the time it was made bearing in mind its purpose and policy." Id. (quotations

4

and citation omitted). "While there is a presumption of arbitrability if the contract contains an arbitration clause, [the court] may conclude that a particular grievance is not arbitable if it is determined with positive assurance that the contract is not susceptible of an interpretation that covers the dispute." Id. at 355-56 (quotations, citation and brackets omitted).

Under § XI(a) of the MSA, the Independent Auditor is required to make all calculations of all payments owed, including calculating any adjustments, reductions and offsets. Arbitration of disputes regarding the Independent Auditor's calculations and determinations is required by § XI(c), which states, in relevant part:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

Subsection IX(j) of the MSA lists the order in which various allocations, offsets and reductions are to be applied. Clause Sixth of Subsection IX(j) specifically references the application of the NPM Adjustment. Therefore, as the arbitration clause specifically covers determinations and calculations relative to those items in Subsection IX(j), and the claims and controversies relating to or arising out of them, and the NPM Adjustment is specifically mentioned in subsection IX(j), a dispute over the application of the NPM Adjustment, as this matter appears to be, ought to be submitted to arbitration in accordance with the MSA.

This conclusion is further bolstered by other language in the MSA. Section VII(a) of the MSA defines the jurisdiction of this Court relative to the MSA. Under that section:

5

> Each Participating Manufacturer and each settling State acknowledge that the Court: (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) except as provided in subsections IX(d), XI(c) and XVII(D) and Exhibit O, shall be the only court to which disputes under the Agreement or the Consent Decree are presented as to such Settling State.

Thus the Court retains jurisdiction except as to matters within §§ IX(d), XI(c) and XVII(D) and Exhibit O. As noted previously, § XI(c) is the arbitration provision, whereby disputes regarding adjustments and reductions are placed squarely within the jurisdiction of a panel of arbitrators. Furthermore, § IX(d) of the MSA, over which the Court specifically does not have jurisdiction, creates and defines the NPM Adjustment. Thus, it is abundantly clear that the Court does not have jurisdiction to hear disputes over the applicability of the NPM Adjustment.

The State contends that this dispute is not in regard to the NPM Adjustment. Instead, the only issue is whether it diligently enforced its Qualifying Statute during 2003. While the State has attempted to rephrase this issue as unrelated to the NPM Adjustment, the Court finds the argument unavailing. The parties do not point to, and the Court is not aware of, any provisions in the MSA other than those regarding the NPM Adjustment, where the diligent enforcement of a Qualifying Statute has any relevance. Thus, a dispute over diligent enforcement arises out of a determination by the Independent Auditor whether to apply the NPM Adjustment. Further, the only result of a ruling regarding the State's diligent enforcement of its Qualifying Statute will be to determine whether the NPM Adjustment ought to be applied. As stated, the application of adjustments, including the NPM Adjustment, is a matter specifically reserved to the

6

Independent Auditor and the Independent Auditor determined that it should not apply. A challenge to that determination, and the indispensable underlying determination of whether the State diligently enforced its Qualifying Statute, belongs before the arbitration panel contemplated by the MSA.

The Court also finds that this matter ought to be submitted to arbitration because to do so would more closely conform to the parties' expectations and intentions. As noted, the total amount the OPMs are required to pay in a given year is calculated on a nationwide level and the sums paid are then allocated to the various Settling States. The NPM Adjustment is an adjustment made to the total amount owed by the OPMs, as opposed to an adjustment on a state-by-state level. As such, its application can profoundly impact the amounts the OPMs are required to pay as a result of nationwide activities. Moreover, under § IX(d)(2)(C), if the NPM Adjustment is determined not to apply to a given state because it diligently enforced its Qualifying Statute, the amount by which its allocated share would have been reduced is reallocated *pro rata* to other Settling States to which the NPM Adjustment does apply. Thus, if this Court were to determine that New Hampshire had diligently enforced its Qualifying Statute, the allocated shares of all other Settling States would, necessarily, be decreased. Out of fear of having their allocated shares cut, each of the remaining Settling States would then race to their respective courthouses for a declaration that they had diligently enforced their Qualifying Statutes so that the NPM Adjustment would not apply to them and they would not suffer a loss to their allocated share. Such a result is plainly contrary to the parties' intent to have issues of nationwide concern, such as the application of nationwide adjustments and reductions, determined on a nationwide basis. For all of the above

7

reasons, the Court finds that this matter ought to be submitted to arbitration according to the terms of the MSA. Accordingly, the respondents' motion to compel arbitration and to dismiss is **GRANTED**.

So ordered.

_6/5/06_
Date

_[signature]_
Edward J. Fitzgerald, III
Presiding Justice