

EXHIBIT 23

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH



STATE OF OREGON,                    )
                                    )    Case No. 0604-04252
                                    )
            Plaintiffs              )
                                    )
    vs.                             )
                                    )
PHILIP MORRIS, USA, et al           )
                                    )
                                    )    OPINION IN SUPPORT OF
                                    )    ORDER GRANTING
            Defendants.             )    DEFENDANTS' MOTION TO
                                    )    COMPEL ARBITRATION
                                    )
_____ )

Background

The parties to this case are parties to the Master Settlement Agreement ("MSA") entered into in November 1998. The MSA is an agreement between, on one side, 46 states (including Oregon), the District of Columbia, the Commonwealth of Puerto Rico and four territories (the "Settling States"[1]) and, on the other side, the "Participating Manufacturers" ("PMs"). The PMs include the tobacco companies that were originally sued by the various states (the "Original Participating Manufacturers" or "OPMs") and those tobacco companies which later joined the agreement (the "Subsequent Participating Manufacturers" or "SPMs"). The background of the litigation leading to the MSA and its overall operation is described in detail in several opinions rendered by courts in other states. No point would be served by repeating it here. For a particularly detailed discussion, see State of Connecticut v. Philip Morris Inc., et al., 2005 WL 2081763 (Conn. Super 2005).

Very briefly, the MSA requires the PMs to make annual payments, forever, to the Settling States, and to fund a national educational foundation devoted to educating the public about the dangers of tobacco use. It also requires the PMs to abide by certain restrictions on their advertising and marketing practices.

The MSA provides that an Independent Auditor "shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions, and offsets thereto . . . , the allocation of such payments, adjustments, reductions, offsets and carry-forwards among

_____

[1]All capitalized terms are defined in the MSA.

1       Opinion

the Participating Manufacturers and among the Settling States, and shall perform all calculations in connection with the foregoing . . . ."  MSA §XI(a).

Section IX(j) of the MSA spells out the order of application of allocations, offsets, reductions and adjustments.  "Clause Sixth" of that subsection calls for the application of the NPM Adjustment (explained below) to the calculations carried out as a under the first five clauses.

The "NPM Adjustment"

Both sides entering the MSA were concerned that tobacco manufacturers who did not become parties to the MSA (Non-Participating Manufacturers or "NPMs") would have a competitive advantage over the PMs.  The advantage would take two forms: (1) the NPMs would have lower costs of doing business because they were not making substantial payments each year to the Settling States; and (2) the NPMs were not bound by the marketing and advertising restrictions imposed by the MSA.

To reduce the risk that NPMs would gain market share because of these advantages, and to encourage the NPMs to join the MSA, the MSA provides a Model Statute that, if adopted in a state, requires NPMs to place a certain amount of money for every cigarette sold in that state into an escrow fund.  The substantial equivalent of the Model Statute is referred to in the MSA as a Qualifying Statute.[2]  This is intended to make certain a fund is available to satisfy any judgment obtained by the state if and when it successfully sues the NPM.  As noted, it also provides an incentive for NPMs to join the MSA.

Each Settling State is given an additional incentive to adopt and enforce a Qualifying Statute.  That incentive is protection from a reduction in its annual payment that might otherwise be due under the MSA as the result of the NPM Adjustment.

The MSA provides that if the PMs lose market share (as defined in the MSA), the Firm answers the question whether the disadvantages experienced by the PMs as a result of the MSA were a significant factor contributing to the Market Share Loss.  The Firm's decision is final, binding and non-appealable.  MSA §IX(d)(1)(c).  If the answer is "yes," then the NPM Adjustment "shall apply."  *Id.*[3]

---

[2]If a Settling State adopts a statute other than the Model Statute and contends that it is a Qualifying Statute, any dispute about whether it should be treated as a Qualifying Statute is decided by a nationally recognized firm of economic consultants (the "Firm").  The Firm's decision is final, binding and non-appealable.  MSA §IX(d)(2)(G).

