| | | |
|---|---|---|
| **STATE OF MARYLAND**<br>**Plaintiff** | * | IN THE |
| | * | CIRCUIT COURT |
| v. | * | FOR |
| **PHILIP MORRIS, INC., et al.**<br>**Defendant** | * | BALTIMORE CITY |
| | * | CASE NO. 96122017/CL211487 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPINION

*Submitted* October 5, 2006
*Decided* January 19, 2007

I. The Master Settlement Agreement

The State of Maryland brought this action seeking a declaratory order to enforce the Master Settlement Agreement of 1998 ("MSA"). The Participating Manufacturers ("PMs") oppose such an order and moved to compel arbitration of the dispute. A hearing on the issues was held October 5, 2006.

The present dispute flows out of a 1996 lawsuit instituted by the State of Maryland against the major domestic tobacco companies in an effort to recover damages associated with the public cost of treating smoking-related illnesses. At the time most states were filing analogous lawsuits to the one brought in Maryland. In November 1998 the Attorneys General of forty-six states (including Maryland) and six territories (the "Settling States") entered into a global settlement agreement, the MSA, with the four major domestic tobacco companies (Original Participating Manufacturers or "OPMs").[1] This Court approved the MSA on December 1, 1998, but the agreement also authorized other tobacco product manufacturers to

---

[1] The four major domestic tobacco companies being Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, and Lorillard Tobacco Company, but in 2004 Brown & Williamson merged into R.J. Reynolds.

join in the agreement after that time and over forty additional companies have joined the MSA ("Subsequent Participating Manufacturers" or "SPMs").

The MSA imposes certain restrictions on the marketing, promotion, and packaging of cigarettes and also requires an annual payment by the PMs to the Settling States in perpetuity. The PMs make one lump sum payment annually, the amount of this payment and each Settling State's share is determined by an independent auditor ("Independent Auditor"); Maryland receives 2.26% of the payment (subject to any adjustments). One such adjustment to the payment, the NPM Adjustment, is at issue here.

At the time of the settlement the OPMs were concerned their business would suffer in the market because other tobacco companies not joining the MSA ("Non-Participating Manufacturers" or "NPMs") would not be restricted in the same way as the PMs. The MSA attempted to resolve this issue by offering the PMs a downward adjustment to the payment if two conditions involving the NPMs are met. First, the PMs must experience a Market Share Loss of 2.4% or more in the year, and secondly the MSA must be deemed to be a "Significant Factor" in the loss. When these two conditions are met, the PMs are entitled to a downward adjustment by the Independent Auditor. However, no adjustment will be made if each Settling State has a Qualifying Statute in effect and diligently enforces it during the year. Maryland has an appropriate Qualifying Statute under the MSA that requires NPMs to pay money into an escrow account, which is intended to level the playing field for the PMs and prepare for future public health costs that may be attributable to the tobacco products of the NPMs.

II. The Present Dispute

The PMs believe they are entitled to an NPM Adjustment for the year 2003 and therefore have placed some of the 2006 payment into an escrow account for disputed payments where the Settling States cannot reach it. In 2003 the PMs did lose market share sufficient for the adjustment to be applied, and on March 1, 2006 the MSA was deemed to be a substantial factor in the 2003 loss. The Independent Auditor did not apply the NPM Adjustment, however, because diligent enforcement by the states was presumed. The issue now before the Court is whether the MSA requires the question of diligent enforcement to be arbitrated as opposed to litigated in this Court. The Court is not alone in examining the issue; the tobacco companies have filed motions nationwide seeking to compel arbitration of this dispute. At present, twenty-eight of the twenty-nine state courts that have decided the case have ordered the dispute to arbitration.[2] While clearly not binding on this court, those decisions cast a noticeable shadow on the issue.

III. Analysis

In determining the scope of any arbitration provision, the starting point is a consideration of two competing aims. *The Redemptorists v. Coulthard Services, Inc.* 145 Md.App. 116, 150 (2002). In Maryland, there is a strong public policy in favor of arbitration so any doubts should be resolved in favor of arbitration. *Id. at 150-51*. At the same time an arbitration agreement is like any contract, and "a party cannot be required to submit any dispute to arbitration that it has not agreed to submit." *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 378 Md. 139 (2003). The State of Maryland contends that it has never agreed to arbitrate the issue of diligent

---

[2] North Dakota denied the OPMs Motion to Compel Arbitration. *North Dakota v. Philip Morris, Inc.*, No. 09-98-C-03778 (N.D. Dist. Ct. July 18, 2006)

enforcement and as such it is an issue to be properly decided by this court, while the PMs believe this issue falls within the four corners of the MSA's arbitration clause relating to the Independent Auditor's work.

There is no dispute that this Court has exclusive jurisdiction for the purposes of implementing and enforcing the MSA, §VII(a)(2), and subject to just a few exceptions, this Court is the only court to which disputes under the agreement may be brought. §VII(a)(3). However, one of these listed exceptions is §XI(c), a provision entitled <u>Resolution of Disputes</u> that is found within a main section entitled **CALCULATION AND DISBURSEMENT OF PAYMENTS**. MSA §XI(c) reads:

> **(c) <u>Resolution of Disputes</u>. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subjection IX(j) or XI(j)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.**

In Maryland, the meaning of contractual language is to be objectively interpreted and when the language is unambiguous, it must be given its plain meaning. *Della Ratta v. Larkin*, 382 Md. 553 (2004). The PMs argue that the Independent Auditor made a determination by choosing not to apply an NPM Adjustment for 2003, and a plain reading of the section includes as arbitrable, claims or disputes arising out of calculations or determinations made by the Independent Auditor. The State acknowledges the Independent Auditor did not apply an NPM Adjustment for 2003 but contends that is not the kind of determination contemplated by the MSA's arbitration clause.

