IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

| | |
|---|---|
| THE STATE OF ALASKA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> PHILIP MORRIS INCORPORATED; ) <br> R.J. REYNOLDS TOBACCO CO.; ) <br> AMERICAN TOBACCO CO., INC.; ) <br> BROWN & WILLIAMSON TOBACCO ) <br> CORP.; LEGGETT & MYERS, INC.; ) <br> LORILLARD TOBACCO CO., INC.; ) <br> UNITED STATES TOBACCO ) <br> COMPANY; B.A.T. INDUSTRIES, ) <br> P.L.C.; BRITISH AMERICAN ) <br> TOBACCO COMPANY, LTD.; ) <br> HILL & KNOWLTON, INC.; THE ) <br> COUNCIL FOR TOBACCO ) <br> RESEARCH – U.S.A., INC; and ) <br> TOBACCO INSTITUTE, INC., ) <br> Foreign corporations, ) <br> ) <br> Defendants. ) | February 5, 2007 <br> TV <br><br><br> 1JU-97-915 CI |

### ORDER COMPELLING ARBITRATION

The matter before the court arises out of a lawsuit brought by numerous government entities against the major tobacco producers to recoup health-care costs associated with tobacco use. The lawsuit resulted in a written settlement agreement, called the Tobacco Litigation Master Settlement Agreement (the "Agreement" or "MSA"), between 46 states, the

District of Columbia, Puerto Rico, and four U.S. territories (collectively the "States" or "Settling States") and Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Corporation, collectively the Original Participating Manufacturers ("OPMs").[1] Approximately 40 additional, smaller, tobacco companies, Subsequent Participating Manufactures ("SPMs"), voluntarily joined the settlement and agreed to be bound by its provisions.[2] All those companies and the State of Alaska are now before the court on the Tobacco Companies' Motion to Compel Arbitration.

## I. BACKGROUND

The Settlement Agreement sets forth rights and responsibilities of the parties. The Agreement restricts the Tobacco Companies' marketing rights and requires the Tobacco Companies to make annual lump-sum payments to the states. An independent auditor (the "auditor") calculates the annual payment and allocates it among the Plaintiffs. The calculation begins with an agreed upon annual payment set forth in the Agreement ($8.0 billion for 2006). The auditor allocates payments to individual Tobacco Companies based on a market share calculated using the company's percentage share of the total number of cigarettes sold nationally. This payment amount is subject to certain adjustments. One such adjustment is designed to compensate the Tobacco Companies for any market share loss caused by the Agreement.

---

[1] In 2004, Brown & Williamson Tobacco Corporation combined with R.J. Reynolds Tobacco.

Tobacco companies that did not participate in the settlement are not subject to the Agreement. The companies not a part of the agreement need not comply with marketing limitations imposed on the Tobacco Companies or make the payments under the agreement. The payments to the states are equivalent to $4.40 per carton for each carton of cigarettes sold by the tobacco companies who are bound by the agreement. Potentially, the Agreement creates a competitive advantage for the nonparticipating tobacco companies.

Anticipating this potential outcome, the Agreement requires application of a "Nonparticipating Manufacturer adjustment" (the "NPM adjustment") if (1) the Tobacco Companies suffer a "market share loss" and (2) an independent firm of economic consultants (the "Firm") finds that the Settlement Agreement was a "significant factor" contributing to that market share loss. This determination by the Firm is final and non-appealable. If the adjustment applies, then the auditor calculates the adjustment on a nationwide basis utilizing a procedure set forth in the Agreement.

The adjustment reduces the annual payments to a state unless the state had a "Qualifying Statute"[3] in full force and effect during the entire calendar year immediately preceding the year in which the subject payment is due. The state must also have diligently enforced the provisions of that statute. If the Plaintiff meets these qualifications, the NPM

---

[2] The court refers to OPMs and SPMs together as the "Tobacco Companies" or the "Participating Manufactures."
[3] See MSA § IX(d)(2)(E) (defining a "Qualifying Statute" as "a Settling State's statute, regulation, law and/or rule (applicable everywhere the Settling State has authority to legislate) that effectively and fully neutralizes the cost

adjustment does not reduce that State's annual receipts. A "Qualifying Statute" requires the small tobacco companies that are not a part of the agreement to also pay the $4.40 per carton of cigarettes and the state must vigorously pursue those small companies who do not comply.

In an attempt to prevent future litigation, the Agreement contains a limited arbitration clause. However, in most circumstances, the court retains jurisdiction. Differing interpretations and applications of the arbitration provision resulted in this dispute.

