EXHIBIT 2

Commonwealth v. Philip Morris Incorporated.

COMMONWEALTH vs. PHILIP MORRIS INCORPORATED
& others.[1]

Middlesex. March 8, 2007. - April 23, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Tobacco. Contract,* Arbitration, Settlement agreement. *Arbitration,* Arbitrable question, Scope of arbitration. *Uniform Arbitration Act, Federal Arbitration Act.*

A Superior Court judge did not err in ordering to arbitration a dispute concerning the decision of an independent auditor not to apply a certain adjustment to payments due under a settlement agreement (agreement), where submittal of the dispute to arbitration comported with both the over-all structure of the agreement and the plain and unambiguous language of the arbitration provision contained therein [843-846], and the fact that the auditor demurred from resolving explicitly the subsidiary issue whether a condition in the agreement had been met did not compel a different result [846-849].

CIVIL ACTION commenced in the Superior Court Department on December 19, 1995.

The case was heard by *Bonnie H. MacLeod-Mancuso,* J., on motions for entry of judgment, to compel arbitration, and to dismiss.

The Supreme Judicial Court granted an application for direct appellate review.

*James J. Arguin,* Assistant Attorney General, for the Commonwealth.

*Robert J. Brookhiser,* of the District of Columbia, *& Stephen R. Patton,* of Illinois (*Patricia A. Hartnett & Thomas E. Peisch* with them) for Liggett Group LLC & others.

[1] R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; Liggett Group LLC; Commonwealth Brands, Inc.; Lorillard Tobacco Company; New England Wholesale Tobacco Co.; Albert H. Notini & Sons, Inc.; The Council for Tobacco Research U.S.A., Inc.; and The Tobacco Institute, Inc.

Commonwealth *v.* Philip Morris Incorporated

CORDY, J. This case arises out of a settlement agreement between the defendants, a number of tobacco companies, and the Attorneys-General of the several States. The so-called "Master Settlement Agreement" (settlement agreement) ended a host of lawsuits in which the States sought massive payments from the companies under a range of liability theories. The damages claimed by the States were based on the expense of providing health care to those suffering from smoking-related ailments. While denying liability, the companies accepted (among other things) a scheme of regular payments to the States and extensive restrictions on their advertising in return for the dismissal of all litigation. The settlement also saved the States from having to litigate complicated cases with unpredictable and possibly uneven results.

The settlement agreement provides for an independent auditor to calculate the companies' annual payments to the States in accordance with an agreed formula. Disputes "arising out of" or "relating to" that calculation are referred to an arbitration panel consisting of three former Federal judges. In this case, a dispute arose over the application of a downward payment adjustment meant to compensate the companies for loss of market share caused by the settlement. The downward adjustment does not apply against States who "diligently enforced" statutes which in effect subject tobacco companies not parties to the settlement agreement to the same scheme of payments as companies that are parties to it. On motion by the companies, a judge in the Superior Court ordered arbitration. The Commonwealth appealed, claiming that the instant dispute does not fall under the arbitration provision. We affirm.

I. *Settlement agreement.* The Commonwealth commenced the underlying action in the Superior Court on December 19, 1995. It was one of many similar actions filed by State Attorneys-General against the tobacco companies. After years of legal proceedings (the details of which are not relevant here) the States and the tobacco companies reached a comprehensive settlement. That settlement, memorialized in the settlement agreement, granted signatory companies a complete release of liability[2] in exchange for large annual payments. On December 3, 1998, a consent

[2] Section XII(a)(1) of the settlement agreement provides: "Upon the occur-

decree entered in the Superior Court. It provided, "The Agreement, [and] the settlement set forth therein . . . are hereby approved in all respects, and all claims are hereby dismissed with prejudice as provided therein." The Superior Court retained jurisdiction over the case "for the purposes of implementing and enforcing the Agreement and this Consent Decree and Final Judgment and enabling the continuing proceedings contemplated herein." The order to arbitrate we review here was entered by a Superior Court judge pursuant to that ongoing jurisdiction: "The Commonwealth of Massachusetts and/or any Participating Manufacturer may apply to the Court at any time for further orders and directions as may be necessary or appropriate for the implementation and enforcement of this Consent Decree and Final Judgment." The term "Participating Manufacturer" includes any company subject to the settlement agreement and the consent decree, whether an original or a subsequent signatory. Our discussion here applies to all participating manufacturers; distinctions among them in the settlement agreement are not relevant to our analysis.

