NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2006-621

STATE OF NEW HAMPSHIRE

v.

PHILIP MORRIS USA, INC. & a.

Argued: March 22, 2007
Opinion Issued: June 22, 2007

Kelly A. Ayotte, attorney general (Richard W. Head, senior assistant attorney general, & a. on the brief, and Mr. Head orally), for the State.

Ransmeier & Spellman, of Concord (R. Matthew Cairns and Lisa M. Lee on the brief), Ford, Weaver & McDonald, of Portsmouth (Marc McDonald on the brief), Kirkland & Ellis LLP, of New York, New York (Marjorie P. Lindblom & a. on the brief), Winston & Strawn, LLP, of Chicago, Illinois (Thomas J. Frederick on the brief), Kirkland & Ellis LLP, of Chicago, Illinois (Stephen R. Patton and Douglas G. Smith on the brief, and Mr. Patton orally), Weil Gotshal & Manges, of New York, New York (Penny Reid on the brief), and DLA Piper US LLP, of New York, New York (Alexander Shaknes & a. on the brief), for defendants Philip Morris USA, Inc., R.J. Reynolds, Inc. and Lorillard Tobacco Company.

McNeill, Taylor & Gallo, P.A., of Dover (Robert J. Gallo on the brief), and Howrey LLP, of Washington, D.C. (Robert J. Brookhiser and Elizabeth B. McCallum on the brief, and Mr. Brookhiser orally), for defendants Commonwealth Brands, Inc. & a. (the Subsequent Participating Manufacturers).

DUGGAN, J.  The State appeals an order of the Superior Court (Fitzgerald, J.) granting the defendants' motion to compel arbitration and dismissing its petition for declaratory judgment.  We affirm.

I.  Background

    A.  The Master Settlement Agreement

Several years ago, New Hampshire, along with other states and jurisdictions, filed suit against a number of tobacco manufacturers, alleging that they were engaging in wrongful advertising and marketing of cigarettes and other tobacco products.  See, e.g., Com. v. Philip Morris, Inc., 864 N.E.2d 505, 507 (Mass. 2007); State v. Philip Morris, Inc., 905 A.2d 42, 43 (Conn. 2006).  In November 1998, the Attorneys General of forty-six states, the District of Columbia, the Commonwealth of Puerto Rico and four United States Territories (the Settling States) entered into the Tobacco Master Settlement Agreement (MSA) with four domestic tobacco manufacturers, known as the Original Participating Manufacturers (OPMs).  Because two of the manufacturers have merged, the OPMs now are defendants Philip Morris USA, Inc., R.J. Reynolds, Inc., and Lorillard Tobacco Co.

Under the MSA, the Settling States agreed to dismiss their lawsuits and to release past and future claims against the OPMs in exchange for annual payments from the OPMs, as well as several other concessions, including marketing and advertising restrictions.  Since the execution of the MSA, various other tobacco manufacturers, known as Subsequent Participating Manufacturers (SPMs), have joined the MSA and are subject to the same payment obligations and other restrictions as the OPMs.  Collectively, the OPMs and the SPMs are known as Participating Manufacturers (PMs).  Those tobacco companies that did not enter into the settlement are known as Non-Participating Manufacturers (NPMs).

The annual payments that the MSA requires the PMs to make are intended to help the Settling States achieve "significant funding for the advancement of public health" and "the implementation of important tobacco-related public health measures."  Under the MSA, the PMs do not make

payments directly to the individual Settling States. Instead, each PM is required to make a single, nationwide payment into an escrow account on April 15th of each year, and the funds are subsequently allocated among the Settling States. The PMs' payment obligations are calculated annually by an "Independent Auditor." Currently, the Independent Auditor is the public accounting firm PricewaterhouseCoopers LLP.

The MSA contains a comprehensive formula governing how the Independent Auditor calculates the PMs' annual payment obligation. The starting point is for each of the OPMs to pay into the escrow account its relative market share of the base amount for the year at issue as specified in section IX(c)(1) of the MSA. This amount is then subject to several reductions and adjustments. One adjustment is the "Non-Participating Manufacturer Adjustment" (NPM Adjustment), which is here at issue.

As noted above, the NPMs are tobacco manufacturers that have not joined the MSA, and are thus not subject to the MSA's marketing restrictions and payment obligations. The drafters of the MSA acknowledged that marketing restrictions and payment obligations could put the PMs at a competitive disadvantage and potentially cause PMs to lose market share to the NPMs. Thus, the NPM Adjustment attempts to level the marketplace by reducing the annual payment obligations of the PMs if – as a collective group – it is proven that they lost market share to the NPMs.