[3]This description is for the NPM Adjustment for the OPMs, but the analysis for the SPMs is basically a "tag along."  MSA §IX(d)(4).

The amount of the NPM Adjustment is based on the magnitude of the Market Share Loss, as set out in a detailed formula. MSA §IX(d)(1)(A). The NPM Adjustment reduces the payment due to each Settling State unless an exception applies. MSA §IX(d)(2)(A).

The exception to reduction of the payment to a Settling State as a result of the NPM Adjustment is at the heart of this action. A Settling State can avoid having its payment reduced by the NPM Adjustment if it had a Qualifying Statute in full force and effect during the entire preceding year and diligently enforced it for that entire year. (A Settling State can also avoid the consequences of the NPM Adjustment if it enacted the Model Statute during the calendar year, had it in full force and effect for the last six months of the year and diligently enforced it.) MSA §IX(d)(2)(B).[4] For purposes of this motion, there is no dispute that every Settling State has enacted a Qualifying Statute.

If a Settling State meets the criteria to avoid the NPM Adjustment, the loss it would have suffered is reallocated among the other states. MSA §IX(d)(2)©. A sort of reverse musical chairs ensues until the entire NPM Adjustment has been absorbed by the states who are subject to it or no state can be required under the MSA to absorb any more of it. MSA §IX(d)(2)(D). The total amount of the adjustment that the states can be required to absorb (or are ineligible to avoid) is the "Available NPM Adjustment" enjoyed by the PMs. MSA §IX(d)(3). If every Settling State has a Qualifying Statute that it has diligently enforced, the Available NPM Adjustment is zero – the PMs must make the full payment otherwise owed.

For 2003, the PMs suffered a Market Share Loss and the Firm determined that the disadvantages experienced by the PMs as a result of the MSA were a significant factor contributing to that loss. Nevertheless, the Independent Auditor did not reduce any of the payments due from the PMs. The Independent Auditor apparently did as requested by the Settling States and presumed that each had diligently enforced its Qualifying Statute as required to avoid the adjustment.

The PMs assert that they are entitled to an NPM Adjustment. Some PMs nevertheless made the full amount of the payments they would otherwise owe. Other PMs put a portion of their payments in a Disputed Account, held in escrow until the dispute is resolved.

---

[4]A Settling State receives limited, but not complete, protection from reduction of its payment due to an NPM Adjustment if it enacted the Model Statute and used its best efforts to keep it in full force and effect, including fully defending it in litigation, but the statute was nevertheless invalidated or rendered unenforceable by a court of competent jurisdiction. In that situation, the state's payment can be reduced a maximum of 65% by the NPM Adjustment. MSA §IX(d)(2)(F).

Nature of Plaintiff's Complaint and Defendants' Motion

In this action the State of Oregon seeks declaratory relief against the PMs. Plaintiff alleges that "An actual controversy has arisen and now exists between Oregon and defendants in that defendants contend that they are entitled to a NPM Adjustment for calendar year 2003, while Oregon contends that no such adjustment applies to Oregon." Complaint, ¶25.

Plaintiff seeks in enforcement order or declaratory order that:

"(1) Oregon had a Qualifying Statute in effect during the entire calendar year 2003;

(2) Oregon diligently enforced its Qualifying Statute during the entire calendar year 2003;

(3) Oregon is entitled to and shall be paid its full share of payments due under the MSA from defendants without any NPM Adjustment for the calendar year 2003, together with an award of interest upon funds improperly withheld, from the date that the payment was due until it is paid; and

(4) Under Oregon law, in interpreting the MSA, in the absence of a conclusive finding that Oregon has not diligently enforced its Qualifying Statute, Oregon is not subject to any NPM Adjustment." Complaint, ¶29.

Those defendants which have appeared have moved the court to compel arbitration of the dispute pursuant to §XI(c) of the MSA.