The State argues that a factual determination with regard to diligent enforcement is necessary prior to making an NPM Adjustment, and that the Independent Auditor is not responsible for deciding such an issue. It points out that "diligent enforcement" is not a calculation and is absent from the list of calculations assigned to the Independent Auditor in MSA §XI(a). The State advances its position by quoting the Independent Auditor on the issue, "The Independent Auditor is not charged with the responsibility under the MSA of making a determination regarding this issue. More Importantly, the Independent Auditor is not qualified to make the legal determination as to whether any particular Settling State has 'diligently enforced' its Qualifying Statute." *Notice of Preliminary Calculations for the Tobacco Litigation Master Settlement Agreement, from PriceWaterhouseCoopers to all parties,* March 7, 2006.

The State's contention that the Independent Auditor is assigned solely to the task of mechanical number crunching seems logical, but is clearly in conflict with the language of the agreement itself. The State's argument would read the words "any determinations made by the auditor" out of the MSA's arbitration clause. If the parties intended for the Independent Auditor to be confined to performing calculations, then the agreement should read as such. Additionally, when the State notes that "diligent enforcement" is not listed as a task assigned to the Independent Auditor, it casts away much of the language of §XI(a). That section reads, "an Independent Auditor shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto." The NPM Adjustment is indeed one of the adjustments to the annual payment and therefore in the purview of the Independent Auditor. While the opinion of PriceWaterhouseCoopers may be helpful to interpret ambiguous contract language, it cannot affect the outcome in a case where the language of the contract is clear. "[C]lear and unambiguous language of an agreement will not give way to what

the parties thought that the agreement meant." *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254 (1985).

Both the State and the tobacco companies devoted significant portions of their briefs addressing whether the arbitration clause should be characterized as broad or narrow. The State contends the arbitration clause is narrow because it applies only to a specified portion of the agreement while the tobacco companies note that traditionally the phrase "arising out of or relating to" signifies a broad arbitration clause. In resolving this case it is not necessary to categorize the arbitration clause as either broad or narrow. The arbitration clause applies specifically to disputes with regard to a determination made by the Independent Auditor, which is the kind of dispute that exists here. This creates a basis on which to compel arbitration without parsing the phrase "arising out of or relating to."

Additionally, the State advances its position on the ground that arbitration will be logistically burdensome and never-ending. It notes all the Settling States as well as the tobacco companies will need to present evidence on the issue of diligent enforcement to the Independent Auditor, which is likely to be followed by re-presenting it to an arbitration panel on an annual basis. First, this argument cannot defeat the MSA's directive to arbitrate disputes regarding the determinations of the Independent Auditor, because of the controlling nature of contract language. Second, the State has offered no explanation as to how litigation in individual states throughout the nation will be more effective or less repetitive. In fact each MSA court would still need to hear testimony from both sides with respect to the issue of diligent enforcement every year in which there is a dispute.

Finally, two additional theories advanced in opposition by the State of Maryland need to be quickly addressed. The State argues that the market share loss in Maryland for 2003 was not

large enough to trigger an NPM Adjustment. While this contention is creative, it has no basis within the MSA. The application of the NPM Adjustment requires only that the national market share for the PMs drop below 97.6% it does not call for any state-by-state analysis of market share loss (this information is more appropriate to be considered by someone determining if Maryland did in fact diligently enforce its Escrow Statute). The second, and seemingly more persuasive argument is that a 2003 NPM Adjustment cannot be subject to arbitration due to the settlement agreement signed that year. *Settlement Agreement Between R.J. Reynolds Tobacco Company and the Settling States with Respect to Potential NPM Adjustments*, June 18, 2003. The State contends that an NPM Adjustment for 2003 must be based on sales from 2002 and that the PMs expressly released any claims they had regarding cigarettes sold or shipped in 2002 in ¶ 6. However, the 2003 settlement agreement ¶ 8 reserves the PM's right to seek an NPM Adjustment for the year 2003. Therefore neither of these arguments by the State can succeed.

IV. Conclusion

The language of the MSA is clear in its directive to submit a dispute such as this one to arbitration. The contract language compels arbitration even without considering the existing state opinions that conclude the same. The State's argument based on logistics and impracticality is unpersuasive and fails to overcome the controlling language of the MSA.

ROGER W. BROWN
JUDGE – Baltimore City Circuit Court

| | | |
|---|---|---|
| STATE OF MARYLAND<br>Plaintiff | * | IN THE |
| | * | CIRCUIT COURT |
| v. | * | FOR |
| PHILIP MORRIS, INC., et al.<br>Defendant | * | BALTIMORE CITY |
| | * | CASE NO. 96122017/CL211487 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER COMPELLING ARBITRATION

It is this _19_ day of _January_ 2007, **ORDERED** that arbitration be compelled in the above captioned case.

_____
ROGER W. BROWN
JUDGE – Baltimore City Circuit Court

| | | |
|---|---|---|
| STATE OF MARYLAND<br>Plaintiff | * | IN THE |
| | * | CIRCUIT COURT |
| v. | * | FOR |
| PHILIP MORRIS, INC., et al.<br>Defendant | * | BALTIMORE CITY |
| | * | CASE NO. 96122017/CL211487 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### ORDER DENYING DECLARATORY ORDER

Upon consideration of the State of Maryland's Motion for a Declaratory Order; It is on this _17_ day of _January_ 2007, the motion in the above captioned case is hereby DENIED.

_____
ROGER W. BROWN
JUDGE – Baltimore City Circuit Court