The present dispute concerns the auditor's decision not to apply an NPM adjustment to the Tobacco Companies' April 17, 2006 annual payments. The Firm found that under the NPM adjustment provision the tobacco companies in the agreement had suffered a market share loss in 2003 and that the Agreement was a "significant factor" contributing to that loss. In response to these findings and in anticipation of the 2006 payment, the Tobacco Companies requested the auditor apply an offset to their 2006 payment based upon the 2003 NPM adjustment. The auditor elected not to apply the NPM adjustment. The auditor acknowledged that in 2003 some Plaintiffs failed to diligently enforce their qualifying statutes, but still determined that the Tobacco Companies were not entitled to the adjustment. The auditor said this conclusion was required because no final determination had been made regarding each state's diligent enforcement. The auditor elected to "presume" diligent enforcement.

---

disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such

On April 10, 2006, the Tobacco Companies timely served notice that they disputed the auditor's final calculation. On April 17, 2006, the Agreement payment date, the Tobacco Companies paid the calculated amounts. The disputed amounts were paid into an escrow account. To clarify the issue, some states filed actions in their state courts seeking a declaration that they had diligently enforced their qualifying statutes. In response, the Tobacco Companies filed motions requesting the state courts order arbitration. To date, some 33 state courts have ruled on the issue. All but one state court has granted the Tobacco Companies' motion to compel arbitration.

On October 31, 2006, the companies filed, with this court, a motion to enforce the arbitration provisions of the Agreement and compel arbitration. The State of Alaska (the "State") filed an opposition recognizing two issues: (1) the appropriateness of arbitrating the auditor's application of the presumption of diligent enforcement; and (2) the appropriateness of determining diligent enforcement through arbitration.[4] The state did not oppose arbitration regarding the auditor's determination to apply a presumption of diligent enforcement. However, the state contends that the diligent enforcement determination falls outside the scope of the arbitration provision and the court should make this determination.[5]

On January 31, 2007, this court listened to oral argument in this matter. Counsel for the Tobacco Companies reaffirmed arguments posed in their supporting memorandum that:

---

Settling State as a result of the provisions of this Agreement.").

(1) the plain language of the Agreement requires arbitration of the NPM dispute; (2) the structure of the Agreement and the nationwide payment provisions compel arbitration; and (3) where questions exist as to the arbitrability of a dispute, Alaska law favors arbitration. . Counsel for the state argued that the decisions of whether the state diligently enforced its qualifying statute falls within the jurisdiction of the court not an arbitration body.

## II. RELEVANT PROVISION OF THE SETTLEMENT AGREEMENT

Subsection VII (a) of the Agreement outlines the jurisdiction of the court:

> Each Participating Manufacturer and each Settling State acknowledge that the Court:
> (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer;
> (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and
> (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State.

Subsection IX(d) outlines NPM adjustment calculation and allocation procedures. Specifically, IX(d)(1)(A) sets forth the calculation procedure, IX(d)(1)(C) delineates when the NPM adjustment will apply:

> On or before February 2 of each year following a year in which there was a Market Share loss greater than zero, a nationally recognized

---

[4] State's Partial Opposition to Motion to Compel Arbitration at 2-3.
[5] Id.

firm of economic consultants (the "Firm") shall determine whether the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question. If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question, the NPM adjustment described in subsection IX(d)(1) shall apply. If the Firm determines that the disadvantages experienced as a result of the provisions of this Agreement were not a significant factor contributing to the Market Share Loss for the year in question, the NPM adjustment . . . shall not apply. . . . The determination of the Firm with respect to this issue shall be conclusive and binding upon all parties, and shall be final and non-appealable.

Subsection IX(d)(2) discusses allocation among Settling States of the NPM adjustment:

> (A) The NPM adjustment set forth in subsection (d)(1) shall apply to the Allocated Payments of All Settling States, except as set forth below.
> (B) A Settling State's Allocated Payment Shall not be subject to an NPM adjustment: (i) if such Settling State continuously had a Qualifying Statute (as defined in subsection (2)(E) below) in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year; . . .
> (C) The aggregate amount of the NPM adjustments that would have applied to the Allocated Payments of those Settling States that are not subject to an NPM adjustment pursuant to subsection (2)(B) shall be reallocated among all other Settling States pro rata in proportion to their respective Allocable WShares . . . and such other Settling States' Allocated Payments shall be further reduced accordingly.

Subsection XI(c) discusses procedures for the resolution of disputes:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. . . . The arbitration shall be governed by the United States Federal Arbitration Act.