Section XI of the settlement agreement describes the process by which payments due from the participating manufacturers to the States are calculated. It assigns the task to an independent auditor, who "shall calculate and determine the amount of all payments owed pursuant to [the settlement agreement], the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the [participating manufacturers] and the Settling States, and shall perform all other calculations in connection with the foregoing . . . ."[3] The auditor is to request the information needed to perform the calculations not less than ninety days before the

rence of State-Specific Finality in a Settling State, such Settling State shall absolutely and unconditionally release and forever discharge all Released Parties from all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have."

[3] "The Independent Auditor shall be a major, nationally recognized, certified public accounting firm jointly selected by agreement of the OPMs [Original Participating Manufacturers] and those Attorneys General of the Settling States who are members of the [National Association of Attorneys General] executive committee, who shall jointly retain the power to replace the

Commonwealth v. Philip Morris Incorporated

due date, and by forty days before the due date is to submit to the participating manufacturers and the States preliminary calculations of amounts owing and the allocation among the States. The preliminary calculations must include "all applicable offsets, adjustments, reductions and carry-forwards and [set] forth all information on which the Independent Auditor relied in preparing such Preliminary Calculations." The parties then have ten days to submit any objections to the preliminary calculations. The auditor next presents a final calculation fifteen days before the date of payment. The final calculation is to include an explanation for any changes from the preliminary calculation. Under the settlement agreement, the participating manufacturers do not owe specific amounts to the States individually; rather, their payments are calculated as a single amount due. That money is paid into an escrow account from which the States are paid, largely based on an agreed-on allocation.

The formula used to calculate payments due from the participating manufacturers appears in § IX of the settlement agreement. It begins with a base payment amount for the calendar year, to which is applied a series of adjustments and offsets. Among these is the "Non-Participating Manufacturer Adjustment" (NPM adjustment). The NPM adjustment applies in years when a firm of economic consultants selected by the parties "determines that the disadvantages experienced as a result of the provisions of [the settlement agreement] were a significant factor contributing to" a two per cent or greater loss of market share[4] by participating manufacturers to tobacco companies not subject to the settlement agreement. It therefore acts to compensate the participating manufacturers for the fact that nonparticipating tobacco companies have not taken on the burdens of the settlement agreement, including its extensive advertising restrictions.

States may, however, avoid the application of the NPM adjustment to their respective shares if a so-called "Qualifying Statute" is "in full force and effect during the entire calendar

Independent Auditor and appoint its successor." Settlement agreement § XI(b). At all relevant times, the auditor was PricewaterhouseCoopers, LLP.

[4] The market share loss is calculated in comparison with a base year of 1997.

Commonwealth v. Philip Morris Incorporated.

year immediately preceding the year in which the payment in
question is due, and [the relevant State] diligently enforced the
provisions of such statute during such entire calendar year." A
"Qualifying Statute" is one which "effectively and fully neu-
tralizes the cost disadvantages that the Participating Manufactur-
ers experience vis-à-vis Non-Participating Manufacturers within
[the relevant State] as a result of the provisions of [the settle-
ment agreement]."[5] The settlement agreement exhibits include a
model statute that is deemed to be a "Qualifying Statute." The
Legislature enacted, and the Governor approved, the model
statute on June 29, 2000. G. L. c. 94E, inserted by St. 2000,
c. 117, § 2. If a State avoids the NPM adjustment by diligently
enforcing a qualifying statute, that State's share of the
downward adjustment is reallocated to the States that are subject
to the adjustment because of their lack of diligent enforcement.
That reallocation is done pro rata, based on the relevant State's
allocated share of payments. Because of this reallocation, the
decision to apply (or not to apply) the NPM adjustment to one
State can affect the calculations of amounts due to all other
States.