In order for the NPM Adjustment to apply and reduce the annual payment obligations of the PMs, it first must be determined whether the PMs experienced a collective loss of a certain percentage of domestic market share to the NPMs. Next, it must be determined by a nationally recognized economic consulting firm – referred to in the MSA as the "Firm" – whether the MSA imposed a competitive disadvantage on the PMs and whether that disadvantage was a "significant factor" in the PMs' loss of market share. If the PMs experience the requisite market share loss and the Firm also concludes that the MSA was a significant factor contributing to that loss, then the NPM Adjustment applies.

Even if these two factors are proven and the NPM Adjustment is applicable, the MSA contains a mechanism for a Settling State to avoid a reduction of payments. The MSA provides that:

> A Settling State's Allocated Payment shall not be subject to an NPM Adjustment . . . if such Settling State continuously had a Qualifying Statute . . . in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year . . . .

MSA § IX(d)(2)(B).  New Hampshire has a Qualifying Statute, codified as RSA chapter 541-C (2007).  RSA chapter 541-C requires NPMs doing business in New Hampshire to place into a qualified escrow fund by April 15th a certain amount of money based upon the number of individual cigarettes sold in New Hampshire by the NPM during the previous year.  See RSA 541-C:3, I(b); see also RSA 541-C:2, VI, :2, X (defining "qualified escrow fund" and "units sold").

B.  The Present Dispute

The present dispute concerns the Independent Auditor's decision not to apply an NPM Adjustment to the PMs' April 17, 2006 annual payments.  In accordance with the MSA, the Independent Auditor issued detailed preliminary calculations of the amounts due from the PMs on March 7, 2006.  In its calculations, the Independent Auditor did not apply the NPM Adjustment to the PMs' payment obligations.  Recognizing that the parties disputed whether the adjustment should apply, the Auditor stated that:

> The Independent Auditor is not charged with the responsibility under the MSA of making a determination regarding this issue. More importantly, the Independent Auditor is not qualified to make the legal determination as to whether any particular Settling State has "diligently enforced" its Qualifying Statute. . . . Until such time as the parties resolve this issue or the issue is resolved by a trier of fact, the Independent Auditor will not modify its current approach to the calculation.

Although the Independent Auditor did not – in its preliminary calculations or elsewhere – explicate its current approach to determining whether an NPM Adjustment applies, apparently its approach was to presume that the Settling States were diligently enforcing their Qualifying Statutes, since, in spite of the fact that it acknowledged that all of the conditions for applying an NPM Adjustment had been met, it refused to apply the NPM Adjustment to the PMs' annual payments for 2003.  See Com. v. Philip Morris, Inc., 864 N.E.2d at 510 n.7.

After receiving the Independent Auditor's preliminary calculations, the PMs requested that an NPM Adjustment for 2003 be applied to their final 2006 payment calculation.  Nonetheless, the Independent Auditor did not apply the NPM Adjustment in its final calculations issued March 29, 2006.  Even though the Independent Auditor again acknowledged the dispute between the PMs and the Settling States concerning application of the NPM Adjustment, it did not attempt to resolve the dispute.  Rather, it reiterated its prior statement that "[u]ntil such time as the parties resolve this issue or the issue is resolved by a

trier of fact, the Independent Auditor will not modify its current approach to the application of the NPM Settlement Adjustment."

Shortly following the release of the Independent Auditor's final calculations, several PMs served notice that they disputed the final calculation. While most of the PMs paid the full amounts calculated on the due date of April 17, 2006, albeit under protest, see People v. Lorillard Tobacco Co., 865 N.E.2d 546, 551 (Ill. App. Ct. 2007), R.J. Reynolds and Lorillard paid the sums attributable to the NPM Adjustment into the "Disputed Payments Account," as provided in the MSA. Id.

On April 18, 2006, the State filed a petition for an expedited declaratory order in superior court, seeking a declaration that it had a Qualifying Statute in effect and that it diligently enforced that statute during 2003. The State also sought an order requiring the OPMs to release all money due New Hampshire from the disputed payments account. The PMs countered that the issue of New Hampshire's diligent enforcement of its Qualifying Statute was not properly the subject of an action in superior court, and that the matter ought to be submitted to arbitration in accordance with section XI(c) of the MSA. Consequently, the PMs filed a motion to compel arbitration and to dismiss the State's petition.