Jurisdiction to Resolve Disputes Under the MSA

Section VII(a) of the MSA provides in pertinent part that this court "(2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement as to [Oregon]; and (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to [Oregon]."

As noted above, subsection IX(d) of the MSA describes the operation of the NPM Adjustment. Subsection XVII(d) and Exhibit O relate to the payment by the PMs of private outside counsel retained by Settling States.

The third exception to the exclusive jurisdiction of this court, subsection XI(c), provides:

"Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in

subsection IX(j) or subsection XI(I)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act."

Analysis

Defendants contend that the questions raised by plaintiff's complaint describe a dispute, controversy or claim arising out of or relating to a determination made by the Independent Auditor and therefore must be arbitrated. Plaintiff argues that the Independent Auditor has not determined (and cannot determine) whether Oregon has diligently enforced its Qualifying Statute, and this dispute is therefore outside the scope of the arbitration clause.

The task of this court is to interpret the contract the parties have made and determine whether the arbitration agreement set out in §XI(c) of the MSA covers the dispute described in plaintiff's complaint. Oregon has a strong policy favoring arbitration. Our appellate courts have adopted the so-called positive assurance test. *Snow Mountain Pine, Ltd. v. Tecton Laminates Corp.*, 126 Or App 523, 529, 869 P.2d 369 (1993), *rev. denied* 319 Or. 36 (1994). Under that test, arbitration is required "unless we can say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, and we resolve all doubts in favor of coverage." *Id.*

The dispute described in the complaint has directly to do with "calculations performed by, or any determinations made by, the Independent Auditor." It is a "dispute concerning the operation or application of [an] . . . adjustment[] . . . described in subsection IX(j)." The existence of a Qualifying Statute and Oregon's diligent enforcement of it have absolutely no significance apart from the NPM Adjustment. The Independent Auditor has, in fact, necessarily made a determination about Oregon's diligent enforcement of its statute. The Independent Auditor could not otherwise have determined that the Available NPM Adjustment for 2003 was zero. It does not matter whether the Independent Auditor made the determination by application of a presumption instead of a fact-finding effort.

Nor does it matter whether or the parties' choice to leave the evaluation of a state's enforcement of its laws to the Independent Auditor was a wise or sensible one. This court's job is to decide whether that was the choice they made, and I conclude that it was.

(There may be wisdom in the choice, in any event. Because of the way the NPM Adjustment works, the questions presented in Oregon's complaint must be determined for every Settling State before the amounts owed by the PMs can be calculated. Having the determination made by the Independent Auditor and any disputes about it resolved under the arbitration procedure is much more efficient than waiting for final decisions, including appeals, in 52 state

5     Opinion

courts. It is also no odder than having a firm of economic consultants decide whether a statute is a Qualifying Statute.)

Selection of an Arbitrator

The arbitration clause in the MSA says that "each of the two sides to the dispute shall select one arbitrator." MSA, §XI(c). Plaintiff argues that this means that Oregon is entitled to select one of the arbitrators on its own, without regard to the existence of similar disputes in many other Settling States, or the arbitrator those states would select. In addition to the language of the agreement, Oregon points out that because of the way loss from an NPM Adjustment is allocated, each of the Settling States is adverse to the others, at least until that state is determined to have diligently enforced its own Qualifying Statute (when it becomes neutral). This is a variation on "misery loves company."

The current situation does not present such a dilemma, however. The Independent Auditor has determined that all of the Settling States are spared the reduction in their payments they would otherwise suffer because of the NPM Adjustment. Conversely, the Independent Auditor has determined that because there is no Available NPM Adjustment, no PM will be relieved of any of its payment obligation. Thus the Settling States represent one "side" of the dispute and the PMs represent the other "side."

Conclusion

As previously set forth in this court's order, defendants' motion to compel arbitration is granted. The arbitration shall be conducted as set forth in §XI(c) of the MSA, and this action is stayed pending the outcome of that arbitration.

September 5, 2006.

Janice R. Wilson
Circuit Court Judge

6        Opinion