IX(j) sets forth the sequence for applying allocations, offsets, reductions and adjustments to the base payments due from the Tobacco Companies. Included in IX(j), as the sixth step, is the NPM adjustment. IX(i) applies the NPM adjustment to SPM payments.

## III. DISCUSSION

The dispute before the court arises out of the interpretation and application of the Agreement's jurisdiction and arbitration provisions. To resolve this dispute the court must determine the scope of the court's jurisdiction as established in section VII(a) of the Agreement.

Under Alaska law, arbitration is "essentially a creature of contract, a contract in which the parties themselves charter a private tribunal for the resolution of their disputes."[6] Thus, a question of contract interpretation confronts the court. The goal of contract interpretation is

---

[6] Municipality of Anchorage v. Frank Coluccio Const. Co., 826 P.2d 316, 322 (Alaska 1992) (quoting Nizinski v. Golden Valley Electric Ass'n, 509 P.2d 280, 283 (Alaska 1973) (quoting Astoria Medical Group v. Health Insurance Plan of Greater New York, 182 N.E.2d 85, 87 (1962)).

to give effect to the reasonable expectation of the parties.[7] In interpreting a contract, Alaska courts consider disputed language in its context in the contract as a whole and look to the purposes of the contract, the circumstances surrounding its formation, and the case law on similar contractual provisions.[8]

Under the Agreement, the court has jurisdiction over the subject matter of the original action and over each Tobacco Company.[9] In addition, the court "retain[s] exclusive jurisdiction for the purposes of implementing and enforcing [the Agreement] and the Consent Decree" with regard to Alaska and, with limited exception, '[is] the only court to which disputes under [the Agreement] or the Consent Decree [concerning Alaska] are presented."[10] Pursuant to section XI(c) of the Agreement, which sets forth the relevant limitation on the court's jurisdiction, the resolution of disputes "arising out of or relating to calculation performed by, or any determinations made by, the Independent auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) . . . shall be submitted to binding arbitration." Section IX(j) includes the NPM adjustment.

---

[7] Casey v. Semco Energy, Inc., 92 P.3d 379, 383 (Alaska 2004) (citing Exxon Corp. v. State, 40 P.3d 786, 793 (Alaska 2001)).
[8] Id. (citing Zuelsdorf v. Univ. of Alaska, Fairbanks, 794 P.2d 932, 934 (Alaska 1990)).
[9] MSA § VII(a).
[10] Id.

The Tobacco Companies dispute the auditor's failure to apply the NPM adjustment to their 2003 payment. The auditor did not subject the Tobacco Companies' payment to the NPM adjustment because the auditor presumed that the Plaintiffs had diligently enforced their qualifying statutes. Specifically, the Tobacco Companies dispute the auditor's diligent enforcement determination and claim that this determination is arbitratable under section XI(c). The state does not oppose arbitration regarding the auditor's determination to apply a presumption of diligent enforcement. However, the state contends that the diligent enforcement determination falls outside the scope of the arbitration provision and the court should make this determination.

Interpreting the language of section XI(c), in a manner consistent with the requirements of contract interpretation under Alaska Law, and applying this interpretation to the fact pattern, the court concludes that this dispute demands arbitration. A decision to presume diligent enforcement constitutes a "determination" made by the Arbitrator. This determination concerned the "operation and application" of the NPM adjustment, an adjustment expressly included in section XI(c) via its reference to section IX(j). Under the Agreement, disputes "arising out of or related to" such a determination are explicitly intended for arbitration and are not within the scope of the court's jurisdiction. Further, in disputes regarding the propriety of arbitration, the Alaska Supreme Court has made clear that public policy of Alaska strongly favors arbitration.

The court grants the Tobacco Companies' joint motion to compel arbitration of the dispute regarding the auditor's determination to apply a presumption of diligent enforcement and for determination of whether Alaska diligently enforced its Qualifying Statute.

Dated this 5th day of February, 2007, at Juneau, Alaska.

Larry R. Weeks
Superior Court Judge

CERTIFICATION OF SERVICE
I certify that I served the following parties on the __6__ day of __Feb.__, 2007:

Chris Poag
Attorney General
Court Box

All by FAX w/ attached memo.

James Stoetzer
Lane Powell
301 W. Northern Lights Blvd, Ste 301
Anchorage, AK 99503

James Leik
Perkins Coie
1029 W. Third Ave, Ste 300
Anchorage, AK 99501

Douglas Serdahely
Patton Boggs
601 W. Fifth Ave., Ste 700
Anchorage, AK 99501