This reflects a general characteristic of the payments scheme
in the settlement agreement: Because the auditor calculates both
"all payments owed pursuant to this Agreement" and "the al-
location of such payments, adjustments, reductions, offsets and
carry-forwards among the Participating Manufacturers and
among the Settling States," any of its conclusions with respect
to any participating manufacturer or any State potentially af-
fects all of the others. Disputes thus create the potential for
complexity and confusion, including the possibility of compet-
ing (and conflicting) judgments in a host of State courts. To
avoid such difficulty, the parties to the settlement agreement
devised a unitary dispute resolution process applicable to the
calculation and disbursement of payments. Section XI(c) of the
settlement agreement provides:

---

[5]This cost neutralization is achieved by subjecting tobacco companies that
are not parties to the settlement agreement to annual payments (assessed on
the cigarettes sold) equivalent to those that would be due under the settlement
agreement. Those funds are deposited into an escrow account to pay any
future judgments against the nonparticipating companies. See G. L. c. 94E,
§ 2 (b).

Commonwealth v. Philip Morris Incorporated.

"*Resolution of Disputes.* Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) [Order of Application of Allocations, Offsets, Reductions and Adjustments] or subsection XI(i) [Miscalculated or Disputed Payments]) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act [9 U.S.C. §§ 1 et seq. (2000)]."

The question before us is the applicability of this arbitration provision to the dispute over the NMP adjustment.

2. *Present proceedings.* On March 7, 2006, the independent auditor distributed to the settlement agreement parties its preliminary calculations for the payment due April 17, 2006. The auditor has stated, and the Commonwealth concedes, that by this time the conditions described in § IX(d)(1) of the settlement agreement for an NPM adjustment to the 2003 payments had been met: the participating manufacturers suffered a loss of market share above the two per cent threshold, and a firm of economic consultants had determined that the settlement agreement was a significant factor contributing to that loss of market share in that year. After receiving the preliminary calculations, the participating manufacturers requested that an NPM adjustment for 2003 be applied to their final 2006 payment calculation.[6] The States replied, through the National Association of Attorneys General, in a letter to the auditor, which contended that the economic consultants' determination was irrelevant because nothing in the consultants' determination "changes the fundamental fact that during 2003 Model Statutes had been enacted and were in full force and effect" in all of the

---

[6] Any downward adjustment due from a prior year, in this case 2003, is to be applied to payments due in future years, in this case 2006.

States. Thus, the States argued, the NPM adjustment should not be applied.

The auditor issued its final payment calculations on March 29, 2006. These did not include an NPM adjustment. In its letter accompanying the calculations, the auditor acknowledged the dispute but did not purport to resolve it directly. Rather, "Until such time as the parties resolve this issue or the issue is resolved by a trier of fact, the Independent Auditor will not modify its current approach to the application of the NPM Settlement Adjustment," which was to presume that the statutes were diligently enforced by the States and therefore not to apply the adjustment.[7]

Several participating manufacturers then informed the States that they disagreed with the independent auditor's decision not to apply the NPM adjustment. When the payments came due on April 17, 2006, all of the participating manufacturers except two paid the full amount due, but did so under protest. R.J. Reynolds and Lorillard paid their amounts due, less their share of any would-be NPM adjustment, which they deposited into an escrow account for disputed payments, as provided for in the settlement agreement.[8] The next day, the Commonwealth filed in the Superior Court an "Emergency Motion for Entry of an Enforcement Order and Declaratory Order." In its motion, the Commonwealth requested that an order enter declaring that it was not subject to an NPM adjustment for 2003, and directing the participating manufacturers who had "withheld, reduced, or otherwise offset" their settlement payments to pay "all amounts

---

[7] In its preliminary calculation letter of March 7, 2006, the auditor wrote, "The [I]ndependent Auditor is not qualified to make the legal determination as to whether any particular Settling State has 'diligently enforced' its Qualifying Statute. . . . Until such time as the parties resolve this issue or the issue is resolved by a trier of fact, the Independent Auditor will not modify its current approach to the calculation." The first sentence quoted here did not appear in the final calculation letter of March 29, 2006. Whatever its statements, the auditor impliedly did determine, by means of its nonapplication of an NPM adjustment for 2003, that the States had diligently enforced their statutes in that year, because all of the other conditions for applying the NPM adjustment had been met.

[8] Of the amount deposited in the disputed payment account, approximately $32.5 million was allocable to the Commonwealth's total share (without NPM adjustment) of approximately $265 million.

Commonwealth *v.* Philip Morris Incorporated.

necessary to restore the Commonwealth's full Allocated Payment that was due on April 17." The participating manufacturers responded with a Motion to "Compel Arbitration and to Dismiss or in the Alternative Stay, This Litigation."