The superior court examined the provisions of the MSA in order to determine whether the dispute between the parties was arbitrable. It concluded that the MSA's arbitration clause, section XI(c), covers disputes concerning the application of the NPM Adjustment. In addition, the court found that the matter ought to be submitted to arbitration "because to do so would more closely conform to the parties' expectations and intentions." Particularly, the court noted that submitting the matter to arbitration would be consistent with the parties' intent "to have issues of nationwide concern, such as the application of nationwide adjustments and reductions, determined on a nationwide basis." Consequently, the court found that the matter ought to be submitted to arbitration in accordance with the terms of the MSA, and dismissed the State's petition. The State filed a motion for reconsideration, which was denied.

II. Discussion

On appeal, the State argues that: (1) the dispute over whether it diligently enforced its Qualifying Statute in 2003 is not subject to the arbitration provisions of the MSA; (2) section IX(j) of the MSA does not apply to the issues raised in its petition; (3) the Settling States did not contract away from their own judiciaries the review of their executive officers' diligence; and (4) the PMs waived their right to contest diligent enforcement in 2003 by virtue of a series of agreements executed by the parties in June 2003. The State also

argues that it never surrendered its sovereignty to provide an accounting firm with the duties and powers that are traditionally within its province.

In response to the State's arguments, the OPMs and the SPMs assert that: (1) the superior court correctly ruled that the plain and unambiguous language of the MSA requires arbitration of this dispute; (2) the superior court correctly concluded that the MSA's nationwide payment structure compels arbitration; (3) the well-settled presumption in favor of arbitration compels arbitration; and (4) the State's assertion that the OPMs "waived" their right to contest diligent enforcement during 2003 through agreements settling their NPM Adjustment claims for 1999-2002 is an arbitrable issue. The OPMs and SPMs also point to the fact that a significant number of other states have considered these and similar issues and concluded that the MSA requires that they be submitted to arbitration.

"The scope of an arbitration provision contained in a contract presents a question of law for this court." John A. Cookson Co. v. N.H. Ball Bearings, 147 N.H. 352, 355 (2001). "Such a clause is to be interpreted so as to make it speak the intention of the parties at the time it was made bearing in mind its purpose and policy." Id. (quotation omitted). While there is a presumption of arbitrability if the contract contains an arbitration clause, we may conclude that a particular grievance is not arbitrable if it is determined with positive assurance that the contract is not susceptible of an interpretation that covers the dispute. Id. at 355-56.

The arbitration provision of the MSA states as follows:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry–forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.

MSA § XI(c).

We conclude that the plain language of the arbitration provision evinces the parties' intent to arbitrate disputes such as the one at issue in this case. The language used in section XI(c) is broad, encompassing "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by or

any determinations made by, the Independent Auditor." See, e.g., Merrimack School Dist. v. Nat'l School Bus Serv., 140 N.H. 9, 13 (1995) (the phrase "arising out of" is a "very broad, general and comprehensive term" (quotation omitted)). The provision also explicitly includes disputes related to the adjustments described in section IX(j), which lists the various adjustments (including the NPM Adjustment), allocations, offsets and reductions that are to be applied by the Independent Auditor.

In addition, section VII of the MSA, entitled "Enforcement," defines the exclusive jurisdiction of the Merrimack County Superior Court relative to the MSA, and provides that it has jurisdiction to enforce the MSA and resolve disputes "except as provided in subsections IX(d) [the NPM Adjustment provision], [and] XI(c) [the arbitration clause] . . . ." Thus, as the superior court determined, "it is abundantly clear that [the superior court] does not have jurisdiction to hear disputes over the applicability of the NPM Adjustment."