The judge heard oral argument on April 25, and issued her memorandum of decision and order on June 20, 2006. She rejected the Commonwealth's arguments and denied its motion. Concluding that the dispute fell squarely within the settlement agreement's arbitration clause, the judge allowed the motion of the participating manufacturers to compel arbitration and dismissed the litigation. The Commonwealth filed a notice of appeal.[9] We allowed its application for direct appellate review.

3. *Discussion.* Arbitration is a creature of contract, and what we have before us is in essence a contract dispute. Four basic principles have guided our discussions of arbitration contracts. First, a party cannot be required to arbitrate any dispute that it has not by contract submitted to arbitration. Second, unless otherwise provided by the parties, the preliminary question whether a dispute is subject to arbitration is an issue for judicial determination.[10] Third, when deciding whether a dispute is arbitrable, a court does not consider the merits of underlying claims. Fourth, when considering a broadly worded arbitration clause, there is a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded. See

---

[9] After the appeal was docketed, the participating manufacturers filed a motion to strike the Commonwealth's appeal on the ground that there was no final order from which an appeal could be taken. Appellate review generally requires a final decision, which means "a determination that 'puts an end to litigation, . . . leaving nothing more open to dispute and set[ting] controversy at rest.' " *Chavoor v. Lewis,* 383 Mass. 801, 803 (1981), quoting *Pollack v. Kelly,* 372 Mass. 469, 475-476 (1977). The judge's dismissal of the Commonwealth's motion and order compelling arbitration was such a final decision. We therefore deny the motion and proceed to the merits. Dismissal is a final order which is subject to immediate appeal. *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 89 (2000) ("where, as here, [a court] has ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is 'final' within the meaning of [the Federal Arbitration Act, 9 U.S.C.] § 16(a)(3), and therefore appealable"). We reach the same conclusion under the Massachusetts Arbitration Act, G. L. c. 251, § 18 (*a*) (6). See *Miller v. Cotter, ante* 671, 676-679 (2007) (similar provisions of Federal Arbitration Act and Massachusetts Act construed similarly).

[10] This is an example of the general principle that the construction of a contract's terms is a matter of law for a court to decide.

*Local No. 1710, Int'l Ass'n of Fire Fighters, AFL-CIO* v. *Chicopee,* 430 Mass. 417, 420-422 (1999), and cases cited. See also *AT&T Techs., Inc.* v. *Communications Workers,* 475 U.S. 643, 648-650 (1986).

Guided by these principles, we review the court's decision to compel arbitration de novo. See *Miller* v. *Cotter, ante* 671, 676 (2007). We do so mindful that, in the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2000), Congress has declared a strong national policy favoring arbitration. *Mastrobuono* v. *Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62 (1995). Similarly, the Massachusetts Arbitration Act, St. 1960, c. 374, § 1, codified at G. L. c. 251, which is this Commonwealth's version of the Uniform Arbitration Act, "express[es] a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes." *Home Gas Corp. of Mass., Inc.* v. *Walter's of Hadley, Inc.,* 403 Mass. 772, 774 (1989), quoting *Danvers* v. *Wexler Constr. Co.,* 12 Mass. App. Ct. 160, 163 (1981).

The dispute at issue is the auditor's decision not to apply an NPM adjustment for 2003 to the 2006 payment calculation under the settlement agreement. To determine whether this dispute is one that the parties have agreed to arbitrate, we look first to the language of the arbitration clause. That language is broad, encompassing "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the [i]ndependent [a]uditor." It also specifically includes disputes related to the adjustments described in § IX(j), which lists the various adjustments (including the NPM adjustment) in the order that they are to be applied by the auditor; and those disputes described in § XI(i) (captioned "Miscalculated or Disputed Payments"), which includes repeated reference to the NPM adjustment in its formulas for accounting for miscalculated and disputed payments. Finally, § VII of the settlement agreement (Enforcement) acknowledges the exclusive jurisdiction of the Superior Court under the consent decree to enforce the agreement and resolve disputes "except as provided in [§§ ] IX(d) [the NPM adjustment provision[11] and] XI(c) [the arbitration clause for payment calculation disputes]." The language of the settlement

[11]The NPM adjustment provision is presumably listed separately from the

agreement arbitration clause thus plainly and unambiguously encompasses the present dispute.[12]