While not binding upon us, we note that courts in other jurisdictions have almost unanimously concluded that by operation of the MSA's plain language, disputes pertaining to the Independent Auditors' decision not to apply the NPM Adjustment to the PMs' 2003 annual payment are arbitrable. We agree with those courts. See, e.g., Com. v. Philip Morris, Inc., 864 N.E.2d at 512 ("The language of the [MSA] arbitration clause thus plainly and unambiguously encompasses the present dispute."); People v. Lorillard Tobacco Co., 865 N.E.2d at 552 ("We conclude that the clear language of the Arbitration Provision shows that the parties intended to arbitrate the present dispute."); State v. Philip Morris, Inc., ___ N.E.2d ___, ___, 2007 WL 1624765 (N.Y. June 7, 2007) ("The plain language of the MSA compels arbitration."); State v. Philip Morris, ___ N.W.2d ___, ___, 2007 WL 1650423, at *5-*6 (N.D. June 7, 2007) ("[W]e believe the plain and unambiguous language of the settlement agreement requires arbitration of the parties' dispute. Our conclusion comports with the decisions of every other state court that has decided the issue to date."); see also Colorado v. R.J. Reynolds Tobacco Co., No. 97CV3432, at 6 (Denver Dist. Ct. July 19, 2006); Hawaii v. Philip Morris USA, No. 06-1-0695, at 7 (Haw. Cir. Ct. Aug. 3, 2006); Idaho v. Philip Morris, Inc., No. OC 97 03239D, at 12 (Idaho Dist. Ct. June 30, 2006); Iowa v. Philip Morris USA, Inc., No. CL 71048, at 5 (Iowa Dist. Ct. Aug. 16, 2006); Nevada v. Philip Morris USA, Inc., No. CV06-00929, at 3 (Nev. Dist. Ct. Aug. 4, 2006); Vermont v. Philip Morris USA, Inc., No. S 0463-06-CnC, at 5 (Vt. Super. Ct. July 14, 2006); Virginia v. Brown & Williamson Tobacco Corp., No. HJ-2241, at 6 (Richmond Cir. Ct. Aug. 9, 2006).

The State argues that the dispute over whether it diligently enforced its Qualifying Statute is not a dispute that "arises out of or relates to" a calculation or determination made by the Independent Auditor. It asserts that since the Independent Auditor does not have the authority to make a diligent enforcement determination and has not made one, there is nothing to arbitrate.

We concur with other appellate courts that have held that the Independent Auditor did, in fact, make a determination regarding diligent enforcement of Qualifying Statutes. As explained by the Supreme Judicial Court of Massachusetts:

> [B]ecause [the Firm] had determined that the [MSA] was a significant factor in the loss of market share by the participating manufacturers in 2003, the only means by which the auditor could have denied the NPM adjustment for that year was by affirmatively finding that there was diligent enforcement by the States. It is therefore logically necessary that the auditor did make a diligent enforcement determination. Whether the auditor made this determination explicitly, or impliedly, or by employing a presumption makes no difference.

Id; see also People v. Lorillard Tobacco Co., 865 N.E.2d at 553 (Independent Auditor's decision not to apply NPM Adjustment was based upon its presumption that the Settling States were diligently enforcing their Qualifying Statutes).

Further, we are unconvinced by the State's contention that because the Auditor did not make a specific determination as to whether there was diligent enforcement of the Qualifying Statutes, there were no calculations or determinations to submit to arbitration. The State overlooks the broad language in the arbitration clause stating that any dispute, controversy or claim arising out of or relating to the Auditor's calculations or determinations is subject to arbitration. Moreover, "there is nothing in the arbitration clause limiting arbitration to those questions actually determined." Com. v. Philip Morris, Inc., 864 N.E.2d at 513. The arbitration clause specifically includes "any dispute concerning the operation or application of any of the adjustments . . . described in subsection IX(j)," which discusses the NPM Adjustment. This language is broad enough to encompass "disputes over issues not actually determined, just as well as those over issues which are actually determined." Id. at 513.

Finally, we disagree with the State's contention that the Independent Auditor lacks authority to make a diligent enforcement determination. To the contrary, the MSA not only authorizes the Independent Auditor to make the initial determination of whether to apply the NPM Adjustment to the PMs' annual payments, but it requires the Auditor to make this determination. See MSA § XI(a)(1) (Independent Auditor shall calculate and determine the amount of all payments owed, including adjustments, reductions and offsets thereto). The Independent Auditor was, therefore, acting within its authority by presuming diligent enforcement.

The State also apparently argues that the superior court erred in concluding that submitting this dispute to arbitration "would more closely conform to the parties' expectations and intentions" under the MSA. The OPMs and SPMs counter that the superior court's ruling was correct, and point out that the MSA's nationwide payment structure compels arbitration. We agree.

As the superior court noted, the total amount the PMs are required to pay in a given year is calculated on a nationwide level, and the sums paid are then allocated to the Settling States. The NPM Adjustment is an adjustment made to the total amount owed by the PMs, as opposed to an adjustment on a state-by-state level. Under MSA section IX(d)(2)(C), if the NPM adjustment is determined not to apply to a given state because it diligently enforced its Qualifying Statute, the amount by which its allocated share would have been reduced is reallocated pro rata to the other Settling States to which the NPM Adjustment does apply. In other words, the application of the NPM Adjustment to one state's allocated share affects the payments made to the other settling states.