Submitting this dispute to arbitration also comports with the broader structure of the settlement agreement. As discussed above, the application (or not) of the NPM adjustment to one State's share potentially affects the payments to many other States. "Accordingly, the [settlement agreement's] broad referral to an arbitration panel of '[a]ny dispute, controversy or claim arising out of' the independent auditor's calculations or determinations reflects the necessity of creating a uniform, nationwide set of rules by which the independent auditor is to calculate the annual payments. Indeed . . . if the interpretation of the rules on calculating annual payments were left up to the courts of each of the settling states, 'fifty-two different sets of payment rules might emerge, sowing confusion, depriving Settling States of mon[eys] needed for smoking cessation and other essential health programs, and causing wave after costly wave of new litigation.' " *State* v. *Philip Morris, Inc.,* 279 Conn. 785, 800 (2006). As the Supreme Court of New York, Appellate Division, observed, "Such a result [would defeat] the whole purpose of having a Master Settlement Agreement. The mechanism of submitting disputes involving the decision of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA." *State* v. *Philip Morris Inc.,* 30

---

more generally applicable arbitration clause because it also involves the conclusions of a firm of economic consultants, which must determine whether the settlement agreement was a "significant factor" in the loss of market share by participating manufacturers in any given year.

[12]All State courts to have considered this question save one have reached the same conclusion, and for principally the same reasons. This includes two published opinions, one from the Supreme Court of Connecticut and the other from the Supreme Court of New York, Appellate Division. *State* v. *Philip Morris, Inc.,* 279 Conn. 785 (2006), *State* v. *Philip Morris Inc.,* 30 A.D.3d 26 (N.Y.), leave to appeal granted, 7 N.Y.3d 716 (2006). The parties have drawn our attention to proceedings in the lower courts of thirty States which, at the time of oral argument, had resulted in orders compelling arbitration. The only lower court decision to the contrary they have cited is from North Dakota, which at the time of oral argument was on appeal to that State's Supreme Court.

Commonwealth v. Philip Morris Incorporated.

A.D.3d 26, 32-33 (N.Y.), leave to appeal granted, 7 N.Y.3d 716 (2006).

The Commonwealth's argument that applicability of the NPM adjustment is not a matter for arbitration begins by framing the dispute more narrowly. The Commonwealth contends that the only issue before the Superior Court was its diligent enforcement of G. L. c. 94E, and it contests any suggestion that it "ceded this quintessential[ly] judicial determination to an accounting firm, subject to review by a panel of arbitrators." By the Commonwealth's reading, "a dispute is subject to arbitration under [the settlement agreement], § XI(c) only if it is a matter committed to the [i]ndependent [a]uditor to decide and the [i]ndependent [a]uditor actually calculates or decides the issue." The fact that the resolution of the diligent enforcement question will affect the payments does not, it claims, automatically render the dispute arbitrable.

We find unconvincing the contention that, because the auditor demurred on the question of diligent enforcement, there were for present purposes no "calculations" or "determinations" to submit to an arbitrator. The Commonwealth argues that this fact excludes the diligent enforcement dispute from the settlement agreement arbitration clause, which by its terms only applies to "calculations performed by, or any determinations made by" the independent auditor. Focusing on this language in the arbitration clause ignores, or at least reduces the force of, the preceding phrase, which brings under the clause "*[a]ny dispute, controversy or claim arising out of or relating to*" the auditor's calculations or determinations (emphasis added). Settlement agreement, § XI(c). This language must be read broadly. See *Carpenter v. Pomerantz*, 36 Mass. App. Ct. 627, 630 (1994) (phrase "as broad as ['arising out of or relating to']" creates "strong presumption of arbitrability").

Further undermining the Commonwealth's position, there is nothing in the arbitration clause limiting arbitration to those questions actually determined. Rather, it specifically includes "any dispute concerning the operation or application of any of the adjustments . . . described in subsection IX(j)," which discusses the NPM adjustment. This language includes disputes over issues not actually determined, just as well as those over

issues which are actually determined. Furthermore, because the economic consultants had determined that the settlement agreement was a significant factor in the loss of market share by the participating manufacturers in 2003, the only means by which the auditor could have denied the NPM adjustment for that year was by affirmatively finding that there was diligent enforcement by the States. It is therefore logically necessary that the auditor did make a diligent enforcement determination. Whether the auditor made this determination explicitly, or impliedly, or by employing a presumption makes no difference.