> [T]he [MSA's] broad referral to an arbitration panel of any dispute, controversy or claim arising out of the independent auditor's calculations or determinations reflects the necessity of creating a uniform, nationwide set of rules by which the independent auditor is to calculate the annual payments. Indeed . . . if the interpretation of the rules on calculating annual payments were left up to the courts of each of the settling states, fifty-two different sets of payment rules might emerge, sowing confusion, depriving settling states of moneys needed for smoking cessation and other essential health programs, and causing wave after costly wave of new litigation.

State v. Philip Morris, Inc., 905 A.2d at 50 (quotations and alterations omitted). As the Appellate Division of the New York Supreme Court aptly stated:

> Such a result [would defeat] the whole purpose of having a Master Settlement Agreement. The mechanism of submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA.

State v. Philip Morris, Inc., 813 N.Y.S.2d 71, 76 (App. Div. 2006), aff'd, ___ N.E.2d ___, 2007 WL 1624765 (N.Y. June 7, 2007). Accordingly, we reiterate

our conclusion that the plain and unambiguous language of the MSA requires arbitration of this dispute.

Next, the State argues that section IX(j) of the MSA does not apply to the issues raised in its petition.  It contends that it filed its petition in superior court to obtain a determination that it had diligently enforced its Qualifying Statute, but that the superior court mistakenly concluded that it brought its petition to dispute the application of the NPM Adjustment.  Although the State acknowledges that section IX(j) lists the various adjustments (including the NPM Adjustment), allocations, offsets and reductions that are to be applied by the Auditor, it nonetheless argues:

> The arbitration clause specified in § XI(c) refers to the "<u>operation or application</u> of any of the adjustments, reductions, offsets, carry-forwards and allocations <u>described in subsection IX(j)</u> . . . not the allocations <u>enumerated</u> in subsection IX(j).  Simply because the NPM Adjustment is mentioned in this list – as one would expect, as it would need to be applied before certain adjustments are applied and after others – is not a reason to conclude that [ ] every issue related in any way to the NPM Adjustment is arbitrable.

We are not persuaded by this argument.  First, the State misconstrues the arbitration clause by drawing a meaningless distinction between the words "described," which is the word used in the arbitration clause, and "enumerated," which is the word used to describe the NPM Adjustment in section IX(j).  A close reading of section IX(j), however, reveals that the NPM Adjustment is described in the same manner as all of the other adjustments and allocations listed in section IX(j).  Second, as the superior court observed:

> The State contends that this dispute is not in regard to the NPM Adjustment.  Instead, the only issue is whether it diligently enforced its Qualifying Statute during 2003.  While the State has attempted to rephrase this issue as unrelated to the NPM Adjustment, the Court finds the argument unavailing.  The parties do not point to, and the Court is not aware of, any provisions in the MSA other than those regarding the NPM Adjustment, where the diligent enforcement of a Qualifying Statute has any relevance.  Thus, a dispute over diligent enforcement arises out of a determination by the Independent Auditor whether to apply the NPM Adjustment.

We agree with the superior court and consequently reject the State's argument.

Next, the State argues that the parties executed a series of agreements in June 2003, in which the PMs absolutely and unconditionally released and

discharged each Settling State from any and all claims under section IX(d) of the MSA (the provision discussing the NPM Adjustment) with respect to cigarettes shipped or sold during 1999, 2000, 2001 and 2002, including any effect such claims may have on future payments under the MSA. Thus, the State contends that the PMs have waived their right to contest diligent enforcement in 2003. The State points out that the June 2003 agreements do not contain an arbitration clause, and thus argues that the superior court – not the arbitration panel – has the authority to determine the scope and effect of these agreements.

The PMs question whether the June 2003 agreements apply to the present dispute, arguing that the PMs' NPM Adjustment for a particular year is based upon cigarettes sold in that year, and the agreement does not prohibit them from asserting claims pertaining to the NPM Adjustment for 2003. Further, they assert that the issue of whether the PMs "waived" their right to contest diligent enforcement through execution of the June 2003 settlement agreements is arbitrable, because disputes concerning the applicability of the diligent enforcement exemption fall within the plain language of the MSA's arbitration clause. They argue that it is irrelevant that the June 2003 agreements do not contain an arbitration clause, because "[w]hat is dispositive is that the dispute in which those agreements are being asserted as a defense is arbitrable." We agree.