The Commonwealth also argues that the independent auditor lacked authority under the settlement agreement to make a diligent enforcement determination, calling this a "quintessential[ly] judicial determination." After noting that the term "diligent enforcement" is not defined in the settlement agreement, the Commonwealth cites settlement agreement, § VII(c)(5), in which the court where the consent decree is entered (here, the Superior Court) is given the power to resolve (by declaratory judgment or otherwise) "a good-faith dispute . . . as to the meaning of the terms of [the settlement agreement]." This provision must, however, be read in concert with an earlier clause, settlement agreement § VII(c)(1), which (as discussed *supra*) keeps disputes about the auditor's determinations out of the Superior Court because of the applicability of the arbitration provision.

In the same vein, the Commonwealth argues that only the Superior Court can make a diligent enforcement determination because it involves "reviewing the discretionary decisions of those public officials charged with enforcing the Commonwealth's laws, including Chapter 94E." It notes the presumption that public officials carry out their duties with diligence and in the public interest. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy*, 440 Mass. 625, 634 (2004); *Konover Mgt. Corp.* v. *Planning Bd. of Auburn*, 32 Mass. App. Ct. 319, 326 (1992). Consequently, the Commonwealth claims, "Absent unmistakably clear language in the [settlement agreement], it cannot be inferred that the Commonwealth agreed to cede to an accounting firm (and, by extension, to a panel of arbitrators) the task of reviewing discretionary enforcement decisions under c. 94E where judicial review

of such decisions must itself proceed deferentially to preserve the constitutional separation of powers."

This argument draws on the long-standing principle that the government is generally presumed not to have delegated or by contract alienated its sovereign powers. *Home Tel. & Tel. Co.* v. *Los Angeles*, 211 U.S. 265, 273 (1908) ("surrender, by contract, of a power of government . . . is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized"). Contracts with the government are properly construed against that backdrop. *Merrion* v. *Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) ("Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms").

The Commonwealth's argument misses the mark. Submitting the diligent enforcement question to an arbitrator cedes neither sovereign power nor "the task of reviewing discretionary enforcement decisions under Chapter 94E." Any determination by the auditor or the arbitrator concerning diligent enforcement has meaning only in the context of the settlement agreement, with no effect on anyone except for the settlement agreement parties. It is an analysis to determine whether a condition in the contract has been met. There is no reason why the Commonwealth, as opposed to any other party to a contract, cannot be subject to an analysis of its having met (or not) contractual conditions within the terms established by the contract. Determining whether the Commonwealth has met a condition in a contract does not constitute a cession or delegation of the sovereign enforcement power. Indeed, the settlement agreement places no limitations on the Commonwealth's prerogative to enforce G. L. c. 94E as it sees fit. Nor, as the Commonwealth suggests, does it subject the Commonwealth's enforcement decisions to discretionary review of the sort that takes place in a court. Judicial review tests the basis and legality of government action, and can result in a court's vacating a rule or an enforcement decision. See G. L. c. 30A (review of administrative actions) and G. L. c. 231A (declaratory judgment act). In contrast, the settlement agreement's diligent enforcement determination

Commonwealth v. Philip Morris Incorporated.

does nothing to compel, modify, or vacate any action the Commonwealth may take pursuant to G. L. c. 94E.

Because we determine that the dispute over the applicability of the NPM adjustment was a matter for arbitration, we do not reach the substance of the Commonwealth's argument that it did diligently enforce G. L. c. 94E. Diligent enforcement is, under the settlement agreement, a question subsidiary to the applicability of the NPM adjustment. For this court to make the determination would violate our third principle guiding arbitration, that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Local No. 1710, Int'l Ass'n of Fire Fighters, AFL-CIO* v. *Chicopee*, 430 Mass. 417, 421 (1999), quoting *AT&T Techs., Inc.* v. *Communications Workers*, 475 U.S. 643, 649-650 (1986). The matter is one for the arbitration panel.

In sum, this dispute falls squarely under the arbitration provision of the settlement agreement. The Commonwealth's arguments to the contrary are unavailing. The order dismissing the Commonwealth's motion and compelling arbitration is affirmed.

*So ordered.*