We have not yet had the occasion to examine whether a dispute concerning a subsequent agreement must be arbitrated pursuant to an arbitration clause in a settlement agreement involving the same parties. Nonetheless, we begin our analysis by reiterating our conclusion that the language of the MSA arbitration clause is broad, encompassing any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor. Bearing this in mind, we turn to decisions from other jurisdictions that provide guidance on this issue. Several circuit courts of appeals have held that "a settlement agreement is an arbitrable subject when the underlying dispute is arbitrable, except in circumstances where the parties expressly exclude the settlement from being arbitrated." Niro v. Fearn International, Inc., 827 F.2d 173, 175 (7th Cir. 1987); see also Inlandboatmens Union of the Pacific v. Dutra Group, 279 F.3d 1075, 1080 (9th Cir. 2002) ("disputes arising under a side agreement must be arbitrated if the dispute relates to a subject that is within the scope of the CBA's arbitration clause").

We find these cases persuasive, and conclude that the dispute over whether the June 2003 agreements prohibit the PMs from contesting diligent enforcement in 2003 falls within the purview of the Independent Auditor's determination concerning applicability of the NPM Adjustment to the PMs' 2003 annual payment, and therefore must be presented as part of the

arbitration process.  The fact that the June 2003 agreements do not contain arbitration clauses is significant because there is no language in the agreements indicative of the parties' intent to expressly exclude the agreements from being arbitrated.  See L.O. Koven & Bro., Inc. v. Local Union No. 5767, United Steelworkers of America, 381 F.2d 196, 204-05 (3d Cir. 1967) (dispute over a side agreement that was silent as to arbitrability was governed by the Collective Bargaining Agreement arbitration clause because the underlying subject was one "ordinarily a matter for consideration by an arbitrator" under the Collective Bargaining Agreement).

As mentioned above, the State asserts that this court "should not lightly infer that the settling states contracted away from their own judiciaries the review of their executive officers' diligence."  It argues:

> In the absence of unmistakably clear language in the MSA, it cannot be inferred that the State agreed to cede to an accounting firm the task of reviewing regulatory and enforcement activities under RSA 541-C where judicial review of such decisions must itself proceed deferentially in order to preserve the constitutional separation of powers.

This is the identical argument that the Commonwealth of Massachusetts made on appeal in Com. v. Philip Morris Inc., 864 N.E.2d at 513-15, which the Supreme Judicial Court of Massachusetts soundly rejected.  We concur with the Supreme Judicial Court's analysis.  As the court noted, the argument "draws on the long-standing principle that the government is generally presumed not to have delegated or by contract alienated its sovereign powers."  Id. at 514 (citing Home Tel. & Tel. Co. v. Los Angeles, 211 U.S. 265, 273 (1908)).  However, as it further observed:

> The Commonwealth's argument misses the mark.  Submitting the diligent enforcement question to an arbitrator cedes neither sovereign power nor the task of reviewing discretionary enforcement decisions under [Massachusetts' Qualifying Statute].  Any determination by the auditor or the arbitrator concerning diligent enforcement has meaning only in the context of the [MSA], with no effect on anyone except for the [MSA] parties.  It is an analysis to determine whether a condition in the contract has been met.  There is no reason why the Commonwealth, as opposed to any other party to a contract, cannot be subject to an analysis of its having met (or not) contractual conditions within the terms established by the contract.  Determining whether the Commonwealth has met a condition in a contract does not constitute a cession or delegation of the sovereign enforcement power.  Indeed, the [MSA] places no limitations on the

> Commonwealth's prerogative to enforce [its Qualifying Statute] as it sees fit.

Id. (quotations omitted).  Thus, we find the State's argument unpersuasive.

Finally, the State argued in its reply brief that it never surrendered its sovereignty to provide an accounting firm with the duties and powers that are traditionally the province of the State, citing language in United States Supreme Court decisions holding that such a waiver of state sovereignty may only be imputed to the State if the waiver was made in unmistakable language. See, e.g., United States v. Winstar, 518 U.S. 839, 874-75 (1996) (courts should not interpret a contract to include a surrender of the powers of state sovereignty "unless such surrender has been expressed in terms too plain to be mistaken."(quotation omitted)).  However, at oral argument the State conceded that it raised this argument for the first time on appeal, and it is well established that we will not consider issues raised on appeal that were not presented in the superior court.  Sullivan v. Town of Hampton Bd. of Selectmen, 153 N.H. 690, 695 (2006).

For the foregoing reasons, we conclude that this dispute falls squarely under the arbitration provision of the MSA.  Consequently, the superior court's order is affirmed.

Affirmed.

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.